**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| JUDICIAL WATCH, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No.  15-cv-1740 (RBW) |
| v. | ) | |
| | ) | |
| NATIONAL ARCHIVES AND | ) | |
| RECORDS ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND IN
SUPPORT OF PLAINTIFF'S CROSS-MOTION
<u>FOR SUMMARY JUDGMENT</u>**

Paul J. Orfanedes
D.C. Bar No. 429716
JUDICIAL WATCH, INC.
425 Third Street SW, Suite 800
Washington, DC  20024
Tel:     (202) 646-5172
Fax:     (202) 646-5199
Email: porfanedes@judicialwatch.org

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

**Page**

I.      Introduction ..........................................................................................................1

II.     Factual Background ...............................................................................................2

III.    Argument ...............................................................................................................8

        A.      Summary Judgment Standard ...................................................................8

        B.      Exemption 3 ...............................................................................................9

        C.      Exemptions 6 and 7(C) ............................................................................19

IV.     Conclusion ...........................................................................................................26

# TABLE OF AUTHORITIES

<u>**Cases**</u>                                                                                                               <u>**Page**</u>

*Allen v. Central Intelligence Agency*,
    636 F.2d 1287 (D.C. Cir. 1980) ...................................................................14

*Ass'n. of Am. Physicians and Surgeons, Inc. v. Clinton*,
    997 F.3d 898 (D.C. Cir. 1993) ....................................................................23

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)..........................................................................................9

*Boehm v. Fed. Bureau of Investigation*,
    948 F. Supp.2d 9 (D.D.C. 2013) ...............................................................14

*Citizens for Responsibility and Ethics in Washington v. U.S. Dep't of Justice*,
    746 F.3d 1082 (D.C. Cir. 2014) ............................................................ *passim*

*Dep't of the Air Force v. Rose*,
    425 U.S. 352 (1976)..........................................................................................8

*Fund for Constitutional Gov't v. Nat'l Archives & Records Serv.*,
    656 F.2d 856 (D.C. Cir. 1981) ...................................................................10

*In re Grand Jury Investigation*,
    610 F.2d 202 (5th Cir. 1980) ......................................................................12

*In re Grand Jury Subpoena*,
    920 F.2d 235 (4th Cir. 1990) ......................................................................12

*In re North*,
    16 F.3d 1234 (D.C. Cir. 1994) ...................................................................12

*In re Madison Guaranty Sav. & Loan*,
    334 F.3d 1119 (D.C. Cir. 2003) .............................................................6, 18

*In re Petition of Craig v. United States*,
    131 F.3d 99 (2d Cir. 1997) .........................................................................13

*In re Sealed Case*,
    192 F.3d 995 (D.C. Cir. 1999).............................................................. *passim*

*Judicial Watch, Inc. v. U.S. Postal Service*,
    297 F. Supp.2d 252 (D.D.C. 2004) ..............................................................9

**Page**

*Nat'l Archives and Records Admin v. Favish,*
     541 U.S. 157 (2004)......................................................................19

*Sec. and Exchange Comm'n v. Dresser Indus., Inc.,*
     628 F.2d 1368 (D.C. Cir. 1980)......................................................11

*Sussman v. U.S. Marshals Serv.,*
     494 F.3d 1106 (D.C. Cir. 2007)......................................................25

*Trans-Pacific Policing Agreement v. U.S. Customs Serv.,*
     177 F.3d 1022 (D.C. Cir. 1999)......................................................25

*U.S. Dep't of Defense vs. Fed. Labor Relations Auth.,*
     510 U.S. 487 (1994)......................................................................24

*U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press,*
     489 U.S. 749 (1989)......................................................................24

*U.S. Dep't of Justice v. Tax Analysts,*
     492 U.S. 136 (1989).......................................................................8

*U.S. Dep't of State v. Ray,*
     502 U.S. 164 (1991).......................................................................8

*Weisberg v. U.S. Dep't of Justice,*
     745 F.2d 1476 (D.C. Cir. 1984).......................................................9

## Rules and Statutes

Fed. R. Civ. P. 56(c) ............................................................................9

Fed. R. Crim. P. 6(e) ....................................................................... *passim*

Fed. R. Crim. P. 6(e)(2)(A).............................................................9, 10

Fed. R. Crim. P. 6(e)(2)(B) .............................................................9, 10

5 U.S.C. § 552(b) ...........................................................................8, 25

5 U.S.C. § 552(b)(7)(C) ........................................................................19

28 U.S.C. § 591......................................................................................9

**Page**

28 U.S.C. § 594(h) ..................................................................................................4

28 U.S.C. § 594(h)(1) ............................................................................................3

28 U.S.C. § 594(h)(2) ............................................................................................4

28 U.S.C. § 594(k)(1) ..........................................................................................10

28 U.S.C. § 599 ....................................................................................................10

**Miscellaneous**

Barns, Steve, "Court Told of Draft Indictment That Included the First Lady,"
*New York Times* (March 19, 1999) ..............................................................6

Gormley, Ken, *The Death of American Virtue:  Clinton vs. Starr*
(Broadway Books 2011) ............................................................................6, 7

Plaintiff Judicial Watch, Inc. ("Judicial Watch"), by counsel and pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, respectfully submits this memorandum of points and authorities in opposition to Defendant National Archives and Records Administration's motion for summary judgment and in support of Plaintiff's cross-motion for summary judgment.

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.    Introduction.**

At issue in this Freedom of Information Act ("FOIA") lawsuit are draft indictments of former First Lady, former U.S. Senator, former U.S. Secretary of State, and current U.S. presidential candidate Hillary Rodham Clinton.  The indictments were prepared by Deputy Independent Counsel Hickman Ewing, Jr. of the U.S. Office of the Independent Counsel ("OIC") between 1996 and 1998 and concern alleged false statements to federal investigators and the withholding of evidence by Mrs. Clinton while she was First Lady of the United States.  The draft indictments have been in the possession, custody, and control of Defendant National Archives and Records Administration ("the Archives") since March 2004.

Judicial Watch requested the draft indictments in March 2015, but the Archives refused to produce them, purportedly to protect grand jury secrecy and Mrs. Clinton's privacy interests. There is no dispute about the scope of the Archives' search.  The only question before the Court is whether the Archives has satisfied its burden of proving that FOIA Exemptions 3, 6, and 7(C) apply.  Because an enormous amount of information about the independent counsel's investigations into Mrs. Clinton's conduct as first lady, including grand jury information, has already been published in official reports and other government records, there is no grand jury secrecy to protect.  For this same reason, Mrs. Clinton has no privacy interest in keeping the draft indictments secret.  At a minimum, the Archives has not demonstrated that the indictments

contain any grand jury or other information not already in the public domain such that the agency's claimed exemptions apply.  For these and the other reasons set forth below, the Archives' motion for summary judgment should be denied, and summary judgment and an order releasing the draft indictments should be entered in Judicial Watch's favor.

## II.      Factual Background.

On January 20, 1994, U.S. Attorney General Janet Reno appointed Robert B. Fiske, Jr. as independent counsel to investigate allegations of criminal activity in connection with a defunct Arkansas thrift institution, the Madison Guaranty Savings & Loan Association ("Madison Guaranty").  *See* Plaintiff's Statement of Undisputed Material Facts in Support of Cross-Motion for Summary Judgment ("Plf's Stmt. of Facts") at para. 1.  Also among the matters Fiske was charged with investigating were an Arkansas real estate venture, known as the Whitewater Development Company, Inc., in which then-Governor William Jefferson Clinton and Mrs. Clinton and Madison Guaranty owners Jim and Susan McDougal were partners, and an investment company, Capital Management Services, owned by Arkansas municipal court judge David Hale.[1]  *Id.* at para. 2.  Attorney General Reno defined Fiske's jurisdiction as follows:

(a)      The Independent Counsel: In re Madison Guaranty Savings & Loan Association shall have jurisdiction and authority to investigate to the maximum extent authorized by part 600 of this chapter whether any individuals or entities have committed a violation of any federal criminal or civil law relating in any way to President William Jefferson Clinton's or Mrs. Hillary Rodham Clinton's relationship with:

(1)      Madison Guaranty Saving & Loan Association;
(2)      Whitewater Development Corporation; or
(3)      Capital Management Services.

(b)      The Independent Counsel: In re Madison Guaranty Savings & Loan Association shall have jurisdiction and authority to investigate other allegations or evidence of violation of any federal criminal or civil law by

---

[1]      The matters under investigation were commonly referred to as "Whitewater."  Plf's Stmt. of Facts at para. 3.

any person or entity developed during the Independent Counsel's investigation referred to above, and connected with or arising out of that investigation.

(c)     The Independent Counsel: In re Madison Guaranty Savings & Loan Association shall have jurisdiction and authority to investigate any violation of section 1826 of title 28 of the U.S. Code, or any obstruction of the due administration of justice, or any material false testimony or statement in violation of federal law, in connection with any investigation of the matters described in paragraph (a) or (b) of the this section.

(d)     The Independent Counsel: In re Madison Guaranty Savings & Loan Association shall have jurisdiction and authority to seek indictments and to prosecute, or to bring civil actions against, any person or entities involved in any of the matters referred to in paragraph (a), (b), or (c) of this section who are reasonably believed to have committed a violation of any federal criminal or civil law arising out of such matters, including persons or entities who have engaged in an unlawful conspiracy or who have aided or abetted any federal offense.

