# **EXHIBIT 3 (Part 2)**

to

Plaintiff's Response to Defendant's Statement of Material Facts Not in Dispute and Statement of Undisputed Material Facts in Support of Cross-Motion for Summary Judgment

Obtained by Judicial Watch, Inc. via FOIA

[132]

Gregory remembers two specific concerns about representing Madison prior to its undertaking the representation.[133] The first concern was whether Rose should represent Madison at all: Gregory felt that Rose, which had not represented any savings and loans, did not have the expertise to handle such a representation; also, Gregory believed that the business potential representing Madison was small and the risks were great because he understood that savings and loans in general and Madison in particular were having financial difficulties, so he "didn't perceive Madison to have a particularly attractive risk/reward ratio for our firm as a new client."[134] The second concern was that what Madison wanted to do substantively was unprecedented and "there was no bright-line, black-letter statement in the Arkansas statutes that would say you can have two classes of stock."[135] Gregory has no memory of any discussion at the origination of the retainer about Madison having an outstanding bill.[136] When asked about how Massey came to be assigned the project, Gregory said, "I have some recollection that he, at one point, mentioned a friendship or an acquaintanceship with this John Latham."[137]

---

132

133 Id. at 13, 15-16 ("But I do know that there was an open discussion about the client, or the potential client, as well as the substantive issue, could a state-chartered, stock-owned savings & loan association have two classes of stock. . . . But to my way of thinking, the discussions about, 'Should we be doing this,' took place before we undertook the particular project.").

134 Id. at 8-10.

135 Id. at 13-14.

136 Id. at 18.

137 Id. at 29.



FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure
NW: 15416 DocId: 70001585 Page 79

Obtained by Judicial Watch, Inc. via FOIA

* * * * *

***3) 1987-1992: RLF Conflicts/Ward v. Madsion/U.S. v. McDougal –*** [The RLF's conflict of interest in representing the RTC in Madison v. Frost is detailed in Dreiband & Myers, "Summary of Rose Conflicts," April 1998.]

Borod & Huggins Report

On July 11, 1986, the FHLBB ordered James McDougal and Madison President John Latham removed from Madison Guaranty. Shortly thereafter, Madison's board hired the Memphis law firm of Borod & Huggins to investigate Madison Guaranty. Borod & Huggins issued a report on March 3, 1987, and that report discusses various matters related to McDougal's use of Madison Guaranty to benefit himself and other insiders. The Borod & Huggins Report also identified numerous persons -- including Seth Ward -- as having engaged in "apparent criminal violations."

Madison sent a criminal referral to the United States Attorneys' office in Little Rock and attached a copy of the Borod & Huggins Report. The Federal Bureau of Investigation investigated the matter, and that investigation led to the indictment of McDougal, Latham, and others in November 1989 for matters related to Castle Grande.[138]

Borod & Huggins issued a second supplemental report on August 31, 1988. Coincidentally, August 31, 1988 is the same day the jury returned a verdict in Seth Ward's favor in the *Ward* case.

---

[138]*See* FBI Madison case file, 29A-2459, Serials 1, 2, 7, 9, 10, 13, and 52; and 105-00071012 *et seq.* (which is a copy of the Borod & Huggins Report that Rose produced to the OIC).

Obtained by Judicial Watch, Inc. via FOIA

Rose Began Work For The FSLIC In December 1985.

In December of 1985, the Rose Law Firm began its representation of the government in connection with failed savings and loan institutions. It represented the Federal Home Loan Bank Board ("FHLBB") and its agent, the FSLIC, in the takeover of Guaranty Savings & Loan in Harrison, Arkansas. Vincent Foster served as billing partner and lead counsel for the FSLIC. The Guaranty matter proved quite lucrative for Rose, and Mr. Foster, Rose member Herb Rule, and other Rose attorneys made repeated efforts during 1986 and 1987 to obtain more FSLIC business. Hillary Clinton billed the FSLIC for work on the Guaranty matter. Webb Hubbell did not bill the FSLIC for matters related to Guaranty, but he did receive memoranda about Rose's representation of FSLIC.[139]

FirstSouth and C. Joseph Giroir

During the Fall of 1986, the FHLBB began to prepare for the imminent failure of an Arkansas savings and loan institution named FirstSouth, which Hubbell described as "the largest savings and loan in Arkansas."[140] The FHLBB began to negotiate with various law firms for work on the FirstSouth receivership, including the Rose Law Firm. The FHLBB learned that Rose had a serious conflict of interest with FirstSouth. The FHLBB threatened to sue Rose. The FHLBB also threatened to sever its relationship with Rose.

The conflict involved Joe Giroir, a senior Rose attorney, and Giroir's work with

[139] *See, e.g.*, a July 14, 1986 memorandum from Mr. Foster to Mrs. Clinton, Mr. Hubbell and others at Rose which attached copy of an appellate opinion in the Guaranty matter. 264-00022363-76.

[140] 2625-00001113.

Obtained by Judicial Watch, Inc. via FOIA

FirstSouth prior to its failure. Webb Hubbell negotiated and signed a $3 million settlement agreement with the FHLBB/FSLIC, and Rose managed to salvage the business.

Mr. Foster, Mr. Hubbell, and Hillary Clinton began meeting in Mrs. Clinton's office "almost daily."[141] Mr. Hubbell later wrote:

> Hillary was angry, too. She had participated in several of Vince's phone calls to the FSLIC assuring them that we had no conflict. She felt betrayed. She also worried that a $10 million claim would finally put the oldest law firm west of the Mississippi out of business. Years later, she would tell me that the years 1987-88 were the two hardest years of her life.[142]

On November 10, 1994, Hillary Clinton told the FDIC-OIG when asked about FirstSouth that "there were issues involving C. Joseph Giroir, a former Rose partner, but [she] *was unaware of what those issues may have been.* She stated she had no involvement with the FSLIC and any negotiations involving FirstSouth or Mr. Giroir."[143]

Additionally, Hubbell testified in 1996 that he "may have taken" his FirstSouth files from Rose when he left Rose and came to Washington in January 1993.[144]

Seth Ward v. Madison Guaranty

In mid-1987, Seth Ward began to complain that Madison owed him "commissions" for the sale of the IDC/Castle Grande land he warehoused for Madison Guaranty and Madison Financial. On June 1, 1987, the FHLBB issued a subpoena to Ward as part of its investigation of

---

[141] *Friends*, at 132.

[142] *Friends*, at 132.

[143] H.R. Clinton FDIC-OIG Statement, 11/10/94, at 5 (emphasis added). As noted above, Mr. Hubbell's book, *Friends*, suggests that Mrs. Clinton's statement-- that she was "unaware" of the First South issues-- is false.

[144] Hubbell Senate Testimony, 2/7/96, at 158.

Obtained by Judicial Watch, Inc. via FOIA

Madison Guaranty.[145] [146] Shortly thereafter, Ward decided to sue Madison Guaranty Savings & Loan and Madison Financial Corporation.

Ward filed a lawsuit against Madison Guaranty and Madison Financial on September 2, 1987. Ward's complaint sought payment of "commissions" Ward claimed that Madison owed him for his work on the IDC/Castle Grande matter. Ward's attorney for the initial part of the case was Alston Jennings of Wright, Lindsey & Jennings.

Ward's various agreements with Madison Financial, his sham loans to and from Madison, the May 1, 1986 option agreement drafted by Hillary Clinton, and the history of his dealings with Madison were at issue in the case. The case was tried before a jury on August 30 and August 31, 1988, and the jury returned a verdict in Ward's favor. Hubbell attended at least portions of the trial, allegedly because he wanted to hear Alston Jennings give his closing argument.

From September through November 1988, after the jury returned its verdict, Hubbell served and filed a series of documents related to writs of garnishment on behalf of Skeeter Ward, Skeeter's wife, and POM.[147] Skeeter Ward and POM had loans outstanding at Madison Guaranty. By means of the writs of garnishment, Hubbell and the Wards sought to have the trial court order Skeeter Ward and POM to pay Seth Ward the monies Skeeter and POM owed Madison Guaranty. The writs eventually became moot as the parties entered into an escrow



[145] *See* Exs. 4 and 33 of the FDIC-OIG Supp. Rep., 9/20/96;

[146]

[147] RTC-OIG Rep., 8/3/95, Ex. 123



FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

Obtained by Judicial Watch, Inc. via FOIA

agreement while the case was on appeal.

In October of 1989, Hubbell learned that the state appellate court dismissed the appeal of Ward's case. Hubbell called Alston Jennings to relay the news of the dismissal, and Jennings then retrieved the escrowed money and gave it to Ward. The FDIC and RTC, however, removed the case to federal court -- Madison was in conservatorship -- and Wright, Lindsey & Jennings had to agree to indemnify the RTC for the escrowed money while the case was on appeal in the federal courts. Wright, Lindsey & Jennings withdrew from the case, but demanded that Ward agree to indemnify the firm. Ward agreed, and Hubbell negotiated an indemnification agreement between Ward and Wright, Lindsey & Jennings.

The case continued on appeal until 1993, when the parties settled the case. As part of the settlement, Ward returned the money he obtained as a result of the jury's verdict.[148] Hubbell advised Ward on the settlement (although Ward primarily used another lawyer, Thomas Ray).

