**<u>EXHIBIT 3 (Part 4)</u>**

to

Plaintiff's Response to Defendant's Statement of Material Facts
Not in Dispute and Statement of Undisputed Material Facts
in Support of Cross-Motion for Summary Judgment

Obtained by Judicial Watch, Inc. via FOIA

Q.     Oh? Ickes is in it, huh?

Let me ask you this. Prior to this meeting, was there any representation, was there any counsel, that was representing the President's interests or Mrs. Clinton's interests, or anyone else that you were aware of, as it relates to the matter that you went to brief them on?

A.     No. Not to my knowledge. Nor were there any substantive conversations -- subsequent conversations.

Q.     Did anyone request this meeting?

A.     I requested the meeting.

Q.     Was there any other meeting that may have been requested?

A.     No.

Q.     There was no other meeting that you were aware of that the White House counsel requested?

A.     No.

Q.     Or anyone else from the White House?

A.     No.

Q.     Mr. Ickes?

A.     I had no subsequent -- I received no subsequent requests for meetings.

Q.     What about private counsel? Did private counsel -- I find it hard to believe that there was no private counsel. Are you saying to me that there was not even private counsel meeting with staff lawyers at some level?

A.     Not to my knowledge, Senator.

Altman, Senate Hearing, Feb. 24, 1994, at 63-64.

Altman testified that he meant to say that there were no subsequent, substantive conversations with the White House. Altman claims that he did not intentionally leave out his

131

request for the February 3 meeting with Ickes because as he understood the question, D'Amato
was asking whether *the White House* had requested any other meetings. Again Altman claims
that while he may have misinterpreted the question, he did not intentionally conceal the February
3 meeting; his defense is that had he intended to conceal the meeting, he would not have had the
meeting described in his Q&A briefing books access to which as many as a dozen people at
Treasury and the RTC had.

Senator Bond then asked Altman questions regarding the criminal referrals:

Q.    Next, when did you become aware of the RTC recommendations that
      further criminal prosecution be taken against Madison?

A.    Last fall. I was advised that the question of a referral to the Justice
      Department was under consideration at the RTC. And as other members
      of the RTC staff will attest, I said that normal procedures with no
      deviations whatsoever should be pursued, including chain of command
      procedures, in terms of reaching that conclusion.

      I might tell you that typically decisions like that are made at the Regional
      Office level, and it was in this case.

Q.    Were you aware that the Regional Office had asked the National Office to
      make a determination as to whether the Clintons' name should be in the
      new expanded referral?

A.    - No.

Q.    You did not know they were asking for the National Office to make a
      determination?

A.    No. I was simply informed that this issue was on the table, and my
      reaction was -- and I had only one conversation about it -- that normal
      procedure should be followed. That is the way we are going to handle this
      thing from beginning to end.

Q.    How was the White House notified of the referral?

A.    They were not notified by the RTC, to the best of my knowledge.

132

Q.      Nobody in your agency, to your knowledge, advised the White House staff
        that this was going to be a major -- this could be a major source of
        concern?

A.      Not to my knowledge.

Altman, Senate Hearing, Feb. 24, 1994, at 69.

As soon as Altman provided this last response, he turned back to Hanson (who
was sitting behind him) and asked her a question. Hanson testified that Altman asked her, in
substance, whether his answer was correct, and Hanson responded that she thought it was.
Hanson then spoke with Kulka, who was seated next to her, and asked her if she was aware
whether the RTC had notified the White House of the referrals, and she said, "No." She
remembers that when Bond asked his question she had a vague recollection of having spoken
with Nussbaum, but she recalled no other details of the conversation at that time other than that
the conversation obviously related to the criminal referrals in some way.[321] Hanson testified that
she does not recall if she had her "flash" of recollection about the Nussbaum conversation before
Altman turned to her or afterwards.[322] When she did recall this information, she did not believe
Altman had to correct his testimony because she understood the questions as asking simply
whether *the RTC* had notified the White House, not the Treasury. Hanson also remembers
having thought at the time that Treasury had not prepared a Q&A about the fall contacts for

---

321.  Hanson testified that she did not recall at the time the October 14 meeting.

322.  According to Hanson, she did not mention her conversation with Nussbaum to Altman
after the hearing.

133

Altman.[323]

According to Altman, as soon as Bond finished with him, Altman turned to Hanson, who was seated just behind him, to double-check his response. Altman testified that he said to Hanson, "They didn't, did they?" and Hanson responded, "No."

We had lip reading experts from the FBI examine the videotape of this incident. Because of the camera angles, they were not able to provide a definitive analysis of exactly what Altman said to Hanson. They did conclude that the videotape is consistent with the versions given by both Altman and Hanson, that Altman asked Hanson a negative question along the lines of, "We didn't do that, did we?" and Hanson responded in the negative by shaking her head side to side to confirm Altman's recollection.

Senator Domenici concluded the questioning on contacts:

Q.    Mr. Altman, you spoke a while ago of your one contact with the White House regarding this, and you and your counsel went up to talk to the White House counsel.

A.    One substantive contact.

Q.    Please?

A.    One substantive or meaningful contact.

Q.    Well, I assume we are not arguing there that you had -- you are not suggesting you had more than one are you?

A.    No. I am just saying that if you, you know, you run into someone in the hall, if you see that thing in the paper this morning, I am not including

---

323.  Eggleston testified that he did not have immediate concerns with Altman's response to Bond about the White House being notified about the criminal referrals. He believes he may have temporarily forgotten about the fall contacts or simply not had concern for whatever unidentified reason.

134

that.

Q.    You said you were there to give a heads-up.

What I understand the situation to be on average folks, like a couple of folks in my State that were bordering up alongside of a statute of limitations becoming a defense, was that they were presented with a tolling agreement. If they did not sign it, the suit was filed so as to toll the statute.

Is that a rather fair assessment of the way business is done?

A.    I think I would have to know the details of the matter, Senator.

Q.    I guess what I am wondering is are we getting the right perspective of why you did this?

Did you go there because you wanted them to know that, clearly, they might be asked to sign a tolling agreement?

Or, to know that the normal process was that the statute is going to toll. If there were reasonable grounds to suspect something, they might expect a lawsuit?

Why else would you give them a heads-up?

A.    The difference between this and a matter like the one you referred to is I had been receiving -- I had begun to receive a lot of inquiries, including inquiries in writing, from Congress as to what procedures the RTC was going to follow.

