# EXHIBIT 2

to

Plaintiff's Response to Defendant's Statement of Material Facts
Not in Dispute and Statement of Undisputed Material Facts
in Support of Cross-Motion for Summary Judgment

**PART B**

**THE RELATIONSHIP OF MADISON GUARANTY, CMS, AND
THE ROSE LAW FIRM**

**Chapter 3:**

**Mrs. Clinton's Madison Guaranty Representation**

# I.    INTRODUCTION

Mrs. Clinton represented Madison Guaranty between April 1985 and July 1986, a time when the institution was in severe financial trouble and when insiders committed numerous criminal and otherwise fraudulent acts.  The most serious of those fraudulent and criminal acts are the subject of Chapter 1 of this Part.  Several individuals were eventually convicted of or pleaded guilty to federal crimes for their roles in connection those transactions.  As Chapter 1 showed, Mrs. Clinton represented Madison Guaranty in regard to some of the fraudulent transactions, and Madison Guaranty insiders used and misused her legal services to thwart federal examiners.

After July 14, 1986, when federal regulators had demanded that the McDougals be removed from control of Madison Guaranty and Mrs. Clinton ended Madison Guaranty's retainer arrangement, it was clear that the insiders had engaged in substantial misconduct, including possibly having committed crimes.  The Clintons' association with the McDougals, and in particular Mrs. Clinton's representation of Madison Guaranty, were, at a minimum, a substantial political liability.  Moreover, Mrs. Clinton's representation of Madison Guaranty could have been a civil liability for Mrs. Clinton and the Rose Law Firm.

Rose, and in particular Webster Hubbell, also represented Madison Guaranty and its conservators, the FDIC and the RTC, beginning in 1989.  Hubbell concealed numerous potential conflicts of interest from the FDIC and RTC during that representation.  That representation and Hubbell's acts of concealment are discussed in Chapter 2 of this Part.  Hubbell eventually pleaded guilty to a felony for those acts.

410

When Governor Clinton ran for president in 1992, Mrs. Clinton's representation of Madison Guaranty, including how the representation had come about, became matters of public inquiry.  At that time, Madison Guaranty had failed, a failure that ultimately cost the American tax payers about $73 million.  Mrs. Clinton and the Clinton campaign made public statements regarding her representation that minimized her role.

After 1993, the conduct of insiders at Madison Guaranty and the Rose Law Firm became the subject of multiple federal investigations.  The RTC investigated whether insiders had committed criminal acts, and also examined whether the agency had viable civil claims against any insiders or professionals who had represented Madison Guaranty, including the Rose Law Firm.  Also, the FDIC and RTC investigated whether Rose attorneys had concealed potential conflicts of interest from the agencies.  The FBI and the United States Department of Justice also conducted criminal investigations of the conduct of the Madison Guaranty insiders and others, including Rose attorneys, who had been associated with the institution.  Beginning in 1994, those investigations were continued by this Office.

In the course of the federal investigations, Mrs. Clinton made numerous statements and gave sworn testimony regarding her representation of Madison Guaranty.  This Office investigated whether Mrs. Clinton had committed perjury, made false statements, or obstructed justice during those investigations.  The Independent Counsel concluded that there was insufficient evidence to prove beyond a reasonable doubt that Mrs. Clinton had committed any federal criminal offense.  While the evidence did show that some of Mrs. Clinton's statements had been factually inaccurate, the evidence did not establish beyond a reasonable doubt that she

411

knew that they were factually inaccurate when she made them.

This Chapter details the results of the investigation of Mrs. Clinton's statements regarding her representation of Madison Guaranty and the origin of that representation.

## II.     ANALYSIS

### A.     Madison Guaranty Hired Rose.

In April 1985, Madison Guaranty retained the Rose Law Firm, and that relationship continued until July 1986, when the federal regulators removed the McDougals from Madison Guaranty and Mrs. Clinton terminated the retainer.  The circumstances leading to Rose's being retained were later disputed by the individuals involved -- Jim McDougal stated that he hired Rose and Mrs. Clinton as a favor to Governor Clinton, while Mrs. Clinton stated that Madison Guaranty hired Rose because a Rose associate, Rick Massey, was a friend of Madison Guaranty's president, John Latham.

The circumstances of Rose's being retained by Madison Guaranty were investigated by numerous federal bodies, including this Office, the FDIC, the RTC, and Congressional committees.  The FDIC and RTC investigation included determining whether Madison Guaranty's retaining Rose had been proper, or whether it had caused any losses to the institution. This Office's investigation included determining whether anyone had committed perjury, made a false statement, or obstructed any federal investigation.

The principals involved in the retention disagreed as to how it came about.  Jim McDougal said he hired Rose as a favor to Governor Clinton.  Mrs. Clinton said Rick Massey brought in the work and her only role was to collect on an old bill still owed by Madison Bank

412

and Trust, McDougal's other institution.  President Clinton said he could not remember asking

McDougal to give his wife business, but did not say that McDougal's recollection was false.

Massey testified he did not remember bringing Madison Guaranty to Rose, asking Mrs. Clinton

to act as billing partner, or discussing McDougal's unpaid bill.  Massey said that when partner

David Knight had asked Latham for business, Latham said he wanted to give Knight and Massey

the business, but Jim McDougal hired Madison Guaranty's lawyers.  Latham said McDougal was

satisfied with Madison Guaranty's principal counsel, Mitchell Williams, which was the firm of

Jim Guy Tucker, McDougal's long-time friend and business partner.

Documents establish that some of Mrs. Clinton's statements were factually inaccurate.

Mrs. Clinton stated that in April 1985, Rick Massey tried to bring Madison Guaranty to Rose as a

client, but was told by some partners that he could not do so until McDougal agreed to pay the

outstanding bill owed to Rose by Madison Bank and Trust.  Mrs. Clinton stated that on April 23

she arranged for McDougal to have the old bill paid so that Massey could bring Madison

Guaranty in as a client.  That statement was factually incorrect.  The evidence uncovered by this

Office conclusively established that the old bill had been settled in October 1984, six months

before Mrs. Clinton's supposedly having arranged for it to be paid.  In October 1984, Madison

Bank and Trust paid $5,000 of the outstanding balance of $5,893.  Rose never attempted to

collect the remaining $893, and Madison Bank and Trust never paid it; the understanding was

apparently that the $5,000 payment was a final settlement of the debt.

Although the evidence thus conclusively established that Mrs. Clinton's statements had

been to some extent factually inaccurate, the Independent Counsel concluded that the evidence

413

did not establish beyond a reasonable doubt that Mrs. Clinton knew the statements were factually inaccurate when she made them.

### 1.     McDougal's Account of Madison Guaranty's Retention of Rose.

Jim McDougal said Rose hired Madison Guaranty after Governor Clinton jogged by Madison Guaranty early one morning in August or September 1984, and sat in a new leather chair in McDougal's office, leaving a sweat stain.  Governor Clinton had complained about Mrs. Clinton's earnings at Rose.  McDougal offered to send her some legal work, putting Rose on retainer of $2,000 per month.  Mrs. Clinton came by McDougal's office later that day to finalize the arrangement.

McDougal's version of events -- sometimes called the "jogging incident" -- was first reported by the national media during the 1992 Presidential campaign.  McDougal related the incident to Jeff Gerth, but it was excluded from Gerth's initial article by his editors.  But other articles soon reported McDougal's story within the next few weeks, and Madison Guaranty's hiring of Rose became a campaign issue.

McDougal's initial statements to the press during the '92 campaign were consistent with his later sworn testimony and statements to this Office about the retainer.  There were some inconsistencies in the details of McDougal's recollection, and McDougal conceded at his 1996 criminal trial that his memory of the specifics of the jogging incident may have become jumbled.[1735]

---

[1735]  Tr. at 7299, <u>United States v. McDougal et al.</u>, No. LR-CR-95-173 (E.D. Ark. May 8, 1996) (testimony of James McDougal) ("I've been asked about it so many hundreds of times, it's

McDougal's statements can be summarized as follows:

Regarding the time that the jogging incident happened, McDougal said Governor Clinton

jogged to McDougal's office between 6:00 a.m. and 7:00 a.m. one morning near the end of

August, or the first part of September 1984, but before Madison Bank & Trust's September 25

board meeting.[1736]  McDougal said he and Susan McDougal's brother Bill Henley were at the

office early to catch up on abstracting and title work:[1737]

> I remember it was very early in the morning, or early for office hours, probably
> about 6:30.  My brother-in-law and I were down at the office trying to catch up on
> the paperwork because we were running such a huge volume of sales at these
> various subdivisions.  And we were in there very early, and the governor came by
> obviously jogging.  He was wearing jogging clothes and was -- you know, it was
> hot weather.  He was sweating.[1738]

McDougal placed the date of the jogging incident using three events:  1) he said it

happened soon after he received a leather chair, which Susan McDougal gave him as a birthday

gift on August 25, 1984;[1739]  2) McDougal said it happened four to five months before Rose did

work for Madison Guaranty in front of the Arkansas Securities Department -- work Rose started

---

running together in my mind in terms of specifics").

[1736]  J. McDougal 4/2/97 GJ at 97, 108-09; J. McDougal 8/96-6/97 Int. at 9-10.  McDougal
testified that the jogging incident could have occurred even earlier:  "[I]t was pretty hot weather .
. . . I thought it was in the summertime, but I'm basing that on the profuse amount of sweat he left
on my chair."  Tr. at 7299, 7304, United States v. McDougal et al., No. LR-CR-95-173 (E.D.
Ark. May 8, 1996) (testimony of James McDougal).  McDougal did not remember the exact date
of the jogging incident.  J. McDougal 4/2/97 GJ at 100.

[1737]  Tr. at 7298, United States v. McDougal et al., No. LR-CR-95-173 (E.D. Ark. May 8,
1996) (testimony of James McDougal); J. McDougal 8/96-6/97 Int. at 9.

[1738]  J. McDougal 4/2/97 GJ at 97.

[1739]  J. McDougal 8/96-6/97 Int. at 10.

April 23, 1985;[1740] and (3) McDougal said it happened before an April 5, 1985 fundraiser

McDougal hosted for Governor Clinton at Madison Guaranty.[1741]

      McDougal said he was annoyed when Governor Clinton stained his chair because

McDougal had just received it as a birthday gift from his wife.[1742]  McDougal described the event

to the grand jury in 1997:

> I had this new chair that Susan had just given me that was expensive because it
> was designed to take care of a back problem.  And he plopped down in that chair,
> and when he got up, the outline of his body was there in sweat.[1743]

      On how the topic of Rose's and the Clintons' finances came up, McDougal said he

casually asked Governor Clinton how things were going, and Governor Clinton responded that

something at Rose had decreased Hillary's earnings:

> Well, I think we had . . . just the general polite conversation you usually have
> among friends, you know.  But when I said, "How are y'all doing," he said that
> they weren't doing too well because they had run into some kind of big expense at
> the Rose Law Firm which had cut down on Mrs. Clinton's income.  I don't
> remember what it was.[1744]

---

[1740] Id. at 11.

[1741] Id.

[1742] Id. at 10; J. McDougal 4/2/97 GJ at 99:

Q.    Now, at some point, have you made a statement that the President actually
       sweated on your new chair?

A.    Well, that's why it kindly burned at my mind, because the chair was brand new
       and he was sweating pretty profusely.  So when he got up, I had a salty outline of
       Bill Clinton on my new chair.

[1743] J. McDougal 4/2/97 GJ at 99; see also Tr. at 7299, United States v. McDougal et al.,
No. LR-CR-95-173 (E.D. Ark. May 8, 1996) (testimony of James McDougal).

[1744] J. McDougal 4/2/97 GJ at 98; see also J. McDougal 8/96-6/97 Int. at 9 ("McDougal
could not recall how they got onto the topic of Clinton's finances.  McDougal speculated that he
may have just asked Clinton how things were going and then Clinton told him about the cutbacks

McDougal said he asked Governor Clinton if it would help if Madison Guaranty sent work to Hillary,[1745] and agreed to when Governor Clinton said yes.[1746]  At his 1996 criminal trial, McDougal testified that after hearing about Rose's problems, "I said to Bill something to the effect of, 'We're needing more legal work.  Would it help Hillary if we gave some of the work to the Rose firm?'  And he said yes."[1747]

On the $2,000 monthly retainer, McDougal said though he had never paid a retainer, he suggested the retainer and the $2,000 monthly amount when he spoke with Mrs. Clinton after the meeting with Bill Clinton.[1748]  McDougal also remembered telling John Latham, then president of

---

at the Rose Law Firm").  McDougal did, however, at one point suggest that Governor Clinton, not McDougal, initiated the conversation about financial problems.  J. McDougal 6/22/95 Int. at 6-7 ("Clinton came in claiming he had financial problems").  When asked about the notes from his 1995 interview during his 1996 criminal trial, McDougal said the notes were wrong: "[Governor Clinton] did not specifically raise the question of needing money or elaborate beyond responding to what I asked him. . . . I did not say [in the '95 interview] that Clinton came in claiming he had financial problems."  Tr. at 7300-02, United States v. McDougal, et al., No. LR-CR-95-173 (E.D. Ark. May 8, 1996) (testimony of James McDougal); see also Rempel Frantz, Fallout from Collapse of S&L Shadows Clinton, L.A. Times, Nov. 7, 1993, at A17 (McDougal quoted saying, "I hired Hillary because Bill came in whimpering they needed help").

[1745] J. McDougal 8/96-6/97 Int. at 9.  McDougal says Madison Guaranty's retainer of Rose had nothing to do with the Clintons' needing money to meet any obligation related to Whitewater.  Id. at 12.

[1746] J. McDougal 6/22/95 Int. at 7; J. McDougal 8/96-6/97 Int. at 9.

[1747] Tr. at 7298, United States v. McDougal et al., No. LR-CR-95-173 (E.D. Ark. May 8, 1996) (testimony of James McDougal); see also J. McDougal 4/2/97 GJ at 98 ("And I said, 'Would it help Hillary if we gave her some of this legal work,' and he said, 'Yes'").

[1748] J. McDougal 8/96-6/97 Int. at 10; J. McDougal 4/2/97 GJ at 98-99 (McDougal did not agree with Governor Clinton on the amount of the retainer.  But see Rempel Frantz, Fallout from Collapse of S&L Shadows Clinton, L.A. Times, Nov. 7, 1993, at A17 ("I asked him how much he needed, and [Governor] Clinton said 'about $2,000 a month,' McDougal said"); J. McDougal 8/96-6/97 Int. at 10 ("McDougal could not initially recall whether he or Hillary

Madison Guaranty, to write a $2,000 check to Rose the same day as McDougal's meeting with Mrs. Clinton.[1749]  McDougal could not explain why Rose's first retainer check was issued in May 1985, rather than the fall of 1984.[1750]

Finally McDougal said Mrs. Clinton came to Madison Guaranty about an hour after Bill Clinton.[1751]  Mrs. Clinton said Bill Clinton sent her:

Q.     And [after Bill Clinton's visit] did you then talk to Mrs. Clinton?

A.     Yes, sir.  She came by, I would say, about between 8:00 and 8:30.  It was before the opening of business.  She came by and said, "Bill asked me to stop, said you wanted to visit about some legal work or whatever."

Q.     And did you agree with her to give her and the Rose Law Firm some legal work?

A.     Yes, sir.

Q.     And was this as a result of the President . . . or the governor at the time and you having a conversation earlier in the day?

A.     Yes, sir.[1752]

---

Clinton came up with the $2,000 per month figure").

[1749] J. McDougal 8/96-6/97 Int. at 10 ("On the same day as Hillary Clinton's visit, McDougal requested Latham to prepare a $2,000 check to Rose for the first month's retainer. McDougal never saw the check that he instructed Latham to prepare.  If Latham did not prepare the check on the day of Hillary Clinton's visit, then Latham failed to follow his instruction").

[1750] Id. at 11 ("McDougal was informed that the first retainer check to Rose was not issued until May 2, 1985.  McDougal thought the checks should have started the same day as [Hillary] Clinton's visit which McDougal thought was in approximately September 1984. McDougal could not explain why he thinks the retainer was in September 1984 and yet no checks were issued to the Rose Law Firm until May 1985").

[1751] Id. at 9.

[1752] J. McDougal 4/2/97 GJ at 99.

418

McDougal said he told Mrs. Clinton he needed her help on some real estate abstract work.[1753]  McDougal said the meeting with Mrs. Clinton lasted about five minutes, and Mrs. Clinton left Madison Guaranty before 8:30 a.m.[1754]  McDougal said that day was the last time he remembered actually meeting with Mrs. Clinton.[1755]

### 2.      Evidence Reflecting on the Accuracy of McDougal's Version.

#### a.      Mrs. Clinton's Income.

Tax records showed Mrs. Clinton's Rose income dropped from 1983 to 1985, consistent with McDougal's testimony that Governor Clinton told him Mrs. Clinton's Rose earnings had fallen.  The Clintons' tax returns for 1983-85 show the following earnings for Mrs. Clinton at Rose:

| Year | Wages from Rose |
|------|-----------------|
| 1983 | $ 82,741[1756]  |
| 1984 | $ 72,989[1757]  |
| 1985 | $ 55,382[1758]  |

---

[1753]  J. McDougal 8/96-6/97 Int. at 10.

[1754]  Id.  ("McDougal was fairly certain that Hillary Clinton left just prior to 8:30 a.m. because he wanted to introduce Hillary Clinton to John Latham who had not yet arrived to work.  Latham arrived shortly after Hillary Clinton left").

[1755]  McDougal did remember speaking to Mrs. Clinton by phone in 1986 about a proposed brewery.  Id. at 13.

[1756]  Tax Return and W-2 Statements for William J. and Hillary R. Clinton (1983) (Doc. No. DEK001329).

[1757]  Tax Return and W-2 Statements for William J. and Hillary R. Clinton (1984) (Doc. No. DEK000753).

### b.   Others' Statements about McDougal's Account.

**President Clinton** -- President Clinton testified he had been to Madison Guaranty "[l]ess than 10 times, more than two, three"[1759] and agreed that while jogging by Madison Guaranty he had "once or twice actually went in."[1760]  When asked about the jogging incident, President Clinton said he had "tried to remember" and was not accusing McDougal of lying, but he did not remember it:  "I don't recall that.  I am aware that he has recounted a conversation about that.  But I don't have any specific recollection of doing that."[1761]  President Clinton said he did not remember asking McDougal to send Mrs. Clinton legal work.[1762]  President Clinton also said he did not remember complaining to McDougal about finances or saying "Hillary and I need some money."[1763]  The President was asked whether he thought McDougal was lying:

> Q.   Do you have any reason to believe that Jim McDougal is not being truthful--
>
> A.   No.
>
> Q.   -- about [the jogging incident]?
>
> A.   I have absolutely -- I have no reason to believe that.  And I have really tried to search my memory to see if there was anything remotely similar to what he said.  I mean, I really tried to remember the conversations that I've

---

[1758] Tax Return and W-2 Statements for William J. and Hillary R. Clinton (1985) (Doc. No. DEK001371).