*Id.* at para. 4.  The scope of the independent counsel's jurisdiction and authority was later expanded to include investigations into firings in the White House Travel Office, the Death of Deputy White House Counsel Vincent W. Foster, Jr., the White House FBI Files controversy, and the Monica Lewinsky matter.  *Id.* at para. 5.  In August 1994, Fiske was replaced as independent counsel by Kenneth W. Starr.  *Id.* at para. 6.  The independent counsel's investigations are among the most controversial, high profile, and politically charged criminal investigations in U.S. history and led directly to President Clinton's 1998 impeachment.

By law, the independent counsel was required to issue final reports detailing its work and its findings.  *See* 28 U.S.C. § 594(h)(1).  At least five final reports ultimately were prepared by the independent counsel.  Plf's Stmt. of Facts at para. 7.  They are:

(1)     Final Report of the Independent Counsel, *In re Madison Guaranty Savings and Loan Association* (In re Anthony Marceca) (published March 16, 2000);

(2)    Final Report of the Independent Counsel, *In re Madison Guaranty Savings and Loan Association* (In re Bernard Nussbaum) (published March 16, 2000);

(3)    Final Report of the Independent Counsel, *In re Madison Guaranty Savings and Loan Association* (In re William David Watkins and In re Hillary Rodham Clinton) (published June 22, 2000);

(4)    Final Report of the Independent Counsel, *In re Madison Guaranty Savings and Loan Association* (published January 5, 2001) ("January 5, 2001 Final Report"); and

(5)    Final Report of the Independent Counsel, *In re Madison Guaranty Savings and Loan Association* (Regarding Monica Lewinsky and Others) (published March 6, 2002).

*Id.* Each report contains enormous quantities of investigative materials, including grand jury testimony. *Id.* at para. 8. Each report also was approved for publication by the U.S. Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") under Section 594(h) of Title 28, and is publicly available on the U.S. Government Publishing Office's website.[2] *Id.* at para. 9.

The January 5, 2001 Final Report contains an 87-page chapter – Chapter 3 – detailing the independent counsel's investigation into Mrs. Clinton's representation of Madison Guaranty while an attorney at the Rose Law Firm in Little Rock, Arkansas. Plf's Stmt. of Facts at para. 10. According to the introduction to Chapter 3, "Mrs. Clinton represented Madison Guaranty between April 1985 and July 1986, a time when the institution was in severe financial trouble and when insiders committed numerous criminal and other fraudulent acts." *Id.* at para. 11. "Several individuals were ultimately convicted of or pleaded guilty to federal crimes for their roles in connection [with] those transactions." *Id.* at para. 12. "Mrs. Clinton represented Madison Guaranty in regard to some of the fraudulent transactions, and Madison Guaranty

---

[2]    Section 594(h) not only authorized the D.C. Circuit to order the reports be made public, but also authorized the Court to "make such orders as are appropriate to protect the rights of the individuals named in [the] report." 28 U.S.C. § 594(h)(2). Given that the D.C. Circuit chose to make the reports public, it is fair to conclude that it already weighed the privacy interests at stake and ruled in favor of disclosure.

insiders used and misused her legal services to thwart federal examiners." *Id.* at para. 13.  The

introduction continues:

> When Governor Clinton ran for president in 1992, Mrs. Clinton's representation
> of Madison Guaranty, including how the representation had come about, became
> matters of public inquiry.  At that time, Madison Guaranty had failed, a failure
> that ultimately cost the American tax payers about $73 million.  Mrs. Clinton and
> the Clinton campaign made public statements regarding her representation that
> minimized her role.

*Id.* at para. 14.

"After 1993, the conduct of insiders at Madison Guaranty and the Rose Law Firm

became the subject of multiple federal investigations."  Plf's Stmt. of Facts at para. 15.  The

Resolution Trust Corporation ("RTC") "investigated whether insiders had committed criminal

acts, and also examined whether the agency had viable civil claims against any insiders or

professionals who had represented Madison Guaranty, including the Rose Law Firm."  *Id.* at

para. 16.  "Also, the [Federal Deposit Insurance Corporation] and the RTC investigated whether

Rose attorneys had concealed potential conflicts of interest from the agencies."  *Id.* at para. 17.

"The FBI and the United States Department of Justice also conducted criminal investigations of

the conduct of the Madison Guaranty insiders and others, including Rose attorneys, who had

been associated with the institution."  *Id.* at para. 18.  "Beginning in 1994, those investigations

were continued by [the independent counsel]."  *Id.* at para. 19.

"In the course of the federal investigations, Mrs. Clinton made numerous statements and

gave sworn testimony regarding her representation of Madison Guaranty."  Plf's Stmt. of Facts at

para. 20.  The independent counsel "investigated whether Mrs. Clinton had committed perjury,

made false statements, or obstructed justice during those investigations."  *Id.* at para. 21.  While

the independent counsel found some of the First Lady's statements were factually inaccurate, it

"concluded that there was insufficient evidence to prove beyond a reasonable doubt that Mrs. Clinton had committed any federal criminal offense." *Id.* at para. 22.

Ultimately, the independent counsel's investigations resulted in 24 indictments and at least 16 convictions. *In re Madison Guaranty Sav. & Loan*, 334 F.3d 1119, 1122 (D.C. Cir. 2003). Among those convicted were the First Lady's former partner at the Rose Law Firm and President Clinton's former associate attorney general, Webster L. Hubbell. Also convicted was President Clinton's successor as governor of Arkansas, Jim Guy Tucker. Others include the President and Mrs. Clinton's business partners, Jim and Susan McDougal.

Hickman Ewing, Jr. was a deputy independent counsel at the OIC. According to testimony Ewing gave at Susan McDougal's 1999 criminal contempt and obstruction of justice trial, he drafted an indictment of Mrs. Clinton in 1996 regarding allegedly false statements the First Lady had made to federal investigators and the alleged withholding of evidence by the First Lady. *See, e.g.*, Steve Barnes, "Court Told of Draft Indictment That Included the First Lady," *New York Times* (March 19, 1999). Ewing apparently updated and revised the indictment over time, and, at an April 27, 1998 meeting at OIC, laid out the case for a multi-count indictment against the First Lady:

> Each of the lawyers in the room was flipping through a black binder approximately four inches thick, marked in bold letters on the exterior: "HRC Meeting," referring to Hillary Rodham Clinton. Inside that binder was a memo dated April 22, 1998, directed to "All OIC attorneys" from the "HRC Team," summarizing the criminal case against Mrs. Clinton. Following this were four documents for their review: a memo, dated April 10, that spelled out the "Theory of the Case"; an overview of the evidence against Mrs. Clinton; a draft indictment against Mrs. Clinton and her alleged co-conspirator [former Associate U.S. Attorney General Webster L. Hubbell]; and a draft order of proof that listed all the witnesses Starr's prosecutors would call against the First Lady in a criminal trial.
>
> Although nobody outside the room would ever know the details of the proposed indictment against the First Lady, it was captioned *United States of America v.*

> *Hillary Rodham Clinton and Webster Lee Hubbell.*  It was to be filed in the
> United States District Court for the Eastern District of Arkansas.

Gormley, Ken, *The Death of American Virtue:  Clinton vs. Starr* (Broadway Books 2011) at 478.

In June 2014, Judicial Watch submitted a FOIA request to the Archives seeking access to the binder referenced in Gormley's book.  Plf's Stmt. of Facts at para. 26.  The Archives ultimately produced 246 pages of the records in response to the request.  *Id.* at para. 27.  Among the records produced to Judicial Watch by the Archives was a 206-page memorandum, dated April 22, 1998, to "All OIC Attorneys," from the "HRC Team" and bearing the subject line "Summary of Evidence:  Hillary Rodham Clinton and Webb Hubbell."  *Id.* at para. 28.  The 206-page summary is particularly detailed and contains countless citations to and quotations from witness interviews, deposition testimony, documentary evidence, and grand jury testimony.  *Id.* at paras. 29-31.  It is largely unredacted and is available to the public, along with the other records produced by the Archives, on Judicial Watch's website.[3]  *Id.* at para. 32.

On March 9, 2015, Judicial Watch submitted a FOIA request to the Archives seeking access to Ewing's draft indictments.  Plf's Stmt. of Facts at 34; Declaration of Martha Wagner Murphy ("Murphy Decl.") at para. 6 and Exhibit B thereto.  Specifically, Judicial Watch requested:

> All versions of indictments against Hillary Rodham Clinton, including but not
> limited to Versions 1, 2, and 3 in box 2250 of the Hickman Ewing Attorney Files,
> the "HRC/___ Draft Indictment" in box 2256 of the Hickman Ewing Attorney
> Files, as well as any and all versions written by Deputy Independent Counsel
> Hickman Ewing, Jr. prior to September of 1996.

*Id.* at paras. 34-35; Murphy Decl. at para. 6 and Exhibit B thereto.  The Archives claims to have located 12 different draft indictments, one "draft indictment without a caption" listing "overt

---

[3]      Judicial Watch did not pursue an administrative appeal of the Archives' redactions to the memo for reasons unrelated to whether Judicial Watch believes those redactions have merit.  Plf's Stmt. of Facts at para. 33.

acts," and one record characterized as "scraps of a draft indictment with no caption."[4]  Murphy Decl. at Exhibit A.  Multiple copies of some drafts were located.  *Id.* at Exhibit A, Document Nos. 1-4, 7-3, and 12-13.  One draft is only 3 pages long.  *Id*. at Exhibit A, Document Nos. 12-13.  Another is 40 pages long.  *Id.* at Exhibit A, Document No. 19.  Obviously, some drafts are more detailed and contain more information than others.

According to the Archives, the responsive records were located in boxes identified as containing Ewings' files.  Murphy Decl. at paras. 20 and 21.  As a result, there is no dispute that the draft indictments were prepared by Ewing and concern the same subject matters as the April 1998 memos obtained from the Archives through FOIA and the January 2001 Final Report.