Hubbell concealed his involvement in the *Ward* case from the FDIC and the RTC. Hubbell said that he "did not tell Breslaw about this representation because it was insignificant."[149]

<u>Rose's Work For The FDIC</u>

Rose began its work for the FDIC in approximately July 1987.[150] Vince Foster served as the billing partner and lead attorney on FSLIC matters, while Mr. Hubbell served in that function

---

14 

[149]Hubbell FDIC-OIG Interview, 3/16/95, at 7.

[150]264-00009841-90.



NW: 15416 DocId: 70001585 Page 84
FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

Obtained by Judicial Watch, Inc. via FOIA

for FDIC matters. Mr. Hubbell worked with associate Rick Donovan on a case which involved professional liability matters related to Corning Bank. The Corning Bank matter came to Rose because the prior law firm, the Little Rock firm of Wright, Lindsey & Jennings, had a conflict of interest.[151]

By December of 1987, April Breslaw was the responsible FDIC attorney for the Corning Bank matter. Breslaw worked with Mr. Hubbell and Rose associate Rick Donovan on the matter.

November 1988: Rose Attempts To Qualify As FSLIC Fee Counsel

During October and November of 1988, Vince Foster and Rose attempted to qualify to act as fee counsel to the FSLIC for six Arkansas savings and loan institutions which were about to enter conservatorship or receivership. One of those institutions was Madison Guaranty.

On Monday, October 31, 1988, Foster received the conflicts check lists for the six Arkansas institutions.[152] The conflicts list for Madison Guaranty contained references to Jim and Susan McDougal, Frost partner James Alford, and Castle Grande. It listed law firms and lawyers which FSLIC knew had performed legal work for Madison Guaranty. Those firms included Little Rock's Mitchell, Williams, Selig & Tucker and the Memphis firm of Gerrish & McCreary (which was the successor to Borod & Huggins).[153] The Madison Guaranty conflicts list did not mention Rose.

The next day, Tuesday, November 1, 1988, Foster circulated a memorandum to all Rose

[151] Hubbell RTC-OIG Interview, 4/20/95, at 11-12.

[152]

[153]



FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure
NW: 15416 DocId: 70001585 Page 85

Obtained by Judicial Watch, Inc. via FOIA

attorneys which attached the conflicts check lists. Foster also sent Hindes a letter which informed Hindes that Rose represented a party adverse to the FSLIC in a case called *Universal Savings & Loan Association v. First Investment Securities.*[154] Hindes called and asked about the Universal Savings matter and "advised that the representation might constitute a conflict which could disqualify [Rose] from being considered."[155] The next day, Hindes called again and "advise[d] that this representation was deemed to be a conflict of such a nature to disqualify [Rose] from being fee counsel on any new receivership."[156]

On Thursday, November 3, 1988, Foster circulated another memorandum to Rose attorneys. That memorandum stated in relevant part:

> Stop the presses. Because the firm represents Defendants in an action by a savings and loan which is now in receivership by FSLIC (although it was not at the time we undertook the representation), under current FSLIC policy we are disqualified from receiving any new business while that case is pending. Accordingly, you should ignore the conflicts memorandum circulated earlier regarding Arkansas savings and loan institutions which are prospects for receivership. We should focus our efforts on trying to represent buyers instead of receivers."[157]

Foster persisted. On Tuesday, November 8, 1988, Foster sent FSLIC attorney James Lantelme a letter



[158] On Monday, February 21, 1988, Hindes sent Foster a letter which stated

---

[154]RTC-OIG Rep. 8/3/95, Vol. III, Ex. 96 UNCODED

155

156

[157]281-024945; RTC-OIG Rep., 8/3/95, Ex. 25.

15



NW: 15416 DocId: 70001585 Page 86
FOIA(b)3 - Rule 6(e) - Federal Rules of Criminal Procedure

Obtained by Judicial Watch, Inc. via FOIA

that [redacted] "[159]

Foster's letters did not disclose the Rose Law Firm's prior work for Madison Guaranty, and no one has ever found any document which would indicate that FSLIC, the FDIC, or the RTC ever learned of Rose's prior work for Madison Guaranty before press reports of that work during the 1992 campaign, and then during the investigations which began in the fall of 1993. Foster's letters also did not disclose Hillary Clinton's business partnership with the McDougals, Rose's work on Castle Grande, or Rose's legal work for Jimmie Alford's company, Precision Industries.

In any case, a regulatory change occurred which required Rose to solicit the FDIC for that work.

On February 28, 1989, in response to the regulatory changes that occurred during January and February of 1989, Vince Foster sent solicitation letters to the FHLBB/FSLIC and the FDIC. He did not mention the Rose Law Firm's prior work for Madison Guaranty in those letters.[160]

On August 9, 1989, Congress and the President enacted the Financial Institution Reform, Recovery and Enforcement Act ("FIRREA").[161] Among other things, FIRREA abolished the FSLIC, and created the RTC to manage failed savings and loan institutions.

Hubbell Began "Lawyering With A Vengeance" In Early 1989.

---

[159] [redacted]

[160] 281-00003361-3369; 264-00025765-81; 264-00025889-902; 281-00001578-86; 281-029581-89 (emphasis added).

[161] Pub. L. No. 101-73, 103 Stat. 364.




FOIA(b)(3) - Rule 6(e), Federal Rules of Criminal Procedure

Obtained by Judicial Watch, Inc. via FOIA

In January 1989, Rose members told Hubbell they "wanted [him] out of firm management altogether."[162] FOIA(b) 6 so Mr. Hubbell "resolved to build up [his] practice, increase [his] billings[, and] began lawyering with a vengeance."[163] Along with Vince Foster, Mr. Hubbell focused on obtaining more FSLIC and FDIC work, as he "was in the process of trying to dramatically increase [his] billings at the firm."[164] In short, his "judgment was clouded."[165]

FDIC/RTC/Madison Guaranty v. Frost & Company

Mr. Hubbell accepted the *Madison Guaranty v. Frost* case at a time when "in the only measure that counted -- how much you were billing -- [he] was the low man on the totem pole."[166]

The *Frost* case, Hubbell wrote in 1997, has "become part of the industry known as Whitewater."[167] He predicted, ominously: "The way all of this keeps evolving, I expect *Madison v. Frost* to eventually be linked with Lee Harvey Oswald and Deep Throat."[168]

The Origins Of *Madison v. Frost*

---

[162] *Friends*, at 145.

[163] *Id.* at 145.

[164] *Friend*, at 147.

[165] *Id.* at 147.

[166] *Friends*, at 145.

[167] *Friends*, at 148.

[168] *Friends*, at 149.

Obtained by Judicial Watch, Inc. via FOIA

After the Borod & Huggins law firm issued its 1987 report, it concluded that Madison Guaranty had a viable claim against Frost & Company, the accounting firm which performed audits on Madison Guaranty for the years 1984 and 1985. On February 29, 1988, Madison Guaranty filed a complaint in Arkansas state court against Frost & Company, and other individuals, including Jimmie D. Alford. Mr. Alford was the Frost partner in charge of the 1984 and 1985 audits of Madison Guaranty.[169] Madison Guaranty alleged that Frost was negligent when it performed the 1984 and 1985 audits.

April Breslaw Decided To Hire Rose for the *Frost* Case.

On February 28, 1989, the FDIC was named conservator of Madison Guaranty.[170] April Breslaw, an FDIC attorney, became responsible for the *Frost* case. Ms. Breslaw determined that Borod & Huggins' successor, Gerrish & McCreary, had too many conflicts of interest.[171] She contacted Rick Donovan at Rose and asked if Rose could take the case. Mr. Donovan directed her to Mr. Hubbell.[172]

On March 21, 1989, Mr. Hubbell circulated to other Rose attorneys a memorandum about conflicts of interest related to *Madison v. Frost*.[173] Mr. Hubbell "was aware that Mrs. Clinton

[169]105-070547-52; 281-01612; Alford OIC-302, 2/6/98, at 1-2; Alford RTC-OIG Statement, 9/7/94, at 1-2.

[170]*Cf.* 105-00022985 (3/2/89 letter to Beverly Bassett from a FHLBB/FSLIC representative).

[171]Breslaw Senate Banking Comm., 11/30/95, at 24-25; Breslaw Grand Jury Testimony, 6/16/94, at 7-10.

[172]Interview with Webster Hubbell by Jack Smith and John Downing, 1/11/94.

[173]Hubbell House Banking Comm., 8/10/95, at 47; House Banking Comm. Index, 8/10/95, at 242.

Obtained by Judicial Watch, Inc. via FOIA

had been the billing attorney in 1985 and 1986 . . . [and] that for a period of time, we [Rose] had done some work for Madison."[174] Mr. Hubbell admitted in testimony before the House Banking Committee that Rick Massey "disclosed that there had been prior work done at the Securities Department," either in the fall of 1988 or after Hubbell circulated his March 21, 1989 memorandum. Hubbell did not disclose that information to April Breslaw.[175] In testimony before the Senate, Mr. Hubbell admitted that he did not tell Ms. Breslaw any details about Rose's prior representation of Madison Guaranty:

> Mr. Chertoff. Did you tell Ms. Breslaw, for example, that the Rose Law Firm had represented Madison Guaranty Savings in connection with the acquisition of some property in '85 and '86 known as the Arkansas Industrial Development Corporation property?
>
> Mr. Hubbell. No, I'm sure I did not in that specifics.
>
> Mr. Chertoff. Did you notify Ms. Breslaw that, in fact, the law firm had represented Madison Guaranty in trying to obtain approval from Beverly Bassett-Schaffer in order to issue preferred stock to raise the capital levels in the bank?
>
> Mr. Hubbell. No, I did not.
>
> Mr. Chertoff. Did you indicate that in connection with this same property, this Industrial Development Corporation property acquisition, that the Rose Law Firm had given regulatory advice to Madison Guaranty concerning certain regulations that governed water utilities and sewer utilities?
>
> Mr. Hubbell. No, I'm sure I did not.