I wanted to give them the same sense of those procedures that I was giving Members of Congress. I said to them nothing different than I have said to Members of Congress.

Q.    I understand that, but I guess what I am getting at is there must have been a reason for telling them that.

Congress was just saying "the statute is going to run, what are you going to do." So, you went over there to tell them we are going to apply the same thing we do in any other case?

That is the "heads-up" that you were giving them?

135

A.    That is right.

Q.    Was it serious enough that you wanted them to know because there might
      be something that they would be confronted with that was untoward as
      you applied your rules like asking for a tolling agreement, or filing a
      lawsuit?

A.    Again, the essence of what we said was that the statute of limitations
      which then applied was scheduled to expire on February 28, 1994.

      The RTC was going to make every effort to make a decision by that date.

      It could fundamentally reach only one of two decisions:

      That there was the basis for a claim, or that there was not.

      If there was a basis for a claim, then we would either seek a tolling
      agreement to permit more discovery and more preparation, or we would
      file that claim in court.

Q.    Well, the passage of the statute of limitations extension eliminates that
      problem, as you have already indicated.

      I guess, Mr. Chairman, I am having a little difficulty with the explanation.
      One way of looking at it was that it was not a very meaningful or
      important meeting; that he was just doing this so that he would be able to
      tell Congress he had told them he is going to treat them the same way as
      others.

      I do not think a man -- I know you fairly well. I do not think you would
      be going over there to just be able to send this letter to Senator D'Amato
      that says I have told the White House that they are going to be treated the
      same way as other people.

A.    Senator, I did not know whether they knew of such procedures which, as I
      say, I was then communicating to Members of Congress. It just seemed to
      me a little odd to explain to a Member of Congress that we are going to
      follow X, Y, Z procedures and not have them ever be made aware of what
      those were.

Q.    . . . .

      My last observation would be that it is inconceivable to me, Mr. Altman,

136

that you would really be concerned that people involved in the investigation, whomever they are, whether it be people in Arkansas, whether it be confidants of the President, or whomever, that they would not know that the statute of limitations was going to toll, and that that presented a situation where you had to advise somebody. I just do not think anybody involved in this would not have known that.

A.    Well, Senator, I also -- I would agree with you. I cannot say for sure. I cannot say what was in their minds. I doubt very much that they did not know about the statute of limitations.

Q.    Right.

A.    What I was saying was not that. What I was saying is I did not know if they knew, and, frankly, my impression is, as a result of that meeting, that they had not previously known what procedures the RTC would be following.

By that I mean that you have to choose between -- you have to reach a conclusion as to whether there is a claim or there is not, and then determine what you have to do if you reach a conclusion that there is.

Altman, Senate Hearing, Feb. 24, 1994, at 70-72.

Altman testified that he emphasized to Domenici that he was referring to one "substantive or meaningful contact" to stress again that he was only talking about meetings regarding the substance of the case, and that he did not associate himself and his recusal with any aspect of the case. Altman claims that while he was sitting there testifying he did not think about his conversation with McLarty and his February 3 meeting with Ickes and decide that they were not substantive. Rather, he thought the Senators were asking about only contacts with the White House *about the case*. According to Altman his staff had already prepared a Q&A about the Ickes meeting stating that the contact was not substantive, but was rather "incidental."[324] He

_____

324. As discussed above, Altman consistently defends his testimony on the grounds that he did not prepare the contacts Q&A and that his staff chose the descriptive terms "substantive" and

137

Obtained by Judicial Watch, Inc. via FOIA

claims he excluded his telephone conversation with McLarty because he viewed it as even less than "incidental." In further defining what an "incidental" contact would be -- a hallway conversation about what had appeared in the press that morning -- Altman explained that he might have chosen a bad example, but that he was simply meaning to say he was not talking about incidental contacts.

Steiner recorded in his diary entry dated February 27, 1994 (covering the period February 13 through February 27):

> At the hearing, the recusal amazingly did not come up. The GOP did hammer away at whether RA had had any mtgs. w/ the WH. He admitted to having had one to brief them on the statute deadline. They also asked if staff had met, but RA gracefully ducked the question and did not refer to phone calls he had had.

010-DC-00000014. Steiner testified that his "gracefully ducked" language was "an unfortunate choice of words." Steiner said that when he wrote "ducked," he was referring to his own conversation with Stephanopoulos on February 16. Steiner remembered having told Altman about his conversation with Stephanopoulos, so either Altman had forgotten about it or he had "gracefully ducked" the question by defining "meetings" such that he need not disclose this or other contacts. Steiner assumed it was the latter.[325] Steiner testified that as he left the hearing he was concerned only about Altman's use of the term "heads-up" and Altman's failure to mention Steiner's February 16 meeting with Stephanopoulos.

The evidence does not indicate that anyone expressed to Altman immediately

---

"incidental."

325. Steiner testified that when he wrote this entry he still had no recollection of the October 14 meeting.

138

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

after his testimony any concerns about the accuracy or completeness of that testimony.

**10.     Altman Recuses On February 25.**

On February 25, *The New York Times* published a front page article about Altman's testimony that was highly critical of the fact that the February 2 meeting had taken place, implying that the White House had received an update on the underlying facts in the case. Altman testified that he was shaken by the story and its allegations of impropriety and had decided by 10:00 a.m. that he would recuse himself to limit any appearance of a conflict of interest. ⬚

When he got to work, he did have several conversations with DeVore (who had since retired and was working in Texas) to get his advice on how to make the recusal announcement in a way that would minimize further negative press stories. DeVore's advice was to stay flexible on the issue so as not to "pour kerosene on the fire," possibly waiting a couple days before making the announcement.

Altman testified that he had a statement prepared announcing his recusal. At some point in the mid- to late-afternoon, Altman spoke with Howell Raines, editorial page editor of *The New York Times*, who told Altman that he was writing a very harsh editorial about the February 2 meeting ⬚ Altman attempted to explain what had taken place at the meeting, but Raines apparently had already made up his mind on the editorial. At some point in the conversation, Altman told Raines that he had decided to recuse himself. Within minutes after the call, Altman had the Treasury public affairs office release the recusal statement that had already been drafted announcing Altman's recusal.