[1759] W. Clinton 4/22/95 Depo. at 66.

[1760] Tr. at 70, United States v. McDougal et al., No. LR-CR-95-173 (E.D. Ark. Apr. 28, 1996) (testimony of William J. Clinton).

[1761] W. Clinton 4/22/95 Depo. at 67.  President Clinton testified, "I don't recall that I did know [in 1985 that Hillary was doing some work for Madison Guaranty].  Normally Hillary didn't discuss her legal work with me."  Id. at 65-66.

[1762] Id. at 69.

[1763] Id. at 72.

had with him to try to figure it out, because I am not accusing him of not
telling the truth.  I do not … I simply do not remember the conversation he
says occurred. [1764]

President Clinton gave similar testimony in 1996 for the McDougals' and Governor

Tucker's criminal trial:

Q.      And you are aware, sir, that Mr. McDougal has a recollection of an event
        in which you jogged by and asked Mr. McDougal to place Ms. Clinton's
        law firm on a retainer.  Do you remember that, sir?  I'm saying, do you
        remember that that's one of Mr. McDougal's recollections?

A.      I remember that -- I am now aware that Mr. McDougal remembers that I
        asked -- I believe he has testified that he thought I asked him to give
        Hillary some law business, I don't know about a retainer.

Q.      And you're now aware that Mr. McDougal remembers that event occurring
        and you don't remember it; is that correct, sir?

A.      I remember going in to see him.  I do not remember asking him to do that,
        no.

Q.      Okay.  But you don't recall asking him to place Ms. Clinton on a retainer;
        is that correct?

A.      I do not, no.

Q.      You don't recall -- do you recall asking him to give her a specific amount
        per month in reference to that retainer?

A.      No, I don't.

Q.      Do you recall any -- you say you remember going in to see him.  Do you
        remember going in to see him and discussing Ms. Clinton and law
        business for Madison Guaranty Savings & Loan?

A.      I do not.

---

[1764] <u>Id.</u> at 83.

421

Q.      Is there any -- I just want to make sure I'm asking you the right question, I'm not asking you a question that you don't understand.  Is there any combination of facts that I can ask you that comes anywhere close to what Mr. McDougal recalls as far as that particular conversation is concerned?

A.      Well, I don't remember the specific request.  You know, we spoke in passing about a lot of things over the years.  I don't know whether he asked me, "How is Hillary doing," "How are we doing[.]"[1765]

**Bill Henley** -- Susan McDougal's brother Bill Henley supported aspects of Jim McDougal's testimony.  McDougal said Henley had been at the office when the jogging incident occurred.[1766]  Henley testified that one morning between 6:30 a.m. and 8:30 a.m. he met McDougal at Madison Guaranty.[1767]  The door to McDougal's office was closed, so Henley waited about fifteen minutes.  Henley said Governor Clinton, in jogging clothes and sweating, left McDougal's office.  Henley and Governor Clinton said hello, and Governor Clinton left. Henley said that once Governor Clinton was gone, McDougal commented, "I don't mind the son of a bitch coming by here and taking up my time, but I wish he wouldn't sweat through my chairs."[1768]  Henley said he and McDougal went into McDougal's office.  Henley noticed a fresh sweat stain on one of the two chairs facing McDougal's desk.[1769]

        Henley said the only conversation he had with McDougal about the jogging incident was

---

[1765] W. Clinton 4/28/96 Depo. at 119-20, United States v. McDougal et al., No. LR-CR-95-173 (E.D. Ark. Apr. 28, 1996).

[1766] J. McDougal 6/22/95 Int. at 7  ("McDougal advised that Bill Henley was present during this meeting"); J. McDougal 8/96-6/97 Int. at 9 ("Bill Henley was also present in McDougal's office when Clinton came by in jogging attire").

[1767] W. Henley 6/18/96 GJ at 24.

[1768] Id. at 27, 50.

[1769] Id. at 46-47.

422

at the McDougals' and Governor Tucker's 1996 criminal trial.[1770]  McDougal told Henley that he did not refer to Governor Clinton as a "son of a bitch," as a recent book seemed to indicate Henley had stated.[1771]

Henley remembered one detail not consistent with McDougal's statements.  Henley thought that McDougal's secretary, Sue Strayhorn, was sitting at her desk outside McDougal's office when the jogging incident happened.[1772]  If true, this would contradict McDougal on the date of the incident, because Strayhorn started at Madison Guaranty in February 1985, after McDougal said the incident happened.[1773]  Henley could only place the incident as sometime in 1984 or 1985.[1774]

**Susan McDougal** -- Jim McDougal was certain he discussed the jogging incident with Susan McDougal.[1775]  She refused to give a statement to this Office, and spent eighteen months in

---

[1770] Id. at 50

[1771] Id. at 50-51.

The quote in the book read:

McDougal gently steered [Clinton] out of the office.  Susan's brother Bill Henley was standing nearby.  With the governor safely out of earshot, McDougal turned to Henley.  "I don't mind the fat little son of a bitch coming by and taking up my time.  I just wish he wouldn't ruin my chair."

James B. Stewart, Blood Sport 124 (1996).

[1772] W. Henley 6/18/96 GJ at 24, 30.

[1773] Strayhorn 3/30/94 Int. at 1.

[1774] W. Henley 6/18/96 GJ at 33.  Just as McDougal had, Henley also testified he thought the event happened in the "summertime," because Clinton was sweating and it must have been hot. Id. at 33-34.

[1775] J. McDougal 8/96-6/97 Int. at 10-11; J. McDougal 4/2/97 GJ at 103-04:

Q.     Susan was also quoted in the Washington Post and other publications, I

jail for contempt because she refused to testify pursuant to a grand jury subpoena, even after

being given immunity.  She did give statements to print and television media that agreed with

Jim McDougal.  In March 1992 the <u>Washington Post</u> quoted Susan McDougal saying:

> Hillary came in one day and was telling us about the problem.  The problem was
> finances, her finances. . . . She came to Jim's office.  I remember Jim laughing and
> saying afterward, 'Well, one lawyer's as good as another, we might as well hire
> Hillary.' . . . She was on retainer.  I remember everyone sitting around laughing
> and saying:  'We need to hire Hillary Clinton.'[1776]

Susan more closely corroborated Jim's story in a 1996 television interview:

Q.   There are things that you can help clear up a little bit from -- for some of
     us.  The decision to have Mrs. Clinton help with some of the legal affairs
     for Madison Guaranty.

A.   I'll tell you what I know about it. As I wasn't present at the time.  But I do
     know that Bill came by the bank one day.  He was jogging.  And . . .
     sweating.  The famous story of the sweat in the chair I didn't see that.  But
     I did see that he was running, and he was sweating.  And he came by the
     bank.  And he did talk with Jim.  After that, Jim came to me and said, I've
     just given Hillary some work from the bank.  Is that all right with you?  I
     was at the bank that day.

. . . .

Q.   And did he say then that -- that Mr. Clinton had asked for her?

A.   What he said was, she needs the work.  And I said, that's fine with me.

---

     think, saying, "Yes, I know about this."  Do you recall talking to her about
     this?  Would that have been something you would have told her about?

A.   I'm sure I -- yes.  It would have been something I would have told her
     within the business day, I would think.

[1776] Maraniss & Weisskopf, <u>Lawyer Will Review Arkansas Land Deal</u>, Wash. Post, Mar.
12, 1992, at A1.  In an interview with the Independent Counsel's Office, Jim McDougal was read
Susan's quote from the <u>Washington Post</u>.  McDougal agreed with Susan McDougal's statement
but added that either Bill Henley or he must have told her about the jogging incident.  J.
McDougal 8/96-6/97 Int. at 10-11.

Those were his exact words.  At that time, at that day, she needs the work.
And I said, that's fine, Jim.

Q.     Because, again, she has talked about the business coming in a different
way -- coming through a connection between someone who was in her
office and someone who knew your husband.

A.     I don't know about that.

Q.     But this you do know?  It did take place?

A.     Oh, yes.[1777]

On the eve of being incarcerated for refusing to discuss these subjects with the grand jury,

Susan told talk show host Larry King she did not witness the jogging incident and her only

knowledge came from Jim:

I only know that Jim came to me and said, "They need the money.  I'm going to
give her the work.  Is that all right with you?"  And I said yes.  That's all I know
about how that came to be.[1778]

**John Latham** -- Latham said although he was Madison Guaranty's president, Jim

McDougal hired the attorneys.[1779]  Latham said McDougal never mentioned the jogging incident

to him.[1780]

**Rae Ann Moles** -- Madison Guaranty hired Moles in April 1983 to perform clerical

---

[1777]  Prime Time Live:  Tr. of Diane Sawyer Interview of Susan McDougal at Doc. Nos.
2053-000000069 through 72 (ABC television broadcast, Aug. 30, 1996) (transcript contains
additional interview portions not included in the public broadcast).

[1778]  Larry King Live (CNN television broadcast, Sept. 6, 1996) (videotape).

[1779]  Latham 2/14/95 Int. at 1; Latham 5/15/96 Senate Banking Comm. Depo. at 12-13;
Senate Whitewater Comm. Hearing, supra note 147, at 14-15 (May 16, 1996) (testimony of J.
Latham).

[1780]  Latham 2/14/95 Int. at 2; Latham 5/15/96 Senate Whitewater Comm. Depo. at 18.

work.[1781]  Moles said that late one afternoon in August or September 1984, Governor Clinton rushed into Jim McDougal's office wearing jogging clothes, and she heard most of their conversation because McDougal's office door was open.[1782]  McDougal complained to Governor Clinton that they - the Clintons - needed to pay their fair share on a Whitewater loan.[1783]  Governor Clinton told McDougal that Webb Hubbell was telling Rose attorneys to get more savings and loan business, and asked McDougal to put Mrs. Clinton on a $2,000 per month retainer.[1784]  Moles said McDougal told Clinton "he really didn't have anything for the Rose Law Firm to do [and] that the Mitchell law firm was representing the institution and performing as he expected."[1785]  Moles said McDougal asked Clinton how Rose would credit the new business, and Clinton said Hubbell would likely credit a young associate for the business.[1786]

Moles said Clinton and McDougal met for over an hour and a half and she left before the meeting ended.[1787]  Moles said when she came to work the next morning, Jim McDougal said, "Well, we've put Hillary on the payroll.  Susan will be in shortly.  She doesn't know about it.

---

[1781]  Moles 8/4/94 & 2/9/95 Int. at 3.

[1782]  Moles 10/19/95 GJ at 18.  But see Moles 8/4/94 & 2/9/95 Int. at 7 ("McDougal had Moles into his office and he introduced her to Clinton").

[1783]  Moles 8/4/94 & 2/9/95 Int. at 8.

[1784]  Moles 10/19/95 GJ at 22 ("Mr. Clinton asked him to hire the Rose Law Firm"); Moles 8/4/94 & 2/9/95 Int. at 8 (uppercase in original) ("CLINTON said that he and HILLARY CLINTON were in need of some money and because he was a government servant, he only made so much.  CLINTON then asked McDOUGAL to have MGSL put HILLARY RODHAM CLINTON of the ROSE LAW FIRM on a $2,000 per month retainer").

[1785]  Moles 10/19/95 GJ at 22.

[1786]  Id. at 24.

[1787]  Id. at 26

426

When I tell her, she's going to be really upset.  There may be quite an incident.  If you get

uncomfortable, go downstairs."[1788]  Moles asked Jim McDougal if Madison Guaranty was going

to split the legal work between Mitchell Williams and Rose, and McDougal responded, "You are

to send the Rose Law Firm nothing."[1789]

Moles' testimony was partly corroborated by her sister, Sarah Handley, a former financial

examiner for the Arkansas Securities Department.  Handley testified that her sister told her

"Clinton had come by [Madison Guaranty] and that at the conclusion of that visit,  . . . McDougal

had retained Hillary, the Rose Law Firm."[1790]

**R.D. Randolph** -- Jim McDougal said he might have told R.D. Randolph about Governor

Clinton's sweating in his chair.[1791]  Randolph testified that he remembered McDougal telling him

about retaining Mrs. Clinton, but not about the jogging incident.[1792]

### 3.    Mrs. Clinton's Version.

Mrs. Clinton has made numerous statements about Madison Guaranty's hiring Rose.

During the 1992 campaign, Mrs. Clinton drafted a statement contradicting Jim McDougal's press

statements.  Her statement was never released.  In April 1994, Mrs. Clinton discussed the issue at

a press conference.  Mrs. Clinton gave several more statements on the subject to federal

investigators after that press conference.

-------------------------------------------------

[1788] Id.

[1789] Id. at 27.

[1790] S. Handley 10/31/95 GJ at 22.

[1791] J. McDougal 8/96-6/97 Int. at 12.

[1792] R.D. Randolph 9/17/96 GJ at 69-70.

Mrs. Clinton's version of how Madison Guaranty hired Rose was essentially as follows. In the spring of 1985, Rose associate Rick Massey, a friend of Madison Guaranty president John Latham, spoke with Latham about Madison Guaranty sending legal work to Rose.  Latham agreed, but partners at Rose were opposed.  McDougal's Madison Bank and Trust still had an outstanding bill for work Rose had done in 1981-82.  The partners did not want Rose to do any work until the old bill was paid.  Massey knew that Mrs. Clinton knew Jim McDougal, and asked her to help get the bill paid.  Mrs. Clinton spoke with several Rose partners who said if McDougal paid the old bill, and paid new fees in advance, Massey could do the work.  Mrs. Clinton saw McDougal on April 23, 1985, and told him Rose would not let Massey work until his old bill was paid and a prepayment arrangement was agreed to.  McDougal agreed to the retainer and paid the old bill.  Massey asked Mrs. Clinton to act as billing partner on the account because she helped him retain the business.

The following discussion sets forth Mrs. Clinton's statements regarding Madison's retention of Rose.

### a.     Mrs. Clinton's Unsworn Statements.

Mrs. Clinton drafted her most detailed statement about Rose's retention by Madison Guaranty during the 1992 campaign.[1793]  It read:

> Jim McDougal became a client of the Rose Law Firm in 1981.  He engaged the firm for a matter ~~related to litigation~~ arising out of the decision to move the Bank of Kingston.  At the conclusion of the representation 198_, Mr. McDougal disputed the amount of his final bill and refused to pay [in] the entire amount requested.

---

[1793]  H. Clinton 1/26/96 GJ at 53-55.

In March or April of 1985, Rick Massey, an associate of the firm began talking with John Latham, the CEO of Madison Guaranty S & L, and a friend of Massey's, about some legal work Latham wanted Massey to do for Guaranty.  In April of 1985, Massey went to the partners in the securities section and asked if they would help him with the work Latham wanted him to do.  They advised him that the firm could not do any further work for McDougal until he paid the bill he owed for the previous work and that, even if he did, the firm could not permit Massey to do any work unless McDougal agreed to pay a monthly advance against which fees and expenses could be billed.

Massey also discussed the situation with one of the litigation partners who had worked on McDougal's previous work and who gave Massey the same advice.  Massey then came to see me because he knew that I knew McDougal; he explained his interest in working with Latham on the project and asked if I had any ideas about what he could do.  After talking with Massey, I told him I would talk with McDougal for him and see if McDougal would be willing to pay his past due bill and agree to stay current on any fees and expenses incurred for the new project.

On April 23, 1985, I called McDougal and asked if I could drop by to see him at his office.  When I visited him, I told him that I understood Latham wanted Massey to do some work for them, but that our firm would not let Massey proceed until the previous bill was paid.  McDougal called Latham into the meeting and asked Latham if he wanted Massey to do the work.  As I recall, Latham explained that he and Massey had met already to discuss the matter and he wanted to engage Massey.  After that explanation, McDougal told Latham he could proceed with Massey, and he told me that he would arrange to pay the past due bill.

I reported this conversation to my partners and Massey.  The securities partners who supervised Massey advised Massey that a two thousand dollar per month advance against fees and expenses would be appropriate.  They asked me to convey that to McDougal.  Massey and I called McDougal, but he was not in so we talked with Latham and another employee.  Latham told Massey and me he was sure that amount would be acceptable, but would have to chec[k] with McDougal to confirm.  Latham later advised me they agreed, but they would not make their first payment until May.  During the first week or so of Massey's work for Madison, he kept me advised because he wanted me to be aware of what he was doing in case he had any trouble being paid for his work.  On a few occasions he showed me drafts of documents he was preparing under the supervision of securities partners so that I would be prepared to intervene with McDougal if necessary on the issue of payment.  Since I had negotiated the firm's payment, I

429

also asked to send the bills to McDougal.

I also placed a call to the Securities Commissioner to ask for information; I do not recall talking to her (as she independently does not recall talking to me) but I may have called her or someone in her office, to ask the person to whom I spoke who in the office handled matters related to s&ls since I knew that the office had very little supervisory authority since most of their authority related to brokers.  I was advised to send anything to the Commissioner.  I relayed that information to Massey.

Massey has stated he does not know why he included my name in the letter to the Securities Commissioner, and I do not know either and do not recall ever seeing it before it was sent.  I also do not recall receiving the letter addressed to me from the Commissioner, because if I had seen it I would have immediately sent it to Massey.  Massey has said his secretary may have included my name in error; that is understandable since I was listed as the billing attorney because of my intervention with McDougal.  I realized no financial benefit from that listing; it was done as an accommodation to Massey and the firm.

In addition to the matter Massey did for Madison, the firm did two other matters that were unrelated to the state. [T]he [sic] total billed for all matters was 21,202.25.

As I have said repeatedly, I did not have any substantive involvement in the work our firm did for Madison that involved the Securities Commissioner.  I did not discuss the merits of the matter with the Commissioner or anyone in her office.  I can see how in retrospect I should not have become involved at all in helping Rick Massey work out the problems he encountered, but I knew I was not attempting to influence anyone other than McDougal whom we wanted to pay his bill.  I have practiced law in Arkansas for nineteen years and so far as I know this is the only question that has ever been raised about even the appearance of conflict between my practice and my husband's official positions.  I regret that this incident could be misconstrued by anyone and would only point to my record and to the results in this case in which clearly the Commissioner's actions do not suggest any influence or attempt to influence her by me or anyone in my firm.[1794]

--------------------

[1794] H. Clinton Campaign Statement (1992) (Doc. Nos. DEK200962 through 200963) (strikethrough in original).  In July 1997, a copy of Mrs. Clinton's statement, among other things, was found in a brief case in the attic of Vince Foster's home.  The copy had numerous handwritten changes.  Mrs. Clinton testified that the writing on the document was Foster's and that he and she had worked together on the document.  H. Clinton 4/25/98 Depo. at 28-30.