## III.   Argument.

A.   <u>Summary Judgment Standard</u>.

FOIA generally requires complete disclosure of requested agency information unless the information falls into one of FOIA's nine clearly delineated exemptions.  5 U.S.C. § 552(b); *see also Dep't of the Air Force v. Rose*, 425 U.S. 352, 360-61 (1976) (discussing the history and purpose of FOIA and the structure of FOIA exemptions).  In light of FOIA's goal of promoting agency disclosure, the exemptions are to be construed narrowly.  *U.S. Department of Justice v. Tax Analysts*, 492 U.S. 136, 150-151 (1989).  "[T]he strong presumption in favor of disclosure places the burden on the agency to justify the withholding of any requested documents."  *U.S. Department of State v. Ray*, 502 U.S. 164, 173 (1991).

---

[4]      Several of the drafts apparently are accompanied by memoranda, fax cover pages, and notes.  Murphy Decl. at Exhibit A, Document Nos. 1-4, 5, 6, 14, and 16.  The Archives has not differentiated between allegedly exempt material in the draft indictments and allegedly exempt material in the memoranda, fax cover pages, and notes.  Because Judicial Watch, Inc. only requested the draft indictments, the drafts should not be withheld from Judicial Watch if the only basis for withholding a particular draft is allegedly exempt material in one of these other, non-responsive records.

In FOIA litigation, as in all litigation, summary judgment is appropriate only when the pleadings and declarations demonstrate that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); Fed. R. Civ. P. 56(c). In FOIA cases, agency decisions to "withhold or disclose information under FOIA are reviewed *de novo*." *Judicial Watch, Inc. v. U.S. Postal Service*, 297 F. Supp. 2d 252, 256 (D.D.C. 2004). In reviewing a motion for summary judgment under FOIA, the court must view the facts in the light most favorable to the plaintiff. *Weisberg v. U.S. Dep't of Justice*, 745 F.2d 1476, 1485 (D.C. Cir. 1984).

B.      Exemption 3.

Judicial Watch does not dispute that Federal Rule of Criminal Procedure 6(e) is a "statute" for purposes of Exemption 3. The Archives' invocation of Rule 6(e) to justify withholding the draft indictments under Exemption 3 nonetheless lacks merit.

On its face, Rule 6(e) does not apply to the Archives. The rule states, "No obligation of secrecy may be imposed on any person except in accordance with Rule 6(e)(2)(B)." Fed. R. Crim. P. 6(e)(2)(A). It then specifies the seven categories of persons bound by the rule's secrecy provision:

> Unless these rules provide otherwise, the following persons must not disclose a matter occurring before the grand jury: (i) a grand juror; (ii) an interpreter; (iii) a court reporter; (iv) an operator of a recording device; (v) a person who transcribes recorded testimony ; (vi) an attorney for the government; or (vii) a person to whom disclosure is made under Rule 6(e)(3)(A)(ii) or (iii).

Fed. R. Crim. P. 6(e)(2)(B). The Archives does not fall anywhere within these seven categories of persons, and no other provision of the Federal Rules of Criminal Procedure compels the Archives to withhold records about "a matter occurring before a grand jury." Although the Ethics in Government Act of 1978, as amended, 28 U.S.C. § 591 *et seq.* (2000), directed that an

independent counsel's records be transferred to the Archives after his or her investigation had concluded, the statute did not extend Rule 6(e)'s secrecy obligations to the Archives.[5]  It only directed an independent counsel to "clearly identify" records subject to Rule 6(e).  28 U.S.C. § 594(k)(1).  To find an implied obligation of secrecy under Section 594(k)(1) based on this direction to the independent counsel, not the Archives, would run afoul of Rule 6(e)'s express admonition that "[n]o obligation of secrecy may be imposed on any person except in accordance with Rule 6(e)(2)(B)."  Fed. R. Crim. P. 6(e)(2)(A).

The Archives does not even attempt to argue that it falls under Rule 6(e)'s secrecy provision.  With the exception of *Fund for Constitutional Gov't v. Nat'l Archives & Records Serv.*, 656 F.2d 856 (D.C. Cir. 1981), none of the authorities cited by the Archives concerns records in the possession, custody, or control of the Archives.  They concern records in the possession, custody, or control of the U.S. Department of Justice, the Executive Office for United States Attorneys, and the Federal Bureau of Investigation, all of which indisputably fall under Rule 6(e).  The records at issue in *Fund for Constitutional Gov't* were in the possession, custody, and control of the Watergate Special Prosecution Force,[6] not the Archives, when the FOIA request at issue was made for their production.  656 F.2d at 860.  Unlike in this case, the request in *Fund for Constitutional Gov't* was made to the prosecutors, not to the Archives.  *Id.* The requested records were transferred to the Archives during the course of the litigation, well after the requester filed suit seeking to compel their production.  *Id.*  It has no bearing on this case.

---

[5]         The law expired, pursuant to its own terms, in 1999.  *See* 28 U.S.C. § 599.

[6]         The appointment of the special prosecutors in *Fund for Constitutional Gov't* predated the Ethics in Government Act, which had not yet been enacted when the FOIA request at issue in that case was made.

Even assuming Rule 6(e) applies to the Archives, the rule's protections are limited to matters "occurring before the grand jury."  The D.C. Circuit has cautioned against the "problematic nature" of defining this term broadly, especially, as the Archives asserts here, with respect to claims about the "strategy and direction" of a grand jury investigation.  *In re Sealed Case*, 192 F.3d 995, 1001 (D.C. Cir. 1999).  At issue in *In re Sealed Case* was an order to show cause why the OIC should not be held in contempt for allegedly violating Rule 6(e).  Prosecutors at OIC allegedly told the *New York Times* that they were considering asking a grand jury to indict President Clinton on perjury and obstruction of justice charges following his U.S. Senate impeachment trial.  The prosecutors also allegedly told the newspaper that the charges they were considering arose from what they believed were false statements by the President at his January 1998 deposition in Ms. Paula Jones' civil lawsuit and his August 1998 grand jury appearance. The district court issued the show cause order, and the prosecutors appealed.

In reversing the order, the Court in *In re Sealed Case* noted, "[W]e have never read Rule 6(e) to require that a 'veil of secrecy be drawn over all matters occurring in the world that happen to be investigated by a grand jury.'"  *In re Sealed Case*, 192 F.3d at 1001-02 (*quoting Sec. and Exchange Comm'n v. Dresser Indus., Inc.*, 628 F.2d 1368, 1382 (D.C. Cir. 1980) (*en banc*)).  "Indeed, we have said that the disclosure of information coincidentally before the grand jury [which can] be revealed in such a manner that its revelation would not elucidate the inner workings of the grand jury is not prohibited."  *Id.* at 1002 (internal quotations and citations omitted.).  The Court emphasized the need to differentiate between prosecutors' investigations and grand juries' investigations, a distinction the Court characterized as being "of the utmost significance."  *Id.*  It also differentiated between information uncovered by or made available to prosecutors and grand jury information.  *Id.*  "Information produced by criminal investigations

- 11 -

paralleling grand jury investigations does not constitute matters 'occurring before the grand jury if the parallel investigation was truly independent of the grand jury proceedings." *Id.* (*quoting In re Grand Jury Subpoena*, 920 F.2d 235, 242 (4th Cir. 1990)). "The disclosure of information obtained from a source independent of the grand jury proceedings, such as a prior government investigation, does not violate Rule 6(e)." *Id.* (*quoting In re Grand Jury Investigation*, 610 F.2d 202, 217 (5th Cir. 1980)).

*In re Sealed Case* also differentiated between prosecutors' deliberations and matters actually occurring before a grand jury: "[I]nternal deliberations of prosecutors that do not directly reveal grand jury proceedings are not Rule 6(e) material." *In re Sealed Case*, 192 F.3d at 1003. "It may be thought that when such deliberations include a discussion of whether an indictment may be sought, or whether a particular individual is potentially criminally liable, the deliberations have crossed into the realm of Rule 6(e) material." *Id.* "This ignores, however, the requirement that the matter occur before the grand jury." *Id.* "Where the reported deliberations do not reveal that an indictment *has been* sought or *will be* sought, ordinarily they will not reveal anything definite enough to come within the scope of Rule 6(e)." *Id.* "[B]are statements that some assistant prosecutors in the OIC wish to seek an indictment do not implicate the grand jury; the prosecutors may not even be basing their opinion on grand jury information presented to a grand jury." *Id.* at 1004.

The Court in *In re Sealed Case* also addressed treatment of Rule 6(e) material that has become public. "There must come a time . . . when information is sufficiently widely known that it has lost its character as Rule 6(e) material." *In re Sealed Case*, 192 F.3d at 1004 (*quoting In re North*, 16 F.3d 1234, 1245 (D.C. Cir. 1994)). "The purpose of Rule 6(e) is to preserve secrecy. Information widely known is not secret." *Id.* "The extent to which the grand jury

material in a particular case has been made public is clearly relevant because even partial previous disclosure often undercuts many of the reasons for secrecy." *Id.* (*quoting In re Petition of Craig v. United States*, 131 F.3d 99, 107 (2d Cir. 1997)).  Moreover, "consideration of whether material presumptively within the scope of Rule 6(e) has lost its secrecy should be considered at the *prima facie* stage." *Id.* at 1004, n.12.

Ultimately, the Court in *In re Sealed Case* determined that the independent counsel's deliberations about whether to seek an indictment of President Clinton for perjury and obstruction of justice arising from his allegedly false deposition and grand jury testimony were not protected by Rule 6(e).  It also found the fact that the grand jury was investigating President Clinton and the fact that the President had appeared before the grand jury were so widely known that Rule 6(e) did not apply.  The Court even took judicial notice of these well-known facts.  *In re Sealed Case*, 192 F.2d at 1004-05.