---

[174] Hubbell House Banking Comm., 8/10/95, at 47. *See also*

[175] Hubbell House Banking Comm., 8/10/95, at 59.



NW: 15410 DocId: 70001585 Page 90
FOIA(b)3 - Rule 6(e) Federal Rules of Criminal Procedure

Obtained by Judicial Watch, Inc. via FOIA

| | |
|---|---|
| Mr. Chertoff. | So what is it exactly you told Ms. Breslaw about the nature of your previous representation of Madison? |
| Mr. Hubbell. | As far as telling Ms. Breslaw, I believe the words were something to the effect that we didn't have any conflicts, we could take it on. There had been three matters that I had specifically addressed -- and this may have been less than a 30-second conversation -- the primary one being whether the firm would take on the litigation against Frost since we had other clients who were still being audited by Frost & Company. |
| Mr. Chertoff. | So in this 30-second conversation, you said that the firm had taken on three matters for Madison -- |
| Mr. Hubbell. | No, no, I didn't say that, Mike. |
| Mr. Chertoff. | What did you say in the 30-second conversation? |
| Mr. Hubbell. | Mike, I'm trying to remember. What I'm trying to say, in a very short context, was that in my mind, there were three issues. One was my father-in-law, one was prior work for Madison and the primary one being the Frost issue itself. I knew that there had been a more complete disclosure concerning our representation of Madison to the FDIC. I probably improperly assumed that she knew about that.[176] |
| Mr. Chertoff. | Well, what did you tell Ms. Breslaw? |
| Mr. Hubbell. | I told her that we did not have any conflicts. |
| Mr. Chertoff. | Did you tell her that there had been earlier representations of Madison by the Rose Law Firm? |
| Mr. Hubbell. | Yes. |
| Mr. Chertoff. | Did you describe them? |

[176]We have found absolutely no evidence which supports Mr. Hubbell's assertion that "there had been a more complete disclosure concerning our representation of Madison Guaranty to the FDIC."

Obtained by Judicial Watch, Inc. via FOIA

Mr. Hubbell. I think I said we had done some minor lending work for Madison back in the early '80s.

Mr. Chertoff. Minor -- what does "minor lending work" mean?

Mr. Hubbell. There would be some loans that we would have been counsel to Madison on.

Mr. Chertoff. You mean collecting loans?

Mr. Hubbell. No, no, I meant like closing loans.

Mr. Chertoff. And did you -- did she ask you for any details about that?

Mr. Hubbell. No.

Mr. Chertoff. Now, did you refer her to some prior conversation that someone from the firm had had about what these transactions were?

Mr. Hubbell. No, I did not.

Mr. Chertoff. Did you yourself give consideration to whether these transactions were conflicts?

Mr. Hubbell. I looked at it in the context of the Frost litigation and whether there would be a conflict, and I did not see a conflict as to the prior representation since we were, to some extent, standing in the shoes of the institution.

Mr. Chertoff. Well, let's get into the nature of the prior representations and analyze that for a second. Were you familiar with the fact that in 1986, the Federal Home Loan Bank Board, which was reviewing Madison Guaranty, had described the acquisition of this Industrial Development Corporation property as a fictitious -- involving a fictitious sale?

Mr. Hubbell. Was I aware in '86 at the time I was talking to April?

Mr. Chertoff. Yes, in '89.

Mr. Hubbell. No, I was not aware of that in 1989.

Obtained by Judicial Watch, Inc. via FOIA

| | |
|---|---|
| Mr. Chertoff. | Were you aware of the fact that the firm had represented Madison Guaranty in connection with that acquisition? |
| Mr. Hubbell. | Yes, I was. I don't know that I had remembered it in '89, but I do -- I was aware of it.[177] |

Ms. Breslaw tells a slightly different story: "I have no recollection of ever being told by anyone at the Rose Law Firm that the Rose Law Firm had previously represented Madison before it closed."[178] Furthermore, she says, "[w]hen I retained the Rose Firm to work on Madison -- the Madison accounting case, it disclosed no conflicts of interest."[179]

Mr. Hubbell later admitted that he "exercised very poor judgment in taking on the [*Frost* case].[180] Mr. Hubbell decided to accept the *Frost* case even though some Rose partners objected on the grounds that Rose and Frost had common clients and did not believe Rose should sue a local accounting firm on behalf of the federal regulators.[181] Mr. Hubbell disregarded his partners' objections and accepted the case.

Mr. Hubbell later wrote: "I was angry because even though they wanted me to start billing, every time I came up with a case they found reasons for me not to do it -- reasons that were for their benefit, not mine. So I wasn't in an accommodating mood. I took on *Madison v.*

---

[177]Hubbell Senate Testimony, 12/1/95, at 98-102.

[178]Breslaw Senate Banking Committee Deposition, 7/28/94, at 26-29.

[179]Breslaw Senate Banking Comm., 11/30/95, at 25.

[180]*Friends*, at 146.

[181]*See, e.g., Friends*, at 147; [redacted] [redacted]



NW: 15416 DocId: 70001585 Page 93
FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

Obtained by Judicial Watch, Inc. via FOIA

*Frost*."[182]

Madison Employees Complained About the Hubbell-Ward Relationship.

In June 1989, approximately three months after the FDIC hired Rose, a "noticeably agitated" Madison Guaranty employee, Sue Strayhorn, informed Paul Jeddeloh, Madison's intervention attorney, that Mr. Hubbell, Seth Ward, and Seth Ward II were in-laws.[183]

On June 8, 1989, Mr. Jeddeloh wrote a letter to Ms. Breslaw which highlighted Mr. Hubbell's in-law relationship with Seth Ward, and with Seth Ward II.[184] In his letter, Jeddeloh explained that both Seth Ward and Seth Ward II had lawsuits pending against the Madison Conservatorship.[185] Mr. Jeddeloh also explained that Hubbell "was present at the trial of the Seth Ward matter and appears to have been an interested (indirectly) participant in the Ward proceedings."[186]

Ms. Breslaw spoke with Rick Donovan about the Ward matter on June 20, 1989.[187] Ms. Breslaw asked Donovan if Hubbell was Ward's father-in-law, and Donovan confirmed that Breslaw and Hubbell were in-laws.[188] Shortly after her conversation with Donovan, Breslaw

---

[182]*Friends*, at 147.

[183]Breslaw House Testimony, 8/10/95, at 46; Ex. 15 to FDIC-OIG Rep., 7/28/95 (Jeddeloh FDIC-OIG Statement, 3/15/94).

[184]Ex. 99 to RTC-Rep., 8/3/95, vol. III.

[185]Ex. 99 to RTC-Rep., 8/3/95, vol. III.

[186]Ex. 99 to RTC-Rep., 8/3/95, vol. III.

[187]Donovan Little Rock G.J., 1/21/98, at 18-29; LR GJE 1651 (notes of Donovan's June 20, 1989 conversation with Breslaw).

[188]Donovan Little Rock G.J., 1/6/98, at 93-94.

Obtained by Judicial Watch, Inc. via FOIA

spoke with Hubbell. She described her conversation with Hubbell as follows:

> [Mr. Hubbell] explained that he was not representing Seth Ward. He left me with the impression that he did not have a particularly close relationship with his father-in-law. I believe he suggested that his father-in-law was a relatively staunch Republican and Hubbell himself had been involved in Democratic politics for some time. I believe he was Mayor of Little Rock. So he has own Democratic political connections.
>
> And the way he represented it to me was he and his father-in-law had different political ideas. He went to some lengths to make me have the impression that he was not particularly close to his father-in-law and that he was not representing his father-in-law and that he would not represent his father-in-law in the future. I said, please put that in writing. Confirm what you've just said in writing and send me a letter to that effect. And I believe he did that in June of 1989. Once he had, in my view, confirmed in writing that there was no conflict, in other words, that he was not representing Ward in any matter against us and had promised not to do so in the future, it seemed to me that there was no conflict of interest and I was not -- I did not conclude that it would be necessary to replace the Rose Law Firm simply because Hubbell was related by marriage to someone who was in unrelated litigation, who was involved in unrelated litigation.[189]

Ms. Breslaw "generally recall[s] being irritated that it [the Seth Ward potential conflict] had not been disclosed initially."[190] One of Ms. Breslaw's "considerations" for keeping the *Frost* case at the Rose Law Firm was the fact that Mr. Hubbell represented to her that Mr. Ward was

---

[189] Breslaw Senate Banking Committee Deposition, 6/6/95, at 23-24. *See also, e.g.*, Breslaw Senate Banking Comm. Dep., 10/23/95, at 246 (same).

[190] Breslaw Senate Banking Committee Dep., 10/23/95, at 40. Ms. Breslaw also testified that:

> [Paul] Jeddeloh informed me about this family relationship, and [] I contacted Hubbell to ask him about it. And at that point, he confirmed that he was related by marriage to the Ward family. But he told me that he did not represent Ward. And my recollection of the conversation is that he told me, not only that he did not represent Ward, but that he would not represent Ward in the future.