Steiner's diary dated February 27, 1994 (covering the period February 13 through

139

NW: 15416 DocId: 70001585 Page 177

February 27) records:

> The next day, the NYT ran a front page story on the mtg. The heat was on. We spent a tortured day trying to decide if he should recuse himself. I spoke w/ Podesta to let him know of our deliberations. Very frustrating that he was the chosen point of contact since he clearly was not in the complete confidence of George and Harold. After Howell Rains [sic] from the NYT called to say that they were going to write a brutal editorial, RA decided to recuse himself.



010-DC-00000014.

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

It was only during his telephone call with Raines that Altman decided and announced that he would in fact recuse. Immediately after Altman got off the phone with Raines, Steiner called Podesta to let him know of Altman's announcement.

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

Podesta believes he then told Stephanopoulos and Ickes.

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

Stern remembers a similar conversation with Steiner on February 25. He testified that Steiner called him to say that Altman was seriously considering recusing himself from

140

Obtained by Judicial Watch, Inc. via FOIA

Madison but would not be consulting with the White House on the issue.

According to Altman, he was unaware of any effort by anyone at the Treasury to inform the White House that he was again considering recusal. As Altman put it, if such efforts took place, they were not very effective given the angry call he received soon after his announcement from Ickes and Stephanopoulos.

**11. Eggleston's February 28 Memorandum Regarding The Madison Civil Investigation.**

On February 28, 1994, Eggleston sent Ickes a memorandum regarding "Whitewater -- FDIC and RTC Rose Law Firm Issues." 006-DC-00000014. The memorandum discussed issues raised by the FDIC and RTC reports addressing the question of possible conflicts of interest by the Rose Law firm in its representation of Madison. In the memorandum, Eggleston discussed the findings of both the FDIC and the RTC in their reports and noted that at the February 24 hearing, the Chairman of the FDIC and Altman had both agreed to have the FDIC and RTC Inspectors General review the conflicts issue. Eggleston then reviewed the sanctions that could be imposed by the FDIC or the RTC if they determined the Rose Law Firm had a conflict of interest. Next, he explained the status of the RTC's Madison civil investigation and provided some background information on Ryan and Kulka, as the RTC decisionmakers in light of Altman's recusal. The FDIC and RTC reports were attached to the memorandum.

A March 1, 1994 memorandum addressed from Ickes to Mrs. Clinton with the February 28 Eggleston memorandum attached was produced to the OIC. 006-DC-00000013. Ickes' memorandum stated:

> Attached is a copy of W. Neil Eggleston's 28 February 1994 memorandum to me regarding certain issues involving the RTC and the Rose Law Firm ("Rose"). Attached to that memo are copies of the FDIC report, dated 17

141

Obtained by Judicial Watch, Inc. via FOIA

February 1994, concerning possible conflicts of interest regarding Rose's representation of the FDIC against Madison Guaranty, and the RTC's 8 February 1994 report concerning the same subject.

It is my understanding that shortly after Roger Altman met with Bernie Nussbaum, me and others concerning the RTC statute of limitations, he received an opinion from an ethics officer of the Treasury Department that he, as the acting head of RTC, did not have to recuse himself from matters involving Rose/Madison Guaranty. I will confirm this situation.

Please let me know if you want to discuss the attached.

006-DC-00000013.

Eggleston testified that Ickes called him and asked him to draft a memorandum giving a report on where things stood with respect to the conflicts issue, whether there was a conflict, who was investigating what on the question, and what could happen if the FDIC found a conflict. Eggleston wrote this memorandum to Ickes, and only later learned (in the course of the public hearings) that Ickes had forwarded it to Mrs. Clinton.

Ickes testified that the format of his March 1 cover note to Mrs. Clinton -- the fact that it was not on letterhead stationary and not initialed by Ickes -- indicates that it may not have been sent to Mrs. Clinton, but he is not positive. Ickes claims he does not recall asking Eggleston to prepare the February 28 memorandum, but he is certain that he did. There had been considerable discussion about the Rose Law Firm's possible conflict of interest in representing Madison, and Ickes asked Eggleston to write up a discussion of the intricate issues that were involved in that question, and Ickes believes the February 28 memorandum may be that memorandum.

According to Mrs. Clinton, she has a vague memory of Ickes' asking her if she wanted to know more about the RTC and the Rose Law Firm, and she said she did not. He may

142

have either had this memorandum with him or tried to hand it to her, and she was not interested
in it.  She does not believe she looked through this memorandum until she was later prepared for
questioning by the OIC.

        Ickes testified that he does not remember handing Mrs. Clinton this document,
asking her if she wanted to learn more about the Rose Law Firm/RTC issues, and her responding
that she did not want to do so.

        As discussed above, the White House has produced notes taken by Sherburne and
Cheston in the summer of 1994 of a conversation they had with Ickes' private counsel, Amy
Sabrin.  These notes suggest that Sabrin conveyed to the White House Counsel additional
information that she had received from Ickes regarding the preparation of both the February 28
and the March 1 memoranda.  Sherburne's notes state (with modest expansions of abbreviations):

> Late Feb (2/26 or 27), HI has conversation w/ WJC in which WJC asks
> lots of Q's re RTC procedures, whether [in margins: whether Rose cld be held
> liable] & HRC & WJC exposed.    HI asked NE to draft memo which NE did in
> 12 hours.  HI minor revisions.  Sends to HRC 3/1.  DR discussing.
>
> HRC asked HI a few questions.  Think > received memo.

442-DC-00006540-6541.  Cheston's notes similarly read (again with modest expansions of
abbreviations):

> 2/27-3/1 Memos.
>
> Late Feb, 2/26 or 27 prob'ly, HI -- conv w/ Pres -- had read WSJ article, --
> asks sever qs re procedure RTC; can Rose, HRC, BC be held liable => HI asked
> NE to write memo.
>
> Did w/in 12 hrs.
>
> HI asked NE couple q's, follow up pts.

<div align="center">143</div>

Obtained by Judicial Watch, Inc. via FOIA

3/1 -> HRC only. No recall disc'g w/ her [in margins: other than her asking cple qs. Bef? Aft? Assume aft.] or sending to Pres.

442-DC-00006543.