In a press conference held April 22, 1994, Mrs. Clinton said the following:

There was a very bright, young associate in our law firm who had a relationship with one of the officers at Madison Guaranty, a young man whom he had known. They began talking . . . . Those two young men thought that it would be legal under Arkansas law for a savings and loan to issue preferred stock, but there was absolutely no law on that.  And so they couldn't be sure.  But they decided that what they wanted to do was to ask the person who regulated savings and loans whether it was legal, not if Madison Guaranty could do it . . . .

When they talked about doing that, the young attorney in question needed a partner to serve as his backstop, and that was one of the rules we had in our firm. He knew that I knew Jim McDougal.  He also knew that Jim had been a client of our firm in the past.  This was not a new representation.  So he came to me and asked me if I would talk with Jim to see whether or not Jim would let the lawyer and the officer go forward on this project.  I did that, and I arranged that the firm would be paid a $2,000 a month retainer.  And that was ordinary and customary. That would be billed against . . . . That was arranged.  The young attorney, the young bank officer did all the work, and the letter was sent.  But because I was what you call the billing attorney, in other words I had to send the bill to get the payment made, my name was put at the bottom of the letter.  It was not an area that I practiced in.  It was not an area that I really know anything to speak of about.[1795]

### b.     Statements to Federal Investigators.

### i.     Mrs. Clinton's April 1995 Deposition.

This Office deposed Mrs. Clinton at the White House, on April 22, 1995, which was

before the Office obtained her billing records in January 1996.  Mrs. Clinton gave the following

---

Investigators later discovered another document that was archived on Rose computer systems:  a draft, created by Vince Foster, that was Mrs. Clinton's statement with Foster's handwritten changes typed in.  In 1998, Mrs. Clinton acknowledged Foster's editing of her statement. H. Clinton 4/25/98 Depo. at 30-31.

[1795]  Statement of Hillary R. Clinton, Press Conference, Federal News Service (Apr. 22, 1994).

sworn testimony:

A.      At some point in 1985, in the spring, an associate with our firm by the name of Rick Massey made it known in the firm that he was interested in doing some work with Madison Guaranty, and particularly with a young man that he knew there named John Latham, who was an officer at Madison.

As I have tried to remember and reconstruct this, Rick Massey raised that with the partners in the securities department of our firm, and was told that Mr. McDougal who was at Madison Guaranty had an outstanding bill that he had not paid for previous legal work done by our firm on his behalf. And Mr. Massey consulted broadly with a number of partners, and was advised that he could not go forward unless the past due bill was paid.

At some point Mr. Massey came to see me because he knew that I knew Jim McDougal and asked if I had any ideas about how he could get the bill paid that was pending, so that he could then go forward to try to do this work on behalf of Madison Guaranty. I discussed it with several partners and they all said, well, if McDougal pays the bill, then we will consider letting Massey do the work.

At some point I talked with Jim McDougal and told him that Rick Massey had an interest in doing some work for Madison Guaranty with John Latham, but that the firm would not let Rick do it unless his previous bill was paid. And then at some point after that McDougal paid the money that he had owed the firm for a number of years. Massey then was told that he could proceed with the work.

Massey came to me and asked if I would be the billing partner since I had helped him by getting the past due bill paid, and I told him that I would.

But the firm decided, unlike most of our clients where we do not have any retainer arrangement, that because of the previous experience with Mr. McDougal, Madison Guaranty would be asked to pay in advance against fees and expenses of a monthly amount, and the firm decided $2,000 would be fair. Mr. McDougal was told that. He agreed. And so the $2,000 was deposited . . .

And then at some point Mr. Massey began work and the retainer was paid.

Q.      So, from your standpoint, whose idea was the figure of $2,000 a month?

432

Who came up with that figure?

A.      I don't have any idea.

Q.      Was it as betwixt McDougal and somebody in the Rose Law Firm?

A.      I don't have any idea.

Q.      When you say that Mr. Massey would have talked with partners, are you talking about partners in the securities section of your firm?

A.      I would assume, yes.

Q.      Can you recall here today any partner at the Rose Law Firm whose name you can give us that would confirm that?

A.      Well, I know that I talked with Vince Foster about it -- I cannot tell you who Rick Massey talked with -- because Mr. Foster had been one of the lawyers who had done the work that Mr. McDougal had not paid for.  And so before I did anything to help Rick Massey, I talked with Mr. Foster to be sure that he thought it was appropriate that we try to collect this past due bill, with the idea that if we did Mr. Massey would then be able to represent Madison.

. . . .

Q.      Let's go then to this matter of how it started.  Do you know any reason why Rick Massey would say that he does not think he brought any business into the Rose Law Firm like this?

A.      No, I do not.

Q.      Do you know whether or not the supposed back money that was owed was ever paid?

A.      I assume it was paid.  I can't tell you that for sure.  I don't know for sure, but I assume it was since that was the reason that Rick Massey came to me, and he was then permitted to go forward.

Q.      Did you ever see any back bill that supposedly he owed?

A.      No.

. . . .

433

Q.    And, again, I believe you stated the reason you were going to be the billing partner was because you knew Mr. McDougal?  Is that correct?

A.    Well, I knew him and I had been enlisted to try to help get the bill paid, to clear the way for Mr. Massey to represent Mr. McDougal.  And as an accommodation to Mr. Massey, I agreed to be the billing attorney on the matter that he was going to handle.

Q.    On the front end, were you to be anything other than the billing attorney?  In other words, were you supposed to do any legal work for Madison Guaranty yourself?

A.    Not that I can think of right now.  I was supposed to be the billing attorney because an associate could not represent a client without a partner as a billing attorney.

Q.    Would you say that normally on a securities matter the billing attorney would be a securities partner?

A.    Normally.  Not always however, because if another partner had a relationship with a client that it was thought to be useful or beneficial or requested that that partner be the billing attorney, even though the partner didn't do the work.  I had done that in the past and I had worked on cases where others outside of sections had done that.

. . . .

Q.    And did you go by Madison Guaranty to actually talk to Jim McDougal when this was set up?

A.    I think I did stop by to see him, to have the conversation about paying the past due bill so that Mr. Massey could do the work that he had discussed with Mr. Latham.

Q.    Can you tell us approximately how many times you ever went into Madison Guaranty?

A.    I think that was the only time.[1796]

---

[1796] H. Clinton 4/22/95 Depo. at 8-16.  This statement was consistent with McDougal's statement that he only met in person with Mrs. Clinton once.  J. McDougal 8/96-6/97 Int. at 13.

434

Mrs. Clinton was then asked specifically about McDougal's version of events:

Q.     I want to hand you [a memorandum from Loretta Lynch to Bill Clinton,
       Hillary Clinton, Jim Lyons, and Bruce Lindsey], . . . And it sets forth a
       number of press either inquiries or reports.  And what I want to ask you
       about is this number one, Washington Times, [Jerry Seper] . . . .

       "He has contacted the campaign for a response to the story that BC
       requested that McD retain the Rose Firm/HRC and the timing and
       specifics of that retainer.  At various times I have spoken with Webb
       Hubbell about this retainer issue over the last three weeks "in part to solve
       the 'how did the Madison Guaranty business come in' question and in part
       to determine if McD's allegation that he put HRC on retainer was in fact
       accurate.  Both Jim McD (in Sam Heuer's office to Jim Blair and myself)
       and Susan McD (in the Post) have recounted that BC came into Jim's
       office in the summer of 1984; told him the Cs" "I assume the Clintons",
       "needed $ and asked him to hire HRC.  The same day HRC allegedly came
       by re: a retainer.  HRC was then hired in the summer of 1984.  Supposedly
       there were other witnesses. Note that we have heard generally that 'people'
       are talking about this story to a variety of press."

       Now, first I would ask you, in March of '92, do you recall this matter coming up?

A.     It may have.  I don't recall it specifically at this time as to when I first
       heard about this story.

Q.     Did you hear anything along these lines back in '84 or '85?

A.     No, I did not.

Q.     Did your husband ever say anything about talking to Jim McDougal about you and
       your husband needing money?

A.     No, he did not.

Q.     Do you know whether or not your husband ever did, in fact, jog by Madison
       Guaranty and go in and talk to Mr. McDougal?

A.      I do not know.[1797]

In 1995, prior to the Rose billing records being produced, Mrs. Clinton was asked

specifically about her work for Madison Guaranty in the spring of 1985.  Mrs. Clinton said she

"probably would have billed for every conversation I had about this matter, including the

conversations with Rick Massey or whatever partners I talked to about paying back the past due

bill.  I would have billed for going to see Jim McDougal.  But I can't be more specific than

that."[1798]  The Rose billing records produced to the OIC in January 1996 show that in the first five

months of Rose's representation, Mrs. Clinton billed for speaking to only two partners:  Watt

Gregory on April 23, 1985,[1799] and Joe Giroir on June 5, 1985.[1800]

### ii.      May 1995 RTC Interrogatories.

The RTC served written interrogatories on the Clintons, which Mrs. Clinton answered in

writing under oath, including information on Madison Guaranty's hiring of Rose:

Interrogatory No. 17:  With respect to the Rose Law Firm's representation of
Madison Guaranty in 1985 and 1986:

(a)      Was Mrs. Clinton the lawyer responsible for obtaining this business for the
Rose Law Firm?  If not, who was?

Mrs. Clinton answered in pertinent part:

To the best of my recollection, the president of Madison Guaranty, John Latham,

---

[1797] H. Clinton 4/22/95 Depo. at 17-19.

[1798] Id. at 40.

[1799] Rose Law Firm Billing Records (May 6, 1985) (Doc. No. DEK014947).

[1800] Rose Law Firm Billing Records (July 15, 1985) (Doc. No. DEK014972).  Giroir
testified that he did not remember any discussion of payment of the old bill.  Giroir 7/18/96 GJ at
25-26.

who was a friend of an associate at the Rose Law Firm, Richard Massey, became interested in having Madison Guaranty issue some kind of preferred stock to raise capital. Latham had spoken to Massey about doing the related legal work. In the spring of 1985, Massey came to see me because he had learned that certain lawyers at the law firm were opposed to doing any more work for Jim McDougal or any of his companies until he paid his bill and then only if Madison Guaranty agreed to prepay a certain sum to the firm once a month to cover fees and expenses. Under such an arrangement, the firm could be assured that Madison Guaranty was staying current with regard to paying for the new work that the firm might do for it.

I believe Massey approached me about presenting this proposal to Jim McDougal because he was aware that I knew him. I agreed to go see McDougal. I visited him at his office on April 23, 1985, and told him that I understood Latham wanted Massey to do some work for Madison Guaranty, but that our firm would not let Massey proceed until the previous bill was paid and some kind of prepayment arrangement was worked out for new work the firm might do. As I recall, McDougal agreed that Massey could proceed with the work and informed me he would arrange to pay the past due bill. McDougal also indicated that he was agreeable to some kind of prepayment arrangement.[1801]

### iii.     February 1996 FDIC Interview.

On February 14, 1996, the FDIC interviewed Mrs. Clinton. (The RTC merged into the FDIC on January 1, 1996, and the FDIC continued the RTC's investigation.) This unsworn interview occurred following the public release of Mrs. Clinton's billing records, and after the public testimony of Rick Massey, and others, before the Senate Whitewater Committee. Mrs. Clinton's colloquy with the attorney for the FDIC was as follows:

Q.     Here I'm paraphrasing -- I'm certainly not quoting -- but as I read [Massey's] testimony, he said that he had certainly talked with Mr. Latham about doing work for Madison, but it was not up to Mr. Latham to decide who would be hired. Mr. Massey said he hadn't met Mr. McDougal ever, and that Mr. Massey further said that he did not discuss fees or any sort of retainer arrangement with anyone at Madison. And further, it was his

---

[1801] H. Clinton 5/24/95 RTC Interrog. Resp. at 34-35.

437

recollection that he did not ask you to be billing partner, nor did he raise the subject of fees or retainer with other members of the firm. I'd like to ask you about your own recollection of how the client came in the door, how your recollections compare with those of Mr. Massey.

A.    Well, as I have said consistently since 1992 and again, in my answers to the RTC interrogatories, my recollection is that Mr. Massey wanted to do the work he had discussed with Mr. Latham, that some partners, I believed in the securities section, had advised Mr. Massey that they were not enthusiastic about undertaking representation on behalf of Jim McDougal and Madison because of some problems in having work paid for in the past, and that there were discussions among partners.

I believe it was Vince Foster who came to me, who said that Mr. Massey wanted to do this work, but the partners didn't want him to do it. We had a very high regard for Mr. Massey, who was quite an energetic and accomplished first-year associate, already teaching a securities course at the law school and attracting people who wanted his advice, like Mr. Latham.

And I was asked, as someone who knew McDougal, if I could intervene and perhaps set up an opportunity for Mr. Massey to do this work. I agreed to do that. Obviously now, 10, 11 years later, much to my regret because of all the confusion and concern that has been raised by it.

So I talked with Mr. Massey about that work. Mr. Massey told me, as his testimony relates, that he had a talk with Mr. Latham, but it wasn't up to Mr. Latham, and he wasn't getting any support from others within the firm, and I told him I would talk to Mr. McDougal, which I did.

And as I recall, Mr. McDougal said well, if Latham wants him to do the work, that's fine. And because of the request of other partners in the firm, I advised Mr. McDougal that the work that Mr. Latham wanted Mr. Massey to do could not be done unless Madison [Guaranty] entered into a retainer agreement with the Rose Firm that would be payment against which fees and expenses could be billed on a monthly basis. Mr. McDougal agreed to that. I informed Mr. Massey. Mr. Massey undertook the work.

But it would not surprise me that Mr. Massey, as a first-year associate would not have direct knowledge of conversations among partners and decisions concerning whether or not he could do the work under whatever

438

circumstances.

Q.     You said you were asked to approach Mr. McDougal about the things
       you've described.  Who asked you?

A.     I don't have a specific recollection.  I believe it was Vince Foster, but I'm
       not positive about that.[1802]

This statement by Mrs. Clinton's differs from her earlier statements.  She said that Vince

Foster rather than Rick Massey had approached her about Massey doing the work, and that she

discussed with Foster, not Massey, that Rose partners were unhappy about Madison Guaranty's

outstanding bill.

### iv.     Mrs. Clinton's 1998 Deposition.

In 1998, Mrs. Clinton was again deposed by this Office.  In light of evidence that had

emerged about Madison Guaranty's retainer of Rose -- including the billing records and Massey's

testimony since her 1995 deposition -- Mrs. Clinton was asked to review the matters again:

───────────────────

[1802] H. Clinton 2/14/96 RTC Int. at 27-30.  Mrs. Clinton's testimony was consistent with
representations made to Bruce Ericson, an attorney with the law firm of Pillsbury Madison &
Sutro, counsel to the RTC, by David Kendall, counsel to the Clintons.  Ericson's memorandum of
his conversation with Kendall noted that, according to Mrs. Clinton, the outstanding bill had
been paid in the spring of 1985:

> Kendall told me the following:  McDougal had complained about the bill and had
> refused to pay it.  The bill had remained unpaid until the spring of 1985, when it
> was paid.  The Rose Law Firm's trouble in collecting this receivable accounted for
> the firm's reluctance to accept new business from McDougal unless he paid for it
> in advance.  Hence the retainer. . . . Kendall does not think the bill was adjusted
> downward or otherwise compromised in an attempt to get McDougal to pay.
> Kendall also does not think that McDougal paid it in 1983.  Mrs. Clinton agrees.
> The bill probably remained unpaid until 1985.

Memo from Bruce Ericson, Pillsbury, Madison & Sutro attorney, counsel to the RTC, of
telephone conversation with David E. Kendall, personal attorney for the Clintons at 1-2 (July 25,

439

Q.      All right.  Let me now go to the billing records.

. . . .

The first entry that appears here is 4/23/85, H. Clinton.  It records
"Conference with J. McDougal and J. Latham; conference with [R.]
Massey; conference with W. Gregory."  Can you tell us what prompted
this representation, and what prompted this first conference with Mr.
McDougal.

A.      Well, I can tell you what I remember, and I know this has been the subject
of, you know, many discussions by many people.  But based on my best
memory in 1992, when I first tried to respond to questions about this
matter, I recalled that we had a young, very intelligent, aggressive
associate by the name of Rick Massey, who was friends with a young man
named John Latham, who was maybe the president, but certainly a high-
ranking officer at Madison Guaranty.

And they had been talking about perhaps Mr. Massey doing some legal
business for Mr. Latham in the securities area.  I think that Mr. Latham
and Mr. Massey lunched together.  They had a number of conversations.
Mr. Massey was interested in doing this work.

But when he spoke with his securities partners about doing the work, he
was discouraged from doing so because Mr. McDougal did not have a
good reputation for paying his bills in the Rose Law Firm.  He had been
represented by the Rose Firm some years earlier and had not paid his bill.
And so Mr. Massey was told that he should not get involved in
representing a client, such as Mr. McDougal, for whom there would likely
be payment problems.

Mr. Massey was discouraged by that, because he wanted to do the work.
He then began talking with people in the firm and learned that I knew Mr.
McDougal, and came to me, explained the situation.  I had a high regard
for Mr. Massey's legal skills and his go-getting attitude.

So, after talking with people in the firm, I asked if I were able to persuade
Mr. McDougal to pay his bill and to promise to keep current with costs
and expenses, if Mr. Massey could do the work.  Based on that
understanding, I went and visited with Mr. McDougal and Mr. Latham,

1995).

440

and they said that they would pay a retainer on a monthly basis.

They never completely paid their last bill.  I think they ended up still owing nearly $900, but I later learned that they had paid the bulk of the bill that they hadn't paid for several years.

I also agreed, because of other partners' attitudes about Mr. McDougal, that I would serve as the billing partner and be responsible for making sure that Mr. Massey was paid for the work that he did.

That's my, that's my memory today.  That was my memory in 1992 of what happened to bring this business into the Rose Law Firm.[1803]

Mrs. Clinton was questioned about the 1992 draft press statement, which tracked the recently produced billing records by referring to an April 23, 1985 meeting with John Latham and Jim McDougal, and stated the total amount billed as $21,202.25.[1804]  Mrs. Clinton discussed the 1992 statement as follows:

Q.     Now, in 1992, when you prepared this statement, how did you go about that?

A.     Well, I thought a lot about this . . . because I've had to sort of reconstruct what probably happened, since I don't have any vivid memory of actually doing it.