Plainly, *In re Sealed Case* requires the Archives to demonstrate that disclosure of the draft indictments will reveal non-public facts known to prosecutors only because of the grand jury's investigation, not because of prosecutors' own investigations or others' investigations.  *In re Sealed Case*, 192 F.3d at 1002.  The Archives also must demonstrate that disclosure will reveal non-public matters that actually occurred or were likely to occur before the grand jury. *Id.*at 1002-03.  With respect to whether a matter was "likely to occur," *In re Sealed Case* makes clear that the likelihood must be substantial, such as a witness whose testimony was expected, not something prosecutors were merely considering.  *Id.* at 1002 ("To be sure, we have recognized that Rule 6(e) would be easily evaded if a prosecutor could with impunity discuss with the press testimony about to be presented to a grand jury, so long as it had not yet occurred.  Accordingly, we have read Rule 6(e) to cover matters 'likely to occur.'").  The matter must be

"clearly anticipated." *Id.* at 1003. The mere disclosure of internal deliberations by prosecutors about whether to seek an indictment, on what charges to seek an indictment, and what an indictment might look like, without more, is not prohibited by Rule 6(e).[7]

The single declaration submitted by the Archives in support of its claims of exemption falls far short of satisfying the agency's burden. The declaration, signed by Martha Wagner Murphy, Chief of the Special Access and FOIA Branch at the Archives, paints with far too broad of a brush.[8] Only one paragraph in Ms. Murphy's declaration even addresses the substance of the Archives' Rule 6(e) claim (Murphy Decl. at para. 25), and the declaration as a whole makes no attempt to identify the basis of Ms. Murphy's purported knowledge about the grand jury's investigation that ended twenty years ago such that she is competent to testify about its "inner workings" or "direction." Rather than demonstrating why Rule 6(e) applies, Ms. Murphy's declaration is conclusory and merely repeats language taken out of context from case law applying Rule 6(e).[9] *Compare* Murphy Decl. at para. 25 *with Citizens for Responsibility and Ethics in Washington v. U.S. Dep't of Justice*, 746 F.3 1082, 1100 (D.C. Cir. 2014) ("*CREW*"); *Allen v. Central Intelligence Agency*, 636 F.2d 1287, 1288 (D.C. Cir. 1980) ("Where the agency affidavits merely parrot the language of the statute and are drawn in conclusory terms, the court's responsibility to conduct de novo review is frustrated."). It also ignores the fact that an

---

[7]     *Boehm v. Fed. Bureau of Investigation*, 948 F. Supp.2d 9 (D.D.C. 2013) is inapposite. It does not address whether the Archives is bound by Rule 6(e)'s secrecy provision. It also does not differentiate between different sources of information or different investigations and "matters" actually "occurring before the grand jury." In addition, although the Court in *Boehm* addressed the distinction between public and non-public information, the plaintiff in *Boehm* failed to supply any evidence demonstrating that the information being withheld had been made public. 948 F. Supp.2d at 27. The Court in *Boehm* also only mentioned the draft indictment in passing and did not address it or analyze it separately. *Id.* at 26 and 27.

[8]     The declaration asserts that the boxes containing the draft indictments each bore "a note indicating that the contents include material subject to Rule 6(e)." Murphy Decl. at para. 20. Ms. Murphy does not claim that all of the records in the boxes contained grand jury material or state how she determined what was or was not grand jury material subject to Rule 6(e).

[9]     The declaration ignores the far more limiting language of *In re Sealed Case.*

enormous amount of grand jury material was made public in the independent counsel's multiple reports and elsewhere.

More specifically, Ms. Murphy declares that "[a]ll the responsive records are directly related to the Independent Counsel's consideration of presenting an indictment to a grand jury." Murphy Decl. at para. 25. She does not assert that the drafts were ever presented to the grand jury – they obviously were not – and she does not claim that presentment of any particular draft was "likely to occur" or "clearly anticipated." She does not describe any specific matter "occurring before the grand jury." As in *In re Sealed Case*, merely deliberating on whether to seek an indictment from a grand jury is insufficient to implicate Rule 6(e). Her bald claim that all responsive records relate to consideration of whether to seek an indictment of the First Lady fails to satisfy Rule 6(e).

The same is true for Ms. Murphy's assertion about revealing persons "intended to be subpoenaed." She does not claim that prosecutors were likely to call any such persons or that their appearances before the grand jury were "clearly anticipated." [10] Likewise, her broad brush claims that "the materials" "reflect" and "reveal the inner workings and direction of the grand jury" and that their "[d]isclosure would violate the secrecy of the grand jury by disclosing [its] inner workings" are the same type of "bare statements" the Court found "problematic" in *In re Sealed Case*. *In re Sealed Case*, 192 F.3d at 1001 ("[W]e cautioned the district court about 'the problematic' nature of applying so broad a definition, especially as it relates to the 'strategy or direction' of the investigation."). They do not describe anything that actually occurred or was likely to occur before the grand jury.

---

[10]     Ms. Murphy also does not explain how she knows who the independent counsel may have intended to subpoena. Such information is not typically included in indictments, which renders suspect her claim that disclosure of the draft indictments would reveal names of individuals "intended to be subpoenaed."

Ms. Murphy does not even claim that disclosure of any particular draft indictment would reveal the names or identifying information about persons who testified before the grand jury or identify specific records subpoenaed by the grand jury.  She only asserts that "the material" "collectively reflects" names and identifying information of individuals subpoenaed or "intended to be subpoenaed" to testify before the grand jury and "information identifying specific records subpoenaed during the grand jury process."  Nowhere does she describe what she means by "collectively reflect" or how names, identifying information, and records are "collectively reflect[ed]" in "the material."  If she means that, by reading all of the various drafts together, a person might be able to piece together or otherwise surmise the identity of a person who actually testified before the grand jury or identify a document subpoenaed by the grand jury, she certainly does not say so.  If she means that disclosure of each and every individual record will reveal such information, she does not say that either.  The declaration is too vague, generalized, and conclusory to satisfy the Archive's burden.

Ms. Murphy also declares that the records – again collectively referring to them as "they" – "reflect and quote" grand jury testimony.  She does not identify what she means by "reflect," and, again, she does not differentiate between individual records.  Nowhere does she claim that each and every individual record, even the three-page "draft indictment without a caption" and the four-page "scraps of a draft indictment with no caption," quotes grand jury testimony.  Again, Ms. Murphy paints with far too broad of a brush to satisfy the Archives' burden of proof.  It also seems highly unlikely that, to the extent any particular draft quotes grand jury material that is not already public, any such quote could not be redacted.

Ms. Murphy also made no effort to differentiate between the grand jury's investigation, the independent counsel's investigations, and regulatory and congressional investigations when

- 16 -

she makes her blanket claim about the draft indictments reflecting or revealing grand jury material.  The section of the January 5, 2001 Final Report concerning the independent counsel's investigation into Mrs. Clinton's representation of Madison Guaranty and whether the First Lady committed perjury or obstructed justice during those investigations cites, references, and quotes, in some cases extensively, from as many as 44 different, non-grand jury sources of information, not including numerous individual documents, gathered from various investigations.  Plf's Stmt. of Facts at paras. 10 and 23-24.  These non-grand jury sources of information include:

- independent counsel witness interviews;

- interrogatory responses to regulators;

- deposition testimony;

- trial testimony;

- congressional testimony;

- witness interviews by regulators;

- regulatory reports;

- media reports;

- television interviews; and

- at least one book.

*Id.*  To be sure, the report also cites, references, and quotes grand jury testimony, but the amount of non-grand jury information gathered by the independent counsel and presumably used in preparing the draft indictments is enormous.  *Id.* at paras. 10 and 23-25.

The independent counsel's use and reliance on the numerous non-grand jury sources of information is further demonstrated by the 206-page "Summary of Evidence" prepared by the independent counsel's "HRC team" in April 1998 to aid in discussions about whether to seek an

indictment of the First Lady.  Plf's Stmt. of Facts at paras. 28-30.  The 206-page summary cites, references, and quotes from many of the same, non-grand jury sources of information cited in the relevant portion of the January 5, 2001 Final Report, but also cites, references, and quotes from a great many additional sources, including as many as 12 separate FBI 302s.  *Id.*  Under the circumstances, Ms. Murphy's bare assertion that disclosure of the draft indictments will reveal "matter(s) occurring before the grand jury" is insufficient to meet the Archive's burden of proof.

Finally, enormous amounts of grand jury information about the independent counsel's investigation of the First Lady have already been made public and are widely available.  The relevant section of the January 5, 2001 Final Report – which, again, the D.C. Circuit approved for publication and which is readily available on the Government Publishing Office's website – cites to, references, or quotes testimony from at least 25 grand jury appearances by 21 witnesses between 1995 and 1998.  Plf's Stmt. of Facts at paras. 8-10 and 23-25.  As the D.C. Circuit has declared, the filing of reports by independent counsels is "a complete departure from the authority of a United States Attorney" and "contrary to the practice in federal Grand Jury investigations."  *In re:  Madison Guaranty Sav. & Loan*, 334 F.3d at 1128 (internal quotations omitted).  Once published, independent counsel reports effectively eliminate grand jury secrecy. Similarly, the 206-page "Summary of Evidence" produced by the Archives to Judicial Watch pursuant to a separate FOIA request also discloses even more grand jury information.  *Id.* at paras. 28-31.  Although not an exhaustive count, the summary cites to, references, or quotes testimony from at least 34 grand jury appearances by some 27 witnesses between 1995 and 1998, including 12 witnesses not referenced in the relevant section of the January 5, 2001 Final Report.[11]  *Id.* at para. 31.