*Id.*

Obtained by Judicial Watch, Inc. via FOIA

not a client of the firm.[191]

Mr. Hubbell concealed Rose's work on the IDC/Castle Grande matter from the FDIC and the RTC.[192] Mr. Hubbell only denies, weakly, that he ever told April Breslaw that he and Seth Ward were not close:

Mr. Chertoff. And did you indicate to Ms. Breslaw that your relationship with your father-in-law, Mr. Ward, [was] not a close one?

Mr. Hubbell. Not that I know of.

* * *

Mr. Chertoff. And I want to read to you from line of the statement given by Ms. Breslaw on page 200. "A few months after I had hired the Rose Firm, I learned that Seth Ward was Webster Hubbell's father-in-law and that Ward was in litigation with Madison. Under the ethical rules, an adverse interest by an in-law is not imputed to a lawyer. It is not a conflict of interest. Nevertheless, I asked Mr. Hubbell about the Ward matter. Mr. Hubbell told me that he was not representing Mr. Ward and that he would not do so in the future. He also told me that his relationship with his father-in-law was not a close one. I recall him saying that Mr. Ward was an ardent Republican and that he was an active Democrat." I want to ask you, did you tell Ms. Breslaw that your relationship with your father-in-law was not a close one?

Mr. Hubbell. I don't remember that, Mr. Chertoff.[193]

---

[191] Breslaw Senate Banking Comm. Dep., 10/23/95, at 249. *See also id.* ("I believe that if I had understood in June of 1989 that Hubbell did represent Ward or Ward's interests, that I would have taken that up with supervisors. And I don't know what they would have advised me to do.").

[192] Breslaw Senate Banking Comm., 11/30/95, at 36-37, 40, 42-43. *See also id.* at 32-45 for a fuller reading of Ms. Breslaw's Senate testimony in regard to Rose's work on Castle Grande and Mr. Hubbell's nondisclosure of the Rose-Madison Guaranty relationship.

[193] Hubbell Senate Testimony, 2/7/96, at 14-17. *See also, e.g.,* [redacted]

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

Obtained by Judicial Watch, Inc. via FOIA

After Mr. Hubbell spoke with Ms. Breslaw, he directed Rick Donovan to draft a letter to David Paulson, who was then Madison Guaranty's managing agent. Mr. Donovan drafted the letter, then gave the draft to Mr. Hubbell.[194]

On June 23, 1989, Ms. Breslaw sent a letter to the managing agent of the Madison Conservatorship, David Paulson.[195] Ms. Breslaw explained that Hubbell did not represent Ward, that Hubbell had not submitted pleadings on Ward's behalf, and that Hubbell would not do so in the future.[196]

Mr. Hubbell apparently edited Donovan's draft and, on June 28, 1989 sent the letter to Mr. Paulson with a copy to April Breslaw and Rick Donovan. The June 28, 1989 letter states:

> Dear Mr. Paulson:
>
> At April Breslaw's request, I am writing this letter. This letter is to advise you that *I have not represented Mr. Seth Ward in connection with any issue or matter relating to his disputes with Madison Guaranty.* It is my understanding that Mr. Ward was represented by Wright, Lindsey & Jennings until recently. When the FDIC became managing agent for the FSLIC As Conservator for Madison Guaranty, Mr. Thomas Ray of the firm Shultz, Ray & Kurrus began representing Mr. Ward. In addition, *I do not represent Mr. Seth Ward, II, in regard to any disputes he may have with Madison Guaranty. I have no intention of representing Mr. Ward or his son in the future concerning any matter relating to Madison Guaranty.*

---

[194]Donovan Little Rock G.J., 1/21/98, at 20-24. *See also, e.g.*

[195]Ex. 100 to RTC-OIG Rep., 8/3/95.

[196]Ex. 100 to RTC-OIG Rep., 8/3/95.



FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure
NW: 15416 DocId: 70001585 Page 97

Obtained by Judicial Watch, Inc. via FOIA

Should you have any questions concerning this, please do not hesitate to call me.

/s/ Webb Hubbell

cc: April Breslaw
Rick Donovan[197]

Mr. Hubbell did not tell Ms. Breslaw anything about his relationship with Seth Ward other than that he and Ward were in-laws -- a fact contained in Mr. Jeddeloh's June 8, 1989 letter.[198]

In 1989, Hubbell read the 1986 FHLBB exam reports, and, in particular, he read the May 8, 1986 exam report which criticized Ward and the IDC/Castle Grande transaction.[199] Then in 1990, Hubbell read the Borod & Huggins Report. Hubbell learned that those reports described

---

[197]Little Rock G.J. Ex. 1653 (emphasis added). *See also, e.g.*, Hubbell Telephone Interview, 12/27/95, 39 ("April and I and Mr. Paulson had had some discussions about my father-in-law and concerns being raised by some of the employees of Madison about the Frost litigation, and this is the letter that they asked me to draft."). Rick Donovan testified that he knew nothing about Rose's work for Madison Guaranty and Seth Ward on the IDC/Castle Grande matters when he drafted the June 28 letter to Paulson. He also had no knowledge of Hubbell's involvement in the *Ward* case. Donovan Little Rock G.J., 1/21/98, at 22-29.

Also on June 28, 1989, Chris Wade wrote to Hillary Clinton about matters related to the Whitewater Development Corporation. H.R. Clinton, RTC Interrogs. Resp., 5/22/95, at 65 (and accompanying exhibits). Mrs. Clinton apparently engaged in correspondence of various kinds with Jim McDougal during this time period. *See id.* (indicating that Mr. Wade, Mrs. Clinton and Mr. McDougal exchanged letters on June 22, 1989, June 28, 1989, September 5, 1989, and September 20, 1989).

[198]Jeddeloh later recalled that "[d]uring my tenure as the managing attorney for Madison, I did not come into information that would lead me to believe that Rose had represented Madison at any time prior to its closing." Ex. 15 to FDIC-OIG Rep., 7/28/95 (Jeddeloh FDIC-OIG Statement, 3/15/94). Jeddeloh also stated that if Rose "had represented Madison previously as its general counsel or on operational matters (as opposed to general collection and foreclosure work), it is likely that I would not have utilized the firm, or would have terminated the firm's representation if subsequently discovered." *Id.*

[199]Hubbell Senate Testimony, 2/7/96, at 217-18.

Obtained by Judicial Watch, Inc. via FOIA

Ward's dealings with Madison as involving fictitious sales, sham loans, and potential civil and criminal liability. Yet he never disclosed his, Hillary Clinton's, and Rose's involvement in the IDC/Castle Grande matter to Ms. Breslaw.[200]

The evidence suggests the following:

1. Webb Hubbell misled Breslaw about his relationship with Seth Ward in June of 1989;

2. Webb Hubbell then wrote David Paulson the June 28, 1989 letter, and that letter was misleading, false, and concealed material information about Hubbell's relationship with Ward and Madison;

3. When the investigations started, Hubbell admitted to the OIC on February 1, 1995 that the June 28 letter was "artfully crafted" and that Hubbell represented Ward and POM before, during, and after the *Frost* case;

4. On March 16, 1995, Hubbell changed his story and told FDIC-OIG investigators that the June 28 letter was not "artfully" worded; and

5. On April 20, 1995, Hubbell repeated to the RTC-OIG the story he told to the FDIC-OIG and falsely stated that the letter was not narrowly worded.

<u>Gary Speed Discovered Rose's Work For Madison.</u>

In late 1989 or early 1990, Rose attorney Gary Speed reviewed Frost audit workpapers which related to Frost's Madison Guaranty audits. As part of that review, Mr. Speed "came across a standard audit response letter to Frost and Company from the Rose Law Firm."[201] Mr. Speed learned that Rose had performed legal work for Madison Guaranty. He "wanted to find

[200]Hubbell Senate Testimony, 2/7/96, at 217; *see also id.* at 16-17 (indicating that Hubbell did not disclose any of Rose's involvement in the IDC/Castle Grande-Seth Ward transactions to April Breslaw); and *id.* at 233 ("[A]bout the same time I was reading exam reports and other reports and I was concerned about the allegations that were being made.").

[201]Speed RTC-OIG Statement, 6/30/95, at 5.

Obtained by Judicial Watch, Inc. via FOIA

out the nature of the work and to assure [himself] that there were no conflicts of interest."[202] Mr. Speed went to Rose's accounting department and requested copies of the bills Rose previously submitted to Madison Guaranty.[203] Mr. Speed reviewed the bills, then spoke with Rick Massey about Rose's work for Madison Guaranty before the Arkansas Securities Department. Mr. Speed then spoke to Mr. Hubbell because he (Hubbell) "was the lead attorney on the *Frost* case, was the primary contact with FDIC, and was knowledgeable about the ethical rules concerning conflicts."[204] Mr. Speed asked Mr. Hubbell if Mr. Hubbell was aware of Rose's prior work for Madison Guaranty. Mr. Speed explained:

> [Mr. Hubbell] said he had been aware of some collection work. I showed him the bills I had retrieved concerning the ASD work. He said he would talk about it with April Breslaw. . . . *Within a day or so, Mr. Hubbell told me that he had spoken to Ms. Breslaw about the ASD work and that she agreed it was not a conflict. I recall that conversation clearly.* I do not believe that I ever spoke to Ms. Breslaw personally about the matter, and I do not believe I ever wrote anything about the matter.[205]

The evidence reveals that Mr. Hubbell did not disclose Rose's prior Madison Guaranty work to April Breslaw, even though he learned that Rose had submitted a Frost audit to the ASD during 1985.[206] Mr. Hubbell himself later admitted that he does not recall whether he discussed the ASD work with April Breslaw, and he would not disagree with Ms. Breslaw if she stated (as

---

[202]Speed RTC-OIG Statement, 6/30/95, at 5.