These notes provide a level of detail surrounding the preparation and dissemination of the February 28 and March 1 memoranda that Ickes never provided in his sworn testimony. When confronted with these notes, Ickes testified that while he remembers having spoken with the President and Mrs. Clinton about the statute of limitations issue (as discussed above), he does not recall having the conversation with Clinton that is recounted in these notes regarding the potential liability of the President and Mrs. Clinton or the Rose Law Firm. The notes did prompt him to reveal some further information surrounding the preparation of Eggleston's memorandum, however. Ickes testified that the FDIC and RTC had issued reports dealing with the possible conflict of interest with the Rose Law Firm and Madison and that there had been an article or an editorial in the *Wall Street Journal* some time later in February that Ickes read. Ickes acknowledged that Clinton may have read the same article or editorial and may have asked Ickes some questions about it, but Ickes claims not to recall. Ickes did testify quite firmly that "based on those reports and that either editorial or newspaper article, I had asked Mr. Eggleston to write a memo." Ickes, Senate Hearing, Feb. 22, 1996, at 180.

As to the preparation of Eggleston's memorandum, Ickes testified that he does not recall if Eggleston wrote the memorandum in twelve hours, as described in these notes. He also testified that he does not recall making any revisions to Eggleston's memorandum, although he may well have. On the question whether he sent his own March 1 memorandum to Mrs. Clinton (with the Eggleston memorandum attached), Ickes again testified that he may well have done so,

144

but he does not recall. Contrary to the White House Counsel's notes, Ickes also claims he does

not recall Mrs. Clinton's asking questions about the memorandum.

Ickes' only explanation of the discrepancies between his testimony and the

Sherburne and Cheston notes is that he was not present for the Sabrin conversation and has no

way of knowing what was said, whether what Sabrin said was accurate, and whether Sherburne

and Cheston accurately transcribed what Sabrin said. Sherburne similarly stated to the Senate

Special Committee that she had reason to believe that in the interview Sabrin was providing

information she had collected from a variety of sources, and that she does not know the source of

Sabrin's information on these points. Ickes, Senate Hearing, Feb. 22, 1996, at 187 (statement of

Sherburne).

After Sherburne's and Cheston's conversation with Sabrin, they interviewed Ickes

personally. Ickes, Senate Hearing, Feb. 22, 1996, at 186 (statement by Sherburne). Pursuant to

our arrangement with the White House, portions of the notes of both Sherburne and Cheston

from this interview were read to OIC attorneys. The portions relating to the February 28 and

March 1 memoranda were not read because -- prior to the disclosure of the notes of the Sabrin

conversation -- those issues were not a central focus of the investigation. Depending on the

outcome of the OIC's litigation against the White House in the Eastern District of Arkansas, the

OIC should consider pursuing the notes of Sherburne and Cheston from their interview with

Ickes. Those notes will help in determining whether the statements attributed to Sabrin in the

Sherburne and Cheston notes accurately reflect what Ickes may have been confiding to his

145

private counsel and the White House Counsel's Office in the summer of 1994.[326]

* * * * *

7) **Billing Records** -- [The facts relating to the discovery of the billing records in the White House are detailed in Colloton & Azar, "Rose Law Firm billing records," September 1996.]

The basic facts and circumstances surrounding the disclosure in January of 1996, that Rose Law Firm billing records were in the residence portion of the White House, are well known and ably set forth in the Colloton/Azar memo of September 1996. Also well known is the conclusion which Steve and Alex come to that

FOIA(b)7 - (C)

, they doubt that "the admissible evidence probably is sufficient to establish guilt by proof beyond a reasonable doubt before an unbiased jury." (Colloton & Azar, at 32-33).

Initially, we point out two important factors, or series of factors, not considered in September of 1996:

1.

FOIA(b)7 - (C)

2.

326. In addition, the OIC should consider questioning Sabrin, Sherburne, and Cheston about their conversation. The OIC's position would be that Sabrin waived her private attorney-client privilege by communicating with Sherburne and Cheston and that, in any event, any official or private privileges were waived by the White House's disclosure of the notes of Sherburne and Cheston.

146

Obtained by Judicial Watch, Inc. via FOIA

3.



FOIA(b)7 - (C)

FOIA(b)7 - (C)

Carolyn Huber, Hillary Clinton's personal executive assistant says that the billing records were first found on a table in the Book Room, Room 319A, just outside of Hillary Clinton's office in August 1995. According to Ms. Huber, she did not recognize what they were, boxed them up and put them away and did not "re-discover" them and recognize their significance until

147

January 1996. In January 4, 1996, her office was being rearranged and the table covering the box was moved. When she emptied the box, Ms. Huber says she discovered the records and immediately called her attorney, Henry Schuelke.

FOIA(b)7.- (C)

She is the only individual in the White House who had a significant interest in them and she is one of only 3 people known to have had them in her possession since their creation in February 1992 (the other two were Vince Foster, who was dead at the time of the records discovery, and Hubbell, who was in jail). Moreover, in the late July/early August time-period, Mrs. Clinton had reason to review the records. Relevant events at that time include: an OIC interview on July 22, 1995; release of RTC and FDIC-OIG reports on RLF and MGSL on July 28 and August 3, 1995; and public testimony by the FDIC, RTC and Hubbell before Congress on August 10, 1995. Immediately thereafter the Clintons left on their August vacation in Wyoming.

In addition there is some slight direct evidence that Hillary Clinton possessed the billing records. Three individuals (two construction workers[_____] have all testified that they observed Hillary Clinton carrying a cardboard box in the Residence on or about July 8-9, 1995. [_____] has also testified that the box contained documents that looked like "technical documents" or "blueprint schematics" of the same size and shape as the billing records. He could not, however, conclusively identify the billing records as the documents he saw, but when shown a copy of the billing records he said they were consistent with the documents he saw in Mrs. Clinton's possession.

Finally, we have comprehensively interviewed almost every other individual who had access to Room 319A in August 1995. None appear to have any motive to have placed the

148

FOIA(b)7 - (D)

billing records there and none recalls having seen the billing records in the room. We might reasonably anticipate the possibility of bringing each witness in to the trial for brief questioning; the effect would certainly be compelling.[327]

FOIA(b)7 - (C)

Also significant as pointed out in the Azar/Colloton memo is the fact that Vince's handwriting as well as fingerprints appear on the billing records. His handwriting says in various places, HRC and circles various entries in the billing records. It is clear that the handwritten notations are directing HRC to various events in the billing records. The billing records were under subpoena since June of 1994.[328]

_____

[327]
FOIA(b)7 - (C)

[328] We have been asked our view on how the billing records came into Mrs. Clinton's possession. The Azar/Colloton memo offers a couple of theories as to how HRC came into possession of the billing records.