I do know that this was typed on my daughter's home computer.  So, I obviously prepared and typed it myself at some point in February, March, April, I don't know when, in 1992, when I was home for those very brief visits, when I came home off the campaign trail.  You know, I went back and refreshed my memory about what was going on during that period, and from the New Hampshire primary of February 12th, 1992 until the California primary of June 2nd, there was, you know, all kinds of elections going on every week.  So, this was typed on our home computer by me.

---

[1803]  H. Clinton 4/25/98 Depo. at 22-24.

[1804]  H. Clinton Draft Campaign Statement (1992) (Doc. Nos. DEK 200962 through 963).

441

Q.       And in typing that, did you have the billing records to assist you in putting the date down when you talked to McDougal and went by to see him at his office?  As you see in the billing records, it says you had a conference with Jim McDougal on April 23rd.  Did you have that when you came up with this 21,000 figure?

A.       I might have, or I might have gotten information from Vince Foster or Webb Hubbell, who I knew were reviewing the bills, since I've since learned that.  I don't -- I don't know whether I had them in front of me at that time, or whether I had looked at them and made observations about them.  But obviously I had the information that you refer to that was on the billing records.[1805]

Mrs. Clinton was asked about McDougal's outstanding bill paid by him in October 1984:

Q.       Now, I direct your attention to the billing records again.  It's the first page after the client billing and payment history.  This would be DEK014941.  This -- can you identify that document?

A        This is a Rose Law Firm bill.

Q.       Who is it to?

A.       It looks like it's to the Bank of Kingston.

Q.       . . . . The document there has a Paid stamp down there.  It says Bank of Kingston, date, 12/31/81.  Do you see that?

A.       Yes.

Q.       Then we went through this last time, but there was a note there.  It says, "HRC.  I believe there was a subsequent bill."  And that was Mr. Foster's handwriting, correct?

A.       Yes.

Q.       . . . . Now, you stated during your campaign statement, and then you stated to us in April of '95 that Massey came to you.  He wanted to do the work.  There was an old bill outstanding that was due and owing.  And you were

_____

[1805] H. Clinton 4/25/98 Depo. at 26-27.

asked to intervene with McDougal to get the old bill, plus then arrange for this advance against fees or retainer.

Do you recall that's what you said on those occasions?

A.     Yes, I did.

Q.     Now, and I believe we asked you in April of '95, was the bill ever paid. And I believe your answer at that point was, I don't know. Now, is that your answer today?

A.     No. Since then, I have learned that $5,000 of the $5,900 bill had been paid at some point. I don't know when.[1806]

Mrs. Clinton was also asked about a recently produced chronology drafted by Foster

during the 1992 campaign:

Q.     This document was found in the briefcase of Mr. Foster and produced to the Independent Counsel's Office in late July 1997.

Can you read the entry there for 10/23/84?

A.     Yes. It says "$5,000 paid on Bank of Kingston bill."

Q.     All right. Did Mr. Foster tell you in 1992 that the old bill had been paid, or $5,000 had been paid on the old bill?

A.     No, he did not. And also when he edited my two-page statement, he didn't change my understanding which I typed about his not paying the bill. And also, as we can see with his writing on this copy of the bill, he said, "I believe there was a subsequent bill."

So, either he didn't think that the fact that $5,000 was paid on a $5,900 bill constituted full payment, or for some reason he didn't know. Or he neglected to tell me.

But, in any event, my understanding, which I believe I must have gotten from Mr. Foster since he had worked on the Bank of Kingston matter, was

_____

[1806] <u>Id.</u> at 31-32.

what I believed at the time.[1807]

Mrs. Clinton was asked about the old bill found in Foster's attic, marked "Paid" and dated October 23, 1984, in addition to documents related to the payment of the old bill, also found in Foster's attic, including:

- The minutes of the September 1984 Madison Bank board meeting at which Gary Bunch, president of the bank, was authorized to negotiate settlement of the outstanding Rose bill; [1808]

- The October 9, 1984 letter from Foster to Bunch demanding payment by October 22, 1984 and threatening to sue if payment was not received;[1809] the $5,000 check that Madison Bank & Trust sent to Rose on October 22;[1810]

- The minutes of the November 1984 Madison Bank board meeting, noting that earnings would be down because a legal bill had been paid.[1811]

Mrs. Clinton responded, "I don't know anything about the letter [from Foster to Bunch] or the agreement it refers to."[1812]

Mrs. Clinton was asked if she agreed that these documents established that the bill was paid in October 1984:

_____

[1807] H. Clinton 4/25/98 Depo. at 32-33.

[1808] Minutes of the Madison Bank and Trust Board Meeting (Sept. 25, 1984) (Doc. Nos. MGSL-FR-00000062 through 63).

[1809] Letter from Vincent Foster Jr., Rose Law Firm attorney, to Gary Bunch, Madison Bank & Trust employee (Oct. 9, 1984).

[1810] Check from Madison Bank & Trust payable to Rose Law Firm for $5,000.00 (Oct. 22, 1984) (Doc. No. 2091-00010390).

[1811] Minutes of the Madison Bank and Trust Board Meeting (Nov. 1984) (Doc. Nos. MGSL-FR-00000064 through 66).

[1812] H. Clinton 4/25/98 Depo. at 41.

444

Q.      Taking that [letter from Foster to Bunch], with a copy of the old bill that
        we now have marked paid 10/23/84, does it appear to you that the old bill
        was paid in October of 1984?

A.      Well . . . again, I've never seen these before.  But my reading of Mr.
        Foster's letter is that the firm agreed to a $5,000 fee limitation.  But, of
        course, they would expect their expenses to be paid.  That would, that -- in
        the way that is written, that does not refer to costs and expenses.

        So, from my perspective, the bill, which was for $5,893.63, was not paid
        in full.  And, instead, the firm had to take a diminution of the fee and
        allocate money to the expenses.  And then, if I look back at the chronology
        you've provided me from Mr. Foster, as you identified it, it says that
        $5,000 paid on Bank of Kingston bill which, again, suggests to me that
        Mr. Foster at least did not consider this account to be paid in full.

        So, from my memory of what I knew at the time, at least in the minds of a
        number of lawyers in the Rose Law Firm, Mr. McDougal was a deadbeat
        who was a very difficult client to collect from, that you had to threaten to
        sue to get paid and then, even if you made an agreement with him of a
        $5,000 fee limitation, he didn't fulfill the agreement.

        Now, that's what this says to me, looking at it in a whole.

Q.      Now, we've heard from Mr. Bunch.  He said this was the final payment.  It
        was settled with Mr. Foster.  He was authorized to negotiate a settlement.
        He paid the $5,000.

        You're right, it diminished the fee allocation.  There was never anything
        else paid on this bill.  So, if you went over there to see Mr. McDougal to
        get the $893, do you remember talking to him, you need to pay the rest of
        the money?

A.      [M]y memory in 1992 was that in 1985, seven years earlier, Mr. Massey
        wanted to do work for Mr. Latham at Madison, and was being frustrated in
        doing so because members of our firm said that Mr. McDougal was not
        someone they wanted to do business for again because he didn't pay his
        bills, and that he hadn't paid everything that was owed to the firm.

        Now, that is my memory.  That was my memory in 1992.  It is my memory
        today.  I can't tell you anything other than that.

                                        445

Q.     And you are saying --

A.     And also, I would add that the story that Mr. McDougal was telling at the time made no sense, because everyone who did any business with the Rose Law Firm knew that you didn't get credit for bringing in business.  You didn't get any extra money for bringing in new clients.  And so this, this whole matter just never, you know, rung true to me.

       And so my memory, to me, was much more reliable.

Q.     Mrs. Clinton, let me just ask you, was your stating that this came about through Massey, was it an effort to keep the media away from your husband perhaps requesting work for you from an S&L that was in trouble?

A.     Absolutely not . . . That never crossed my mind.  I told what my memory of what had happened, happened to be, and that's what I believe to this day.

Q.     Mr. Foster died on July the 20th, 1993, which was some two years before we interviewed you on the subject, when you talked about the old bill.  Is it your testimony he never told you that the $5,000 was paid?

A.     I have no memory of Mr. Foster telling me that.  I'm not going to tell you that he absolutely didn't, but I have no memory of that.[1813]

Finally, Mrs. Clinton was asked about her statement (in the 1992 press draft) that she

reported this April 23, 1985 meeting with McDougal to her partners:

Q.     You then state in your statement that you reported your meeting with Mr. McDougal to your partners.  This is the first sentence of the next paragraph.  Which partners did you report the meeting to?

A.     Again, I don't have any memory.  But if you will let me, I will do my best to put this in some context for that question.

       I believe I probably reported it to Watt Gregory, since I had a conference

_____

[1813] Id. at 42-45.

with him on that day, and Watt was a senior securities lawyer and would have, I believe, been responsible for working with Mr. Massey and supervising him.

I believe I also would have reported back to Vince Foster because I have a feeling that Vince Foster had hard feelings about Jim McDougal and about what McDougal had put him through, and about the insulting attitude about Carol Arnold, who was a particular associate in the firm that Mr. Foster did a lot of work with.  So, I think I would have had to go to some lengths to persuade Mr. Foster that it was a good idea for us to become involved with Mr. McDougal again.

Q.      Do you remember it being, so to speak, a tough sell to the partners?

A.      Not once we had the retainer.  I think once there was an agreement that Madison would pay a retainer that would be billed again -- it wasn't a retainer that we would keep; it would be an advance against fees and expenses -- then I think the partners felt that it was all right for Mr. Massey to go forward.  But they certainly wanted me to make sure that that retainer came in every month, and that there wasn't any slippage between the agreement that had been reached and what actually happened.

Q.      Were you always to be the billing partner?

A.      Well, my memory is that that was part of the arrangement, that since I had gone to Mr. McDougal and had actually gotten him to agree to a retainer, that I would be responsible for making sure that the bills for the work that was done would be paid completely, fees and expenses, without any question.

Q.      What was your understanding of the work that was going to be done?

A.      My understanding was that it was going to be securities work and that Mr. Massey would do it pursuant to his discussions with Mr. Latham.

Q.      What was your understanding as to Madison's financial health or Madison's financial condition at the time Rose undertook this representation?

A.      At that time, I don't think I had any knowledge of or information about Madison one way or the other.

447

Q.   Mr. Gregory has told us that there was a -- of course, he was a securities lawyer; you were not -- but that at that time it was well-known in the Little Rock community that Madison was not financially healthy in particular, and that savings and loans in general were not financially secure.

Does that refresh your recollection at all?

A.   Well, I certainly knew that savings and loans were going through some financial difficulties.  I don't know that I knew that any particular one, specifically Madison, was.[1814]

Mrs. Clinton's statements and testimony about the Rose-Madison Guaranty retainer are summarized as follows:

1)   Rick Massey was a friend of Latham, and Latham agreed to have Madison Guaranty hire Rose at Massey's request.

2)   Some Rose partners objected because McDougal had not paid a prior bill.

3)   Massey asked Mrs. Clinton to get McDougal to pay the old bill.

4)   Mrs. Clinton spoke with McDougal, who then paid the bill, and agreed to a "retainer" against future fees.

5)   Mrs. Clinton acted as billing partner because associate Massey could not, and because she had worked out the payment of the old bill.

Mrs. Clinton's testimony varied insofar as in 1996 she testified that a Rose partner, probably Vince Foster, approached her about Massey getting the work, but there was an objection because of the old bill, while her pre-1996 version was that Massey, not Foster, or another partner, came to her.  In 1998, her testimony reverted to the Massey version.  Also in 1998, she testified that the amount outstanding on the bill might have been the remaining $893, rather than the entire amount.  Other evidence regarding the five aspects of Mrs. Clinton's statements is

448

discussed in the following sections.

      **c.**     **Other Evidence Regarding Mrs. Clinton.**

          **i.**    **Whether Massey and Latham Arranged to Have Madison Guaranty Hire Rose.**

**Rick Massey** -- After graduating from law school in May 1984, Massey started at Rose as a law clerk.[1815]  After passing the bar in August 1984, he became an associate assigned to the securities section.  Massey's mentor was partner David Knight.  Massey knew Madison Guaranty's president, John Latham, from college.[1816]  Massey and Knight had lunch with Latham and asked him to send some legal work to Rose.[1817]  Latham said he would like to, but that Jim

---

[1814] Id. at 50-53.

[1815] Massey 11/7/95 GJ at 5.

[1816] Massey 12/3/97 GJ at 24.

[1817] Id.; Senate Whitewater Comm. Hearing, supra note 147, at 45 (Jan. 11, 1996) (testimony of R. Massey).  ("I actually pitched the business to him.  I think the pitch was basically, gee, I'm . . . you're asking me all these questions.  Why don't you hire us and put us to work on some of these things").  Massey agreed that as an associate he could not bring in a new client without a partner as billing attorney.  Id. at 153.

It is unclear when this lunch occurred.  Massey thought that he taught a class on securities regulation with Knight in the fall of 1984, which Latham audited.  Massey 12/3/97 GJ at 24; Senate Whitewater Comm. Hearing, supra note 147, at 18, 23 (Jan. 11, 1996) (testimony of R. Massey); Massey 11/7/95 GJ at 21-23.  Massey testified that he became reacquainted with Latham, who frequently approached him after class to ask about securities issues.  Massey 11/7/95 GJ at 23.  Documents from UALR Law School indicate that Latham took securities regulation in the fall of 1983, and took corporations taught by David Knight in the spring of 1984.  Law School Transcript of John Latham (June 17, 1996) (Doc. Nos. 2031-00000027 through 29).

Massey thought that he pitched the business to Latham in early 1985.  Senate Whitewater Comm. Hearing, supra note 147, at 151 (Jan. 11, 1996) (testimony of R. Massey).  Latham's memory is also different from Massey's.  Latham testified that Massey's pitch about Rose came while he and Massey were studying for the bar examination in the summer of 1984.  Latham

449

McDougal hired the lawyers and McDougal was happy with Jim Guy Tucker's firm, Mitchell Williams.[1818]  Massey said it was "at least weeks later" when Rose was hired by Madison Guaranty on the preferred stock offering.[1819]  Massey testified that he did not think that he brought Madison Guaranty's business into Rose.[1820]  In his grand jury testimony, Massey said he "d[id] not know how Madison Guaranty came to be a client of the firm."[1821]  In his Senate testimony, Massey said that although he did not remember how the business came in, "I don't recall feeling like this was my . . . that I killed this deer . . . I didn't have a big part when they came in."[1822]  Massey said he would have remembered bringing in a client:

> Q.    Mr. Massey, let me say something to you.  First-year associate, you're there, if you had brought in this business, it would have been the first piece of business I think you testified that you brought into the firm; right?

---

5/15/96 Senate Whitewater Comm. Depo. at 7.

[1818] Massey 12/3/97 GJ at 24-25; Massey 11/7/95 GJ at 45 ("And John said, 'Gee, it's….I don't remember the precise words.  Again, it's been 10 years.  But the general impression I got was, he'd like to do that but that his boss, I assume it was Mr. McDougal, was happy working with the Mitchell Firm, and that it was not up to him as to whether we could get any work").

[1819] Senate Whitewater Comm. Hearing, supra note 147, at 152 (Jan. 11, 1996) (testimony of R. Massey) ("I pitched the business, I was told that it wasn't up to him.  Sometime later, months or weeks, I wish I could tell you, hours, days, I believe it was weeks, at least weeks, we got this piece -- the first piece of work for Madison [Guaranty], which was the preferred stock issue").

[1820] Massey 11/7/95 GJ at 43 (Massey did not remember being a part of the process of arranging the retainer); Massey 12/3/97 GJ at 26 (confirming that he did not know how the business got to Rose).

[1821] Massey 11/7/95 GJ at 21.  Massey also said, "My position has been that I'm not -- and it is today that I'm not aware of how -- what their motivation was for hiring us.  I have -- I had a relationship with their president, which might have been a factor.  But I don't -- you know, I don't know that I -- you know, I don't know.  You'd have to ask them why they came to us." Id. at 82.

[1822] Senate Whitewater Comm. Hearing, supra note 147, at 78 (Jan. 11, 1996) (testimony of R. Massey).

A.      That's correct.

Q.      You would have remembered that?

A.      That's correct.

Q.      You don't remember bringing that business into the firm?

A.      No, sir, I do not.[1823]

But Massey stated that he did not have all the facts:[1824] "[I]t's outside my knowledge about whether I brought the Madison Guaranty matter in or not."[1825]  Consistent with his grand jury testimony, Massey said the reason he thought that Latham did not offer Madison Guaranty's work to him was because McDougal, not Latham, hired the attorneys:  "John told me it was up to his boss.  It was up to Mr. McDougal."[1826]

**David Knight** -- Knight remembered lunch with Latham and Massey:  "We took Mr. Latham to lunch, and I can't remember certainly the specific conversation but the gist of it was we told him a little bit about the types of work that Rick and I did.  Representative clients for the firm.  And then asked him for business."[1827]  Like Massey, Knight remembered Latham said

---

[1823] Id. at 232-33, 240-41 (testimony of Massey). By way of contrast, when he was later asked if he remembered the first client he brought in, Massey testified that he remembered bringing in his first client in 1988, shortly before he made partner. Massey 12/3/97 GJ at 64.

[1824] Senate Whitewater Comm. Hearing, supra note 147, at 77 (Jan. 11, 1996) (testimony of R. Massey).

[1825] Id. at 29 (testimony of Massey).

[1826] Id. at 26 (testimony of Massey).

[1827] Senate Whitewater Comm. Hearing, supra note 147, at 10 (May 16, 1996) (testimony of D. Knight).

451

McDougal decided which law firm to hire:  "My recollection is that he said that Mr. McDougal was really the one that made decisions about hiring lawyers . . . .  He also said that Madison Guaranty regularly used another law firm and that he thought they were satisfied with the services provided by the law firm."[1828]  Knight said he left the lunch with the impression Rose did not get the business.[1829]

**John Latham** -- Latham did not remember taking a class taught by Knight and Massey, nor did he remember lunch with them.[1830]  Latham remembered Massey expressing interest in Madison Guaranty's legal work:  "I do recall that Rick pitched the business in the sense that he wanted us to hire them to do legal work for us.  I do not remember the lunch."[1831]  Latham testified in the Senate that Massey approached him, but that he told Massey it was McDougal's decision whether to hire Rose:

> Rick Massey and I ran into each other when we were studying for the bar, and Rick went to work for the Rose Law Firm after that, and had talked with me about us using the Rose Law Firm.  And I think I probably mentioned that to McDougal at some point.  At some later point, Jim came back to me and said let's use the Rose Law Firm, and he wanted to put them on retainer . . . . I think he wanted to use them because he had friends over there, and one of those friends, of course, was Hillary.  He had used the Rose Law Firm there before.  What's open there, of course, is what prompted Jim to make that decision.  Was it a conversation with Hillary or was it just because I had suggested that at some point I would like to work with the Rose Firm at some point.  I don't know.[1832]

---

[1828]  Id. (testimony of D. Knight).