---

[11]     Neither this total nor the total for Volume II, Part B, Chapter 3 of the January 5, 2001 Final Report includes the voluminous documentary evidence cited in the "Summary of Evidence" or the report.  It is not possible to

There is no secrecy left to protect.  At a minimum, the Archives has not demonstrated under the circumstances of this case that Rule 6(e) is necessary to protect the secrecy of any grand jury material contained in any particular draft indictment.  The Archives' invocation of Exemption 3 fails.

C.    Exemptions 6 and 7(C).

Judicial Watch agrees with the Archives' assertion that the analysis and balancing required under Exemptions 6 and 7(C) are sufficiently similar to warrant a consolidated discussion.  Murphy Decl. at para. 30.  Judicial Watch disagrees with the Archives' assertion that Mrs. Clinton's privacy interests outweigh the public interest in disclosure of the draft indictment.

Exemption 7(C) exempts from disclosure "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy."  *CREW*, 746 F.3d at 1091 (*quoting* 5 U.S.C. § 552(b)(7)(C)).  The Court's "task, then, is 'to balance the [] privacy interest against the public interest in disclosure."  *Id.* (*quoting Nat'l Archives and Records Admin. v. Favish*, 541 U.S. 157, 171 (2004)).  There is no dispute that the draft indictments were "compiled for law enforcement purposes," and the Archives does not claim that any person other than Mrs. Clinton has any privacy interest in the draft indictments.  The only issue that remains for purposes of the Archive's Exemption 7(C) claim is whether any privacy interest Mrs. Clinton might have in whatever non-public information exists in the various draft indictments outweighs the public interest in disclosure of the draft indictments.

An Exemption 7(C) analysis focuses on two potential privacy interests.  *CREW*, 746 F.3d at 1091.  The first is an individual's interest in "avoiding the stigma of having his name

discern from the summary or the report whether this evidence was ever presented to or considered by the grand jury.

associated with a criminal investigation." *Id.*  The second is the individual's interest in the

"*contents* of the investigative files." *Id.* at 1092.  At issue in *CREW* were FBI records of a

criminal investigation of former U.S. House of Representatives Majority Leader Tom DeLay.

The former majority leader publicly acknowledged being under investigation, abrogating any

privacy interest in avoiding having his name associated with a criminal investigation.  *Id.*  The

agency asserted that DeLay nonetheless had a broad privacy interest in the contents of the FBI

records, but made no attempt to demonstrate that he had a particular privacy interest in any

particular record.  The D.C. Circuit rejected the agency's "blanket withholding of all responsive

documents" and remanded the case to the district court, declaring that the agency "must attempt

to make a more particularized showing as to what documents or portions thereof are exempt."

*Id.* at 1096.  It also directed the district court to "weigh what information may be withheld under

Exemption 7(C) and whether any information is reasonably segregable and may be disclosed."

*Id.*

  There is no privacy interest to protect for the same reason there is no grand jury secrecy

to protect.  It has long been publicly known that Mrs. Clinton was investigated by the

independent counsel for allegedly making false statements to federal investigators and allegedly

withholding evidence from federal investigators while she was First Lady.  It also is publicly

known that OIC prepared draft indictments of Mrs. Clinton regarding these allegations.  The

Archives has made no effort to shield this fact.  It readily admits that the draft indictments exist.

As a result, the Archives cannot establish the "first" of the two potential privacy interests at issue

in an Exemption 7(C) analysis.

  There also can be no dispute that enormous quantities of information about the

independent counsel's investigation of Mrs. Clinton, including grand jury testimony and other

evidence, are readily available to the public.  The January 5, 2001 Final Report and the 206-page "Summary of Evidence" Judicial Watch obtained from the Archives provide ample evidence of this indisputable fact.

Ms. Murphy's declaration makes no mention of any of this publicly available information and instead baldly claims that, as an "uncharged" person, Mrs. Clinton maintains a "strong privacy interest in not having information from the files of the Independent Counsel disclosed." Murphy Decl. at para. 34.  Ms. Murphy does not describe, identify, or quantify Mrs. Clinton's privacy interest in the draft indictments other to assert that it is "strong."  She also makes no effort to differentiate between any of the 14 draft indictments or portions thereof or assert that any of these records contain information from the independent counsel's files that has not already been made public.  Ms. Murphy's declaration is little more than the same blanket, boilerplate claim rejected by the D.C. Circuit in *CREW*.  Given the mountain of investigative materials about Mrs. Clinton that is publicly available, Ms. Murphy's declaration also is not credible.  There has been no showing whatsoever of any meaningful interest on the "privacy" side of the scales.

On the "public interest" side of the scales, the Archives' claim that the "*only* recognized interest is that which sheds light on the operations and activities of the Independent Counsel" is incorrect.  Murphy Decl. at para. 32 (emphasis added).  Judicial Watch agrees with the Archives that disclosure of the draft indictments will "shed light on the operations and activities of the Independent Counsel."  Judicial Watch disagrees that shedding light on the operations and activities of the independent counsel is the only relevant public interest.

Again, the D.C. Circuit's decision in *CREW* is instructive.   Like in this case, the government in *CREW* sought to minimize the public interest in information about a criminal

investigation of a prominent government official – former House Majority Leader DeLay.  The D.C. Circuit rejected the government's effort, declaring that "there is considerably more than nothing on the public interest side of the scale."  *CREW*, 746 F.3d at 1093.  "Matters of substantive law enforcement policy . . . are properly the subject of public concern, and disclosure of the requested records would likely reveal a great deal about law enforcement policy."  *Id.* (internal quotations omitted).  "Disclosure of the records would likely reveal much about the diligence of the FBI's investigation and the DOJ's exercise of its prosecutorial discretion: whether the government had the evidence but nevertheless pulled its punches."  *Id.*  "Indeed, we have repeatedly recognized a public interest in the manner in which DOJ carries out substantive law enforcement policy (whether or not that interest outweighs any privacy interest at stake in a given case)."  *Id.*  "That the investigation implicated a public official as prominent as the former Majority Leader of the House of Representatives further raises the stake."  *Id.* at 1094.  Like in *CREW*, the Archives tries to minimize the public interest in the independent counsel's investigation of Mrs. Clinton, dismissing that interest as a mere "scintilla."  Murphy Decl. at para. 35.  Also like in *CREW*, that attempt should be rejected.

The public interest in the operations and activities of OIC under Independent Counsel Starr, who led one of the most controversial, high profile, and politically-charged criminal investigations in U.S. history and which led directly to President Clinton's 1998 impeachment, remains substantial nearly two decades later.   A simple google search for the words "Starr Report" yields 13,200,000 results.  Plf's Stmt. of Facts at para. 36.  This public interest is only compounded by the fact that OIC was investigating Mrs. Clinton, a sitting first lady, for allegedly trying to cover up her role in significant financial and other wrongdoing at Madison Guaranty, the failure of which cost taxpayers $73 million and ultimately led to the conviction of

- 22 -

an assistant U.S. attorney general, a sitting governor, the President and Mrs. Clinton's business partners, and at least 12 other persons.  *See*, *e.g.*, *id*. at para. 14.  Disclosure of the draft indictments undoubtedly will shed further light on the independent counsel's investigation of Mrs. Clinton, just as disclosure of the records at issue in *CREW* shed light on the government's investigation of Mr. DeLay.  The public interest in the independent counsel's investigation easily outweighs any remaining privacy interests that Mrs. Clinton might have either in the draft indictments themselves or information in the draft indictments that has not already been made public.

But public interest in disclosure of the draft indictments goes far beyond interest in the operations and activities of the independent counsel.  Again, at the time Mrs. Clinton was being investigated by the independent counsel for making false statements and withholding evidence from federal investigators, she was First Lady of the United States.  The alleged false statements and withholding of evidence also allegedly occurred while Mrs. Clinton was First Lady of the United States.  The D.C. Circuit has found that, as First Lady of the United States, Mrs. Clinton was an officer of the United States, at least for purposes of the Federal Advisory Committee Act. *Ass'n of Am. Physicians and Surgeons, Inc. v. Clinton*, 997 F.3d 898, 911 (D.C. Cir. 1993). After serving as First Lady from 1993 to 2001, Mrs. Clinton went on to serve as a United States Senator from the State of New York from 2001-09.  From 2009 to 2013, she served as U.S. Secretary of State.  She now seeks the nation's highest office and is the Democratic Party's presumptive nominee for that position.  Obviously, making false statements and withholding evidence from federal investigators bears on Mrs. Clinton's honesty, credibility, and trustworthiness, not only as First Lady, but also in her subsequent government service as a U.S. Senator and U.S. Secretary of State and for the position she currently seeks.  Disclosure of the

- 23 -

draft indictments will "shed light" on Mrs. Clinton's decades as a federal official, her fitness for the office she currently seeks, and on "what the government is up to."[12]   The Archives' assertions to the contrary are neither serious nor credible.

The Archives' dismissive characterization of the public interest in the draft indictments as they relate to Mrs. Clinton as being nothing more than a mere "scintilla" also is neither serious nor credible.  Murphy Decl. at para. 35.  Ms. Murphy's declaration fails to disclose her competence to opine on public interest in the draft indictments or the magnitude of that interest. She offers no basis for her opinion and no metric by which to judge the public interest in the draft indictments.  A google search for "Hillary Clinton draft indictment" yields 547,000 results. Plf's Stmt. of Facts at para. 37.  Judicial Watch's efforts to gain access to the draft indictments have been the subject of news reports by CNN, Politico, The New York Post, Investor's Business Daily, The National Review, and even the United Kingdom's Daily Mail.  *Id.* at para. 38.