[203]Speed RTC-OIG Statement, 6/30/95, at 5.

[204]Speed RTC-OIG Statement, 6/30/95, at 5.

[205]Speed RTC-OIG Statement, 6/30/95, at 5 (emphasis added).

[206]Hubbell House Banking Comm., 8/10/95, at 49 ("I became aware that the [Frost] audit had been submitted to the Arkansas Securities Department at some point during the litigation against the auditing firm.").

Obtained by Judicial Watch, Inc. via FOIA

she did) that he had not told her of the ASD work.[207]

It appears that Mr. Hubbell lied to Gary Speed when Hubbell stated that he disclosed the ASD work to April Breslaw.[208] Furthermore, as noted *supra*, Mr. Hubbell admitted in testimony before the House Banking Committee that Rick Massey "disclosed that there had been prior work done at the Securities Department."[209]

<u>Rose Obtained A Copy Of The Borod & Huggins Report On February 2, 1990.</u>

In January of 1990, someone at Rose -- probably Gary Speed -- requested a copy of the Borod & Huggins Report.[210] Sue Strayhorn, a Madison Guarantee employee, objected to giving

---

[207]Hubbell Senate Testimony, 12/1/95, at 114-17 (I don't have any specific memory that I did or that I didn't [discuss the ASD work with Ms. Breslaw]."); OIC-302, 2/1/95, at 19 ("HUBBELL did not have any recollection of discussing the representation of MGS&L before the Arkansas Securities Department with BRESLAW but DONOVAN may have discussed it with her. HUBBELL did not ask DONOVAN to discuss the issue with BRESLAW. Furthermore, HUBBELL did not recall ever writing about the issue to BRESLAW. PETER KUMPE brought up the issue with HUBBELL. HUBBELL believed that KUMPE may have brought the issue up by asking HUBBELL how he was going to get around the issue."); RTC-OIG/OIC Hubbell Interview, 4/20/95, at 18-19 ("HUBBELL said that it is his opinion that the matter should have been reported to BRESLAW, and as lead attorney the responsibility to do so was his. HUBBELL said that although he had no specific recollection of discussing the matter with BRESLAW, he believed that he did; although he said he would not disagree with BRESLAW if her recollection was that he had not told her.").

[208]Breslaw Senate Banking Committee Testimony, 11/30/95, at 40-41.

[209]Hubbell House Banking Comm., 8/10/95, at 59. Hubbell thus admitted that he knew about Rose's Arkansas Securities Department work at the time Rose accepted the *Frost* case, and concealed that information from the FDIC and the RTC. *See also, e.g.*

[210]Also in January of 1990, perhaps coincidentally, Hubbell negotiated an indemnification agreement between Ward and Ward's law firm (Wright, Lindsey & Jennings) in the case of *Madison Guaranty v. Frost*. *See* Exs. 123-25 of the RTC-OIG Rep., 8/3/95, vol. III; Exs. 28-32, FDIC-OIG Rep., 7/28/95, vol. 2. Hubbell concealed that information from the FDIC and the RTC.



FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

Obtained by Judicial Watch, Inc. via FOIA

Rose a copy of the Borod & Huggins Report because Mr. Ward and Mr. Hubbell were in-laws.[211]

Breslaw disregarded Strayhorn's warning. Breslaw spoke with her supervisor, John Beaty, and he approved of her decision to forward the Borod & Huggins Report to Hubbell. Beaty told Breslaw that he had a favorable impression of Hubbell due to Hubbell's work on the FirstSouth matter, and Breslaw understood from her previous discussions with Hubbell that Hubbell and Ward had a distant relationship. Breslaw later explained of her decision to turn over the Borod & Huggins Report to Rose:

> I believe that since I had previously determined that the Ward and Hubbell relationship was not a conflict, and had made the assumption that Hubbell was trustworthy on this issue, I felt that there was no reason to prevent Rose from obtaining whatever information the firm felt was necessary to pursue the Frost suit. I believe that Beaty mentioned that Hubbell had responded to a conflict issue which arose in connection with the FirstSouth project in a very professional manner. I have the impression that Beaty had confidence that Hubbell would behave ethically.[212]

According to the *Frost* billing records, on February 1, 1990, Mr. Hubbell met with Gary Speed, and spoke with April Breslaw via telephone.[213] That same day, April Breslaw forwarded the Borod & Huggins Report to Gary Speed.[214] Ms. Breslaw wrote a note to Gary Speed. Her

---

[211]Ex. 97 to RTC-OIG Rep., 8/3/95, vol. III.

[212]Breslaw RTC-OIG Interview, 4/94, at 12.

[213]105-00083364; 264-00009458; 264-00009713; 105-00083622; 105-00083633; 264-00020682.

[214]Ex. 128 to RTC-OIG Report, vol. III. *See also* Breslaw RTC-OIG Interview, 4/94, at 12, 24; and Breslaw Senate Banking Committee Deposition, 6/6/95, at 24-25 ("[B]ased on the information that we had at the time -- again, I am sorry to repeat myself -- that Hubbell didn't represent Ward, and said he would not represent Ward, it seemed to us that there was no conflict and therefore our counsel should be allowed to see all material that was relevant to Madison to see if it would be of any use in the accounting case. So, despite the fact that Ms.

Obtained by Judicial Watch, Inc. via FOIA

note indicates that Mr. Speed wanted the Borod & Huggins report to assist Rose in preparing interrogatory responses.[215]

The *Frost* billing records indicate that Mr. Hubbell and Gary Speed reviewed the Borod & Huggins Report on February 2, 1990.[216] Mr. Hubbell also billed the RTC for review of the Borod & Huggins Report on February 8, 1991 and February 12, 1991.[217]

During the 1993-96 investigations, Hubbell gave several different stories about his review of the Borod & Huggins Report. Hubbell initially denied that he ever saw the Borod & Huggins Report. Then, he claimed that his *Frost* co-counsel kept the report from him. Then, Hubbell said that maybe Rose delayed requesting the Borod & Huggins Report.[218]

Interview And Deposition Of Patricia Heritage.

On April 4, 1990, Gary Speed, Rick Donovan, and Jim Birch interviewed Patricia Heritage, who then was a newly hired Rose attorney, about her previous work at Madison

---

Strayhorn expressed some concern, we permitted the Rose firm to see Gerrish's report.").

[215]*See* Breslaw RTC-OIG Statement, 7/18/95, at 6-7. Breslaw's note states:"I've enclosed the Gerrish Firm's investigative report on Madison Guaranty loans. I understand that you're in desperate need of it in order to respond to opposing counsel's interrogatories." (emphasis added). Ex. 128 to RTC-OIG Report, vol. III.

[216]264-00014589; 105-00083364; 264-00009459; 105-00083622; 105-00083633; 264-00020682.

[217]105-00083548; 105-00083537; 105-00083558; 264-00020802-03; 105-00083531; 105-00083538; 105-00083550; 105-00083559; 264-00020802.

[218]Hubbell Grand Jury Testimony, 8/22/96, at 115-16; FDIC Interview with Webster Hubbell by Jack Smith and John Downing, 1/11/94; OIC-302, 2/1/95, at 21; Hubbell Senate Testimony, 2/7/96, at 232-34.

Obtained by Judicial Watch, Inc. via FOIA

Guaranty.[219] The billing records reveal that Mr. Speed met with Mr. Hubbell on April 4, 1990. The billing records do not reveal any call to Ms. Breslaw, but Gary Speed says that he and Mr. Hubbell called Ms. Breslaw about the Pat Heritage matter.[220]

Ms. Breslaw denies that anyone informed her about Pat Heritage's previous Madison Guaranty employment. Ms. Breslaw stated that she "learned in roughly January 1994 that she had once worked at Madison and that Gerrish had accused her of editing minutes of Madison board meetings."[221] Mr. Hubbell "said they did not discuss this matter with Breslaw although they probably should have talked with her about it."[222]

The parties in the *Frost* case reached a tentative agreement to settle the *Frost* case sometime in February 1991, and April Breslaw issued a detailed authority to settle memorandum on February 26, 1991.[223] That memorandum recommended that the RTC settle the *Frost* case for $1.025 million.[224]

---

[219]105-00083613; 264-00009497; 264-00020695. *See also* Speed RTC-OIG Statement, 6/30/95, at 7-10.

[220]Speed RTC-OIG Statement, 6/30/95, at 7-10.

[221]RTC Interview, 4/94, at 19-20. *See also, e.g.*, Breslaw RTC-OIG interview, 7/18/95, at 7 ("I do not recall anyone from Rose discussing Patricia Heritage with me in any context during the *Frost* litigation.").

[222]Hubbell FDIC-OIG Interview, 3/16/95, at 11-12. *See also, e.g.*, RTC-OIG/OIC Hubbell Interview, 4/20/95, at 19-21 (which discusses the Patricia Heritage matter).