FOIA(b)7 - (C)

149

| FOIA(b)7 - (C) |
|---|

At the time they were discovered, Associate White House Counsel Jane Sherburne raised the forensic question of fingerprints with Mrs. Clinton's attorney, David Kendall, and Mrs. Huber's attorney, Henry Schuelke. Kendall cavalierly dismissed the concerns and has since said he just didn't consider it a forensic issue. Sherburne and Huber then took the billing records to a color copier in the White House and made 2 copies -- Sherburne kept one and Kendall to the other copy and the originals to his law firm.

At the law firm, Kendall gave the original and the copies to a paralegal named Mark Rolfe and directed him not to let the records out of his sight because they were highly confidential. He did not ask Rolfe to take any special forensic precautions (i.e. wear gloves). Rolfe affixed Bates numbers to the original and the copy and then compared the two sets of documents to insure that the copies were complete. In several instances he determined they were not complete (as the Post-It notes had not been copied) and he recopied the original. Most remarkable, after completing the comparison, Rolfe made additional copies from the first copy (principally for distribution to the Senate Whitewater Committee) but when the copies were incomplete he went back to the original to make copies -- thus the original documents were handled extensively before they were turned over to OIC.

| FOIA(b)7 - (C) |
|---|

For example, in September of 1996, Messrs Colloton and Azar speak of the information contained in the records which show or indicates "Mrs. Clinton's role in suspicious transactions", i.e. Castle Grande. We now have retained a expert in the operation of regulatory agencies, who

150

NW: 15416 DocId: 70001585 Page 189

will testify that the events surrounding Castle Grande, such as the cross loans, were criminal acts.

FOIA(b)7 - (C)

FOIA(b)7 - (C)

FOIA(b)7 - (C)

151

Obtained by Judicial Watch, Inc. via FOIA

Obtained by Judicial Watch, Inc. via FOIA



FOIA(b)7 - (C)

FOIA(b)7 - (C)

152

NW: 15416 DocId: 70001585 Page 190

Obtained by Judicial Watch, Inc. via FOIA

FOIA(b)7 - (C)

FOIA(b)7 - (D)

153

Obtained by Judicial Watch, Inc. via FOIA

```
                          FOIA(b)7 - (C)
```

\* \* \* \* \*

### 8) *Support for Webb Hubbell --*

I. <u>BACKGROUND</u>

On March 14, 1994, Webster L. Hubbell announced his resignation from his position as

Associate Attorney General, the number three position in the Department of Justice. Hubbell's

resignation was effective approximately three weeks later. His last day at DOJ was April 8,

1994. The stated reason for Mr. Hubbell's resignation was that he needed to devote time to

resolve a billing dispute with his former employer, the Rose Law Firm in Little Rock, Arkansas.

At the time of his resignation, it had been reported in the press that Hubbell's billing dispute was

a subject being examined by Special Prosecutor Robert Fiske (title as reported by the press).

```
         FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure
```

154

Obtained by Judicial Watch, Inc. via FOIA

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

During the April through November, 1994, time frame, Hubbell was retained as a consultant by 17 different persons/entities. Hubbell collected $450,010.00 from "consulting" work in 1994. Hubbell collected $91,750.00 in consulting fees in calendar year 1995 (not including $37,500.30 in publishing income from William Morris in 1995).

On December 6, 1994, Hubbell pled guilty to two felonies - Mail Fraud and Tax Evasion based on $482,000.00 in improperly billed fees and expenses associated with his representation of Rose Law Firm clients. As part of his plea agreement, Hubbell agreed to cooperate with the OIC, and to provide complete and truthful information.

Hubbell was sentenced by U.S. District Court Judge George Howard on June 29, 1995. Hubbell received a sentence of incarceration of 21 months. He was designated to serve this sentence at the Federal Correctional Institution at Cumberland, Maryland. Hubbell reported to that institution on August 7, 1995. He was released from FCI Cumberland to a halfway house in Washington, D.C. in November, 1996. He completed his sentence in February, 1997.

II. EFFORTS TO ASSIST HUBBELL

On March 13, 1994, the day prior to Hubbell's announcement of his resignation from DOJ, there were at least two meetings held at the White House to discuss Whitewater related matters. According to the grand jury testimony of then White House Chief of Staff Thomas "Mack" McLarty, there was a meeting scheduled in the residence of the White House to discuss with the President and First Lady an organizational structure to deal with Whitewater related matters. Prior to that meeting, there was a "pre-meeting", at approximately 8:00 a.m., attended

155

by McLarty, Harold Ickes, David Kendall and Bob Barnett.[330] According to McLarty, during this

pre-meeting, McLarty, Ickes, Kendall and Barnett discussed the agenda for the upcoming

meeting in the residence.  At approximately 8:30 or 9:00 a.m., the full meeting was held in the

residence with McLarty, Ickes, Mrs. Clinton, President Clinton, Maggie Williams, Kendall and

Barnett.[331]  Following the completion of the agenda items (reflected in McLarty's notes that were

produced to OIC on May 7, 1997), there was a conversation of approximately 10 minutes with

the entire group that dealt with Hubbell.  McLarty testified that:

> another matter that was topical and pressing in nature was raised at this meeting.  And
> that's how I remember the Webb Hubbell resignation situation or possible resignation
> being raised at this meeting.[332]

McLarty refused to say who said what during the discussion (based upon his instructions to

assert executive privilege) -- but did say that they discussed the facts surrounding Hubbell's

resignation.  McLarty made the general statement that:

> given the fact that there had been apparently discussions with him [Hubbell] by Blair and
> Kantor...it seemed to be a growing possibility that he would not be able to continue to
> effectively serve as Associate Attorney General.  That's how I remember the matter
> coming up and generally what the tone of the discussion was.[333]
>
>                    ....
>
> at least the feeling that I had, and I think it was shared certainly by others, that Mr.
> Hubbell would have to resign...closure was not reached on whether or not Mr. Hubbell
> would be asked to resign [but Hubbell had informed McLarty that he would be willing to

---

[330]     McLarty, 4/17/97 GJT, at 114-117.

[331]     Id at 12-37; 114-117.

[332]     Id at 32.

[333]     Id at 31.