[1829]  Id. at 11, 13 (testimony of Knight).

[1830]  Latham 5/15/96 Senate Whitewater Comm. Depo. at 10-11.  Latham remembered being taught a corporations course by Knight while in law school.  Id.

[1831]  Senate Whitewater Comm. Hearing, supra note 147, at 35 (May 16, 1996) (testimony of J. Latham).

[1832]  Latham 5/15/96 Senate Whitewater Comm. Depo. at 7-8.  Latham graduated from law

Latham said McDougal decided which law firm to hire.[1833]  When asked who hired Rose, Latham

testified, "Jim McDougal did."[1834]  Latham did not remember any discussions about an unpaid

bill.[1835]

**Webb Hubbell** -- Hubbell's earliest statements on Rose and Madison Guaranty were

made during the 1992 presidential campaign.  Hubbell was the campaign contact on Rose

issues.[1836]  Campaign staff member Loretta Lynch's notes show that a reporter called Hubbell on

February 18, 1992, and asked how Rose was hired by Madison Guaranty.[1837]  Lynch's notes

---

school in May 1984, and studied for the bar the summer of 1984.  John Latham's UALR grade
transcript (June 17, 1996) (Doc. No. 2031-00000027).  In a FDIC interview Latham said
McDougal suggested that Madison Guaranty use Rose.  Latham 7/12/95 RTC Int. at 1
("LATHAM said that at one time, date not recalled, JAMES MCDOUGAL suggested that
Madison Guaranty use ROSE for some of the legal work at the institution.  LATHAM said that,
'MCDOUGAL had friends over there, he suggested we use them.'  LATHAM said when asked
who the friends were that it was HILLARY RODHAM CLINTON and others").

[1833]  Latham 2/14/95 Int. at 1; Latham 5/15/96 Senate Banking Comm. Depo. at 12-15.

[1834]  Senate Whitewater Comm. Hearing, supra note 147, at 15 (May 16, 1996) (testimony
of J. Latham).  When asked if it is "safe to say you personally did not hire the Rose Law Firm to
work for Madison Guaranty," Latham responded, "Yes, in the sense . . . that I didn't make the
decision to hire them and move that forward."  Latham 5/15/96 Senate Whitewater Comm. Depo.
at 8-9.  Pat Heritage-Hays, an assistant to Latham, said when she learned Madison Guaranty was
paying Rose $2,000 per month, she asked Latham about it, and he responded, "Oh, it's one of
Jim's deals."  Heritage-Hays 1/6/95 Int. at 1.

[1835]  Latham 2/14/95 Int. at 2; see also Latham 5/15/96 Senate Whitewater Comm. Depo.
at 22.

[1836]  Lynch 2/1/96 GJ at 9.

[1837]  See Memo (draft) from Loretta Lynch, Clinton Campaign Staff, to David Wilhelm,
Clinton Campaign Manager, and Bruce Reed, Clinton Campaign Staff in charge of Issues at 5
(Feb. 18, 1992) (Doc. Nos. 263-00000348 through 360).

453

reflected Hubbell told her that "HRC brought [Madison Guaranty] to the firm."[1838]

Susan Thomases's notes reflect a conversation with Hubbell on February 24, 1992, where Hubbell told Thomases:

> Massey had relationship w/ Latham & HC had relationship w/ MacD.  Rick will say he had rel[ationship] w/ Latham & had a lot to do w/ getting the client in.  She did all the billing.  According to time recs, HC had numerous conf[erences] with Latham, Massey, and McDougal on both transactions.  She reviewed some docs. She had one TC in 4-85 at the beginning of the deal w/ Bev. [Bassett].  Neither deal went through.  Broker/dealer was opposed by staff but approved by Bev under certain condition which they never met.  Preferred stock?!  But for Massey, it would not have been there.  But HC was billing partner and attended conferences.[1839]

Massey testified that during the 1992 campaign he never told Hubbell he would say he brought in the business.[1840]  Massey testified that he never spoke with Hubbell about it.[1841]

Massey said he spoke to reporter Jeff Gerth, and told him he did not know why Rose was hired and that Gerth should ask Jim McDougal.[1842]

Hubbell's February 1995 report of interview with this Office said:

> HUBBELL notes that Madison [Guaranty] was HILLARY's client, as she is the one who brought Madison [Guaranty] into the firm as a client, that is why she became the billing partner.[1843]

---

[1838] See id.; see also Lynch 2/1/96 GJ at 10-11.

[1839] Susan Thomases's notes of conversation with Webb Hubbell (Feb. 24, 1992) (Doc. No. 790-00000020) (emphasis added); see also Thomases 2/29/96 GJ at 45.

[1840] Massey 12/3/97 GJ at 63 ("I can say with certainty that I would never tell Webb Hubbell or gave him the impression that I brought that business in").

[1841] Id. at 37.

[1842] Id. at 38.

[1843] Hubbell 2/1/95 Int. at 7.

In December 1995, Hubbell was asked questions in the grand jury about this:

> Q.   I'm looking back over some notes of interviews with you, and I ask you, do you recall ever saying that Madison Guaranty was Hillary's client as she is the one who brought Madison Guaranty into the firm as a client, that is why she became the billing partner?  Do you ever remember making a statement to that effect?

> A.   I don't remember it.  I don't doubt that I could have, but I don't remember it.[1844]

Hubbell told the Senate in 1995 that "Massey was the one who wanted them as a client and that Mrs. Clinton was one of those who helped him accomplish that task."[1845]  Hubbell was read a March 12, 1992 article that said:  "Webster L. Hubbell, a partner and spokesman at Rose, said that nothing in the law firm's records indicates that Hillary Clinton brought in the Madison Guaranty business.  'That's a new one on me,' he said."  Asked whether the quote was accurate, Hubbell replied, "I don't know if I said that, but there is nothing in the records -- this is where lawyers are being lawyers . . . . There is nothing in the records of the firm that show that Hillary brought in the business."[1846]

Hubbell testified that he had no personal knowledge of the matter.[1847]  In testimony inconsistent with his denial, Hubbell had earlier testified that Massey approached him in 1984 and asked for help getting Madison Guaranty's business.[1848]  Hubbell testified that Massey had

---

[1844]  Hubbell 12/19/95 GJ at 187.

[1845]  Hubbell 10/26/95 Senate Whitewater Comm. Depo. at 122.

[1846]  Hubbell 12/19/95 GJ at 108.

[1847]  Hubbell 5/7/96 GJ at 74-75 ("I don't know for sure who brought it in. . . . I don't have personal knowledge, right").

[1848]  Hubbell 10/26/95 Senate Whitewater Comm. Depo. at 134.

spoken to John Latham, and felt Rose could get some of Madison Guaranty's work.[1849]  Hubbell

said he did not try to help Massey.[1850]

### ii. Whether Rose Partners Objected to Madison Guaranty Becoming a Client.

**<u>Rick Massey</u>** -- Massey testified in 1995 that he did not remember discussing Madison

Guaranty billing matters with Rose partners:

> [D]o I remember going to the partners and saying, "We want to represent the "Madison [Guaranty]," and other partners saying, "You're not going to do that until they catch up on their bill, and maybe there ought to be a retainer."  I have read that [Joe] Giroir said that.  I don't recall Giroir ever having said that to me.  I don't remember me being in any of that discussion, and it frankly would not have been a matter in which I normally would be involved because I was a first year associate, and we didn't have much input on billing arrangements of that kind.  It's possible, however.  I just don't remember it.[1851]

Massey remembered no such discussion with either securities partners or Mrs. Clinton:

> Q.    Mr. Massey, do you remember anything about your going to the securities partners and saying, "I want to work on a case for Madison [Guaranty]," and they said, "We're not going to approve that until Madison [Guaranty] has paid us what they owe us on some other case"?
>
> A.    I don't -- no, sir.  I don't remember that.
>
> Q.    Either with any securities partners or with Mrs. Clinton?
>
> A.    I don't remember doing that with anybody.[1852]

--------------------------------------------------

[1849]  <u>Id.</u> at 134-36.

[1850]  <u>Id.</u> at 135.

[1851]  Massey 11/7/95 GJ at 85.  Giroir testified that he did not remember Rose representing Madison Guaranty in 1985 and 1986 or any discussions in the firm about any representation. Giroir 7/18/96 GJ at 23-27.

[1852]  Massey 11/7/95 GJ at 32.  Massey said that although he does not remember it, it is "possible" he told Knight he thought he was going to get Madison Guaranty as a client.  <u>Id.</u> at 84-

Massey testified that he knew his memory contradicted Mrs. Clinton's.[1853]

**David Knight** -- David Knight remembered "some discussion" about Madison Guaranty

not paying an old bill but could not remember the details.[1854]

**Webb Hubbell** -- Hubbell said he remembered Rose partners were reluctant to work for

Madison Guaranty because of previous payment problems:

> There was an issue in the fact that the firm had represented one of -- Mr.
> McDougal prior to this issue, before Madison Guaranty, and Mr. McDougal still
> owed the firm some money.  And several of the partners were not anxious for us
> to work for McDougal until that outstanding balance was still paid."[1855]

Hubbell said he did not remember if he was part of the discussions about the old bill, just

that he knew about them:

> Q.      You have told us about the talk within the firm that they've got to pay their
>         old bill first, and then some arrangement whereby there's going to be the
>         new.  But I take it you're telling us today you don't remember if you were
>         in on that or not?

---

85.  Before the Senate Whitewater Committee in 1996, Massey also testified that he did not remember a discussion with any Rose partner about Madison Guaranty's outstanding bill or partners objecting to bringing Madison Guaranty in again as a client because of the billing problems:  "I've heard that there were discussions, that there was some disgruntlement.  And discussions like this could have gone on.  I don't believe I was a party to them."  Senate Whitewater Comm. Hearing, supra note 147, at 23-24 (Jan. 11, 1996) (testimony of R. Massey).

[1853]  Massey 11/7/95 GJ at 84.

[1854]  Knight 12/6/95 GJ at 15-16  ("That rings a bell.  I just recall some discussion about a prior problem with Madison Guaranty or McDougal not paying a bill or, you know, some -- with respect to some earlier representation.  But I don't remember it in the sense of kind of a formal declaration or consideration -- you know, consideration of the thing.  I don't recall being involved in any lengthy discussion or, you know, policy statement or anything like that about it.  I just do generally recall that topic coming up").

[1855]  Hubbell 12/19/95 GJ at 43-44.  When asked which partners he remembered being upset about McDougal's past non-payment Hubbell identified Foster and Gregory.  Id. at 46.

457

A.      No, I don't.  I was aware of it, but I don't remember any specific, you
        know, "It's got to be paid," and things of that sort.  I mean, I was aware
        that there was a concern.[1856]

Hubbell said he did not remember talking to Mrs. Clinton about a retainer for Madison

Guaranty, but did remember talking to her about other firms' use of retainers.[1857]  Hubbell said he

spoke to Mrs. Clinton in the mid-1980s about Madison Guaranty's billing problems and the old

bill being paid before doing any more work:

A.      I know that I had conversations with her when we first took on the
        Madison Guaranty representation, that was in '84 or '85.

Q.      What do you recall about those conversations in '84-85 about the Madison
        Guaranty representation?

A.      The law firm did not want to -- some of the members of the law firm did
        not want to represent Madison Guaranty until Mr. McDougal had paid an
        old bill owing the firm.

Q.      And what was Mrs. Clinton's position with regard to whether the firm
        should represent McDougal?

A.      She thought that if he got right with the firm, that she didn't see any reason
        why we shouldn't represent him.

Q.      Did McDougal ever "get right with the firm"?

_____

[1856] Id. at 61-62.

[1857] Id. at 67.  Mrs. Clinton said she did not remember any conversations with Hubbell about Madison Guaranty's business or retainers.  H. Clinton 4/22/95 Depo. at 13-14 ("I don't recall any [conversations with Hubbell], but I might very well have had conversations with him"); see also Hubbell 2/1/95 Int. at 6 ("HUBBELL does not know if HILLARY CLINTON talked to the firm regarding the MADISON retainer, nor does he have any memory of HILLARY CLINTON talking to HUBBELL personally about the retainer").

458

A.      Yes, he did.[1858]

**Watt Gregory** -- Watt Gregory, a senior member of Rose's securities section, said he remembered "some general discussion" about whether Rose should work for Madison Guaranty.[1859]  Gregory remembered talking to Mrs. Clinton "about whether we should or shouldn't [represent Madison Guaranty], or what some of the issues might be in connection with the ability of the savings and loan to raise capital by that particular method."[1860]  Gregory testified "that Mrs. Clinton was instrumental in introducing the client to the lawyers in the firm."[1861]

Gregory remembered two specific concerns about Madison Guaranty.[1862]  Gregory felt that Rose, which had represented no savings and loans, did not have the expertise.[1863]  Gregory thought the business potential was small and the risks were great; he understood that savings and loans in general (and Madison Guaranty in particular) were having financial difficulties and he "didn't perceive Madison [Guaranty] to have a particularly attractive risk/reward ratio for our

---

[1858]  Hubbell 10/26/95 Senate Whitewater Comm. Depo. at 131-32.

[1859]  Gregory 1/3/96 GJ at 7.  Gregory testified that although he remembers some discussion, he cannot remember "names, places, or dates."  Id.  Gregory remembered one party to the discussions was David Knight.  Gregory 5/24/95 Int. at 2.

[1860]  Gregory 1/3/96 GJ at 25-26.

[1861]  Id. at 6.  Gregory's 1995 OIC interview reads:  "RLF's opportunity to represent Madison Guaranty Savings & Loan (MGSL) came through Hillary Clinton in the mid 1980's."  Gregory 5/24/95 Int. at 2.

[1862]  Gregory 1/3/96 GJ at 13, 15-16 ("But I do know that there was an open discussion about the client, or the potential client, as well as the substantive issue, could a state-chartered, stock-owned savings & loan association have two classes of stock . . . But to my way of thinking, the discussions about, 'Should we be doing this,' took place before we undertook the particular project").

[1863]  Id. at 9-10

459

firm as a new client."[1864]  He was also concerned that "there was no bright-line, black-letter statement in the Arkansas statutes that would say you can have two classes of stock."[1865]  Gregory did not remember any discussion about Madison Guaranty's outstanding bill.[1866]  When asked about how Massey was assigned to the project, Gregory said, "I have some recollection that he, at one point, mentioned a friendship or an acquaintanceship with this John Latham."[1867]

Four other Rose partners -- William Kennedy, George Campbell, Joe Giroir, and Wilson Jones -- were asked about any discussions within the firm or with Mrs. Clinton about Madison Guaranty retaining Rose.  None of the four remembered any.[1868]

### iii.    Mrs. Clinton's Discussion with McDougal.

As previously discussed, in 1994, 1995, and 1998, Mrs. Clinton said Massey asked her help to resolve McDougal's old bill.  In contrast, Massey testified in 1995 that he did not remember speaking with Mrs. Clinton or any other Rose partners about the bill.[1869]  Massey told the Senate in 1996 that he did not remember approaching Mrs. Clinton about representing Madison Guaranty:

> Q.    [A]m I correct that you did not go to Mrs. Clinton and say I have a
>        proposal to do work, can you go to Mr. McDougal and get him to agree to
>        prepay?

---

[1864]  Id. at 8-10.

[1865]  Id. at 13-14.

[1866]  Id. at 18.

[1867]  Id. at 29.

[1868]  Senate Whitewater Comm. Hearing, supra note 147, at 277 (Jan. 16, 1996) (testimony of W. Kennedy); Campbell 6/28/96 Int. at 2; Giroir 7/18/96 GJ at 24-26; Jones 6/27/96 Int. at 3.

[1869]  Massey 11/7/95 GJ at 33-34.

A.      Sir, I don't have a recollection of that.[1870]

When asked if he remembered approaching Mrs. Clinton about getting Madison Guaranty

as a client, Massey testified:

> It's possible that I had a casual conversation with her that I don't remember from
> 11 years ago, sir, but I don't recall a conversation in which I went to her and asked
> her to help me bring in the client.
> . . . .
>
> Now, it's possible -- and I think I knew at that time that Mrs. Clinton had some
> relationship with Mr. McDougal, and so it's possible that I could have had a casual
> conversation with her in a hallway and said gee, we'd really like to try to get these
> folks' business, and maybe you could have a word with Mr. McDougal.  It's very
> possible.
> . . . .
>
> It's possible that I had a conversation with her about gee, I think we might be able
> to get these folks' work, you know McDougal, maybe you could go talk to her.
>
> [D]id I talk to her with respect to how we were going to bill them, whether we get
> a retainer, did I have a specific engagement agreement of some kind.  Sir, I don't
> have any recollection of that happening.  I don't believe it happened that way.
> Could I have had a conversation with her, can you have a talk with Mr.
> McDougal, that's very possible.  I want to -- that's my testimony.[1871]

### iv.      Payment of McDougal's Old Bill.

The McDougal-controlled Madison Bank & Trust did at one time have a long-outstanding

old bill from Rose.  Rose billed Madison Bank in July 1982 for $5,000 in legal fees, and $893 in

---

[1870] Senate Whitewater Comm. Hearing, supra note 147, at 26, 135-36 (Jan. 11, 1996)
(testimony of R. Massey) ("I do not remember, as you said earlier, a proposal in hand to her and
discussing with her that there were partners in the firm that were dissatisfied with McDougal and
here is a proposal and let's work it out.  I have no recollection of that").

[1871] Id. at 20, 25, 136, 234 (testimony of Massey).

expenses.  Rose had lost the case it was billing for, and McDougal refused to pay.  The Independent Counsel found several basic facts about this bill.

When the Madison Bank & Trust board of directors met on September 25, 1984, the old bill was on the agenda.  Under the heading "Rose Law Firm," the meeting minutes recorded: "We owe $5,000 for Huntsville move appeal, according to firm.  Mr. Vaughn moved, Mr. McDougal seconded that Mr. [Gary] Bunch [president of Madison Bank] will negotiate settlement with Rose Law Firm.  Approved unanimously."[1872]  On October 9, 1984, Vince Foster wrote to Bunch, referring to their conversation the week before, saying Rose would sue if Madison Bank did not pay its bill by October 22.[1873]  Madison Bank sent a $5,000 check to Rose on October 22, 1984, and Rose endorsed it three days later.[1874]

On November 27, 1984, the Madison Bank and Trust board met again.  The minutes reported earnings would be down because of "heavy accounting fees . . . and a payment of legal fees."[1875]  Bunch said he understood the $5,000 payment settled the debt, even though the costs portion had gone unpaid and Rose never sent another bill.[1876]

The evidence established that Mrs. Clinton was wrong when she said she met with Jim McDougal on April 23, 1985 to discuss the old bill and that he thereafter paid that bill.  According to the chronology Vince Foster created during the 1992 campaign, $5,000 was paid on

---

[1872] Bunch 1/20/98 GJ at 16 (discussing minutes).