---

[12]        Judicial Watch acknowledges that, when weighing whether disclosure is in the public interest, D.C. Circuit case law often differentiates between what a record will reveal about an agency's performance of its statutory duties and what that same record will reveal about the actions of a particular individual.  *See, e.g.*, *CREW*, 746 F.3d at 1093.  Judicial Watch submits that, in making that distinction, the D.C. Circuit has relied on U.S. Supreme Court precedent in which the underlying records concerned the actions of private citizens, not government officials.  These cases include, most notably, *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749 (1989), where the records at issue were "rap sheets" containing the criminal histories of various private individuals. In addressing the public interest in disclosure in that case, the Court noted that FOIA's purpose

> is not fostered by disclosure of information about private citizens that is accumulated in various government files but that reveals little or nothing about an agency's own conduct.  In this case -- and presumably in the typical case in which one private citizen is seeking information about another -- the requester does not intend to discover anything about the conduct of the agency that has possession of the requested records.  Indeed, response to this request would not shed any light on the conduct of any Government agency or official.

*Id.* at 773; *cf. U.S. Dep't of Defense vs. Fed. Labor Relations Auth.*, 510 U.S. 487 (1994) (finding that disclosure of home addresses of agency employees in bargaining units represented by unions would not shed light on agency action).  The same cannot be said for this case.  Mrs. Clinton was not a private citizen at the time she was being investigated by the independent counsel.  She has since gone on to other, higher federal offices and now seeks the nation's highest office.  Disclosure of the draft indictments will shed light on Mrs. Clinton's tenure as First Lady and, as a result, on her subsequent tenure as a U.S. senator and U.S. secretary of state.  It also will shed light on her suitability to serve as president of the United States.  It will help citizens to know not only what their government has been "up to," but what it may be "up to" should they select Mrs. Clinton as their president.  The cases holding that the only relevant public interest is in shedding light on how agencies perform their statutory duties do not address this highly unique factual situation.  They are inapposite.

Clearly, public interest in the draft indictments is substantial.  Again, it far outweighs any remaining, unidentified privacy interest that Mrs. Clinton may have in keeping the records secret. The Archives' Exemption 6 and 7(C) claims have no merit.

D.     Segregability.

An agency must disclose "[a]ny reasonably segregable portion" of an otherwise exempt record.  5 U.S.C. § 552(b).  A "district court must make a specific finding of segregability regarding the documents to be withheld."  *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007).  When, as here, records are withheld in their entirety, a determination must be made as to whether any portion of those records could have been segregated and released. *Trans-Pacific Policing Agreement v. U.S. Customs Serv.*, 177 F.3d 1022, 1027-28 (D.C. Cir. 1999).

No segregability analysis was undertaken here.  The Archives does not claim to have even tried to undertake a segregability analysis.  Should the Archives' claims of exemption be credited, summary judgment still cannot be entered in the Archives' favor until a segregability analysis has been undertaken and any "reasonably segregable portion" of each responsive record has been disclosed.  Given that the responsive records are draft indictments and are likely in paragraph form, any particular paragraph containing non-public material about a matter occurring before the grand jury or in which Mrs. Clinton has some identifiable privacy interest can easily be redacted, allowing the remainder of the record to be produced.  *CREW*, 746 F.3d at 1096.

**IV.     Conclusion.**

For the foregoing reasons, the Archives' motion for summary judgment should be denied,

and summary judgment should be entered in Judicial Watch's favor ordering the release of the

draft indictments to Judicial Watch.

Dated:  March 11, 2016                                  Respectfully submitted,

                                                       JUDICIAL WATCH, INC.

                                                       */s/ Paul J. Orfanedes*
                                                       Paul J. Orfanedes
                                                       D.C. Bar No. 429716
                                                       425 Third Street SW, Suite 800
                                                       Washington, DC  20024
                                                       Tel:     (202) 646-5172
                                                       Fax:     (202) 646-5199
                                                       Email:  porfanedes@judicialwatch.org

                                                       *Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

JUDICIAL WATCH, INC.,                  )
                                       )
                    Plaintiff,         )
                                       )          Civil Action No.  15-cv-1740 (RBW)
v.                                     )
                                       )
NATIONAL ARCHIVES AND                  )
RECORDS ADMINISTRATION,                )
                                       )
                    Defendant.         )
_____)


**PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF MATERIAL
FACTS NOT IN DISPUTE AND STATEMENT OF UNDISPUTED
MATERIAL FACTS IN SUPPORT OF CROSS-MOTION
FOR SUMMARY JUDGMENT**

        Plaintiff Judicial Watch, Inc., by counsel and pursuant to Local Civil Rule 7.1(h),

respectfully submits this response to Defendant's statement of material facts not in dispute and

statement of undisputed material facts in support of Plaintiff's cross-motion for summary

judgment:

**I.      Plaintiff's Response to Defendant's Statement of Material Facts Not in
        Dispute.**

        1.      NARA maintains custody of the records of the independent counsels who served

under Title VI of the Ethics in Government Act of 1978.  Decl. of Martha Wagner Murphy ¶ 15.

        Plaintiff's Response:  Undisputed.

        2.      The records maintained by NARA include the records of Kenneth W. Starr and

his successors.  *Id.* ¶ 18.

        Plaintiff's Response:  Undisputed.

3.      Mr. Starr served as an independent counsel under Title VI from 1994 until 1999; his successors served until 2004.  *Id.*

*Plaintiff's Response*:   Undisputed.

4.      Included among the records of Mr. Starr and his successors are drafts of a proposed indictment of Hillary Rodham Clinton.  *Id*. ¶ 23.

*Plaintiff's Response*:   Undisputed.

5.      The records of Mr. Starr and his successors fill approximately 3149 cubic feet of space at NARA.  *Id.* ¶ 19.

*Plaintiff's Response*:   Plaintiff objects to the facts asserted by Defendant in this paragraph because they are not material.  In addition, Plaintiff is unable to state whether it disputes or does not dispute the facts asserted by Defendant in this paragraph because Defendant's factual assertions concern the internal operations of Defendant or are otherwise uniquely known to Defendant.  *See*, *e.g.*, *Judicial Watch, Inc. v. Food and Drug Admin.*, 449 F.3d 141, 145-46 (D.C. Cir. 2006) (noting that the "asymmetrical distribution of knowledge" between the agency and the requestor in FOIA litigation "distorts the traditional adversary nature of our legal system's form of dispute resolution.").

6.      An index to those records was prepared by the second and last of Mr. Starr's successors and her staff in connection with the transfer of the records to NARA.  *Id*.

*Plaintiff's Response*:   Plaintiff does not dispute that the index referenced in this paragraph exists.  Because the identity of the individual(s) who prepared the index concern the internal operations of the OIC or are otherwise uniquely known to OIC or Defendant, Plaintiff is unable to state whether it disputes or does not dispute who prepared the index.  *See*, *e.g.*, *Judicial Watch, Inc.*, 449 F.3d at 145-46.

7.      A copy of that index was provided to plaintiff, Judicial Watch, by NARA in May 2015.  *Id.* ¶ 19 n.7.

Plaintiff's Response:   Undisputed.

8.      By letter dated March 9, 2015, plaintiff submitted a request to NARA under the Freedom of Information Act (FOIA), 5 U.S.C. § 552, for the following records:

> All versions of indictments against Hillary Rodham Clinton, including, but not limited to, Versions 1, 2, and 3 in box 2250 of the Hickman Ewing Attorney Files, the "HRC/__Draft Indictment" in box 2256 of the Hickman Ewing Attorney Files, as well as any all versions written by Deputy Independent Counsel Hickman Ewing, Jr. prior to September of 1996.

*Id.* ¶ 6.

Plaintiff's Response:   Undisputed.

9.      Hickman Ewing was a lawyer who worked as Kenneth Starr's deputy in Little Rock.  *Id.* ¶ 6 n.2.

Plaintiff's Response:   Undisputed.

10.     Plaintiff said in its request that "[t]he records in question are located in the material submitted to [NARA] by the Office of Independent Counsel In Re: Madison Guaranty Savings & Loan Association, also known as 'the records of IC Starr.'"  *Id.* ¶ 6.

Plaintiff's Response:   Undisputed.

11.     NARA responded to plaintiff's request by locating the two boxes in the records of Mr. Starr and his successors to which the request referred, Boxes 2250 and 2256.  *Id.* ¶¶ 20-21.

Plaintiff's Response:   Plaintiff is unable to state whether it disputes or does not dispute the facts asserted by Defendant in this paragraph because Defendant's factual assertions concern the internal operations of Defendant or are otherwise uniquely known to Defendant.  *See*, *e.g.*, *Judicial Watch, Inc.*, 449 F.3d at 145-46.

12.     Both boxes bear the name, "Hickman Ewing Attorney Work Product"; both boxes bear the heading "HRC," the initials of Hillary Rodham Clinton; and both boxes state on their face that their contents include "material subject to Rule 6(e) of the Federal Rules of Criminal Procedure." *Id.* ¶ 20.

Plaintiff's Response:  Plaintiff objects to the facts asserted by Defendant in this paragraph because they are not material.  In addition, Plaintiff is unable to state whether it disputes or does not dispute the facts asserted by Defendant in this paragraph because Defendant's factual assertions concern the internal operations of Defendant or are otherwise uniquely known to Defendant.  *See*, *e.g.*, *Judicial Watch, Inc.*, 449 F.3d at 145-46.