[223]Donovan Little Rock G.J., 1/21/98, at 44-46; LR GJE 1661; Breslaw RTC-OIG Interview, 4/94, at 13.

[224]Donovan Little Rock G.J., 1/21/98, at 44-46; Little Rock G.J. Ex. 1661; Breslaw Senate House Banking Comm. Dep., 10/23/95, at 239-44 (discussing Breslaw's February 26, 1991 authority to settle memorandum); Breslaw RTC-OIG Interview, 4/94, at 13.

Obtained by Judicial Watch, Inc. via FOIA

The next day, February 27, 1991, as the parties in the *Frost* case continued to negotiate the terms of the settlement agreement, attorneys for the defendants deposed Ms. Heritage.[225] Rick Donovan attended the Pat Heritage deposition and billed the RTC on February 27, 1991 for 8.50 hours for "prepare for and attend deposition of officers/directors; correspondence with witnesses."[226] At the deposition, Ms. Heritage testified that Seth Ward was "someone I wasn't supposed to send past-due letters to" apparently because Mr. Ward was "one of the preferred friends of Jim McDougal or John Latham.[227] Ms. Heritage testified that she had not done any work on the *Frost* case while she was an attorney at Rose.[228] Ms. Heritage also testified about the Borod & Huggins Report and about minutes she prepared at John Latham's direction which purported to document nonexistent Madison Financial Corporation board meetings.[229]

Ms. Breslaw claims that no one from Rose told her about the Heritage deposition.[230]

---

[225]105-00083441; 105-00083566; 105-00083609.

[226]105-00083441; 105-00083566; 105-00083609.

[227]85-00045517.

[228]85-00045519.

[229]85-00045498-506. Heritage also said of Don Denton that "I think Don had a good background and knew what he was doing, yes." 85-00045518.

[230]Breslaw Senate Banking Committee Deposition, 6/6/95, at 28-30. Ms. Breslaw did have access to the Borod & Huggins Report during 1989, and that report discussed Ms. Heritage's work at Madison Guaranty:

> I must have read the section that contains the allegations about Pat Heritage, however, because at that time she was not employed at the Rose Law Firm, she did not, to my knowledge, ever work on the Frost accounting case, and I did not ever speak with her until after the Frost case had been settled for several years. I did not make the connection when I spoke with her in probably 1993, that is four years later, that allegations had been made against her in a

Obtained by Judicial Watch, Inc. via FOIA

No one at Rose informed Ms. Breslaw of Pat Heritage's testimony as a deposition witness in the *Frost* case. Gary Speed did not,[231] and Mr. Hubbell "does not recall Heritage being deposed in the Frost case by the defense."[232] [233]

1989 Indictment And 1990 Trial Of James B. McDougal

In November of 1989, a Little Rock Grand Jury indicted James B. McDougal, John Latham, and others for alleged crimes related to the IDC/Castle Grande transactions.[234] John Latham pleaded guilty. A jury acquitted McDougal after a trial which occurred in May and June of 1990. Rick Donovan and Gary Speed billed the RTC for attending McDougal's trial.[235]

---

report that I read in the spring of 1989.

*Id. See also* RTC-OIG/OIC Hubbell Interview, 4/20/95, at 19-21 (discussing the Pat Heritage matter).

[231] Speed RTC-OIG Statement, 6/30/95, at 9-10.

[232] Hubbell FDIC-OIG Interview, 3/16/95, at 11-12.

[233]

[234] *See*

[235] 105-00083618; 264-00020696; 264-01/1B-149/11; 264-02175; 105-00083510; 264-00020701.



FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure
NW: 15416 DocId: 70001585 Page 106

Obtained by Judicial Watch, Inc. via FOIA

No one ever deposed McDougal in the *Frost* case, but McDougal did meet with the attorney for Frost, Peter Kumpe. Kumpe concluded that McDougal would be helpful to Frost's defense.[237] According to Rick Donovan, Rose felt that "the other side would" depose McDougal because "they wanted to paint McDougal as the criminal" and "we had nothing to gain and everything to lose by that man being on the witness stand."[238] Gary Speed confirms Donovan's story: "McDougal was not seen as helpful to the case because McDougal did not like the government, McDougal had lost his savings and loan and his ability to deal, and [Rose] was afraid of anything McDougal might say."[239]

Hubbell told the House Banking Committee -- wrongly -- that "it was back in the *mid-1980's* that Mr. McDougal was tried and found innocent of any criminal activity at Madison."[240]

<u>The Curious Matter of Sam Heuer</u>

About three weeks before Jim McDougal's 1990 Castle Grande criminal trial, Sam

[236]

[237]Kumpe Little Rock G.J., 2/3/98, at 4-5.;

[238]Donovan Little Rock G.J., 1/6/98, at 98-99.

[239]Speed OIC-302, 1/30/98.

[240]Hubbell House Banking Comm., 8/10/95, at 64. Additionally, Mr. Hubbell never told April Breslaw during the time he handled the *Frost* case that Rose had "represented Mr. McDougal personally in any matters." Breslaw Senate Banking Comm. Dep., 10/23/95, at 54.



FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

Obtained by Judicial Watch, Inc. via FOIA

Heuer sent Hubbell a letter dated May 7, 1990. That letter warned Hubbell that Seth Ward "might have some type of criminal exposure under these broad bank fraud violations that the U.S. Attorney's Office seems so happy to use these days."[241] Heuer wrote that he (Heuer) was "in a pretty tight situation on this McDougal case" and that "Seth Ward, who I understand to be your father-in-law, appears to be a pretty critical witness in this case."[242] Heuer requested an interview of Ward.[243] Hubbell did not respond to the letter.[244]

Rose attorneys Rick Donovan and Gary Speed billed the RTC for attending the first two days of McDougal's 1990 trial.[245]

During the summer of 1990, shortly after McDougal's June 1990 acquittal, Hillary Clinton and Webb Hubbell met with Heuer over lunch individually and on separate occasions.[246]

---

[241]212-011968.

[242]212-011968.

[243]212-011968. Hubbell's co-counsel on the *Frost* case, Rick Donovan, first learned of Heuer's May 7, 1990 letter to Hubbell about Seth Ward's possible criminal exposure on January 6, 1998 when Donovan testified before the Little Rock Grand Jury. Donovan Little Rock G.J., 1/6/98, at 99-100 ("This is the first I've ever heard of anything like that.").

[244]Heuer Little Rock G.J., 10/8/97, at 20-21. *See also* Heuer Little Rock G.J., 4/1/97, at 96 ("The letter went out. Hubbell never got back to me. If I called, he didn't call me back. So we just went on to trial."). *But see id.* at 97 ("After it [McDougal's 1990 criminal trial] was over, I talked to him. But prior to that, he may have -- he may have called me back after I wrote the letter to ask what I -- where I could see potential criminal exposure and me explaining it to him and him communicating that he did not want me to talk to his father-in-law. That very well may have happened. I don't remember.").

[245]105-00083618; 264-00020696; 264-01/1B-149/11; 264-02175; 105-00083510; RIC 000442; 264-00020701.

[246]



FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

Obtained by Judicial Watch, Inc. via FOIA

[47] Mrs. Clinton was "knowledgeable" about McDougal's well publicized trial.[248]

The *Frost* billing records reveal that Hubbell billed the RTC for "conferences" with

---

[247]Heuer Little Rock Grand Jury, 4/1/97, at 26. Heuer's lunch with Hillary Clinton came after he wrote her a July 3, 1990 letter which suggested that the Whitewater Development Corporation be dissolved. *Id.* at 22-26. Heuer and Hillary Clinton discussed Jim McDougal's trial and Whitewater. *Id.* at 29.

[248] Heuer Little Rock Grand Jury, 4/1/97, at 102.

[249]

[250] Governor Clinton also called Heuer "[i]mmediately after McDougal's acquittal" to congratulate Heuer and McDougal. *Id.* at 20.

[25



FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure
NW: 15416 DocId: 70001585 Page 109

Obtained by Judicial Watch, Inc. via FOIA

Heuer on at least four occasions "re: McDogal" [sic] from July 17, 1990 to September 5, 1990.[252] The original trial date in *Frost* was set for late August 1990. Heuer testified before the Little Rock Grand Jury that McDougal spoke with Frost's attorney, Peter Kumpe, about the case. One of Frost's defenses to the RTC's accounting malpractice claim was that Madison's officers and directors were corrupt, and that any losses to Madison Guaranty were the fault of the "crooks running the institution."[253]

<u>Julie Baldridge Speed</u>

During the *Frost* case, Gary Speed learned that his then wife, Julie Baldridge Speed, previously had an ownership interest with James McDougal in the Bank of Kingston and in the Woodruff County Savings and Loan (Madison Guaranty's predecessor). Speed told Hubbell about the matter. As detailed in the Rose Law Firm conflicts memorandum, the following happened:

1. Gary Speed learned during the *Frost* case about his then wife's business relationship with James McDougal and Madison Guaranty;
2. Gary Speed told Webb Hubbell about the Julie Baldridge Speed potential conflict;
3. Webb Hubbell concealed the Julie Baldridge Speed potential conflict from April Breslaw;

---

[252] 105-00083428; RIC 000360; 105-00083432; RIC 000364; 105-00083435-36; RIC 000367-68; 105-00083411; RIC 000343 .