156

Obtained by Judicial Watch, Inc. via FOIA

resign] if the President felt it was necessary.[334]

According to McLarty, as the meeting was breaking up, he initiated a comment to the First Lady and told her: "We're going to be supportive of Webb. And her response to me, as I remember it, was, "Thank You Mack. I appreciate that very much."[335]

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

Following this meeting, McLarty spoke to Truman Arnold and Vernon Jordan about assisting Hubbell in finding clients. In addition to hiring Hubbell himself, Truman Arnold recommended Hubbell to at least four others that eventually hired him: John Moores, Wayne Reaud, Bernard Rapoport, and C.W. Conn. Vernon Jordan recommended Hubbell to at least one entity, McAndrews and Forbes (Revlon), that eventually hired him.

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

Within the first couple weeks of Hubbell's announced resignation, Bill Burton, McLarty's staff director, telephoned Brad Keithley of the Jones, Day law firm in Dallas, TX on Hubbell's behalf. Burton called Keithley at McLarty's direction or on his own initiative following a discussion with McLarty about Hubbell. A short time later, Burton reported back to McLarty that Keithley had been courteous, but had indicated that "it would not work out for Hubbell at

---

[334]    Id at 32.

[335]    Id at 35.

[336]    Id at 37.

157

NW: 15416 DocId: 70001585 Page 195

Obtained by Judicial Watch, Inc. via FOIA

Jones, Day, or other traditional law firms for that matter, as long as this billing dispute was outstanding with Rose Law Firm."[337]

Erskine Bowles, then the head of the Small Business Association, received a telephone call from Mickey Kantor around the time that Hubbell announced his resignation. Kantor was a good friend of Bowles. Kantor said that he was concerned about the plight of Hubbell's family and especially the Hubbell children. Although Kantor did not ask him to do anything and he was not personally a close friend of Hubbell's, Bowles decided to try to help Hubbell because he was a guy who was down FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure Bowles telephoned Hubbell and offered to help him by calling a few friends with contacts in Washington. Hubbell indicated to Bowles that he was interested in remaining in Washington, D.C.

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

---

[337] Id at 50-52.

[338] FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

Obtained by Judicial Watch, Inc. via FOIA

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

## III. HUBBELL'S CLIENTS

The following is a description of several of Hubbell's consulting clients which fall most strongly within the hushmoney allegation. The clients are discussed in the chronological order in which they hired Hubbell.

### 1) Truman Arnold

Arnold paid Hubbell $18,000.00 on April 20, 1994. The $18,000.00 represented a six month contract at $3,000.00 per month. Arnold has testified before the grand jury that he received a call from Mack McLarty in late March or early April, 1994, requesting Arnold keep an eye out for opportunities for Mr. Hubbell and to spread the word among his business associates that Hubbell was available for work in Washington, D.C.

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

159

Obtained by Judicial Watch, Inc. via FOIA



FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

Arnold further testified that when the six month contract expired in

October, 1994, he did not renew the contract because he was "disappointed" with Hubbell's

performance. Hubbell had not approached him with any investment ideas or opportunities during

the six months he was on retainer. Arnold told the grand jury that if he had known the true



340

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

341

160

NW: 15416 DocId: 70001585 Page 198

nature of Hubbell's situation and the fact that he would later plead guilty to the two felony

counts, he never would have hired Hubbell and would not have recommended him to his friends

and associates (Bernard Rapoport, John Moores, Wayne Reaud, and C.W. Conn).

```
FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure
```

## 2) McAndrews and Forbes/Revlon

Prior to Hubbell's resignation from DOJ, on March 12, 1994, Vernon Jordan met with

Webb Hubbell at 8:00 a.m., in the Melrose room at the Park Hyatt Hotel in Washington, D.C.

Hubbell had called Jordan for breakfast. Jordan has testified that Hubbell said in effect that he

was leaving DOJ and:

> I would like a life after that, and will you be helpful to me? And I said, I am happy to be
> helpful to you...Hubbell said he would like to continue doing what he was doing before
> he came into government. That was to practice law, to have clients. And I said, I'll do
> what I can...I said, Webb, I'd like to help you and I will think about it and I will be back
> in touch.[343]

```
FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure
```

---

[342] FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

[343]     Jordan, House Testimony 7/24/97, at 29-34.

161

Obtained by Judicial Watch, Inc. via FOIA

> FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

Jordan says its "entirely conceivable" that McLarty called him about Hubbell and that Jordan told McLarty that he was trying to help Hubbell but, "I do not recollect that." [345]

McAndrews and Forbes is a holding company established to maintain and operate the personal investment holdings of Ronald Perelman. The General Counsel of McAndrews and Forbes is Barry Schwartz. Schwartz testified that in April, 1994, he received a recommendation from Vernon Jordan that Webb Hubbell was available for work in Washington, D.C. Schwartz testified that he spoke with two other employees of McAndrews and Forbes, Howard Gittes and Richard Halperin about the possibility of hiring Hubbell. Shortly after this first telephone call with Vernon Jordan, Jordan brought Hubbell by the New York offices of McAndrews and Forbes to introduce Hubbell.

This is consistent with Jordan's testimony in which he has stated that "I think at some point after that we went to New York and I took him to a client of mine and introduced him." Jordan says he introduced Hubbell to Howard Gittes, vice chairman of McAndrews & Forbes and others on April 6, 1994 3:30 p.m.

> What I did was to make introductions. Introductions to introduce Hubbell to Howard Gittes. I'm a member of the Revlon Inc. board. I am one of many counsel to Revlon and to McAndrews & Forbes. I've had a long relationship there. Howard is a friend of mine. Webb is a friend of mine. I introduced them and left them to talk.

---

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

[345]   Jordan, House Testimony 7/24/97, at 42.

162

Jordan says he had no discussions with Hubbell about any post-employment restrictions he may have been under:

> I did not ask questions about the appropriateness of this or the appropriateness of that. He was a friend in trouble. I could be of some help to him, and I did it. Proudly.

Jordan knows nothing about the details of Hubbell's retainer with M&F. Jordan believes that, at some point, he spoke to Perelman regarding Hubbell being hired. Jordan first said he was certain Perelman had stopped by that initial meeting with Hubbell -- Jordan then backed off and said that it was "entirely possible" that Perelman stopped in.[346]

Jordan further testified that he told the President that he was helping Hubbell. "I told the President in an informal setting that I'm doing what I can for Webb Hubbell. The President said, "Thanks." End of conversation." "It was sometime in the spring I'm sure, and my suspicion is that the forum was the golf course."[347]

Eventually, Schwartz scheduled an interview with Hubbell for April 29, 1994. During that meeting, Hubbell assured Schwartz that there was nothing about his personal situation that would become embarrassing for McAndrews and Forbes in the future. Following the meeting, Schwartz retained Hubbell at the rate of $25,000.00 per quarter.