[1873] Id. at 23-24, 26 (discussing letter).

[1874] Id. at 26-27 (discussing check and endorsements).

[1875] Id. at 17.

[1876] Id. at 30.

the Bank of Kingston bill on October 23, 1984,[1877] and this was confirmed by the original copy of

the bill stamped "Paid" on October 23, 1984 found in 1997 in Foster's attic.  Mrs. Clinton

acknowledged in her 1998 testimony that her earlier testimony was not entirely accurate.  She

noted that even though $5,000 had been paid by the date of her meeting with McDougal, there

still was $893 outstanding.  Even if Mrs. Clinton was referring to this $893 difference when she

said she went to discuss an old bill with McDougal in April 1985, the evidence shows that the

balance was not expected to be paid and that payment of that portion the bill was not a

prerequisite to Rose representing Madison Guaranty.

### v.  Mrs. Clinton as Billing Partner.

In 1995, Massey testified that he did not ask Mrs. Clinton to become the billing partner:

> Q.     All right.  Mr. Massey, do you remember anything about you, Rick
>        Massey, affirmatively going to Hillary Clinton and asking Hillary if she
>        would become the billing partner?
>
> A.     No, I do not.[1878]

Massey testified, consistent with his prior testimony, before the Senate Whitewater

Committee:

> Q.     Did you approach Mrs. Clinton and ask her to be the billing attorney on
>        the Madison Guaranty account?
>
> A.     Sir, I don't recall that.[1879]

---

[1877] Foster Chronology of the Rose Law Firm Representation of Madison Guaranty Savings & Loan (Mar. 26, 1992) (Doc. Nos. 1180-00000236 through 240).

[1878] Massey 11/7/95 GJ at 95-96.

[1879] Senate Whitewater Comm. Hearing, supra note 147, at 29 (Jan. 11, 1996) (testimony of R. Massey).

Massey was asked whether he would have remembered asking Mrs. Clinton to be the

billing partner:

| Counsel. | And do you know how Mrs. Clinton came to be the billing partner? |
|---|---|
| Massey. | No. |
| Counsel. | You didn't ask her to be the billing partner? |
| Massey. | I don't recall asking her to be the billing partner. |
| Counsel. | And it's not the kind of thing -- |
| Chairman D'Amato. | Mr. Massey, . . . If you asked Mrs. Clinton to be the billing partner, wouldn't that be a thing -- notwithstanding that it was 10 or 11 years ago -- that you would recall? |
| Massey. | That's fair. |
|  | . . . . |
| Chairman D'Amato. | Did you ask her to be the billing partner? |
| Massey. | I don't think so. |
| Chairman D'Amato. | All right.  That's better than I don't recall. |
| Mr. Massey. | I should remember it.  It could have happened.  I don't think I did. That's the best I can do. |
| Chairman D'Amato. | And you had to slip in it could have happened.  I mean, Mr. Massey, you get this matter.  Mrs. Clinton is not in your section.  Now you're going to bring me to develop how it is that that would not be consistent at all.  Mrs. Clinton is not in this section.  She doesn't do securities work.  She's not in the area, the general area of the firm that handles this work; is that correct? |
| Massey. | No, she was not. |
|  | . . . . |

464

Chairman D'Amato.    Okay.  So consequently, if you were going to ask her, a partner outside of this area, to be the billing partner, wouldn't you recall that?

Massey.    Yes, sir, that's correct.[1880]

### 4.    Analysis of the Rose Retainer.

Substantial evidence corroborated McDougal's version of events.  Mrs. Clinton's Rose income had declined in the years prior to the alleged jogging incident -- a fact which McDougal should not have known independently.  One witness, Bill Henley, partially corroborated McDougal's testimony by relating McDougal's contemporaneous disclosure of his meeting with Governor Clinton.  Similarly, Susan McDougal's unsworn press interviews also show McDougal contemporaneously told her about the meeting.  President Clinton did not contradict McDougal, merely saying he had no recollection one way or the other.[1881]

Nonetheless, McDougal's statements and testimony must be viewed with caution. McDougal was a confessed perjurer, and no independent witness could entirely corroborate his testimony.

Mrs. Clinton's various descriptions of events about the Rose retainer had substantial inconsistencies.  Latham, Massey, and Knight disagreed with Mrs. Clinton's statement that Massey brought in the business through Latham.  Latham, Massey, and Knight consistently said that McDougal, not Latham, hired the lawyers.  Massey told the grand jury that he was not the

---

[1880]  Id. at 170-72 (testimony of Massey).

[1881]  This Office discounted the testimony of Moles as so at variance with other known facts as lacking in significant probative value.

source of the Madison Guaranty business.[1882]

Massey's testimony was corroborated by documents.  For example, Madison Guaranty's regular firm, Mitchell Williams, had already begun work on the broker-dealer and preferred stock matters prior to Rose's retention.[1883]  A Mitchell Williams attorney had already contacted the ASD about the matter before it was turned over to Rose -- a sequence of events unlikely for Latham to have caused.[1884]  John Selig, the Mitchell Williams partner who did Madison Guaranty's legal work was formerly head of the ASD.[1885]  Beverly Bassett, then the current ASD head, had been a lawyer at Mitchell Williams.[1886]  In addition, Jim Guy Tucker, the billing partner at Mitchell Williams, was a long-time friend and business partner of McDougal.[1887]  It seems unlikely that Latham sought to have a new associate at Rose represent Madison Guaranty before the ASD rather than Selig, a former head of the ASD for whom Bassett had previously worked

---

[1882]  Massey's testimony before the Senate Whitewater Committee was more equivocal, raising doubts about the accuracy of either statement.  The balance of the evidence (including the unlikelihood that Massey would forget his first client ever) supports the conclusion that Massey was not the source of Madison's business, though his confirmed lunch approach to Latham could have played some role in McDougal's decision to hire Rose.

[1883]  Letter from Mitchell, Williams, Selig, Jackson & Tucker Law Offices to Sarah Hawkins, Senior Vice-President, Madison Guaranty, enclosing a Preliminary Offering Circular (Dec. 3, 1985) (Doc. Nos. 155-00001504 through 1506).  More than one month later, Mitchell Williams opened another matter on Madison Guaranty's account, entitled "Broker-Dealer." (Doc. Nos. 155-00001507 through 1509).  The broker-dealer file was also empty. These were the ninth and tenth matters opened by Mitchell Williams for Madison Guaranty.

[1884]  Id.

[1885]  Selig 7/18/96 GJ at 3-4.

[1886]  Letter from Bill Clinton, Governor of Arkansas, to Beverly Bassett, Wright, Lindsey, and Jennings attorney (Jan. 22, 1985) (Doc. No. DEK219149).  The Governor's Office issued a press release announcing Bassett's appointment (Jan. 18, 1985) (Doc. No. 319-00028649).

simply as a favor to his friend Massey.  McDougal offered a simpler and more direct explanation:
He hired Rose because he thought the Governor's wife would have influence in front of a state
agency.[1888]

Also significant is the documentary evidence showing that McDougal's "unpaid" bill had
been paid and settled six months before Mrs. Clinton met with McDougal in April 1985.  If Mrs.
Clinton's testimony reflected her view that the entire bill was not paid, $5,000 had been paid.  If
Mrs. Clinton's account testimony reflected her view that only the unpaid $893 expense portion of
the bill remained unpaid, that portion was never expected by Rose to be paid.

There is a plausible explanation for Mrs. Clinton's testimony.  In late 1983, Mrs. Clinton
was asked by her fellow partners at Rose to intercede with McDougal about payment of the Bank
of Kingston bill.[1889]  This earlier contact with McDougal may have been the contact Mrs. Clinton
remembered, though she mistakenly confused it with the 1985 meeting she and McDougal agreed
occurred.  In the judgment of the Independent Counsel, this plausible explanation for Mrs.
Clinton's confusion would create a reasonable doubt in a trier of fact's mind about the willfulness
of Mrs. Clinton's factually inaccurate statements about going to see McDougal in April 1985
about a billing dispute that had long since been settled.

On balance, the weight of evidence supports McDougal's version of events.  But in the
judgment of the Independent Counsel, the weight of the evidence simply is not sufficient to

---

[1887]  See Tucker 3/18/99 GJ at 21-23.

[1888]  J. McDougal 8/1/96-6/1/97 Int. at 15.

[1889]  See H. Clinton 4/25/98 Depo. at 23-24.

467

warrant prosecution of Mrs. Clinton.  Moreover, with McDougal's death in March 1998, the most important percipient witness became unavailable.  For these reasons and in the exercise of discretion, the Independent Counsel declined prosecution as to Mrs. Clinton's testimony and how Rose was hired by Madison Guaranty.

**B.      Mrs. Clinton's Madison Guaranty Work.**

The legal work that Rose and Mrs. Clinton did for Madison Guaranty was also scrutinized by federal investigators.  Rose's legal work for Madison Guaranty coincided with some of the most serious frauds perpetrated by the Madison Guaranty insiders, including the IDC/Castle Grande transactions, which eventually caused losses of more than $4 million to the institution.[1890]

**1.       Work Related to the IDC and Castle Grande Transactions**

Rose billing records sought for many years by this and other federal investigators were finally produced by Mrs. Clinton's attorneys in January, 1996.  These long sought records provided more detail about Mrs. Clinton's legal work for Madison Guaranty than was previously known.  The Rose billing records showed six separate "matters" worked on by its lawyers for Madison Guaranty.  Matter 5 was called "IDC," for Madison Financial's purchase, development, and resale of a 1,050-acre parcel of land from the Little Rock IDC.  The IDC property was developed under the name "Castle Grande."  As addressed in detail in Volume II, Part B, Chapter 1 of this Final Report, these transactions involved substantial misconduct, discovered by federal

_____

[1890] Pillsbury Madison & Sutro LLP, A Report on Certain Real Estate Loans and Investments Made by Madison Guaranty Savings & Loan and Related Entities:  Prepared for

regulators in 1986.

The billing records showed that Mrs. Clinton billed Madison Guaranty for time working on various aspects of these transactions, such as billing for her conferences with Seth Ward, the admitted straw man for the original purchase of the IDC property who executed a series of "loans" compensating him for that criminal role, while disguising the payments as "loans" to deceive federal examiners auditing Madison Guaranty.

### 2.    Mrs. Clinton's Work According to the Billing Records.

The billing records show Mrs. Clinton's legal work on the IDC transactions between November 14, 1985 and June 10, 1986.[1891]  Her greatest number of billing entries occurred between November 14, 1985 and January 7, 1986.[1892]  During that seven-week period, Mrs. Clinton billed Madison Guaranty for twelve conferences with Seth Ward on the IDC transaction.[1893]  She also billed for two conferences with Webb Hubbell in November 1985.[1894] The billing entries for these conferences do not say what was discussed.  Mrs. Clinton later said she did not remember the details of these conferences, though she thought they were related to

---

Resolution Trust Corporation 29 (Dec. 19, 1995).

[1891]  Rose Law Firm Billing Records (Jan. 1986 through June 1986) (Doc Nos. DEK015013 through 15019, 015021 through 15022, 015029 through 15032, 015038).

[1892]  Rose Law Firm Billing Records (Nov. 1985 through Jan. 1986) (Doc Nos. DEK014991, 015009, 015012, 015014, 015016 through 15019).

[1893]  Id.

[1894]  Rose Law Firm Billing Records (Jan. 1986) (Doc. Nos. DEK015014, 015008 through 15009).

legal research concerning Castle Grande's proposed brewery and the sewer and water utilities.[1895] Seth Ward testified that he did not remember having any discussions with Mrs. Clinton.[1896]

Before January 30, 1986, Mrs. Clinton charged Madison Guaranty for an additional 14.5 hours of legal work on the IDC matter that was otherwise unrecorded on Rose's other records. On January 30, 1986, Rose (by Mrs. Clinton as the billing partner) sent Madison Guaranty five bills for legal services -- one for each open matter.[1897] The IDC draft bill computerized billing memorandum stated that Mrs. Clinton performed $912.50 worth of legal work on the IDC matter.[1898] Mrs. Clinton made a handwritten change to the draft billing memorandum to increase billing for her work to $2,731.25.[1899] Mrs. Clinton did not write down what additional work she had performed to justify this additional charge or when that work had been performed. No supporting details for this increase were ever entered into the Rose billing computer and Mrs. Clinton's personal timesheets for 1985 to 1986 were never produced to this or any other investigation, though they were sought.[1900]

The additional work Mrs. Clinton might have performed could possibly be determined by comparing the computerized billing memorandum with the invoice Rose sent to Madison

--------------------------------

[1895] H. Clinton 2/14/96 FDIC Int. at 72.

[1896] Ward 1/17/96 GJ at 62; Ward 2/12/96 Senate Whitewater Comm. Depo at 44.

[1897] Rose Law Firm Billing Records (Jan. 1986) (Doc. Nos. DEK015008, 015011, 015013, and 015016).

[1898] Rose Law Firm Billing Records (Jan. 1986) (Doc. No. DEK015017).

[1899] Id.

[1900] See Letter from Alden L. Atkins, attorney representing Rose to W. Hickman Ewing Jr., Deputy Independent Counsel (Feb. 9, 1996) (Doc. No. 105-00092699).

Guaranty.  The original draft billing memorandum entry for November 14, 1986 stated: "Conference with Seth Ward regarding purchase from Brick Lile."[1901]  That entry was initially billed to Matter #4 (General), but Mrs. Clinton edited the draft memorandum to move it to Matter 5 (IDC).[1902]  The final January 30, 1986 invoice for Matter #5 contained the description "Conference with Seth Ward regarding purchase from Brick Lile and proposed industrial development on site."  Some of the 14.5 missing hours of work could have been for the "proposed industrial development on site."  This Office was unable to determine the basis for the $1,818.75 increase in Mrs. Clinton's IDC billings for work performed through January 30, 1986. It is possible that the billing records do not accurately reflect Mrs. Clinton's work.  Mrs. Clinton herself has said some of the entries were wrong.

This Office also examined whether Hubbell's IDC work was billed under Mrs. Clinton's name.  Hubbell had substantial contact with Ward on the IDC matter.  File storage records at Rose show Hubbell maintained a file entitled "IDC: UNION TOWNSHIP RESEARCH."[1903]  In his August 1996 testimony, Hubbell admitted advising Ward on most significant aspects of the IDC transaction.[1904]  Don Denton[1905] and Ward's accountant, Mike Schaufele, corroborated

---

[1901]  Rose Law Firm Billing Records (Nov. 22, 1985) (Doc. No. DEK014991).

[1902]  Id.

[1903]  Rose Law Firm Computer Printout by file name and attorney name (undated) (Doc. No. RIC 1212395).

[1904]  Hubbell and Ward discussed:  1) the initial IDC purchase, Hubbell  8/22/96 GJ at 24, 79; 2) letter agreements between Ward and McDougal, id. at 35-36, 41-43; 3) the brewery, id. at 59; 4) Ward's purchase of IDC property, id. at 49; 5) the sewer and water facilities, id. at 24, 60, 108; 6) payment of Ward's commissions and the mechanism for payment including the concept of set off loans, id. at 49-50, 67, 98; 7) tax consequences of Ward's relationship with Madison, id.

Hubbell's testimony.[1906]

Hubbell denied billing time or doing legal work for Madison Guaranty through another

attorney, such as Mrs. Clinton.

> Q.    Did you ever bill for any work for Madison Guaranty Savings & Loan or
> Madison Financial in 1985 and 1986?
>
> A.    Not that I remember, and I haven't seen anything that shows that I did.  I
> mean, I'm hesitant to be 100 percent sure of anything anymore, but if I
> could [sic] 100 percent sure, I don't remember ever billing Madison.  I've
> never seen anything or heard anybody say that I did.
>
> Q.    Would you ever have billed Madison -- and that would include Madison
> Guaranty and Madison Financial Corporation -- indirectly, that is, through
> someone else? That is, you do work and you put it under someone else's
> name or in some other category on the bill, not under Web Hubbell legal
> services?
>
> A.    No, I don't think I have.[1907]

**3.    Mrs. Clinton's Recollection of Madison Guaranty Work.**

Mrs. Clinton testified in 1995 that she remembered performing no legal work that she did

for Madison, other than before the ASD:

> Q.    [F]rom the time of the advance against fees or retainers started in May of
> '85 until it was terminated in July of '86, do you recall today doing any
> other work on anything other than the matter with the Arkansas Securities
> Department?
>
> A.    I have a recollection of the firm during that time doing some other minor
> matters for Madison [Guaranty], but I couldn't tell you what they were

---

at 57-59, 90; and 8) the option agreement.  Id. at 57-59, 93.

[1905]  Denton 8/20/96 GJ at 77.

[1906]  Schaufele 5/27/88 Depo. at 13, Ward v. Madison Guaranty, No. 87-7580, (E.D. Ark.).

[1907]  Hubbell 8/22/96 GJ at 27-28.

right now.[1908]

In 1993, Rose recreated the Madison Guaranty representation from fee allocation documents in the firm's files.[1909]  Mrs. Clinton was questioned using the recreated fee allocation. For January 1986, the allocation showed Mrs. Clinton was credited with earning a fee of $2,731.25 for Stock Offering & IDC and $802.50 for Stock Offering.[1910]  Mrs. Clinton was asked if she had worked on the stock offering matter, and she said:  "I must have done something or it could have gotten misallocated.  There was a -- I think IDC was something different from the stock offering, but I don't have any memory of that."[1911]  This exchange followed:

> Q.      I believe -- and I'm sorry that I don't have a copy, Mrs. Clinton, but the IDC, I think, had to do with Castle Grande.  And there was a memo in there or something on a wet/dry issue.
>
> A.      Uh-huh.
>
> Q.      And there is actually a memo from Rick Donovan to you.  Do you recall anything what that would be about.
>
> A.      I don't recall specifically, but there was some property that Madison either owned or was trying to develop that was partially in a township that was wet, or something like that.  That's all I remember right now.[1912]

---

[1908]  H. Clinton 4/22/95 Depo. at 30.

[1909]  R. Clark 12/5/95 GJ at 20-22.  Some of these documents had been removed in 1992 by Hubbell and Foster.  See Hubbell 5/7/96 GJ at 15, 18-19; Rose storage facility checkout log (Mar. 24, 1992) (Doc. No. 105-00054216).