13.     Box 2250 contains a folder labeled "Draft Indictment."  *Id.*

Plaintiff's Response:  Plaintiff is unable to state whether it disputes or does not dispute the facts asserted by Defendant in this paragraph because Defendant's factual assertions concern the internal operations of Defendant or are otherwise uniquely known to Defendant.  *See*, *e.g.*, *Judicial Watch, Inc.*, 449 F.3d at 145-46.

14.     Box 2256 contains a folder labelled "Hillary Rodham Clinton/Webster L. Hubbell Draft Indictment."  *Id.*

Plaintiff's Response:  Plaintiff is unable to state whether it disputes or does not dispute the facts asserted by Defendant in this paragraph because Defendant's factual assertions concern the internal operations of Defendant or are otherwise uniquely known to Defendant.  *See*, *e.g.*, *Judicial Watch, Inc.*, 449 F.3d at 145-46.

15.     Multiple drafts of the proposed indictment of Mrs. Clinton were located by NARA within these folders.  *See id.* ¶ 21 & Ex. A.

<u>Plaintiff's Response</u>:  Plaintiff is unable to state whether it disputes or does not dispute the facts asserted by Defendant in this paragraph because Defendant's factual assertions concern the internal operations of Defendant or are otherwise uniquely known to Defendant.  *See*, *e.g.*, *Judicial Watch, Inc.*, 449 F.3d at 145-46.

16.     NARA also responded to plaintiff's FOIA request by "search[ing] the 'Box Contents' and 'Subject' fields [of the index to the records of Mr. Starr and his successors] to identify any other folders that could contain 'Indictment' and 'Hillary Rodham Clinton" or 'Hillary Clinton' or 'HRC.'"  *Id.* ¶ 21.

<u>Plaintiff's Response</u>:  Plaintiff is unable to state whether it disputes or does not dispute the facts asserted by Defendant in this paragraph because Defendant's factual assertions concern the internal operations of Defendant or are otherwise uniquely known to Defendant.  *See*, *e.g.*, *Judicial Watch, Inc.*, 449 F.3d at 145-46.

17.     This search "did not locate any other responsive folders."  *Id.*

<u>Plaintiff's Response</u>:  Plaintiff is unable to state whether it disputes or does not dispute the facts asserted by Defendant in this paragraph because Defendant's factual assertions concern the internal operations of Defendant or are otherwise uniquely known to Defendant.  *See*, *e.g.*, *Judicial Watch, Inc.*, 449 F.3d at 145-46.

18.     Each of the drafts of the proposed indictment that NARA located is marked on its face as a draft; is denominated as a draft in accompanying cover memos; or shows through its incompleteness that it is a draft.  *Id.* ¶ 23.

<u>Plaintiff's Response</u>:  Plaintiff is unable to state whether it disputes or does not dispute the facts asserted by Defendant in this paragraph because Defendant's factual assertions concern

the internal operations of Defendant or are otherwise uniquely known to Defendant.  *See*, *e.g.*, *Judicial Watch, Inc.*, 449 F.3d at 145-46.

19.     Some of the drafts contain marginalia or annotations; some are identical duplicates of each other; some are non-identical duplicates; some are accompanied by cover memos; some are accompanied by handwritten notes on separate pieces of paper; and some are accompanied by fax cover sheets.  *Id.*

Plaintiff's Response:  Plaintiff is unable to state whether it disputes or does not dispute the facts asserted by Defendant in this paragraph because Defendant's factual assertions concern the internal operations of Defendant or are otherwise uniquely known to Defendant.  *See*, *e.g.*, *Judicial Watch, Inc.*, 449 F.3d at 145-46.

20.     One of the drafts consists merely of "scraps of a draft indictment."  *Id.*

Plaintiff's Response:  Plaintiff is unable to state whether it disputes or does not dispute the facts asserted by Defendant in this paragraph because Defendant's factual assertions concern the internal operations of Defendant or are otherwise uniquely known to Defendant.  *See*, *e.g.*, *Judicial Watch, Inc.*, 449 F.3d at 145-46.

21.     NARA is withholding each of the drafts in full pursuant to FOIA Exemption 3 and Rule 6(e), *id.* ¶ 25, and, separately, pursuant to FOIA Exemptions 7(C) and 6.  *Id.* ¶ 35.

Plaintiff's Response:  Plaintiff objects to this paragraph to the extent it contains conclusions of law instead of assertions of fact.   Plaintiff does not dispute that the records identified by Defendant as responsive to Plaintiff's request are being withheld in full based on Defendant's assertion of FOIA Exemptions 3, 6, and 7(C).  Plaintiff disputes that Defendant's assertions of FOIA Exemptions 3, 6, and 7(C) are lawful or correct.

22.     No indictment of Mrs. Clinton was ever issued, *id.* ¶ 34, and no charges against

her were ever brought.  *Id.* ¶ 35.

Plaintiff's Response:   Undisputed.

23.     By letter dated March 19, 2015, NARA advised plaintiff that it had "examined the

folders from Hickman Ewing's attorney files that you requested" and was withholding the

following records "in full" pursuant to FOIA Exemption 7(C): "From box 2250 the folder 'Draft

Indictment' (38 pages) . . . From box 2256 the folder 'Hillary Rodham Clinton/Webster L.

Hubbell Draft [Indictment] (approximately 200 pages)."  *Id.* ¶ 8.

Plaintiff's Response:   Undisputed.

24.     The records to which NARA referred in its letter included records other than

drafts of the proposed indictment.  *See id.* ¶ 22.

Plaintiff's Response:   Plaintiff is unable to state whether it disputes or does not dispute

the facts asserted by Defendant in this paragraph because Defendant's factual assertions concern

the internal operations of Defendant or are otherwise uniquely known to Defendant.  *See*, *e.g.*,

*Judicial Watch, Inc.*, 449 F.3d at 145-46.

25.     By letter dated May 14, 2015, plaintiff appealed administratively the withholding

of the above records.  *Id.* ¶ 9.

Plaintiff's Response:   Undisputed.

26.     By letter dated October 16, 2015, NARA advised plaintiff that its administrative

appeal had been placed into the processing queue.  *Id.* ¶ 10.

Plaintiff's Response:   Undisputed.

27.     On October 20, 2015, plaintiff commenced this action.  *Id.* ¶ 11.

Plaintiff's Response:   Undisputed.

28.    Plaintiff's commencement of this action caused NARA to close plaintiff's administrative appeal.  *Id*. ¶ 12.

Plaintiff's Response:  Undisputed.

## II.    Plaintiff's Statement of Undisputed Material Facts in Support of Cross-Motion for Summary Judgment.

1.    On January 20, 1994, U.S. Attorney General Janet Reno appointed Robert B. Fiske, Jr. as independent counsel to investigate allegations of criminal activity in connection with a defunct Arkansas thrift institution, the Madison Guaranty Savings & Loan Association ("Madison Guaranty").  Robert W. Ray, Final Report of the Independent Counsel, *In re Madison Guaranty Sav. & Loan Ass'n*, Vol. I, app. 3 at i-iii (published Jan. 5, 2001) (available at https://www.gpo.gov/fdsys/search/pagedetails.action;jsessionid=jhhW9maoIZ4BLpFXAjR2AY_SvOfGMl34si2KzT58ARKEuXcGtLo7!175185762!-1864458254?granuleId=GPO-ICREPORT-MADISON-1-4&packageId=GPO-ICREPORT-MADISON&fromBrowse=true) ("Final Report").[1]

2.    Among the matters Fiske was charged with investigating were an Arkansas real estate venture, known as the Whitewater Development Company, Inc., in which then-Governor William Jefferson Clinton and Mrs. Clinton and Madison Guaranty owners Jim and Susan McDougal were partners, and an investment company, Capital Management Services, owned by Arkansas municipal court judge David Hale.  *Id.*

3.    The matters under investigation were commonly referred to as "Whitewater."  *Id.* at iii.

4.    Attorney General Reno defined Fiske's jurisdiction as follows:

(a)    The Independent Counsel: In re Madison Guaranty Savings & Loan Association shall have jurisdiction and authority to

---

[1]    Plaintiff respectfully requests that the Court take judicial notice of the Final Report, as it is "a source[ ] whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(2).

investigate to the maximum extent authorized by part 600 of this chapter whether any individuals or entities have committed a violation of any federal criminal or civil law relating in any way to President William Jefferson Clinton's or Mrs. Hillary Rodham Clinton's relationship with:

    (1)    Madison Guaranty Saving & Loan Association;
    (2)    Whitewater Development Corporation; or
    (3)    Capital Management Services.

(b)    The Independent Counsel: In re Madison Guaranty Savings & Loan Association shall have jurisdiction and authority to investigate other allegations or evidence of violation of any federal criminal or civil law by any person or entity developed during the Independent Counsel's investigation referred to above, and connected with or arising out of that investigation.

(c)    The Independent Counsel: In re Madison Guaranty Savings & Loan Association shall have jurisdiction and authority to investigate any violation of section 1826 of title 28 of the U.S. Code, or any obstruction of the due administration of justice, or any material false testimony or statement in violation of federal law, in connection with any investigation of the matters described in paragraph (a) or (b) of the this section.

(d)    The Independent Counsel: In re Madison Guaranty Savings & Loan Association shall have jurisdiction and authority to seek indictments and to prosecute, or to bring civil actions against, any person or entities involved in any of the matters referred to in paragraph (a), (b), or (c) of this section who are reasonably believed to have committed a violation of any federal criminal or civil law arising out of such matters, including persons or entities who have engaged in an unlawful conspiracy or who have aided or abetted any federal offense.