[253] Donovan Little Rock G.J., 1/6/98, at 81-83.

[254]



FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

Obtained by Judicial Watch, Inc. via FOIA

4. Hubbell falsely stated to Gary Speed that Hubbell told Breslaw about the Julie Baldridge Speed potential conflict;

5. Hubbell falsely stated to the OIC that he did not discuss the Julie Baldridge Speed matter with Gary Speed after Speed disclosed the information to Hubbell;

6. Hubbell falsely stated to the FDIC-OIG of the Julie Baldridge Speed matter that "they decided it was not a conflict of interest."[255]

Jimmie Alford & Precision Industries

Jimmie Alford was the Frost & Company partner who had oversight responsibility for the 1984 and 1985 audits of Madison Guaranty. He left Frost in 1988 and went to work for Pace Industries and a division of Pace, Precision Industries. Mr. Alford owned stock in Pace/Precision, was a Pace vice president, and Precision's President. Mr. Alford was also a named defendant in the *Frost* case, and he was a Madison Guaranty borrower.[256] [redacted] [257] Hubbell learned about the matter, and the following occurred:

(1) Mr. Hubbell learned of a potential conflict of interest related to Jimmie Alford;

(2) Mr. Hubbell then met with two Rose attorneys, Tim Boe and Jim Birch, to discuss the matter;

(3) Mr. Hubbell agreed to notify the RTC about the Alford conflict;

(4) Mr. Hubbell concealed the matter from the RTC;

[255]Hubbell FDIC-OIG Interview, 3/16/95, at 2-3.

[256]*See* Alford OIC-302, 2/6/98; Alford FDIC/RTC-OIG Statement, 6/27/95; and Alford FDIC/RTC Statement, 9/7/94.

[257] [redacted]



FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

Obtained by Judicial Watch, Inc. via FOIA

(5) Mr. Hubbell then lied to Tim Boe and stated that he had disclosed the matter to the RTC; and

(6) Mr. Hubbell falsely stated to the investigators that he did not disclose the Alford conflict to the RTC because he learned of the Alford conflict late in the case, near settlement.

The evidence indicates that no Rose attorney disclosed the Alford matter to April Breslaw or anyone else at the FDIC or the RTC.[258]

Beverly Bassett Schaffer

During July or August of 1990, Rose decided to depose Beverly Bassett Schaffer.[259] Mr. Hubbell called Ms. Bassett Schaffer, and she told him that she believed that Rose should not be involved in the *Frost* case because of Rose's prior work for Madison Guaranty.[260]



UNCODED [261] Ms. Bassett Schaffer was "angry with Webb Hubbell," so she called Frost's lawyer, Peter Kumpe, and "told Peter . . . what Webb had done . . . and asked Peter if he was aware that the Rose Law Firm had represented Madison before the [Arkansas Securities] department throughout 1985, and that there were documents and files to that effect, numerous documents

---

[258] *See, e.g.* ; and Speed RTC-OIG Statement, 6/30/95 at 11 ("I do not recall disclosing Rose's representation of Precision to the government. Because Mr. Alford was not our client and there was no conflict, I do not believe we had a duty to disclose it.").

[259] On August 7, 1990, Mr. Hubbell billed the RTC for a "telephone conference with B. Bassett." 105-00083422. Ms. Bassett testified that her conversations with Mr. Hubbell occurred in "roughly July or August of 1990." Bassett Schaffer Little Rock G.J., 11/8/95, at 135.

[260] Bassett Schaffer Little Rock G.J., 11/8/95, at 131-32.

[261]



FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure
NW: 15416 DocId: 70001585 Page 112

Obtained by Judicial Watch, Inc. via FOIA

that would reflect that at the department."[262] According to Ms. Bassett Schaffer, Kumpe told her that he was not aware of the Rose Law Firm's prior work before the Arkansas Securities Department. Commissioner Bassett Schaffer then suggested that Kumpe serve her with a subpoena, and she would produce all public records to Mr. Kumpe.

Mr. Kumpe subsequently issued a subpoena and obtained the records.[263] "[264]

Kumpe took the documents, copied them, and left. Next, Ms. Bassett Schaffer received a call from a Rose paralegal who informed her that the case settled.[265]

Hubbell does not dispute Bassett Schaffer's version of the story.[266]

There is no evidence that Mr. Hubbell informed Ms. Breslaw or anyone else at the FDIC or the RTC about Beverly Bassett's comments to him. Even Rick Donovan, for example, did not know about Ms. Bassett's comments to Mr. Hubbell.[267]

---

262 Bassett Schaffer Little Rock G.J., 11/8/95, at 133.

263 Bassett Schaffer Little Rock G.J., 11/8/95, at 134.

264

265 Bassett Schaffer Little Rock G.J., 11/8/95, at 135.

266 Hubbell House Banking Comm., 8/10/95, at 51 (quoting Ms. Bassett Schaffer's Inspector General statement).

267





NW: 15416 DocId: 70001585 Page 113
FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

Obtained by Judicial Watch, Inc. via FOIA

Frost's Attorneys Learned Of Rose's ASD Work

As explained above, Frost's lead attorney, Peter Kumpe, learned of Rose's ASD work from Beverly Bassett.

POM Work By Rose During The *Frost* Case

On May 4, 1990, Webb Hubbell and the Rose Law Firm filed a patent infringement and anti-trust lawsuit on behalf of POM against Duncan Industries, a POM competitor.[269] [270] Webb Hubbell performed

[268]

[269] *See, e.g.*, RTC-OIG Records Examination, 6/21/94, which indicates that RTC-OIG agents Philip L. Sprague and Patrick S. Durkin examined court records for the United States District Court of the Eastern District of Arkansas, Western Division in the case of *POM, Inc. v. Duncan Indus.*, No. LR-C-90-293 (E.D. Ark.); and DE-00000174-98, which are documents from the *POM* case; Seth Ward II Little Rock G.J., 1/21/98, at 13-45; LR GJE 1669; LR GJE 1674.

[270]



FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure
NW: 15416 DocId: 70001585 Page 114

Obtained by Judicial Watch, Inc. via FOIA

legal work for POM before, during, and after the *Frost* case.

"[T]he RTC is withholding specific loan files pertaining to loans made to Seth Ward."

On January 31, 1991, the defendants in the *Frost* case filed a Motion To Compel Discovery or Exclude Testimony.[271] That motion claimed that "the RTC is withholding specific loan files pertaining to loans made to Seth Ward" and argued that "[t]he withholding of those files should not be permitted."[272] The Motion To Compel did not list any other loan files by name.[273]

Other RTC Work Performed By Rose

After the *Frost* case settled, Rose obtained more savings and loan work from the RTC. By 1991, the RTC had formalized its conflict of interest procedures. The RTC sent Rose conflicts lists which contained the names of individuals and entities that the RTC knew were in potential conflict with particular institutions. Hubbell received these lists, then signed written certifications which stated that Rose did not have any actual or potential conflict of interest. The RTC-OIG discovered, however, that the conflicts lists it sent Rose contained the names of Rose clients. The Rose Law Firm conflicts memorandum contains a more detailed discussion of the



271

272 LR GJE 1656; Kumpe Little Rock G.J., 2/3/98, at 9.

273

274



FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

Obtained by Judicial Watch, Inc. via FOIA

RTC work Rose performed.

* * * * *

*4) 1992 Campaign* -- [The facts relating to the Clinton campaign are detailed in Rosenzweig, "Clinton Campaign: February-March1992," January 1998 and Rosenzweig, "Hillary Clinton, Webb Hubbell and Vince Foster: What Did They Know?" January 1998.]

In February and March, 1992 the substantive outlines of the Clintons' "official" version of Whitewater-related events were first sketched. In response to inquiries from the national press, the Clinton campaign developed a fairly detailed understanding of the role of Hillary Clinton and Bill Clinton in the Whitewater Development Corporation, the Rose Law Firm's representation of Madison Guaranty Savings & Loan, and related matters.

Most importantly, from our perspective, the February-March, 1992 time frame reflects a period of intense scrutiny of Whitewater and Madison Guaranty issues by Clinton campaign members. It is, therefore, a comparatively recent era in which dormant memories of events occurring in 1984-86 were actively revived and refreshed. Mrs. Clinton, Webb Hubbell, Vince Foster and other campaign workers learned information that was contrary to the information they contemporaneously reported to the public and, it appears, may be contrary to the information they provided official tribunals when Whitewater and Madison Guaranty questions became the subject of official inquiry.

A summary of the evidence to be presented, relating to the campaign, includes the following:

Loretta Lynch-- Lynch was responsible for developing information on Whitewater and on

Obtained by Judicial Watch, Inc. via FOIA

who had advised Lynch that there had been at least 1 contact between BBS and HRC on Madison-related issues. Lynch GJ, 2/1/96, at 16-17. Lynch had also, by that date, gone to the Arkansas Securities Department and reviewed the microfiche records reflecting the exchange of letters between the RLF and BBS. Lynch GJ, 2/1/96, at 16.