During his grand jury testimony Schwartz could not describe with any particularity the types of items he anticipated that Hubbell might work on. Hubbell was paid $25,000.00 in April 1994 and a second $25,000.00 in July, 1994.

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

---

[346]   Id at 35-38.

[347]   Id at 46.

163

Obtained by Judicial Watch, Inc. via FOIA
FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

Telephone messages indicate that Hubbell had a series of conversations,

and at least one meeting with Schwartz, in late October and early November, 1994. Schwartz

testified that it was during this period that Hubbell was consulted on one legal matter involving

McAndrews and Forbes. Schwartz refused to answer questions about the substance of the matter

based on attorney/client privilege. Hubbell never produced any written work product during this

consultation.

Eventually, Hubbell was paid an additional $12,775.00 in December, 1994. Schwartz

testified that on approximately December 2, 1994, Hubbell called to inform that he was pleading

guilty. Schwartz testified that he was surprised by this phone call and that up until that time he

had no idea that Hubbell was facing criminal charges. Schwartz terminated Hubbell in a letter

dated December 12, 1994, in which he indicated that given Hubbell's decision to plead guilty, it

was "obvious" that Hubbell would no longer be able to work for McAndrews and Forbes. The

final $12,775.00 payment represented a pro rata payment from the invoice date of October 28,

1994, until December 2, 1994, when McAndrews and Forbes was notified by Hubbell that he

would be pleading guilty.

### 3) American Income Life

American Income Life is a life insurance company owned by Bernard Rapoport in Waco,

Texas. Rapoport is a major Democratic contributor and supporter of President Clinton.

Rapoport received a telephone call from Truman Arnold in April or early May, 1994.

164

Obtained by Judicial Watch, Inc. via FOIA
FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

Arnold indicated that he had hired him for $18,000.00 - $3,000.00 a month for six months. Rapoport indicated he would do the same thing.

American Income Life paid Hubbell $18,000.00 over six months beginning May 23, 1994.                                                                                     Rapoport was not aware of any particular work that Hubbell did. Rapoport testified that if had been aware of Hubbell's criminal activity he would never had hired him. Upon expiration of the six month period, Rapoport did not renew the contract but later did contribute $6,000.00 to the Hubbell Children Education Trust Fund.

### 4) Hong Kong China Limited (Lippo/Riady's)

On June 27, 1994, $100,000.00 was wired into the account of Webster Hubbell from a Lippo/Riady controlled entity, Hong Kong China Limited. Hong Kong China Limited is a foreign corporation based in Hong Kong. We have been unable to interview anyone from that corporation or anyone that works for the Riady's.

According to documents produced by Hubbell, it appears he was hired as a consultant to Hong Kong China Limited. In a June 27, 1994, letter to the Director of Hong Kong China Limited, Mr. David T. Yeh, Hubbell stated:

> I am pleased to provide my consultant services to your company. As you know, I provide a broad range of consultant services including extensive expertise in capital markets, U.S. placements, A.D.R. and investments. From our previous dealing, you are also aware that I have extensive legal experience in banking, insurance, corporate organizations and securities.
>
> I am pleased to confirm that I will be providing the full range of my services for a fee of

165

Obtained by Judicial Watch, Inc. via FOIA

$100,000.00 per year payable in quarterly installments beginning on July 1, 1994...

The retention of Mr. Hubbell by Hong Kong China Limited followed a series of visits to the White House by James Riady and John Huang during the week of June 20, 1994.

**May 19, 1994**  Hubbell writes a letter to Juhn Huang at Lippo Bank in Los Angeles, CA : "It was good to see you last evening. I apologize that I did not have any business cards with me. I am enclosing one and hope you will call if I can be of service or you would just like to visit. Please give James my best and tell him I would love to see him when he comes to Washington in June."

**June 21, 1994**

2:27 p.m.  telephone call charged to Hubbell's calling card from the White House

4:45 p.m.  James Riady and John Huang enter West Wing according to WAVES records

4:51 p.m.  Mickey Kantor enters White House complex according to EPASS records

6:30 p.m.  Mack McLarty receives telephone message from Marsha Scott: "Tomorrow is fine. Seeing President at 7 o'clock and Webb this evening, so we'll have more to report"

6:50 p.m.  James Riady, John Huang, James Lewin (Sprint), Bernard Rapoport, and Wayne Reaud visit POTUS on South Lawn according to WAVES records

7:00 p.m.  Hubbell calendar lists appointment "Marsha Scott"

**June 22, 1994**

2:57 p.m.  James Riady and John Huang visit Mark Middleton in West Wing

3:27 p.m.  Mickey Kantor enters White House complex according to EPASS records

166

Obtained by Judicial Watch, Inc. via FOIA

4:33 p.m.          Kantor exits White House complex according to EPASS
                   records

**June 23, 1994**

7:30 a.m.          Hubbell calendar shows appointment with "J. Riady"

7:51 a.m.          Kantor exits White House complex according to EPASS
                   records (no record of entry)

10:27 a.m.         John Huang visits Alexis Herman in the West Wing
                   according to WAVES records

12:00 p.m.         Hubbell calendar lists appointment with "J. Riady - Hay
                   Adams"

2:35 p.m.          Mickey Kantor enters White House complex according to
                   EPASS records

3:44 p.m.          Kanotr exits White House complex according to EPASS
                   records

**June 24, 1994**

???                Kantor leaves telephone message for Hubbell at his GW
                   Miller office

12:05 p.m.         John Huang visits Middleton in West Wing according to
                   WAVES records

12:56 p.m.         James Riady visits Middleton in West Wing according to
                   WAVES records

5:00 p.m.          Hubbell calendar shows appointment with "J. Riady"

**June 27, 1994**

                   Hubbell writes letter to David Yeh, Director, Hong Kong
                   China Ltd. "...I am pleased to confirm that I will be
                   providing the full range of my services for a fee of
                   $100,000 per year payable in quarterly installments
                   beginning on July 1, 1994..."

167

Obtained by Judicial Watch, Inc. via FOIA

> $100,000 (the entire year's amount) is wired from Hong
> Kong China Ltd to Hubbell's NationsBank account in
> Washington, D.C. through Bank of New York

As for any work that Hubbell did for Hong Kong China Limited, the documents provided by Mr. Hubbell indicate that his only contact with Mr. Yeh was the June 27, 1994, retention letter and subsequent letter acknowledging the lump sum payment of $100,000.00. Hubbell's documents do show contact with other employees of Lippo entities, mainly related to Hubbell assisting them with getting hotel rooms and travel arrangements. Other than assisting with some travel arrangements, there are no documents that indicate any substantive work that Hubbell performed for any of the Lippo entities.

Webb and Suzy Hubbell discussed Lippo in a September 6, 1996 telephone call from FCI Cumberland. Webb describes how the WallStreet Journal is after him again. It ran an article referring to his book and the Jane Sherburne memo refering to monitoring Hubbell cooperation. Webb then says that in addition, the Journal article also "bring[s] out Riady again..."

Webb: And said the Senate was unable to find out what I did for 'em. Hello?

Suzy: Yeah, 'cause you didn't do anything for 'em.

Webb: Yeah. Alright.

In March 1995 (after Hubbell's guilty plea), Hubbell had dinner with Bernard Rapoport and Mark Middleton, a former aide to Mack McLarty. Hubbell asked Middleton if the Riadys intended to continue to pay him. Middleton responded that he didn't know and that Hubbell should talk to John Huang or the Riady's directly.

**5) SunAmerica Corporation**

168

Obtained by Judicial Watch, Inc. via FOIA

SunAmerica Inc. is an insurance and investment company based in Los Angeles, California, owned and controlled by Eli Broad. Broad has known Hubbell since the mid-1980s when he was introduced to Hubbell and the Rose Law Firm by Mickey Kantor. Hubbell did legal work in Little Rock, AR for SunAmerica in 1985 and 1986. Since that time, Broad has maintained periodic personal and telephonic contact with Hubbell. Broad did not recall any contact with Hubbell during the period when Hubbell was at the Department of Justice.

Broad became aware that Hubbell was doing consulting work on or about April 14, 1994, while attending a donor reception dinner at the home of Peter Norton. Hillary Clinton was the guest of honor and there were approximately 150 guests. After the dinner, Mrs. Clinton was "table hopping" shaking hands with all the guests. During the short time Broad spoke with Mrs. Clinton, Broad inquired about how Hubbell was doing. Mrs. Clinton informed Broad that Hubbell was doing consulting work in the Washington area. Broad says he has no clear recollection, but during this brief conversation, Broad either told Mrs. Clinton he was going to give Hubbell a telephone call or Mrs. Clinton suggested that Broad give Hubbell a call.

Broad subsequently did telephone Hubbell at Hubbell's Washington office. Over the next few months, Broad and Hubbell discussed SunAmerica and its interest in a National Savings policy.

Such a policy would likely include certain incentives such as tax deferment, to encourage people to save more money. SunAmerica planned to offer financial products that took advantage of the plan. On May 25, 1994, Broad retained Hubbell at a rate of $5,000.00 per month. Broad has told investigators that he hired Hubbell to assist SunAmerica in promoting a National Savings policy that would be supported by the administration and as an advocate to get

169

Obtained by Judicial Watch, Inc. via FOIA

something moving regarding this issue. Broad also expected Hubbell to remain alert and advise SunAmerica of anything going on in political circles regarding a National Savings policy. It should be noted that Broad is a personal friend of President Clinton and has access directly to him.

On September 19, 1994, Hubbell sent Broad a letter outlining a number of specific efforts he would make on behalf of SunAmerica. These included making certain presentations and contacts with specific members of the Clinton Administration, including the President. There is no evidence that Hubbell completed any of these items.

SunAmerica paid Hubbell a total of $35,000.00 in 1994. Hubbell was terminated shortly after pleading guilty to the criminal charges on December 6, 1994. Broad felt that after his guilty plea, Hubbell was no longer of value to SunAmerica. Employees of the company, including a former General Counsel, Karen Hedlund, and Loren Fife, current Co-General Counsel with Susan Harris, have stated that they felt that Hubbell had been paid an appropriate amount and that SunAmerica had received the fair value of his services up until the time he plead guilty in December, 1994.

### 6) John Moores (JMI Inc., Sugarland, Texas)

John Moores is an entrepreneur and major Democratic donor who made his fortune in computer software. Moores testified that he hired Hubbell in July, 1994, upon the recommendation of Truman Arnold. Moores paid Hubbell $18,000.00 in a lump sum which he said represented a six month contract at $3,000.00 per month. Moores testified that his primary focus in retaining Hubbell was to have him work on an airplane hangar project he was trying to develop in Carmel, California. Moores wanted Hubbell to make contact with the FAA about

170

Obtained by Judicial Watch, Inc. via FOIA

getting approval for his project. Moores also indicated that he later contemplated having Hubbell

work on a real estate project in which he was attempting to purchase some property which was

held by the RTC. Moores is not aware of any contacts that Hubbell made at the FAA or RTC.

Moores did not renew his contract after the six month period expired and indicated that if he had

known about Hubbell's criminal problem beforehand, he never would have hired Hubbell.

### 7) C.W. Conn (Conn Appliance, Beaumont, Texas)

C.W. Conn is the founder of Conn Appliance Corporation and is a multi-millionaire and

major Democratic donor. Conn hired Hubbell upon the recommendation of Truman Arnold.

Conn first met Hubbell and retained him during a July 28, 1994, meeting in Washington, D.C. at

Hubbell's office. Also in attendance at the meeting were Truman Arnold, Wayne Reaud, Bernard

Rapoport, John Moores and Gil Morgan (a law partner of Wayne Reaud). The meeting was

arranged by Truman Arnold to discuss the possibility of Hubbell looking for joint investment

opportunities for the group.

Conn paid Hubbell $18,000.00 on July 28, 1994 in a lump sum representing a six month

contract at $3,000.00 per month. Conn's primary interest was in securing a presidential

appointment as an ambassador. Hubbell indicated that he could help him in that process.

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

Conn has

no evidence that Hubbell did anything to help him get an ambassadorship. Conn is not an

171

NW: 15416 DocId: 70001585 Page 209