[1910]  Recap of fees from Madison Guaranty Savings & Loan Final Recap at 2 (for period 1983 through Sept. 1987) (Doc. No. 105-00083353 through 354).  H. Clinton 4/22/95 Depo. at 41. When discovered, the billing records listed that in fact the entire $2,731.25 was for the IDC matter.  Rose Law Firm Billing Records (Jan. 21, 1986) (Doc. No. DEK015017).

[1911]  H. Clinton 4/22/95 Depo. at 41.

[1912]  Id. at 42-43.

Mrs. Clinton was asked whether she thought the fees had been allocated to her because she had brought in the business, or because she had done the work.  She replied:  "Well, I did work.  I just can't remember 10 years from the work exactly what the work was."[1913]

### 4.  Denton's Explanation of His April 7, 1986 Phone Conversation with Mrs. Clinton

#### a.  The Billing Records and Denton's Testimony

The billing records showed that Mrs. Clinton billed Madison Guaranty for an April 7, 1986 telephone conversation with Don Denton.[1914]  That was the day that Madison Guaranty and Ward executed the second set of "cross notes" that deceived the federal examiners about Ward's compensation.[1915]  Mrs. Clinton's time was billed to the IDC matter.[1916]  In her 1996 RTC

---

[1913]  Id. at 43.  In Mrs. Clinton's FDIC interview on November 10, 1994, she was questioned about one of the few IDC bills investigators then had.  Mrs. Clinton said she did not remember the IDC matter, but presumed her name was listed on the bill as billing partner.  H. Clinton 11/10/94 FDIC Int. at 3.  The investigators asked Mrs. Clinton to give her answers under oath, which she declined.  Id. at 1.  The FDIC also asked Mrs. Clinton about a January 23, 1986 memo from Rick Donovan to her about the wet/dry township issue, and she said the matter was handled by Rick Donovan. H. Clinton 11/10/94 FDIC Int. at 3-4.

[1914]  Rose Law Firm Billing Records (May 13, 1986) (Doc. No. DEK015030).

[1915]  Denton 8/20/96 GJ at 64-65; Ward $300,000 "loan" to Madison Financial (Apr. 7, 1986) (Doc. No. 56-00126454); Ward $70,943.47 "loan" to Madison Financial (Apr. 7, 1986) (Doc. No. 396-00000525); Clark 7/26/97 Int. at 3-4; FDIC-OIG Supplemental Report on Rose Law Firm Conflicts of Interest, WA-94-0016 at ii-iii (Sept. 20, 1996).  In summary, on March 31, 1986, Ward was paid $400,00 by Madison Guaranty as compensation for Ward's role as straw man in the IDC purchase.  To conceal the true nature of the transaction from the examiners who were then auditing Madison Guaranty, two cross notes were prepared: one note purported to evidence a loan from Ward to Madison Financial for $400,000; the other purported to evidence a loan of $400,000 from Madison Guaranty to Ward.  On April 7, 1986, the cross loans were replaced with new notes.  The $400,000 loan note from Ward to Madison Financial was replaced with separate notes for $300,000 and $70,943.47.  The $300,000 note corresponded to the

interview, when asked what she knew of the cross notes, Mrs. Clinton testified: "I don't recall knowing anything about these loans."[1917]  Don Denton said he received a telephone message on April 7, 1986, from Sandra Moody, Hillary Clinton's secretary, asking him to call Mrs. Clinton.[1918]  Denton returned the call and spoke with Mrs. Clinton about Ward's loan to Madison Financial.  On April 7, 1986, Mrs. Clinton billed the IDC matter for a telephone conference with Denton.[1919]  Denton later said he vaguely remembered that Mrs. Clinton was preparing the note from Ward to Madison Financial and that she was calling for Hubbell.[1920]  Denton said he told her the note had already been prepared and executed.[1921]  Denton said Mrs. Clinton asked him to send her a copy of the note, or both notes, for her review.[1922]  Denton said they may also have discussed Ward's cross loans -- the $300,000.00 and $70,000.00 loans to Madison Financial -- that replaced the $400,000.00 loan.[1923]  Denton said he told Mrs. Clinton "there could be a problem with the notes as they constituted in effect a parent entity fulfilling the obligation of a

---

amount of Ward's supposed "commissions" -- his compensation for being straw man on the transaction -- and the $70,943.47 corresponded to the amount that remained outstanding from Ward's initial purchase of IDC.

[1916] Rose Law Firm Billing Records (Mar. 28, 1986) (Doc. No. DEK015022).

[1917] H. Clinton 2/14/96 FDIC Int. at 81.

[1918] Telephone message slip to Don Denton from Sandra Moody (Apr. 7, 1986) (Doc. No. DD00000241).

[1919] Rose Law Firm Billing Records (entry for Apr. 7, 1986) (Doc. No. DEK015030) (reflects 0.2 hours billed by Mrs. Clinton for "Telephone conference with Don Denton").

[1920] Denton 6/20/96 Int. at 5-6.

[1921] Denton 8/20/96 GJ at 64.

[1922] Id.

[1923] Id. at 65-66.

subsidiary." He said she "summarily dismissed" his concern in a way he understood meant that

she wanted him to manage savings and loan matters, and leave legal matters to her.[1924]

Denton described their conversation as follows:

Q.    Tell the ladies and gentlemen of the grand jury what happened when you
      called Sandra in Hillary Clinton's office back.

A.    I returned the call and was immediately connected with Hillary Clinton.
      We exchanged a couple of hellos, how are you, The conversation was very
      short.  I was told that she was working on a transaction involving Seth
      Ward and Madison Financial, and that she was . . . [seeking] information
      so she could document the obligation that Madison owed Seth.  In other
      words, the $400,000 obligation.  She understood that Seth had been loaned
      the 400 by Madison Guaranty Savings & Loan.  And she was working on a
      transaction that would document Madison Financial's obligation to pay
      Seth his commissions, Seth Ward his commissions.

Q.    What type of document was she talking about?

A.    She was talking about a promissory note.

Q.    So what was your response to what she was saying?

A.    I cautioned her that the Madison Financial obligation was not a direct set-
      off or direct tie to Madison Guaranty's loan.  I pointed out that Madison
      Guaranty had loaned Seth the money, but Seth was owed money by
      Madison Financial Corporation.  She rather summarily dismissed my
      concerns and indicated that she'd take care of the lawyering.

Q.    What happened after that?

A.    I informed her that the $400,000 note from Madison Financial -- excuse
      me -- from Madison Financial to Seth had already been prepared.  And she
      asked that we supply a copy of that note, which I did.  I had an employee
      of Madison deliver that note.

Q.    To whom?

---

[1924] Id. at 64.

A.     To the Rose Law Firm.

Q.     And then also the note that you had prepared, was it the first note on April
       -- pardon me -- on March 31st, or was it a note drafted on that day, April
       7th?

A.     I don't recall which it would have been.  It was -- as I recall, it was the
       $400,000 note.  I'll note now that the replacement notes were also dated
       April 7th, so I don't recall specifically which ones were delivered.

                                        . . . .

       So I think on April 7th, two notes were replaced, the 300 plus the 70, to
       take care of the remaining $300,000 balance on the original note plus the
       $70,000 note.  And it more clearly identified them.  Rather than a total
       note for 400, it broke it down into two notes, with those specific amounts,
       the 300 and the 70,000 note.

Q.     Did you and Mrs. Clinton discuss that in your telephone call on April 7th?

A.     I don't recall whether we did or not.

Q.     Your memory is you just discussed the $400,000 note?

A.     That was the reason of her inquiry.  I may or may not have informed her
       that the 300 plus the 70 had already been done.  I just don't recall now.

                                        . . . .

Q.     Who did you believe was Mr. Ward's attorney at that time?

A.     Webb Hubbell.

Q.     Who did you think that she represented at the time you received the phone
       call from her on April 7th?

A.     Seth Ward.[1925]

Denton did not remember this conversation until after the billing records had been found.

_____

[1925] <u>Id.</u> at 63-67.

Prior to that time, Denton had said he remembered no conversations with Mrs. Clinton.[1926]  Mrs. Clinton's counsel, in his letter transmitting her affidavit to the Senate, criticized Denton's "sudden recollection of a twelve-minute phone call with Mrs. Clinton over ten years ago" rendering, he claimed, the memory "wholly unreliable."[1927]

### b.   Mrs. Clinton's Recollection of the Denton Conversation.

Mrs. Clinton addressed the Denton conversation through her attorney in a June 17, 1996 letter to the Senate Whitewater Special Committee after her attorney produced the billing records.  That letter said she thought the April 7 phone conversation related to another Madison Guaranty matter -- the Babcock matter.[1928]  The letter said the April 7 telephone conference was about Babcock because notes underneath the telephone message slip produced by Denton to the Senate were about Babcock.[1929]  Mrs. Clinton billed the Babcock file for 1.5 hours on April 9, 1986 for a conference with Don Denton.[1930]

In 1998, Mrs. Clinton testified about the Denton phone call:

Q.      . . . . If you look at the record on page DEK015030, and I've actually marked this page separately, let me hand you this document.  There is an entry on the billing records on 4/7/86 for a telephone conference with Don Denton.  Can you tell us what that's about?

---

[1926]  Id. at 66.

[1927]  Letter from David Kendall, the Clintons' personal attorney, to the Senate Whitewater Special Committee at 2 (June 17, 1996).

[1928]  Id. at 4-5 (June 17, 1996).  The Babcock matter was a collections/loan workout -- unrelated to IDC -- that Mrs. Clinton worked on for Madison Guaranty with Don Denton's help.

[1929]  Id.

[1930]  Rose Law Firm Billing Records (May 13, 1986) (Doc. No. DEK015036).

A.      No, I can't.  From looking at the billing records, it merely states telephone conference with Don Denton.  I believe that it had to do with a matter referred to as Babcock in the billing records.

Q.      Would you agree that it's listed under the matter IDC?

A.      I would agree with that.

. . . .

Q.      Now, Mrs. Clinton . . . Mr. Denton has stated that on this call, that there was a phone message from you to him on that day and that you and he discussed certain loan documents flowing from Madison Financial to Seth Ward, and then a loan going back from Seth Ward to Madison.  Did you do that?

A.      I do not believe that happened in a 12-minute telephone conference on April the 7th, 1986.

Q.      Your counsel has publicly stated -- I don't know if he put this in any kind of written form, I think he did, I think I read that at some point -- perhaps to the Senate, that he believes that Mr. Denton was not truthful about that; in fact, that there was a message slip that Mr. Denton had but that it was laid on top of some Babcock documents.

        Do you recall, did you participate in that response?

A.      I certainly approved of that response that my attorney sent, I think, to the Senate committee.

Q.      And is it your position that the message slip that he had was actually a copy and it was shown that it was on top of the Babcock documents, and therefore reinforced a belief that maybe he wasn't telling it like it was?

A.      Well, I don't want to draw any conclusions.  I can only say that based on the billing records, and based on the information I have seen, if you look at the 4/7/86 entry, which is the 12-minute telephone conference, and yes it was billed to IDC, but I don't think that was correct, because it was followed two days later by an hour and a half conference with Mr. Denton concerning the loan participations that Savers Savings and Loan had that Madison was interested in resolving.  And then all of the time on Babcock concerns those loans and Mr. Denton is one of the people that I spoke with

479

and had conferences with.

So, I believe, based on the evidence that I see and the fact that Mr. Denton was involved in this Babcock matter, that that is what that first telephone conference also pertained to.

Q.     Why wasn't it billed to number four, General, or some other matter?

A.     That's a good question, Mr. Ewing, and as I've looked at these billing records carefully, over the last days, there are a lot of questions I have about that.  There are a number of errors, and I attribute it to secretarial, clerical, accounting errors.  But I think that's where the telephone conference with Mr. Denton rightly belongs.[1931]

c.     **Other Evidence of Mrs. Clinton's Degree of Involvement with the IDC Transaction and Ward Loans.**

One other document arguably shows Mrs. Clinton's knowledge of Ward's cross-loan agreement with Madison and his interest in Castle Grande - a page of notes written by Rick Donovan when he was first assigned the wet/dry research project by Mrs. Clinton.[1932]  The notes, however, are subject to more than one interpretation.  The undated notes list two research projects Mrs. Clinton assigned to him - an unrelated project on a writ of garnishment and:

2.     Seth Ward

property purchased in Big Rock Township

ABC says Union Township & that is dry . . .[1933]

The notes go on to discuss the project and how Donovan would decide what property was wet or

---

[1931]  H. Clinton 4/25/98 Depo. at 125-27.

[1932]  Donovan 12/6/95 GJ at 6-7.

[1933]  Donovan's handwritten notes (undated) (Doc. No. 105-00003697).

dry south of the Arkansas River.[1934]

The phrase "property purchased" could modify the heading "Seth Ward" -- in which case the notes would confirm that Mrs. Clinton knew Ward owned some of the property.  Another interpretation, though, is that "Seth Ward" refers generally to the source of Mrs. Clinton's information and her contact at Madison, perhaps to let Donovan know who to contact if he needed more information to complete his legal research.

**5.    Mrs. Clinton's Statements about the May 1, 1986 Option Agreement.**

      **a.    Background.**

The FDIC concluded that the May 1, 1986 option agreement between Madison Financial and Seth Ward was intended by Ward and other insiders to deceive the examiners about the true nature of Ward's compensation, and that it accomplished its intended effect.[1935]  Investigators were particularly interested in evidence related to the option when the billing records showed that Mrs. Clinton billed Madison Guaranty for preparing the option.[1936]  On May 1, 1986, Mrs. Clinton billed Madison Guaranty on the IDC matter two hours for:

> conference with Seth Ward; telephone conference with Seth Ward; telephone conference with Mike Schaufele; prepare option.[1937]

Mrs. Clinton testified that it was not unusual for Ward to stop by Rose demanding legal

---

[1934]  Id.

[1935]  FDIC Supplemental Report at V.

[1936]  Id. at IV.

[1937]  Rose Law Firm Billing Records (May 13, 1986) (Doc. No. DEK015032).

481

work immediately.[1938]  It appears that after April 29 (Tuesday), when one of the federal examiners followed up on the option agreement that Denton had told the examiner was being prepared,[1939] Ward went to Rose Law Firm in person on May 1, 1986 (Thursday).  This is corroborated by Mrs. Clinton's two distinct billing references:  one for a "conference with Seth Ward," and the other for a "telephone conference with Seth Ward"[1940] -- the more explicit "telephone" reference in the second entry implying that the "conference" reflected in the first entry was in person.

Hubbell was out of town in an unrelated trial.[1941]  Ward may have asked Mrs. Clinton to draft the option simply because Hubbell was gone.  Billing records show that Mrs. Clinton may have drafted the option after making phone calls to both Ward and his accountant, Mike Schaufele.[1942]  The option was signed and notarized on May 5, 1986.[1943]  The option contained Mrs. Clinton's Rose word processing code.[1944]

---

[1938] H. Clinton 2/14/96 FDIC Int. at 13.

[1939] Denton 3/19/98 GJ at 21.

[1940] Rose Law Firm Billing Records (May 13, 1986) (Doc. No. DEK015032).

[1941] Tucker 3/18/98 GJ at 187.

[1942] Ward 1/17/96 GJ at 31-32.  Schaufele later testified that he did not remember his conversation with Mrs. Clinton but thought that the only topic he would have discussed with her was Ward's tax liability.  See Schaufele 1/30/96 GJ at 27-29.  Ward testified that he has no recollection of any conversation with Mrs. Clinton.  Ward 1/17/96 GJ at 82-83.

[1943] Option to Purchase Real Estate Agreement Version #1 (May 1986) (Doc. Nos. 99-00043196 through 43201); Option to Purchase Real Estate Agreement, Version #2 (May 1986) (Doc. Nos. 99-00043202 through 43208).

[1944] See Option to Purchase Real Estate (May 5, 1986) (Doc. No. 99-0043197).  In the bottom-right corner is the code "0190g," Mrs. Clinton's word processing code.

Denton gave a copy of the option to examiner Darlene Ford on May 7, 1986.[1945]  Ford

reviewed the legal description of the property and noticed it was wrong.[1946]  The option did not

refer to Holman Acres, but to property already purchased by Davis Fitzhugh on February 28,

1986.[1947]  Ford pointed out the error to Denton, who had the first two pages re-typed to describe

Holman Acres as the subject property.[1948]

This Office could not identify the source of the incorrect legal description.  Rose files that

might have shown how the error occurred were destroyed at Mrs. Clinton's direction in 1988, one

of which was titled "Ward Option."[1949]

### b.    Mrs. Clinton's Statements.

Mrs. Clinton was first questioned about the option agreement on December 21, 1995,

when the RTC sent her supplemental interrogatories.[1950]  The RTC learned on December 21 that

---

[1945] Copy of option with Ford's handwritten notes (May 1, 1986) (Doc. No. 99-00043196).

[1946] Ford 7/29/96 Int. at 3.

[1947] This same property description appears on an attachment to a release deed given to Seth Ward by Madison Guaranty dated December 30, 1985.  Martha Patton, Webb Hubbell's secretary at the Rose Law Firm, said she typed the attachment.  Patton 9/25/96 Int. at 2.

[1948] Ford's notes on her copy of the option she received from Denton state: "Talked to Don Denton.  He said that this land description goes with the Fitzhugh mortgage property and that this description is in error.  He said it should be the property known as Tract 27 and 28 of Holman Acres on which Ward [unintelligible]." Copy of Option with Ford's Handwritten Notes (May 1, 1986) (Doc. No. 99-00043196); see also Ford 7/29/96 Int.; Clark 7/26/96 Int.  Denton had the first two pages of the incorrect option re-typed.  Denton 6/26/96 Int. at 7.  Denton's corrected version is referenced as Doc. No. 99-00043202.

[1949] Memo from Mary Russell, secretary to Mrs. Clinton, to Mrs. Clinton (July 21, 1988) with attached list of files destroyed (Doc. No. FDICHRC 0163).

[1950] H. Clinton 1/20/96 RTC Interrog. Resp. at 2-3.

the Rose word processor identification code on the document ("190g") was hers.[1951]  Mrs. Clinton

answered the December 21, 1995 interrogatories on January 20, 1996, using information

contained in the recently produced billing records.  The interrogatories asked sixteen questions

about the option agreement, thirteen of which Mrs. Clinton responded to in one omnibus

response:

> I have reviewed document SW1-070 through SW1-074 (which appears to be an
> option agreement dated May 1, 1986, on a 6.6667 acre parcel of land in Pulaski
> County, Arkansas) and document SW1-063 through SW1-068 (which appears to
> be an option agreement dated May 1, 1986, on land described as "[p]art of Tracts
> 27 & 28, Holman Acres, Pulaski County, Arkansas").  I have no recollection of
> these documents or the transactions they reflect.  I do not recall what my word
> processing code was in 1986.  My time records reflect the following entry for May
> 1, 1986, representing two hours of work done for Madison Guaranty on the
> "General" account: "Conference with Seth Ward; telephone conference with Seth
> Ward concerning option; telephone conference with Mike Schauffler [sic];
> prepare option."  I know that Mike Schaufele is a CPA at L. Cotton Thomas &
> Company, and I believe he was Mr. Ward's CPA at one time.  Based upon the
> May 1, 1986, entry in my time records, I believe that I did some work on these
> documents.  The client was Madison Guaranty or Madison Financial, not Seth
> Ward.  I have no recollection of what this work was, who originally prepared the
> option documents, how many pages of the documents were typed at the Rose Law
> Firm, what the circumstances were which led to the drafting of these options, or
> whether either of the options was ever exercised.  I was in the litigation section of
> the Rose Law Firm.  Although I have no specific recollection of this matter, I do
> not believe I would have drafted such real estate documents from scratch,
> particularly in a two-hour period that also contained phone calls and conferences.
> I have no recollection of who may have asked me to prepare these documents, or,
> in particular, if Messrs. McDougal, Latham, Ward, or Hubbell asked me to
> prepare or work on these documents, although it is possible that one or more of
> them did so.  I have no recollection of discussing these documents prior to March
> 11, 1991, although I believe, based upon my time records, that I probably did in
> 1986 when the documents were apparently prepared.  I do not know what

---

[1951]  Pillsbury Madison & Sutro LLP, A Supplemental Report on the Representation of
Madison Guaranty Savings & Loan by the Rose Law Firm:  Prepared for Federal Deposit
Insurance Corporation 125, n.308 (Feb. 25, 1996).

relationship there is, if any, between these two option agreements.[1952]

In her February 14, 1996 FDIC interview, Mrs. Clinton was asked about the option agreement:

Q.     Let's talk for a minute about the option that was drafted on May 1, 1986 . . . . Now, the billing records and the word processing codes indicate that you have something to do with the drafting of this option.  But you're a litigator, as you've told us.  Had you had occasion before this to draft options for real estate purposes?

A.     No.  That was not part of my practice, and I have no recollection of doing this.  I can only go by what the billing records describe.  And I think it's unlikely that I would have drafted this option from scratch, that I would have had [a] conversation with Mr. Ward and Mr. Schaufele and a conference with Mr. Ward all within a two-hour period.

Q.     Mr. Hubbell suggested in testimony that the Rose Firm maintained form files that were available to people when they were drafting various kinds of legal documents and at least made the suggestion that this was something he or others might have used for a purpose like this. In your practice, would you on occasion, use these form files when you had to draft documents with which you were unfamiliar?

A.     I might have on occasion.  I don't have any recollection of having done it in this instance.  I don't know what had already been prepared.  I don't have any recollection of the two hours at all, other than what the time records say.

Q.     Mr. Donovan, in his testimony, said rather colorfully, for him, would have regarded drafting an option as malpractice waiting to happen.  And I wonder, is what you're saying that this is not something you would have been comfortable doing on your own?  You would have involved somebody else?

A.     I have no recollection of what occurred, Mr. Ericson.  It's also possible that since only two hours were recorded, that Mr. Ward had something that had already been prepared by somebody else and wanted my secretary to make

---

[1952] H. Clinton 1/20/96 RTC Interrog. Resp. No. 33.

some changes on it.  That was not uncommon for Mr. Ward, and I would
have talked to him about it and maybe he needed some piece of
information from Mr. Schaufele.  I'm totally speculating now, but Mr.
Ward often walked around our firm asking our people to help out on
certain legal matters that were pressing, so far as he was concerned, and
insofar as we were able we tried to accommodate him.

Q.     Do you have any recollection of ever talking to Mr. Schaufele about the
       IDC property or Mr. Ward's work with respect to it?

A.     I have no recollection.  All I can point to is the billing record that reflects a
       telephone conference with Mr. Schaufele.[1953]

Mrs. Clinton testified on the same subject at her 1998 deposition:

Q.     Mrs. Clinton, we -- the bank examiners were in the bank during this time.
       There is evidence that there were these cross loans where Mr. Ward was
       advanced monies by Madison, but to cover the obligation, he then on
       paper loans money back to Madison, but it was not funded.  That later, on
       May 1st, '86, there was an option agreement put in place of this document.

       Now, we know now that you apparently drafted the option agreement that
       took the place of this document here.

A.     I don't believe I drafted the option agreement, Mr. Ewing.

Q.     But you billed for it?

A.     It, it was billed for.  That is correct, along with several other activities in a
       two-hour period on May the 1st.

Q.     Did you actually bill the client and list on the records of your law firm,
       draft option agreement?

A.     Draft option agreement is what it says, that's right.  But I do not believe I
       drafted that option agreement from scratch.  That would not be something
       I would do.[1954]

---

[1953]  H. Clinton 2/14/96 FDIC Int. at 83-85.

[1954]  H. Clinton 4/25/98 Depo. at 129.

486

**6.      Mrs. Clinton's Work for Ward.**

The May 1 billing entry raised the issue of whom Mrs. Clinton represented in that

transaction.  The option agreement was between Ward and Madison Guaranty, and Mrs. Clinton's

billing entry showed she consulted only with Ward and Ward's personal accountant, Schaufele.

Investigators questioned whether Mrs. Clinton had breached legal conflict rules by representing

both sides of the option transaction.  Mrs. Clinton denied representing Ward in his individual

capacity.  In her 1996 answers to the RTC interrogatories, Mrs. Clinton said:

> To the best of my recollection, I don't believe that I have performed legal services
> for Seth Ward individually, although I did confer with him on certain matters, as
> described more fully herein, when he was working for Madison Financial
> Corporation, a wholly owned subsidiary of Madison Guaranty Savings & Loan.[1955]

In her 1996 FDIC interview, Mrs. Clinton addressed the potential conflict of interest.  She

said:

> Q.      The option is an agreement between Mr. Ward on the one hand and
> Madison Financial on the other, so there are two parties to it.  Yet, the
> time records indicate you talked to Mr. Ward.  They indicate you talked to
> Mr. Schaufele, who is Mr. Ward's accountant.  They don't indicate you
> talking to anyone other than Mr. Ward associated with Madison.
> In a matter such as this, where you're drafting something, an agreement --
> strike that.  Let me put it this way.  Your client was Madison, not Ward;
> right, and this is an agreement between Madison and Ward, yet so far as
> the billing records indicate, you talked only to Ward and to Ward's
> accountant.  Do you think you would have talked to someone at Madison
> to ascertain whether this is what they wanted to do?
>
> A.      Well, in most of my dealings in the last months preceding this on behalf of
> Madison, I dealt with Mr. Ward.  He was the person I dealt with on the
> brewery issue.  He was the person that we dealt with on the utility issue.

---

[1955]  H. Clinton 1/20/96 RTC Interrog. Resp. at No. 32.

487

He was Madison so far as I was concerned.

Q.     You dealt virtually exclusively with him as opposed to Latham or McDougal?

A.     In the late 1985, 1986 period, that's correct.

Q.     What I'm getting at is, what distinguishes this in my mind from that representation, here you have at least the possibility -- feel free to disagree with me -- of a conflict and yet this is a transaction between Ward and Madison.  It's not Ward simply acting as agent of Madison, but you didn't speak to anyone at Madison?

A.     I may have.  I don't recollect that, and the time records don't reflect that, but I can't tell you, sitting here today, I did not speak to anyone at Madison.[1956]

Mrs. Clinton was also asked whether she in fact represented Ward as an individual, and she responded:  "I do not recall thinking anyone was the client other than Madison Guaranty."[1957]

Webb Hubbell, Ward's usual Rose attorney, testified he understood Mrs. Clinton was representing both Madison Guaranty and Seth Ward on the option:

Mr. Chertoff.         Can you help us to understand why it was Mr. Ward would have gone to Mrs. Clinton to help him draft an option rather than to you?

Mr. Hubbell.          She was representing Madison.

Mr. Chertoff.         Who was representing Ward with respect to the option?

Mr. Hubbell.          Mrs. Clinton.

Mr. Chertoff.         So Mrs. Clinton was representing both Madison and Ward?

--------------------------------------------

[1956] H. Clinton 2/14/96 FDIC Int. at 85-87.

[1957] Id. at 48-49.

Mr. Hubbell.        That's my understanding.[1958]

### 7.        Analysis of Mrs. Clinton's Work on Castle Grande/IDC.

Substantial evidence supported the conclusion that Hillary Rodham Clinton did more than an insubstantial amount of legal work on the IDC matter for Madison Guaranty.  Significant evidence also supported the conclusion that Mrs. Clinton's testimony about that work was incomplete and factually inaccurate.  Nonetheless, insufficient evidence exists to prove beyond a reasonable doubt that Mrs. Clinton's inaccurate statements and testimony were knowingly false, and therefore given with the requisite criminal intent.

**Lack of Memory** -- This Office examined Mrs. Clinton's initial claim that she did not remember working on the IDC matter.  This Office concluded that certain evidence contradicted Mrs. Clinton's claim.

The billing records showed that Mrs. Clinton did more work on the IDC matter than on any other Madison Guaranty matter.  There is also evidence that Mrs. Clinton reviewed the billing records in 1992 showing this work.  Her fingerprints were on a copy of the billing records produced in 1996,[1959] and she later agreed that if she touched them it was in 1992 rather than 1994 or 1995.[1960]

When Mrs. Clinton said in 1995 that she could not remember what IDC was because the work had been done 10 years previously, it had only been three years since she reviewed the

---

[1958]  Senate Whitewater Comm. Hearing, supra note 147, at 7 (Feb. 7, 1996) (testimony of W. Hubbell).

[1959]  Federal Bureau of Investigation, Laboratory Report at 3 (Mar. 21, 1996).

billing records recording that work.  In 1994, when she told the FDIC investigators that she thought her name was on the IDC bill only as the billing partner, it had been two years since she had reviewed the billing records showing her work.  Nevertheless, this circumstantial evidence was, in the Independent Counsel's judgment, insufficient to obtain and sustain a conviction.

The billing records provided significant documentary evidence about Mrs. Clinton's connection to Seth Ward.  The records showed that at several times when Seth Ward was engaged in irregular activities, Mrs. Clinton was billing for legal services performed for Ward and Madison Guaranty.  For example, on April 7, 1986, when Don Denton and Seth Ward were executing the cross notes to conceal Ward's compensation from the regulators examining Madison Guaranty, Mrs. Clinton billed Madison Guaranty on the same IDC matter for a telephone conference with Denton.  Mrs. Clinton was also personally involved in preparing the May 1, 1986 option agreement used by Ward and Denton to deceive the federal examiners.  On February 28, 1986, a day that numerous fraudulent transactions were conducted on the eve of the federal examination,[1961] Mrs. Clinton billed Madison Guaranty for three-quarters of an hour for "Seth Ward."[1962]

Mrs. Clinton had three motives to minimize her role in the IDC/Castle Grande transactions:  First, there was the potential for political embarrassment because the press was closely scrutinizing the work she did for a corrupt thrift, some of which involved representing the

---

[1960]  H. Clinton 4/25/98 Depo. at 126.

[1961]  Denton 8/20/96 GJ at 48-50.

[1962]  Rose Law Firm Billing Records (Mar. 28, 1996) (Doc. No. DEK015022).

thrift before state agencies regulated under her husband's authority as Governor. Second, there was the potential for legal action by the FDIC and RTC against Rose for negligently facilitating transactions that caused substantial losses to the institution. Third, there was the possibility of criminal liability resulting from frauds perpetrated by insiders and others associated with Madison Guaranty.

As set forth in Chapter 2 of this Part, many events had happened following Mrs. Clinton's termination of Madison as a client -- any of which, in this Office's judgment, could have refreshed her recollection. By 1990, for example, Mrs. Clinton must have known that John Latham had pleaded guilty to criminal fraud in a Castle Grande transaction, and Jim McDougal and Jim and David Henley had been indicted and acquitted on Castle Grande transactions.

Most significantly, in 1992, Mrs. Clinton's work for Madison Guaranty became a campaign issue. Mrs. Clinton, Webb Hubbell, and Vincent Foster focused significant attention on the matter at that time. Of particular significance is that Hubbell reviewed the billing records during the campaign and discussed with Mrs. Clinton her numerous conferences with Seth Ward.[1963] Mrs. Clinton's fingerprints were found on the billing records produced from the White House in 1996. Mrs. Clinton explained her fingerprints on the records by testifying that she may have looked at the records during the 1992 campaign, but not later when they had been subpoenaed.[1964]

Balanced against this circumstantial evidence, however, is Mrs. Clinton's denial of any

---

[1963]  Hubbell 12/19/95 GJ at 177-78.

[1964]  H. Clinton 1/26/96 GJ at 28.

recollection.  As Mrs. Clinton frequently said, the length of time since her work for Madison

Guaranty was substantial, almost 8 years.  That passage of time could support a reasonable

inference that Mrs. Clinton could not remember what work she had done.  There is no direct

evidence to contradict Mrs. Clinton's claimed lack of memory.

The circumstantial evidence about Mrs. Clinton's lack of memory was inconclusive and,

therefore, insufficient to refute Mrs. Clinton's claimed lack of memory.  Considering the totality

of the evidence, it is the judgment of the Independent Counsel that Mrs. Clinton's statements and

testimony that she did not remember working on the IDC/Castle Grande transaction could not be

proven deliberately false beyond a reasonable doubt.

**April 7, 1986 Phone Call With Denton** -- This Office examined whether Mrs. Clinton

played any role in the creation of the Ward "cross notes" or concealed that role from federal

investigators.

It is indisputable that, on April 7, 1986, Mrs. Clinton had a telephone conversation with

Don Denton of Madison Guaranty.  Documentary evidence, in the form of a telephone message

slip and Mrs. Clinton's billing records, provided contemporaneous corroboration that the

telephone conversation occurred.  It is equally indisputable that on April 7, 1986, Madison

Guaranty and Ward executed two "cross notes" on Ward's "commissions" from the IDC/Castle

Grande transaction.  It is indisputable that Mrs. Clinton billed her telephone conference with

Denton to the IDC matter in the Rose billing system.  Significant evidence corroborated Denton's

claim that he and Mrs. Clinton discussed the Ward cross notes during the April 7 conversation.

Mrs. Clinton's contrary explanation -- that their conversation was about Babcock and not

492

the IDC matter -- is supported by less corroborative evidence.  There is also a substantial basis to challenge Denton's recollection of the conversation.  Denton offered a detailed recollection, but Denton was not an unbiased witness and his detailed recollection was not disclosed when he was first questioned on the subject.  The delay in recounting this conversation leaves his credibility subject to challenge.  And, of course, the only other participant in the conversation, Mrs. Clinton, denied Denton's version of events.

Thus, the testimony of a single witness whose credibility is subject to impeachment provided insufficient evidence to prove that Mrs. Clinton falsely denied that she had done work on the Ward cross notes.

**May 1, 1986 Option** -- This Office examined Mrs. Clinton's role in the drafting of the May 1, 1986 option agreement.  It is indisputable that Mrs. Clinton played a role in drafting the option agreement -- she billed for doing so, and the option agreement bears her word processing code.

However, the evidence was equally clear in supporting Mrs. Clinton's statement that she did not draft the option agreement from scratch.  As a litigator, Mrs. Clinton had little or no experience in real estate matters, and the option prepared by Mrs. Clinton erroneously described the property being optioned.  Thus, Hubbell's suggestion that Mrs. Clinton may have used Rose's form files in an effort to be responsive to Seth Ward seemed plausible.

Given that the evidence supports the conclusion that Mrs. Clinton worked on the option matter for two hours as an apparent accommodation to Ward and/or Hubbell, no basis exists to contradict Mrs. Clinton's claim that, when she prepared the option, she did not know the use to

493

which it would be put.  In particular, there is no direct evidence that Mrs. Clinton knew the

option would be used to deceive federal regulators.  Though there is some circumstantial

evidence to negate Mrs. Clinton's subsequent claim that she did not remember the option

agreement, that evidence (as with other evidence of lack of recollection) is insufficient to sustain

a prosecution.

**Representing Seth Ward** -- The RTC and FDIC examined whether Mrs. Clinton's work

on the May 1, 1986 option agreement constituted a conflict of interest.  This Office examined

whether Mrs. Clinton may have tried to conceal such a conflict from those agencies or other

federal investigators.  On its face, the May 1, 1986 option agreement was a transaction between

Ward and Madison Financial -- the subsidiary of Mrs. Clinton's client, Madison Guaranty.

Though Schaufele testified he had no memory of speaking with Mrs. Clinton about the option, he

noted that the only subject he thought that he could have discussed would have been the tax

implications of the option for his client, Ward.[1965]  Such a conversation would support the

conclusion that Mrs. Clinton was working for Ward in his individual capacity when she drafted

the option, and Hubbell stated that he understood that this was so and that he understood that

Mrs. Clinton had represented both sides in the transaction.

Mrs. Clinton, however, denied that she represented Ward in his individual capacity.  This

denial is corroborated by the documenting record -- her work on the option was billed to

Madison Guaranty, not Seth Ward, and Madison Guaranty paid the bill.

In sum, given insufficient evidence, this Office determined that no prosecution was

494

appropriate for any of the statements made by Mrs. Clinton about her work on the IDC/Castle Grande transaction.

## III.  SUMMARY CONCLUSION

The foregoing Chapters have summarized the evidence about the interaction between Rose, Madison Guaranty Savings & Loan, Hillary Rodham Clinton, Jim McDougal, Webb Hubbell, and Seth Ward.  The evidence, as already noted, establishes indisputably that Jim McDougal and other Madison Guaranty insiders engaged in criminally fraudulent conduct through the operation of the institution.  The evidence also establishes that Mrs. Clinton's representation of Madison involved legal work that, ultimately, was used by McDougal and others to conceal unlawful activity.

In the end, however, the Independent Counsel concluded that there was no substantial evidence to support the conclusion that Mrs. Clinton was a knowing participant in the criminal conduct of McDougal or others.  The Independent Counsel also concluded that there was insufficient evidence to prove that any of Mrs. Clinton's subsequent statements about her representation (including her statements to the effect that she did not remember the details of that representation) were knowingly false.  Though in some instances her recollection proved to be factually inaccurate, the Independent Counsel ultimately determined that a trier of fact would not conclude, beyond a reasonable doubt, that Mrs. Clinton's recollection was knowingly false.  For this reason, prosecution of Mrs. Clinton regarding these allegations was declined, and the matter is now closed.

---

[1965]  Schaufele 1/30/96 GJ at 29.