*Id.* at iii-iv.

5.    The scope of the independent counsel's jurisdiction and authority was later

expanded to include investigations into firings in the White House Travel Office, the Death of

- 9 -

Deputy White House Counsel Vincent W. Foster, Jr., the White House FBI Files controversy, and the Monica Lewinsky matter.  *Id.* at i, n.1.

6.      In August 1994, Fiske was replaced as independent counsel by Kenneth W. Starr. *Id.* at x.

7.      At least five final reports ultimately were prepared by the independent counsel. They are:

(1)    Final Report of the Independent Counsel, *In re Madison Guaranty Savings and Loan Association* (In re Anthony Marceca) (published March 16, 2000);

(2)    Final Report of the Independent Counsel, *In Re Madison Guaranty Savings and Loan Association* (In re Bernard Nussbaum) (published March 16, 2000);

(3)    Final Report of the Independent Counsel, *In re Madison Guaranty Savings and Loan Association* (In re William David Watkins and In re Hillary Rodham Clinton) (published June 22, 2000);

(4)    Final Report of the Independent Counsel, *In re Madison Guaranty Savings and Loan Association* (published January 5, 2001) ("January 5, 2001 Final Report"); and

(5)    Final Report of the Independent Counsel, *In Re Madison Guaranty Savings and Loan Association* (Regarding Monica Lewinsky and Others) (published March 6, 2002).

Declaration of Paul J. Orfanedes ("Orfanedes Decl."), attached hereto as Exhibit 1, at para. 2.

8.      Each report contains enormous quantities of investigative materials, including grand jury testimony.  *Id.* at para. 2.

9.      Each report also was approved for publication by the U.S. Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") pursuant to Section 594(h) and is publicly available on the U.S. Government Publishing Office's website:  https://www.gpo.gov/fdsys/

- 10 -

browse/collection.action?collectionCode=GPO&browsePath=Independent+Counsel+Investigatio

ns%2FLewinsky&isCollapsed=true&leafLevelBrowse=false&isDocumentResults=true&ycord=

191.[2]  *Id.* at para. 2

10.     Volume II, Part B of the January 5, 2001 Final Report contains an 87-page

chapter – Chapter 3 – detailing the independent counsel's investigation into Mrs. Clinton's

representation of Madison Guaranty while an attorney at the Rose Law Firm in Little Rock,

Arkansas.  *Id.* at para. 3.  A true and correct copy of this chapter, entitled "Mrs. Clinton's

Madison Guaranty Representation," is attached hereto as Exhibit 2.[3]

11.     According to the introduction to Chapter 3, "Mrs. Clinton represented Madison

Guaranty between April 1985 and July 1986, a time when the institution was in severe financial

trouble and when insiders committed numerous criminal and other fraudulent acts."  Exhibit 2 at

410.

12.     "Several individuals were ultimately convicted of or pleaded guilty to federal

crimes for their roles in connection [with] those transactions."  *Id.*

13.     "Mrs. Clinton represented Madison Guaranty in regard to some of the fraudulent

transactions, and Madison Guaranty insiders used and misused her legal services to thwart

federal examiners."  *Id.*

14.     The introduction continues:

When Governor Clinton ran for president in 1992, Mrs. Clinton's representation
of Madison Guaranty, including how the representation had come about, became
matters of public inquiry.  At that time, Madison Guaranty had failed, a failure
that ultimately cost the American tax payers about $73 million.  Mrs. Clinton and

---

[2]     In addition to the January 5, 2001 Final Report, Plaintiff respectfully requests that the Court take judicial notice of the other four final reports issued by the independent counsel as "sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(2).

[3]     Due to the large size of the January 5, 2001 Final Report, Plaintiff is only submitting Chapter 3 of Volume II, Part B, Chapter 3 of the report.  Plaintiff will submit the entire report if the Court wishes.

the Clinton campaign made public statements regarding her representation that minimized her role.

*Id.* at 411.

15.     "After 1993, the conduct of insiders at Madison Guaranty and the Rose Law Firm became the subject of multiple federal investigations."  *Id.*

16.     The Resolution Trust Corporation ("RTC") "investigated whether insiders had committed criminal acts, and also examined whether the agency had viable civil claims against any insiders or professionals who had represented Madison Guaranty, including the Rose Law Firm."  *Id.*

17.     "Also, the [Federal Deposit Insurance Corporation] and the RTC investigated whether Rose attorneys had concealed potential conflicts of interest from the agencies."  *Id.*

18.     "The FBI and the United States Department of Justice also conducted criminal investigations of the conduct of the Madison Guaranty insiders and others, including Rose attorneys, who had been associated with the institution."  *Id.*

19.     "Beginning in 1994, those investigations were continued by [the independent counsel]."  *Id.*

20.     Also according to Chapter 3, "In the course of the federal investigations, Mrs. Clinton made numerous statements and gave sworn testimony regarding her representation of Madison Guaranty."  *Id.*

21.     The independent counsel "investigated whether Mrs. Clinton had committed perjury, made false statements, or obstructed justice during those investigations."  *Id.*

22.     While the independent counsel found some of the First Lady's statements were factually inaccurate, it "concluded that there was insufficient evidence to prove beyond a reasonable doubt that Mrs. Clinton had committed any federal criminal offense."  *Id.*

23.     Volume II, Part B, Chapter 3 of the January 5, 2001 Final Report cites, references, and quotes, in some cases extensively, from as many as forty-four (44) different, non-grand jury sources of information, not including numerous individual documents, gathered from various investigations.   Orfanedes Decl. at para. 4.

24.     These non-grand jury sources of information include:

- •     independent counsel witness interviews;

- •     interrogatory responses to regulators;

- •     deposition testimony;

- •     trial testimony;

- •     congressional testimony;

- •     witness interviews by regulators;

- •     regulatory reports;

- •     media reports;

- •     television interviews; and

- •     at least one book.

*Id.*

25.     The chapter also cites, references, and quotes grand jury testimony from at least 25 grand jury appearances by 21 witnesses between 1995 and 1998.  *Id.*

26.     In June 2014, Judicial Watch submitted a FOIA request to the Archives seeking access to a binder of materials prepared by OIC, as referenced in *The Death of American Virtue: Clinton vs. Starr* (Broadway Books 2011) by Ken Gormley.  *Id.* at para. 5.

27.     The Archives ultimately produced 246 pages of the records in response to the request.  *Id.*

28.     Among the records produced to Judicial Watch by the Archives was a 206-page memorandum, dated April 22, 1998, to "All OIC Attorneys," from the "HRC Team" and bearing the subject line "Summary of Evidence:  Hillary Rodham Clinton and Webb Hubbell."  *Id.* at para. 6.  A true and correct copy of the April 22, 1998 "Summary of the Evidence" memorandum is attached hereto as Exhibit 3.

29.     The April 22, 1998 "Summary of Evidence" memorandum is particularly detailed and contains a great many citations to and quotations from witness interviews, deposition testimony, documentary evidence, and grand jury testimony.  Orfanedes Decl. at para. 7 and Exhibit 3.

30.     The April 22, 1998 "Summary of Evidence" memorandum cites, references, and quotes from many of the same, non-grand jury sources of information cited in Volume II, Part B, Chapter 3 of the January 5, 2001 Final Report, but also cites, references, and quotes from a great many additional sources, including as many as 12 separate FBI 302s.  *Id.*

31.     Although not an exhaustive count, the April 22, 1998 "Summary of the Evidence" memorandum also cites to, references, or quotes testimony from at least 34 grand jury appearances by some 27 witnesses between 1995 and 1998, including 12 witnesses not referenced in Volume II, Part B, Chapter 3 of the January 5, 2001 Final Report.  *Id.*

32.     The April 22, 1998 "Summary of Evidence" memorandum, which is largely unredacted, is available to the public on Judicial Watch's website along with the other records produced by Archives in response to Judicial Watch's June 2014 FOIA request.   *Id.* at para. 8.

33.     Judicial Watch did not pursue an administrative appeal of the Archives' redactions for reasons unrelated to whether Judicial Watch believes those redactions have merit.  *Id.*

34.     On March 9, 2015, Judicial Watch submitted a FOIA request to the Archives

seeking access to Ewing's draft indictments.  *Id.* at para. 9.

35.     Specifically, Judicial Watch requested:

All versions of indictments against Hillary Rodham Clinton, including but not
limited to Versions 1, 2, and 3 in box 2250 of the Hickman Ewing Attorney Files,
the "HRC/___ Draft Indictment" in box 2256 of the Hickman Ewing Attorney
Files, as well as any and all versions written by Deputy Independent Counsel
Hickman Ewing, Jr. prior to September of 1996.

*Id.*

36.     A simple google search for the words "Starr Report" on March 5, 2016 yielded

13,200,000 results.  *Id.* at para. 10.

37.     A google search for "Hillary Clinton draft indictment" on that same date yielded

547,000 results.   *Id.*

38.     Judicial Watch's efforts to gain access to the draft indictments have been the

subject of news reports by CNN, Politico, The New York Post, Investor's Business Daily, The

National Review, and even the United Kingdom's Daily Mail.  *Id.* at para. 11.

Dated:  March 11, 2016                          Respectfully submitted,

                                                JUDICIAL WATCH, INC.

                                                */s/ Paul J. Orfanedes*
                                                Paul J. Orfanedes
                                                D.C. Bar No. 429716
                                                425 Third Street SW, Suite 800
                                                Washington, DC  20024
                                                Tel:     (202) 646-5172
                                                Fax:     (202) 646-5199
                                                Email:  porfanedes@judicialwatch.org

                                                *Attorneys for Plaintiff*

- 15 -