On February 21st, Lynch spoke with Susan Thomases who had spoken to HRC on the issue. According to Thomases, HRC claimed that she was the billing partner because "McDougal insisted that she be the contact person." Lynch GJ, 2/1/96, at 18. Both Lynch and Thomases recognized that the RLF billing records would provide additional detail on HRC's activities and Lynch considered it a "hot topic." Lynch GJ, 2/1/96, at 16. She enlisted Thomases help in pressing WLH to do a more thorough review of the RLF records. Lynch GJ, 2/1/96, at 19-20. *See also*

On February 24th, Lynch met with WLH to discuss RLF's representation of MGSL for more than an hour. Lynch GJ, 2/1/96, at 40. She recorded her notes of that conversation in another, handwritten rolling memorandum. In that discussion WLH disclosed to Lynch the earlier RLF representation of McDougal in 1981. He also advised Lynch that HRC was the billing attorney in 1985 and that "Rick [Massey] had a relationship with John Latham." Lynch GJ, 2/1/96, at 24. According to WLH, the RLF bill roughly 200 hours total and that "20 percent of HRC was allocated to McDougal." Lynch GJ, 2/1/96, at 24-25. From this Lynch

---

276

UNCODED



FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

Obtained by Judicial Watch, Inc. via FOIA

the Rose Law Firm's representation of Madison Guaranty Savings and Loan on behalf of the Clinton campaign. Her first awareness of the issue arose in early February 1992 when the campaign became aware that Jeff Gerth, of the New York Times, was researching an article on the topic.

Between the start of her assignment to the Whitewater issue and February 22nd, Lynch kept on computer a "rolling file " memorandum to herself, Lynch GJ, 2/1/96, at 12, of the results of her investigation. [275] As of February 18th, Lynch had identified 4 separate topics that Gerth was interested in: RLF's representation of MGSL; HRC's activity representing clients before state officials; RLF's subsequent work for the RTC in a suit against MGSL; and terms of the settlement entered into with the Frost accounting firm on behalf of the RTC.

In her rolling memorandum Lynch identified the parenthetical comments on these 4 issues as WLH's commentary on Gerth's questions. On February 18, 1992 her understanding of the state of WLH's knowledge was:

- With regard to RLF's representation of MGSL, WLH understood that "HRC brought it to the firm."
- With regard to HRC's activity representing clients, WLH told Lynch that the file indicated that HRC had contact with BBS and
- With regard to RLF's work for the RTC and the settlement, WLH told Lynch that the potential conflict had been disclosed, and that he had told Gerth that the settlement terms were confidential.

Prior to February 22nd, Lynch had also already spoken with Beverly Bassett Schaffer,

[275] Lynch's recollection was generally refreshed by her notes.

FOIA(b)7 - (C)



FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

Obtained by Judicial Watch, Inc. via FOIA

realized that the Clinton campaign could not publicly maintain that HRC had done no work for MGSL or McDougal, as it would have liked to do. WLH expressly told Lynch he had reviewed the billing records. Lynch GJ, 2/1/96, at 73-74.[277]

On March 5th, Lynch spoke with WLH again regarding the RLF's representation of MGSL. She took contemporaneous notes of that conversation. (DEK-008878). At that time WLH had, evidently, spoken with both Rick Massey and John Latham, neither of whom were reported to have any recollection of how MGSL came to hire RLF. Massey is quoted has having said: "I don't remember this matter. I don't remember who did what." Lynch GJ, 2/1/96, at 51-52.[278]

[Those same notes of a discussion with WLH also reflect his discussion with HRC and WJC. The entry for HRC is a cryptic "HRC -- ever conversed with Rose Law Firm/McDougal" which Lynch is confident could not have been "never." Lynch GJ, 2/1/96, at 52. The reference to WJC is clearer -- "he has no recollection" of having anything to do with RLF. Lynch GJ, 2/1/96, at 53.]

On March 5th and 6th, Lynch and Thomases met with Gerth for several hours in New York City. Lynch GJ, 2/1/96, at 41. Based on that conversation, Thomases reported to the

---

277 Lynch, it should be noted, was not given access to the RLF files on MGSL; nor to her knowledge was any other campaign employee --

278 FOIA(b)7 - (C)



FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

Obtained by Judicial Watch, Inc. via FOIA

campaign that she had bought some time -- enough to put the issue off past Super Tuesday on March 10th. Because it turned out she had not succeeded in buying the time, she fell somewhat out of favor and Jim Lyons took responsibility for much of WW work. Lynch GJ, 2/1/96, at 66.

On the night of March 7, 1992, just prior to the publication of Gerth's article on March 8th, there was a scramble at the Clinton campaign to respond to the anticipated allegations. Most of the scramble involved review of Whitewater-related documents that WLH had finally been persuaded to release to the campaign. Lynch was less concerned with the issue of HRC's representation of MGSL and her activity before the Arkansas Securities Department because she already knew that BBS would be in a position to provide an exculpatory statement. Lynch GJ, 2/1/96, at 37.

However, the picture Lynch paints is one of high-level activity. She had numerous discussions with Thomases, Jim Lyons at other staff. She went back to the RLF to review WW documents relating to the Clinton's WWDC losses. Lynch GJ, 2/1/96, at 45. She also contacted BBS and Sam Heuer to try and coordinate a response. Lynch GJ, 2/1/96, at 44. Lynch drafted the BBS statement. Lynch GJ, 2/1/96, at 37.

She also drafted the campaign response on WW which was released to the public on March 8th, after having cleared the statement with George Stephanopolous, Bruce Reed, HRC and WJC. [redacted] Lynch GJ, 2/1/96, at 48-49. The campaign response affirmatively stated that Rick Massey brought in the MGSL business through his friend John Latham, notwithstanding Lynch's understanding from WLH that neither of those individuals had a recollection to that effect. According to Lynch that assertion was made at the direction of Susan Thomases, who Lynch questioned on the matter and who instructed Lynch that the statement



FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

Obtained by Judicial Watch, Inc. via FOIA

should be made. Lynch GJ, 2/1/96, at 55-56.

On March 16, 1992 HRC made the public claim that she had done no work before state agencies and received no compensation based upon work RLF did before state agencies.

On March 22 the campaign received a list of questions from the Washington Post that it wished to have answered by HRC. These, along with questions from other Post reporters were all answered by Lynch. On March 24, 1992 she prepared a draft of responses to follow-up questions on WW posed by the Washington Post.

The campaign statement carefully stated that "Hillary Clinton knows of no instance in which she ever represented anyone before a state agency."



FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

Obtained by Judicial Watch, Inc. via FOIA



Susan Thomases -- Susan Thomases, an attorney in New York City, played a role in the early development of the Clinton campaign response to the inquiries from Jeff Gerth. [279]

As of February 20th, Thomases role was to respond to additional inquiries being made by Gerth. Thomases GJ, 2/29/96, at 22-23. She had this role notwithstanding her location in New York and Gerth's location in Washington, D.C.

[279]



FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

Obtained by Judicial Watch, Inc. via FOIA

The next day, February 21st, Thomases called Gerth. One of the issues Gerth inquired about was the relationship between RLF and MGSL and "how it came about." Thomases GJ, 2/29/96, at 34. Subsequently Thomases annotated her notes of the conversation with Gerth with the answers she had been able to find. Thomases came to understand from HRC that the RLF-MGSL connection was made by Rick Massey who was a friend of John Latham. Thomases GJ, 2/29/96, at 36.

280

In a further effort to gather information, Thomases spoke with WLH directly on February 24th. Her notes of that conversation reflect information WLH gave her on that day. Thomases GJ, 2/29/96, at 44; According to those notes WLH told Thomases that HRC had a relationship with McDougal and that "Rick will say" he had a relationship with Latham

280 FOIA(b)7 - (C)



FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure
NW: 15416 DocId: 70001585 Page 123

Obtained by Judicial Watch, Inc. via FOIA

that figured in RLF getting the MGSL business. Thomases GJ, 2/29/96, at 45. According to WLH, HRC's role involved reviewing some documents and conducting one phone call with BBS in April 1985. This discussion of HRC's role is annotated "acc. to time rec." reflecting her understanding that WLH was relying on time records to provide her this information. Thomases GJ, 2/29/96, at 47. Thomases, however, is not certain he had the records in his possession at that time. Senate Banking Com., 12/18/95, at 53. Her notes also reflect her desire to have an accounting of the relative number of hours Massey and HRC spent on MGSL matters -- a question to which she never got an answer. Senate Banking Com.., 12/18/95, at 68, 71.

On March 5, 1992 Thomases had another phone conversation with Jeff Gerth. [redacted] In that conversation Gerth posed additional questions for the Clinton campaign to answer. Senate Banking Com.., 12/18/95, at 92. When Gerth inquired whether HRC had spoken with McDougal about MGSL hiring RLF, Thomases, on behalf of the campaign, told him that HRC believed that Latham had brought the business to Rick Massey. She made this representation based on information she had from HRC and WLH, though she never spoke directly with Massey. Thomases GJ, 2/29/96, at 49. Gerth also asked Thomases to confirm McDougal's recollection that he spoke with WJC about the hiring of BBS. Thomases GJ, 2/29/96, at 56. Thomases notes reflect that she spoke with WJC on this issue, [redacted] and he had no recollection of the discussion. Thomases GJ, 2/29/96, at 60.

Gerth also posed certain questions that he wanted HRC to answer. [redacted] He asked whether HRC ever spoke directly with McDougal regarding MGSL and RLF. Thomases annotated this question with her answer "Introduce J McDougal to Rick Massey with John Latham" but she does not recall whether this answer was, in fact, provided to her by HRC.



FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure