**<u>EXHIBIT 3 (Part 1)</u>**

to

Plaintiff's Response to Defendant's Statement of Material Facts
Not in Dispute and Statement of Undisputed Material Facts
in Support of Cross-Motion for Summary Judgment

Obtained by Judicial Watch, Inc. via FOIA

**Memorandum**                                    Office of the Independent Counsel

To:          All OIC Attorneys                                    Date: 4/22/98

From:        HRC Team

Subject:     Summary of Evidence ☐☐☐☐☐
             Hillary Rodham Clinton and Webb Hubbell

This memorandum summarizes the evidence available to us which relates to the

☐☐☐☐☐ Hillary Clinton and Webster Lee Hubbell. Section I contains a

detailed summary of the evidence broken down into the following subsections:

    1)    Castle Grande
    2)    Other Facts Relating to RLF Work for MGSL
    3)    1987-1992: RLF Conflicts/Ward v. Madison/U.S. v. McDougal
    4)    1992 Campaign
    5)    Foster Documents
    6)    The White House and RTC Contacts
    7)    Billing Records
    8)    Support for Webb Hubbell

                                                      FOIA(b)6
                                                    FOIA(b)7 - (C)

Section II contains a chronological background and contextual summary of the investigation so

that the facts relating to possible obstruction can be placed in the context of the ongoing

investigation by OIC.

☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐ should be read in conjunction with our

introduction/outline memorandum of April 10th which, for convenience, is also included.[1]

---

[1] In almost all instances our summary of the evidence is derivative of and relies upon
other, earlier work done by OIC attorneys. In those instances, as we did in our earlier
memorandum of April 10th, we refer you to the underlying memorandum for additional
background and information, should you wish to delve further into the evidence. [You received a
binder with copies of significant portions of these memorandum on Monday, the 20th].

1

Obtained by Judicial Watch, Inc. via FOIA

The memo also reflects our best assessment of some of the contrary evidence and theories likely to be presented by the defendants in the event an indictment is returned and a trial takes place, as well as evidentiary considerations.

We recognize the task set for all attorneys by this memorandum. As Tom Dawson has said: "The strength of this case is its weakness, and vice versa." In other words, this would be a mostly (though not exclusively) circumstantial case which gains strength through the repeated concatenation of events and circumstances. But detailing each and every one of those, and linking them together would be a difficult, indeed daunting, task -- as an introduction it might be suitable to first reread the April 10th memorandum.

We also note at the outset that other options exist which might do justice to the evidence presented. As you all know, the Dreiband/Heaton/Myers team have drafted        based upon a small subset of this evidence.

## I. Evidence

---

[2] Because this memorandum has been prepared by the HRC team, you will notice some stylistic differences in the various sections. We see these as evidence of the collaborative nature of our endeavor.

2

NW: 15416 DocId: 70001585 Page 40

FOIA(b)6
FOIA(b)7 - (C)

Obtained by Judicial Watch, Inc. via FOIA

FOIA(b)6
FOIA(b)7 - (C)



The case would be the story of how

that happened. Here is a summary of the evidence developed by the investigation:

*1) Castle Grande* -- [The facts relating to the Castle Grande transaction are detailed in

Section IV of Bittman & O'Brien, "Clinton Finance," June 1997.]

Can we say that crimes were committed in connection with the Castle Grande

transactions? Yes.

Castle Grande refers to a 1,050 acre development south of Little Rock, Arkansas which

was purchased by Madison Financial Corporation (MFC) and Seth Ward from the Industrial

Development Corporation (IDC) on October 4, 1985. The statement that "Castle Grande was a

crime" is true in several respects. First, the initial sale of the property to MFC and Ward was

accomplished in a fraudulent way that violated federal law governing savings and loans as well

as Arkansas State law. Second, subsequent transactions involving parcels of the property during

the development of Castle Grande involved inflated appraisals and fraudulent financing and have

themselves resulted in multiple investigations, indictments, and convictions.

**a.      The initial purchase of the property by Seth Ward and MFC violated federal
and Arkansas state law.**

Seth Ward and Jim McDougal negotiated an arrangement whereby Ward agreed to act as

3

Obtained by Judicial Watch, Inc. via FOIA

a "straw purchaser"[3] and take title to a portion of the IDC property Madison wanted to acquire.

Ward took title to the property to get around the 6% direct investment limitation, imposed by

Arkansas law, which limited the amount of money Madison Guaranty Savings & Loan

("MGSL") could invest in the developments of the service corporation, Madison Financial

Corporation ("MFC").[4] Jim McDougal confirmed this as early as December 11, 1986, when he

told Jeff Gerrish of Borod & Huggins that:

> the reason that Seth Ward was brought in to purchase the property north of 145th
>
> Street was simply because of the service corporation limitations would have been
>
> exceeded if the service corporation had bought the entire property. [5]

The 6% investment limitation restricted the amounts MGSL could loan its affiliate MFC,

it did not limit the amount MGSL could loan to a private party such as Ward.[6] To avoid the 6%

limitation, McDougal and Ward agreed that Ward would take title to all of the IDC property

north of 145th Street as a nominee purchaser for MFC.[7] Ward and McDougal agreed that

MGSL would loan Ward the entire amount of the purchase price on a nonrecourse basis.

---

[3]  FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

[4]  At the time federal law applicable to federally chartered savings and loans had a
3% direct investment limitation. States were allowed greater latitude in the regulation of their
own institutions.

[5]  J. McDougal Interview, 12/11/86, Madison Guaranty Savings & Loan Association
Special Counsel Investigative Report as of January 1, 1987, Report Date March 3, 1987, Section
XV, at 84 (hereinafter " Borod & Huggins Report, 1/1/87").

[6]  There are, however, limitations on the amounts of loans an institution may make
to insiders. As an employee of MFC, Ward was considered an insider.

[7]  Memorandum from Jim McDougal to Seth Ward, September 3, 1985 (396-
00001130).

4

Obtained by Judicial Watch, Inc. via FOIA

Nonrecourse means that MGSL could look only to the property for repayment. In the event the loan went into default, Ward had no personal liability for a deficiency if the proceeds from the sale of the land were insufficient to pay off the loan.

Ward also agreed to grant MFC an option on the entire parcel he was purchasing.[8] In this way, MFC could purchase portions of Ward's property as it needed to sell them to third parties. Ward assumed absolutely no risk in the deal. He did not invest any of his own money. He was not required to make any down payment. MFC agreed to reimburse him for any additional taxes he may have to pay by virtue of his holding the property. MFC also agreed to handle all of the administrative duties associated with the property such as collecting rents, and the like.[9] In return for his role in the transactions, Ward was to receive approximately $300,000 in "commissions" on the subsequent sales of the property to third parties -- even if he had nothing to do with arranging the sales.[10]

It is these terms -- under which Ward received significant compensation, but assumed no risk or responsibility -- that have led to Ward being characterized as a "straw man" or "nominee" purchaser. This characterization is supported by the fact that he did not have to do anything to earn his "commissions" and he had none of the traditional indicia of ownership of the property --

---

[8]    Memo from Jim McDougal to Seth Ward, September 3, 1985, (396-00001130); Letter from Seth Ward to Jim McDougal, September 23, 1985; Letter from Seth Ward to Jim McDougal, September 24, 1985 (99-00035000-1); Letter from Seth Ward to Jim McDougal, September 24, 1985 ( 105-00007181-83).

[9]    Id.; Schaufele deposition (Ward v. Madison), 5/27/88, at 9; [        ]

[10]    Id.

5

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

such as responsibility for taxes and collecting rents. Moreover, unlike most owners, Ward's only

source of compensation was his "commission" -- he did not benefit directly from any

appreciation in the value of the property.[11]

This conclusion has been reached by numerous investigative bodies. The examiners at

MGSL in 1986 criticized Castle Grande. The May 8, 1986 interim report stated:

> Ward apparently warehoused this land to reduce Madison Financial's investment
> and the attendant borrowing from Madison Guaranty. In this way, limitations on
> Madison Guaranty's investment in its service corporation are avoided. By using
> this circuitous route, additional Madison Guaranty investment in Madison
> financial was disguised as a loan to Ward.

The report prepared for the RTC by Pillsbury, Madison & Sutro was also critical of Castle

Grande.

In addition, the FDIC Inspector General, after a lengthy and quite thorough investigation,

concluded that Ward was a straw purchaser. In its Supplemental Report on Rose Law Firm

Conflicts of Interest dated September 20, 1996 the FDIC Office of Inspector General stated:

> However, entries in the billing materials and other evidence suggest that former Rose Law Firm
> partners Hillary Rodham Clinton and Webster L. Hubbell performed work that appears to have
> facilitated the payment of substantial commissions to **Ward, who acted as a straw buyer for
> Madison Financial in the IDC transaction**. Ward is Hubbell's father-in-law. **The method of
> payment of the commissions evaded regulations designed to protect the safety and
> soundness of the institution, and violated the integrity of its books and records.** Further,
> Madison Guaranty used a document drafted by Clinton to deceive Federal Bank examiners as to

---

[11]   Some have argued that Ward earned his commissions, at least in part, by playing a
critical role in putting together the IDC deal because of his relationship with Everett Tucker and
officials of IDC's lenders, such as Bob Wilson of Union National Bank, who was a close friend
of Ward's. Contemporaneous documents, however, indicate that IDC was under severe financial
pressure from its lenders, and that this was "widely known around town". IDC's attorney, Darrell
Dover, left the impression during his interview that IDC would have entertained any serious offer
on the IDC property and that the final selling price of $1.75M would have been accepted from
any qualified buyer. Dover 302, 7/18/96.

6

NW: 15416 DocId: 70001585 Page 44

Obtained by Judicial Watch, Inc. via FOIA

the true nature of the payments to Ward.[12]

b.   **Not only was the initial transaction illegal, but the subsequent payment of Ward's commissions was also illegal.**

Ward was paid his commissions through a series of loans involving MFC and MGSL. When Ward demanded his commissions be paid in March 1986, MFC did not have the cash on hand. In order to satisfy Ward, the savings and loan, MGSL, made a $300,000 loan to Ward. MFC signed a loan note the same day stating that it owed Ward $300,000. Ward's obligation to repay the MGSL loan was thus "set-off" against the corresponding note from MFC to Ward. This transaction was illegal because 1) it further violated the 6% rule because MGSL was putting another $300,000 into MFC (by virtue of it paying MFC's commission to Ward); and 2) MGSL's accounting records and the corporate records of MFC never properly reflected the loans and their purposes. Moreover, when the bank examiners who were at the institution in March 1986 questioned the loans, Madison officials deceived the examiners about the true nature of the loans and their connection to the payment of Ward's commissions.

c.   **Transactions at Castle Grande have been the subject of criminal investigations, indictments and convictions.**

Transactions related to the Castle Grande development have been the subject of several criminal investigations by the FBI, RTC, FDIC, and OIC. These investigations resulted in the first McDougal criminal trial in 1990, and the recent trial of Jim and Susan McDougal and Jim Guy Tucker ("825 trial"), which resulted in all three defendants being convicted of various charges related to fraudulent loans made during the course of the Castle Grande project.

---

[12]   FDIC Office of Inspector General Supplemental Report on Rose Law Firm Conflicts of Interest September 20, 1996 at ii-iii (emphasis added).

7

NW: 15416 DocId: 70001585 Page 45

Obtained by Judicial Watch, Inc. via FOIA

### 1.    First McDougal case

According to the official FBI file, Special Agent Gary Aaron received information from a confidential source on January 9, 1987, which alluded to insider transactions and land flips involving Jim McDougal, Senator William Fulbright, and Jim Guy Tucker.[13] The information alleged, among other things, that Jim Guy Tucker had received an insider loan from MGSL for the Castle Grande project.[14] Special Agent In-Charge Don Pettus notified the United States Attorney for the Eastern District of Arkansas, George Proctor, of the opening of the case on January 23, 1987.[15]    On March 19, 1987, The FBI received a criminal referral from MGSL employee Sarah Hawkins[16] which attached a copy of the investigative report prepared by Borod & Huggins.[17] Hawkins sent the identical information to the FHLBB. At an April 1987 meeting, which included personnel from the FHLBB, federal investigators determined that the focus of the investigation would be the Castle Grande and Maple Creek Farms projects.[18]

In October 1987, investigators further narrowed the focus of the investigation, deciding to concentrate on transactions related to Robert Palmer, David Hale, Dean Paul, and Davis

---

[13]     FBI Madison case file, 29A-2459, Serial 1.

[14]     Id. at Serial 7.

[15]     Id. at Serial 2.

[16]     Id. at Serials 9 and 10.

[17]     105-00071012. The bates number on this document indicated it was produced pursuant to a subpoena served upon the Rose Law Firm.

[18]     FBI Madison case file, 29A-2459, Serial 13.

8

Obtained by Judicial Watch, Inc. via FOIA

Fitzhugh.[19]  By August 18, 1988, the agents and AUSAs Stoll and Cherry decided to focus the

investigation on, among other things: falsification of Madison records (alluding to the alteration

of MGSL board minutes with John Latham as the potential target); David Hale's loans with

MGSL which were allegedly obtained with false information; 1308 Main Street land flip

involving Jim Guy Tucker; and Castle Grande, to include Davis Fitzhugh's purchase of the Levi

Strauss building, Jim Guy Tucker's purchase of 34 acres, Fulbright's purchase of property, and

the acquisition of Castle Sewer and Water by Tucker, R.D. Randolph, Palmer, Hale and Dean

Paul.[20]

On November 14, 1989, Latham agreed to plead guilty to one count of false entry in

violation of 18 U.S.C. § 1006 based upon his falsification of board of director minutes.[21]  He was

eventually sentenced to 2 ½ years probation and ordered to pay $10,000 in restitution.  Jim

McDougal was indicted on or about November 20, 1989, along with Jim and Bill Henley (Susan

McDougal's brothers), based upon their conduct surrounding the sale of the Levi Strauss building

at Castle Grande to Davis Fitzhugh.

Jim McDougal was charged with two counts of misapplication (18 U.S.C. § 657), one

count of false entry (18 U.S.C. § 1006), one count of bank fraud (18 U.S.C. § 1344), three counts

of false statements (18 U.S.C. § 1014), and conspiracy to commit bank fraud and false statements

(18 U.S.C. § 371).  McDougal and the Henleys was acquitted by a jury in June 1990.

---

[19]     FBI Madison case file, 29A-2459, Serial 52.

[20]     Id.

[21]     Id.

9

2.    **825 case**

As a result of the $825,000 loan to Dean Paul Ltd., from Madison Guaranty, David Hale

netted approximately $500,000. As a part of the scheme between McDougal, Hale and Tucker,

David Hale, in turn, made 4 different loans to McDougal and his associates. One of those loans,

was $150,000 to Castle Sewer and Water which was a corporation which Jim Guy Tucker had an

interest in. Castle Sewer and Water used those proceed to make the down payment on the

purchase of the sewer and water utility from Madison Financial Corporation, who had received

the property in the purchase from Industrial Services Corporation. The balance of the purchase

price ($1.05 million) was funded directly in the form of two loans to Castle Sewer and Water

from Madison Guaranty.

Jim McDougal was charged in 19 of the 21 counts in the indictment. He was convicted

on 18 of the 19 counts for conspiracy, misapplication, false statement, false entry, bank fraud,

wire fraud, and mail fraud.

Susan McDougal was initially charged in 8 counts of the 21 count indictment. Four of

the counts were dismissed by Judge Howard. Susan McDougal was convicted on the four

remaining counts which related to the Master Marketing loan (misapplication, false entry, false

statement, and mail fraud). Susan McDougal was sentenced on August 20, 1996 and received 22

months.

Jim Guy Tucker was initially charged in 11 counts of the 21 count indictment. Four of

the counts were dismissed by Judge Howard. Tucker was convicted on 2 of the remaining seven

counts (conspiracy and mail fraud) related to the $150,000 loan from CMS. Tucker was

sentenced on August 19, 1996 and received a sentence of 18 months home detention (including

10

writing and speaking assignments on family and education), ordered to pay restitution of $150,000 to the SBA, and a fine of $25,000.

Possible Defenses --

## 1. Ward was not a straw man

Even the Minority Report from the Senate Whitewater Committee did not conclude that Ward was not a straw man -- instead it focused on whether or not it could be proven that anyone at RLF was aware that he was a straw. (They conclude, of course that no one at RLF knew, with the possible exception of Hubbell, and even if he did know, there is no evidence he told anyone else.)

The only testimony the report cites for the proposition that Ward was not a nominee buyer is Ward's denial and some testimony from John Latham's Senate deposition. Latham testified that the IDC transaction was structured with Ward purchasing everything north of 145th street for two reasons: 1) MFC was up against its investment limitation and would have exceeded the limitation had it purchased the entire property; and 2) everyone viewed the transaction a as a good deal and Ward and McDougal both wanted to make as much money as possible so they decided to split it up.[22] Even Ward, while denying that he was a straw man, admits to all the factual predicates that make him a straw -- non-recourse loan, no personal investment, no responsibility for taxes or collecting rents.[23]

## 2. "McDougal was acquitted in the first case, therefore Castle Grande was not a crime"

---

[22]     John Latham, 5/15/96 Senate Deposition, at 36-37.

[23]     Seth Ward, 1/17/96 GJT, at [page].

11

Obtained by Judicial Watch, Inc. via FOIA

This is unpersuasive because the structure of the purchase from IDC and Ward's role in it were not issues in the first case against McDougal, and of course, McDougal was convicted in the second case (the 825 case).

Order of Proof

1. Jim Clark- re: 1986 examination of MGSL; loans to Ward; deceptive explanation; violation of 6% investment limitation and regulations regarding accuracy of the institutions books and records.

2. Fred Gibson - re: loans to Ward; deceptive explanation; violation of 6% investment limitation and regulations regarding accuracy of the institutions books and records.

3. Bill Black - expert testimony re: regulations applicable to MGSL and MFC and how sale to Ward and loans violated same.

4. Don Denton - circumstances surrounding initial purchase of IDC by MFC and Ward; purpose of cross loans was to pay Ward his commissions.

5. SA Gary Aaron - first investigation into Castle Grande and summary testimony re: charges and disposition of first McDougal case.

6. SA Mike Patkus/ Steve Irons - summary testimony re: 825 case: investigation, charges, and disposition.

\* \* \* \* \*

2) *Other Facts Relating to RLF Work for MGSL* -- [The facts relating to RLF's retention by MGSL and work before the Arkansas Securities Department ("ASD") are detailed in Sections II and III of Bittman & O'Brien, "Clinton Finance," June 1997.]

The other significant area where it appears that proof exists of Hillary Clinton's false

12

statements to investigators lies in her statements regarding the manner in which Rose Law Firm

came to be hired by Madison Guaranty Savings & Loan. There are, in essence, two competing

versions. One is Mrs. Clinton's "unpaid bill" story (which she first made public during the 1992

campaign -- see the discussion below for how that came about). In essence she claims that John

Latham of MGSL and Rick Massey of Rose wanted to do business together, that her partners

would not accept MGSL as a client because of an unpaid bill and that she interceded with

McDougal to get the bill paid, at the request of Massey. The other version is Jim McDougal's

"jogging incident" story -- that Bill Clinton came by his office while jogging one morning, sat in

his new leather chair, staining it with sweat and asked McDougal to send some business to HRC

because she could use the work.

### 1.    **Background of Madison's Legal Representation**

It is important to understand the background of Madison's legal representation for

two reasons. First, Mrs. Clinton claims that in 1985 Rose partners conditioned Rose's agreement

to represent Madison on Madison's first paying an overdue bill owed by Madison's sister

institution, Madison Bank & Trust ("MB&T"). Unequivocal evidence shows, however, that the

old bill was paid in 1984 and thus could not have been a condition of the representation as Mrs.

Clinton claims. Second, Mrs. Clinton claims Madison's business was initially brought to Rose by

a young associate at Rose, Rick Massey. However, the evidence shows that Madison had long

and competently been represented by another firm and there was no reason -- other than perhaps

a personal favor for the Governor -- for Madison to switch counsel and have Rose represent it in

a matter where Rose had little expertise.

### a.    **Bank of Kingston (Madison Bank & Trust)**

13

)

Rose's first representation of a McDougal-controlled institution began in 1981 when it

represented the Bank of Kingston ("BOK") in a single matter involving McDougal's moving the

bank's principal office to a different city in Arkansas.[24] MB&T lost the case in the trial court and

approved an appeal. Carol Arnold, a young associate at Rose, argued the case before the

Arkansas Supreme Court,[25] which upheld the Chancery Court and ruled against BOK.[26] Rose's

fees for the appeal totaled $5,000 plus $893.63 in expenses, and on July 30, 1982, Giroir mailed

McDougal Rose's bill, writing that the "statement is, of course, subject to your approval."[27]

McDougal wrote a note on the outside of the envelope: "Carla: DO NOT PAY. KEEP IN FILE.

Jim."[28]

Rose's July 1982 bill remained outstanding for several years. McDougal says he refused

---

[24]  The first aspect of the Rose's representation involved petitioning the Arkansas Bank
Department to move BOK's principal office to Huntsville, Arkansas. The First National Bank of
Huntsville, a competing bank affiliated with the former owners of BOK, learned of BOK's
proposal and objected to the move based on non-compete clause in BOK's purchase agreement.
In a letter to the president of First National Bank of Huntsville, Jim Guy Tucker, on behalf of
BOK, threatened litigation: "As representatives of the minority stockholders in the Bank of
Kingston, we are considering litigation to declare this non-competition provision void." Letter to
James Hargis, Chairman, Bank of Huntsville, from Jim Guy Tucker, Feb. 13, 1981 (RIC120734
to 735). On August 4, 1981, First National Bank of Huntsville sued BOK to enforce the purchase
agreement and enjoin BOK from moving to Huntsville. RIC120653 to 656. On August 21, 1981,
Vincent Foster and Rose answered on behalf of BOK. RIC120648 to 651.

[25]  See Letter to Steven Smith from Vincent Foster, Jul. 2, 1982, at 1 (Carol Arnold
reports that [Justice] Steele Hays asked her a question at oral argument . . .") (GG-00000165 to
166).

[26]  Madison Bank & Trust v. First National Bank of Huntsville, 276 Ark. 405, 635
S.W.2d 268 (1982).

[27]  Letter to James B. McDougal from C.J. Giroir, Jul. 30, 1982.

[28]  Id. After the appeal, Rose did no additional legal work for MB&T.

14

to pay the bill because he was being "vastly overcharged"[29] in that Rose billed him for a senior

attorney like Vince Foster but sent a junior attorney to argue the appeal.[30] Giroir, who was the

billing partner on the BOK account, testified he believes he asked Mrs. Clinton to intercede to

get the bill paid because Mrs. Clinton knew McDougal and the former president of MB&T, Steve

Smith.[31] In late 1983, Mrs. Clinton spoke to McDougal in an attempt to get the bill paid.[32]

Following Mrs. Clinton's conversation with McDougal,[33] Giroir sent McDougal another copy of

the original bill on October 10, 1983.[34] Again, the bank did not pay.

After remaining outstanding for more than two years and almost a year after Giroir's

October 1983 letter requesting payment, the matter of the outstanding bill was brought to the

---

[29]   J. McDougal GJ, 4/2/97, at 77-78, 105-106.

[30]   McDougal 302, 2/19/97 (DRAFT), at 7; J. McDougal GJ, 4/2/97, at 114. Board
Minutes from MB&T corroborate some discussion about a "new lawyer" who was assigned to the
appeal. MB&T Board Minutes, Sep. 25, 1984, at 2 ("Board discussed the fact that new lawyer
sent to argue case."); see also Letter to Gary Bunch (cc: James McDougal, Joe Giroir) from
Vincent Foster, Oct. 9, 1984 ("You [Bunch] mentioned something about a 'girl' lawyer doing the
work on appeal.").

[31]   Giroir GJ, 7/18/96, at 21-22.

[32]   Letter to James B. McDougal from C.J. Giroir, Oct. 10, 1983 ("Pursuant to
your discussion with Hillary Rodham Clinton, I am enclosing a copy of our firm statement, dated
December 23, 1981.") (56-00064693). McDougal was shown a copy of Giroir's letter and has no
recollection of speaking to Mrs. Clinton about the outstanding bill. J. McDougal 302, 2/19/97
(DRAFT), at 10;

[33]   Notes of John Podesta from May 18, 1994, indicate that Mrs. Clinton has "some
recollection" of talking to Giroir: "This is a 10 year letter. She has some recollection of Giroir
talking to her about the unpaid bill and may have talked to McDougal about it." 2139-00000158.

[34]   Letter to James B. McDougal from C.J. Giroir, Oct. 10, 1983 (56-
00064693).

15

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

attention of the MB&T Board in the fall of 1984.[35] Gary Bunch, then an officer at MB&T,

testified that McDougal asked him in a board meeting on September 25, 1984, to settle the

outstanding bill with Rose.[36] According to an October 9, 1984, letter, Foster had been in contact

with Bunch to pay the bill, and Rose was going to sue MB&T unless payment was received by

October 22, 1984:

> In accordance with our telephone conversation last week, I am enclosing another
> copy of the statement for our services rendered in connection with the appeal of
> the referenced litigation. As I mentioned to you the $5,000.00 fee limitation was
> established by agreement between Joe Giroir and Jim McDougal before we began
> work on the appeal. The agreement turned out to be to the benefit of the Bank
> since our actual time spent exceeded the amount charged.

> You mentioned something about a "girl" lawyer doing the work on appeal. I was
> assisted on the appeal briefs and abstracting of the record by Carol Arnold, then a
> 40 year old trial lawyer, who had already done some of the basic legal research for
> trial. According to our records approximately 75% of the attorney time on the
> appeal was spent by me.

> We are totally baffled by the continued delay in the payment of this statement, but
> are willing to allow you an extension until October 22 in which to satisfy this
> statement. Otherwise, I am directed by the Firm to file suit.[37]

Bunch does not know why the payment of the old bill came up in the fall of 1984 but

recalls that shortly thereafter Rose "agreed on a $5,000 *settlement*" and that MB&T paid the bill

in October 1984.[38] Indeed, records from MB&T show that on October 22, 1984, MB&T paid the

---

[35]     As discussed infra,, this is just after McDougal says Bill Clinton jogged by
Madison and complained about the Clintons' financial situation.

[36]        Bunch Senate Hearing, 5/16/96, at 17.

[37]     Letter to Gary Bunch (cc: James McDougal, Joe Giroir) from Vincent Foster, Oct.
9, 1984.

[38]     Bunch Senate Hearing, 5/16/96, at 39-40 (emphasis added). Bunch
speculated that a reason why the matter of the old bill came up in September 1984 was because

16

bill by issuing a check to Rose in the amount of $5,000 for "Legal Fee." Statements from Rose

corroborate that Rose apparently settled for payment of $5,000 as full payment of the $5,893 bill:

Rose credited the attorneys who worked on MB&T's appeal $4,106.37, which equates to the

$5,000 MB&T paid less the expenses Rose incurred, $893.63.[39]

More significantly, the only known copy of the original bill from Rose to MB&T was

found, years later, in a brief case in Vince Foster's attic. The bill is annotated as "paid" and

contains hand-written notations which refigure the allocation of fees to Rose attorney's based

upon the $5,000 payment. Thus, the evidence is conclusive that long before April 1985, when

Hillary Clinton met Jim McDougal the "unpaid" bill had been paid. [And, indeed, if the

argument is that the $893.63 remained to be paid, the evidence is equally clear that these unpaid

---

MB&T "may have had a little more money at that time than we'd had previously." Id. at 58.
Bunch's testimony that the MB&T old bill was considered in September 1984 and paid in
October 1984 is corroborated by several documents. First, minutes from MB&T's board meeting
from September show that Bunch "will negotiate settlement" with Rose concerning the MB&T
bill. Minutes of the Madison Bank & Trust Board Meeting, Sep. 25, 1984, at 2 ("Rose Law Firm
-- We owe $5,000 for Huntsville move appeal, according to firm. Board discussed the fact that
new lawyer sent to argue case. Mr. Vaughn moved, Mr. McDougal seconded that Mr. Bunch will
negotiate settlement with Rose Firm. Approved unanimously."). Second, records from MB&T
show that on October 23, 1984, a debit of $5,000 was made from its general ledger for legal fees.
Third, records from Rose confirm a credit of $5,000 on MB&T's account one day later on
October 24, 1984. Letter to Hickman Ewing from Alden Atkins, Apr. 17, 1996 ("[Records from
Worthen Bank] show that Rose deposited a check for $5,000 on October 24, 1984. We are told
by the bank's representatives that the identification number for that check shows that it was
written on an account at Madison Bank & Trust in Kingston, Arkansas."). Fourth, minutes from
MB&T's November board meeting reflect that a reduction in earnings was due in part to "a
payment of legal fees from a 1983 lawsuit." Minutes of Madison Bank & Trust Board Meeting,
Nov.
27, 1984, at 1. The lawsuit actually ended in 1982, but Rose's last letter requesting payment was
sent in 1983.

[39]       Letter to Amy St. Eve from Ronald M. Clark, May 31, 1996. See also Letter to
Bruce A. Ericson from Alden L. Atkins, Oct. 31, 1995, at 6.

17

Obtained by Judicial Watch, Inc. via FOIA

expenses were never paid.]

### b.   The Mitchell Firm

In 1982, the McDougals purchased Madison Guaranty Savings & Loan ("Madison").[40]

Beginning in 1982 and throughout McDougal's ownership, Madison's primary counsel and "lead

firm" was Mitchell, Williams, Selig, Jackson & Tucker (the "Mitchell" firm).[41]  McDougal hired

the Mitchell firm because of his relationship with Jim Guy Tucker, with whom McDougal had

been friends and business partners for years.[42]  In addition, Tucker had previously represented

McDougal in numerous matters.[43]

---

[40]      McDougal purchased Woodruff County Savings and Loan on January 26,
1982 with Susan McDougal, Steve Smith, C.E. Ransom, and Julie Baldridge.  174-00012956.  Its
name was changed to Madison Guaranty Savings & Loan within a few months of purchase.



[41]

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

[42]      J. McDougal 302, 2/19/97 (DRAFT), at 6.

[43]      In a deposition from the Bank of Kingston litigation, Tucker described his
professional relationship with McDougal:  "Mr. McDougal and I have a continuing attorney-
client relationship because of various business ventures that he brings to me and I act on, some of
which reach fruition and some of which do not. . . . I have served as personal attorney for Mr.
McDougal since I entered private law practice on transactions ranging from timberland purchases

18

Throughout its existence, Madison relied almost exclusively on the Mitchell firm for legal advice. Mitchell provided a wide range of legal services to Madison, including extensive regulatory work before the Arkansas Securities Department, Arkansas Bank Department, Federal Home Loan Bank Board, and other agencies; litigation, including defending Madison in Seth Ward's breach of contract action against it; various real estate matters, including activities involving David Hale, Dean Paul, among others; and other general legal representation.[44]

While Tucker was the billing partner for the Madison account, John Selig, a former Commissioner of the Arkansas Securities Department, was the attorney at the Mitchell firm who primarily handled the Madison account. Other attorneys at Mitchell who did work for Madison included Beverly Bassett, who left the Mitchell firm in 1985 to become, with McDougal's recommendation, the Commissioner of the Arkansas Securities Department. There was no written retainer agreement between Madison and the Mitchell firm, and the fees were charged at the normal hourly billing rate.

According to records from the Mitchell firm, on February 6, 1985, Mitchell opened a new file on the Madison account, file number 5615-9.[45] The matter was described as "Sale of Stock," and the responsible attorney was listed as John Selig.[46] Almost two months later, on March 27,

---

and sales to condominium developments to examination of some of the various banks." Tucker Kingston Deposition, 9/23/81, at 13-14 (RIC120463 to 464). Tucker represented McDougal and his partners in the purchase of the Bank of Kingston in 1979. RIC120684.

[44]    Information concerning the scope of the Mitchell firm's representation of Madison is found in the voluminous billing records produced by Mitchell to the OIC under subpoena. See generally 155-0005700 et seq.

[45]    155-00001506.

[46]    Id.

19

1985, Mitchell opened another new file for Madison, file number 5615-10, entitled "Broker-

Dealer" -- again the responsible attorney was Selig.[47]  Both files are virtually empty, and it

appears the firm did little, if any, work on either matter.[48]  Although Mitchell did no work on

these matters, someone at Madison apparently requested or anticipated that Mitchell, as its

regular outside counsel, would do the work.  As described below, it was these same matters that

Rose worked on for Madison beginning in April 1985.

### 2.  Hiring of Rose in April 1985

According to documents from Rose and Madison, Rose's representation of Madison

Guaranty Savings & Loan began April 23, 1985, on two matters:  the preferred stock offering and

the limited partnership/broker-dealer matters.[50]  The stock offering was an attempt by Madison,

---

[47]      155-00001508.

[48]      155-00001504 to 509.

[49]

[50]      As discussed infra, at the time of Rose's retention, Madison was under a
Supervisory Agreement with the FHLBB restricting its loan practices and
requiring Madison to increase its net worth.

20

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

Obtained by Judicial Watch, Inc. via FOIA

apparently at the request of the ASD and the FHLBB, to raise capital and increase its net worth by issuing a new class of preferred stock.[51]  Madison needed approval from the ASD to issue a new class of stock, and Arkansas law was unclear as to whether a savings and loan could issue a non-voting, preferred class as Madison intended.  Rose was hired to secure approval from the ASD for this unprecedented request.  The limited partnership matter, also known as the broker-dealer matter, was an effort by Madison to establish a subsidiary investment broker-dealer through which Madison was to sell real estate limited partnerships.[52]  Both the preferred stock and the limited partnership/broker-dealer matters required regulatory approval from the ASD.

The Rose Law Firm billing records show that Mrs. Clinton met with Jim McDougal and John Latham on April 23, 1985.[53]  Mrs. Clinton's personal calendar from April 23 reflects the following entry: "9 - McDougal."[54]  The Rose billing records also reflect that Rose commenced legal work for Madison in earnest that day.[55]  On the next day, April 24, 1985, Rose continued its

---

[51]     Rose referenced the preferred stock matter on the Madison account as matter "1".

[52]     Rose referenced the limited partnership/broker-dealer matter on the Madison account as matter "2".

[53]     DEK014947.  The entry on the billing records reflect the following entry for Mrs. Clinton: "4/23/85 -- Conference with J. McDougal and J. Latham."  Mrs. Clinton recalls meeting only with McDougal and says that it was at that meeting that they discussed Massey's and Latham's proposal that Rose do work for Madison.  McDougal does not recall the meeting but says that his last meeting with Mrs. Clinton was in the fall of 1984 when they set up the retainer.  J. McDougal 302, 2/19/97 (DRAFT), at 10.

[54]     319-00034730.  This notation appears to refer to 9:00 a.m., as it is from the morning portion of the calendar.

[55]     DEK014947.  Mrs. Clinton's billing entries for April 23, 1985, reflect that after her meeting with McDougal and Latham, she had a conference with Rick Massey, a young associate
in the securities section, and a conference with Watt Gregory, a senior partner in the securities section.  Massey's entries for April 23, 1985, show that he had a conference with Mrs. Clinton, a

21

use

Obtained by Judicial Watch, Inc. via FOIA

work on the preferred stock offering.[56]  Also on April 24, an internal Madison memorandum

from Latham to Greg Young, Madison's comptroller, announced Madison's retainer of Rose:

> Greg, we have retained the Rose law firm. We will be paying them retainer of
> $2,000 per month. Please go ahead and send the first $2,000 check to the firm, in
> care of Hillary Clinton.[57]

Madison issued its first retainer check to Rose on May 2, 1985, in the amount of $2,000.[58]

For the next fifteen months through August 1, 1986, Madison continued to send Rose monthly

"retainer" checks -- all but two in the amount of $2,000.[59]  There was no written engagement

agreement between Madison and Rose.[60]  Rose billed Madison its usual hourly rates and used the

monthly retainer as a prepayment against fees actually incurred by Rose.[61]  Mrs. Clinton

---

conference with John Latham, a conference with Les Baledge, another associate in the securities
section at Rose, and conducted research on "preferred stock offering." Id.

[56]     DEK014947. Mrs. Clinton "review[ed] draft documents" and had "conferences"
with Massey, Latham, and Davis Fitzhugh, an attorney at Madison. Massey and Sharon Grimes,
a paralegal at Rose, conducted legal research and "draft[ed] documents." Id.

[57]     54-00266226.

[58]     54-002312771. McDougal says that he had never paid a retainer to a law firm
before. McDougal 302, 2/19/97 (DRAFT), at 8. Latham says that Rose was the only law firm
Madison ever had on retainer. Latham 302, 2/14/95, at 2.

[59]     The second and third checks to Rose dated 5/17/85 and 7/22/85 were in the
amounts of $2,018.00 and $3,023.20, respectively. 54-00231446, 54-00232199. The difference
represents fees incurred in excess of the $2,000 retainer.

[60]     As noted above, McDougal had a written retainer agreement with Rose for the
representation in the Bank of Kingston matter. There was no policy at Rose in 1984 or 1985
requiring written retainer agreements; such decisions were left to the individual attorney. Letter
to Bruce A. Ericson from Alden L. Atkins, Oct. 31, 1995, at 6 ("In 1985, Rose Law Firm did
not have a policy regarding retention letters. We are unaware of any retention letter for Madison
Guaranty.") (RIC120845);

[61]     Internal Madison documents reference the monthly retainer payments to Rose as
"prepaid legal fees." See, e.g., 54-00266225, 54-00264666 to 667, 54-00264669, 54-00260954,

22

Obtained by Judicial Watch, Inc. via FOIA

described the agreement in a letter to McDougal and Latham dated July 14, 1986, as follows:

> [I]n April, 1985, I advised you that the firm would credit fees against a monthly retainer and then bill for whatever fees might be in excess of the retainer at the end of each month.[62]

Mrs. Clinton was the billing attorney on the Madison account, and almost all of the retainer checks were addressed to her attention.[63] Rose had no policy in 1985 with regard to retainers, and the decision whether to use a retainer was discretionary with the responsible attorney.[64]

As to the regularity of retainers at Rose, Ron Clark testified, "back in those days, it was a little bit unusual for Rose to get a retainer. Even to this day, except for large clients, it's unusual."[65] Webb Hubbell, chief operating officer at Rose from 1985 through 1988, testified that retainers were indeed unusual, and he could not remember any client at Rose other than Madison which was on retainer.[66] As to her understanding of the regularity of retainers, Mrs. Clinton

---

54-00260973, 54-00260956, 54-00282220.

[62]      54-00260979 to 980. Each cover letter transmitting Rose's bills acknowledges "receipt" of the previous month's "retainer" fee, e.g., 54-00266228 ("April Retainer Received ... April Fees ... Balance Due ...").

[63]      Thirteen of Madison's nineteen checks to Rose listed the payee as "Rose Law Firm, Attn: Hillary Clinton." See, e.g., 54-00231446, 54-00232199, 54-00232674, 54-00233116, 54-00233456, 54-0054-00234001, 54-00234265, 54-00212147, 54-00212393, 54-00214419, 54-00215014, 54-00216137. Rose deposited all Madison's checks into a trust account against which the actual fees were billed. See RIC120846.

[64]      Letter to Bruce A. Ericson from Alden L. Atkins, Oct. 31, 1995, at 6 ("In 1985, Rose Law Firm did not have any policy regarding retainers or client advances. The decision about whether a retainer or client advance would be requested was left to the discretion of each lawyer depending on the circumstances of the particular matter.").

[65]      Clark GJ, 3/30/94, at 58-59.

[66]      Hubbell GJ, 12/19/95, at 187-188.

23

testified, however, that retainer agreements were not unusual:

> I can't call their name to you right now, but it was not unusual to ask a client, a
> new client or a client that perhaps there had been some billing problems with in
> the past, to make a deposit against fees and expenses.[67]

How Mrs. Clinton came to be the billing attorney on the Madison account is disputed.

According to Joe Giroir, former chief operating officer at Rose, the billing attorney is usually --

but not always -- the person who brought the client to the firm.[68] The billing attorney is

responsible for assigning and supervising the legal work in addition to reviewing and sending

bills to the client.[69] An internal Rose document entitled "The Daily Briefs" dated April 29, 1985,

announces Madison as a new client and identifies Mrs. Clinton as the "attorney" for the

account.[70] The purpose of "The Daily Briefs" is to announce new clients and determine whether

the firm has any conflicts.[71]

---

[67]     H. Clinton, OIC Deposition, 4/22/95, at 14.

[68]     Girioir GJ, 7/18/96, at 12.  Rose had a policy that first and second year associates
could not serve as a billing attorney.  Giroir GJ, 7/18/96, at 13;  Massey Senate Hearing, 1/11/96,
at 76.

[69]     Id. at 13.

[70]     105-00008011.  A second "The Daily Briefs" dated the next day announces the
second Madison matter -- the broker/dealer -- and Mrs. Clinton again as the attorney.  105-
00008012.

[71]     In February 1989, Vince Foster sent a ten-page proposal to the FDIC soliciting
legal work.  105-00003859 to 868.  Page eight of the letter addresses potential conflicts of
interest as follows: "[Rose] does not represent any savings and loan association in state or
federal regulatory matters.  From time to time we have provided specialized services to some
savings and loan associations in such areas as employment discrimination, work-out of
participation loans and bankruptcy.  We do not represent any of these clients on an ongoing basis
. . ." 105-00003866.  Notably
omitted from Foster's description are the services Rose provided for Madison between 1985 and
1987:  regulatory work before state agencies, capitalization, real-estate developments, etc.

24

### 3.    Evidence Supporting McDougal's Version

Obviously the disproof of Mrs. Clinton's "unpaid" bill story does not, necessarily require affirmative proof of McDougal's jogging version. Equally obviously, if the jury were to credit affirmative proof of the jogging incident, it would be significant and would greatly assist the prosecution. And, most obviously of all, with Jim McDougal's death the admissible evidence of the jogging incident is very limited. What follows below is a summary of the proof available without McDougal -- only a portion of which is admissible, but the full scope of which is useful in assessing McDougal's veracity.

Jim McDougal has identified several people who may have information confirming his version of the jogging incident. At least one of these witnesses, according to McDougal, was present during McDougal's meeting with Clinton. The other witnesses may have knowledge of the jogging incident because of contemporaneous statements made by McDougal about the circumstances of Rose's retention. In addition, one witness, Rae Ann Moles, who was not identified by McDougal, claims she overheard the meeting between McDougal and Clinton. These witnesses and other evidence pertaining to the jogging incident are outlined below.

### I.    Bill Clinton

Remarkably, Bill Clinton does not deny the jogging incident. Clinton testified he has been to Madison "[l]ess than 10 times, more than two, three"[72] and while jogging by Madison "once or twice actually went in."[73]  When asked about the jogging incident, Clinton says he has

---

[72]    B. Clinton OIC Deposition, 4/22/95, at 66.

[73]    B. Clinton 825 Trial Testimony, 4/28/96, at 69-71.

25

NW: 15416 DocId: 70001585 Page 63

"tried to remember" and is not accusing McDougal of lying,[74] but he does not remember anything like the jogging incident: "I don't recall that. I am aware that he has recounted a conversation about that. But I don't have any specific recollection of doing that."[75] Clinton said he does not recall any conversation where he asked McDougal to send legal work to Mrs. Clinton.[76] Clinton also said he does not recall ever complaining to McDougal about financial problems and telling McDougal that "Hillary and I need some money."[77]

## ii.   Bill Henley

---

[74]   B. Clinton OIC Deposition, 4/22/95, at 83:

Q  Do you have any reason to believe that Jim McDougal is not being truthful --

A  No.

Q  -- about [the jogging incident]?

A  I have absolutely -- I have no reason to believe that. And I have really tried to search my memory to see if there was anything remotely similar to what he said. I mean, I really tried to remember the conversations that I've had with him to try to figure it out, because I am not accusing him of not telling the - truth. I do not -- I simply do not remember the conversation he says occurred.

[75]   Id. at 67. Clinton also testified he does not recall whether he knew in 1985 that Mrs. Clinton was doing legal work for Madison. Id. 65-66 ("I don't recall that I did know [in 1985 that Hillary was doing some work for Madison]. Normally Hillary didn't discuss her legal work with me.").

[76]   Id. at 69.

[77]   Id. at 72. Clinton says he does not remember McDougal ever complaining that the Clintons were not putting their fair share into Whitewater: "I certainly don't remember any time when he complained about that. I can remember the occasions in which he said we had to put more money in, and when we did put more money in, and we did that." B. Clinton OIC Deposition, 4/22/95, at 83-84.

26

NW: 15416 DocId: 70001585 Page 64

Jim McDougal says that Bill Henley, Susan McDougal's brother, was present during the

meeting where Bill Clinton discussed sending legal work to Mrs. Clinton.[78] Henley says he was

not present at such meeting but does remember seeing Clinton leave McDougal's office and

McDougal complaining about Clinton's leaving a sweat stain on the chair.

Henley testified before the grand jury that one morning between 6:30 a.m. and 8:30 a.m.

he went to Madison to meet with McDougal.[79] Henley said the door to McDougal's office was

closed, so Henley waited a short period of time -- no more than 15 minutes. Henley thinks

McDougal's secretary, Sue Strayhorn, was also present sitting at her desk outside McDougal's

office.[80] When the meeting ended, Henley said Clinton, who was in jogging clothes and

sweating, exited McDougal's office. Henley and Clinton exchanged pleasantries, and Clinton left

the building. Henley testified that as soon as Clinton was out of earshot, McDougal commented,

"I don't mind the son of a bitch coming by here and taking up my time, but I wish he wouldn't

sweat through my chairs."[81] Henley said he and McDougal then entered McDougal's office and

---

[78]    J. McDougal 302, 6/22/95, at 6-7 ("McDougal advised that Bill Henley was
present during this meeting."); J. McDougal 302, 2/19/97 (DRAFT), at 7 ("Bill Henley was also
present in McDougal's office when Clinton came by in jogging attire.").

[79]    McDougal says Henley was at Madison to help with backed-up title work. Henley
was a real estate salesman for Madison Financial Corporation, a subsidiary of Madison. B.
Henley GJ, 6/18/96, at 7.

[80]    If Strayhorn had been present outside McDougal's office as Henley remembers, it
would be inconsistent with McDougal's timing of the jogging incident because Sue Strayhorn
began work at Madison in February 1985 -- well after McDougal says the
jogging incident occurred. Strayhorn 302, 3/30/94, at 1. This testimony is also inconsistent with
testimony from Rae Ann Moles. Moles testified she overheard Clinton and McDougal set up the
retainer, but Moles left Madison before Strayhorn started work. See subsection "v." infra.

[81]    Henley GJ, 6/18/96, at 27, 50.

27

conducted their meeting. Henley testified that while he was in McDougal's office he noticed a

fresh sweat stain on one of the two chairs facing McDougal's desk.[82] Henley was only able to

date the event to sometime in 1984 or 1985.[83] The only conversation Henley has had with

McDougal about the jogging incident occurred during the 825 trial, sometime after the book

Blood Sport was published. Henley said McDougal corrected a quote in the book attributed to

McDougal apparently by Henley:[84] McDougal told Henley that he did not refer to Clinton as a

"son-of-a-bitch" as quoted in the book.

### iii.   Susan McDougal

Jim McDougal feels certain he discussed the jogging incident with Susan McDougal.[85]

---

[82]   Id. at 46-47.

[83]   Id. at 33. Henley testified at one point, however, that he believed the event may
have occurred in the "summertime." When asked why he thought it occurred in the summertime,
Henley's explanation was Clinton was sweating and it must have been hot. Id. at 33-34.

[84]   The relevant portion from Blood Sport reads as follows:

McDougal gently steered [Clinton] out of the office. Susan's brother Bill Henley
was standing nearby. With the governor safely out of earshot, McDougal turned
to Henley. "I don't mind the fat little son of a bitch coming by and taking up my
time. I just wish he wouldn't ruin my chair."

Stewart, Blood Sport (1996), at 124.

[85]   J. McDougal 302, 2/19/97 (DRAFT), at 8-9; J. McDougal GJ, 4/2/97, at 103-104:

Q.   Susan was also quoted in the Washington Post and other publications, I
think, saying, "Yes, I know about this." Do you recall talking to her about this?
Would that have been something you would have told her about?

A.   I'm sure I -- yes. It would have been something I would have told her within
the business day, I would think.

28

Obtained by Judicial Watch, Inc. via FOIA

Ms. McDougal refuses to give a statement to the OIC, but she has given statements to print and

television media consistent with Jim's recollection. Shortly after publication of Gerth's article on

March 9, 1992, The Washington Post quoted Susan in a follow-up piece as follows:

> Hillary came in one day and was telling us about the problem. The problem was
> finances, her finances. . . . She came to Jim's office. I remember Jim laughing and
> saying afterward, 'Well, one lawyer's as good as another, we might as well hire
> Hillary.' . . . She was on retainer. I remember everyone sitting around laughing
> and saying: 'We need to hire Hillary Clinton.'[86]

In an interview with Diane Sawyer on ABC's Prime Time Live, Ms. McDougal

corroborated that Jim told her contemporaneously about his discussion with Clinton. Ms

McDougal also said that she was at Madison the day of the jogging incident, saw Clinton jogging

and sweating, and saw that Jim and Clinton talked with each other:

| | |
|---|---|
| Sawyer: | There are things that you can help clear up a little bit from -- for some of us. The decision to have Mrs. Clinton help with some of the legal affairs for Madison. |
| McDougal: | *I'll tell you what I know about it, as I wasn't present at the time. But I do know that Bill came by the bank one day. He was jogging -- and sweating. The famous story of the sweat in the chair -- I didn't see that. But I did see that he was running, and he was sweating. And he came by the bank. And he did talk with Jim. After that, Jim came to me and said, "I've just given Hillary some work from the bank. Is that alright with you?" I was at the bank that day. . . .* |
| Sawyer: | And did he say then that -- that Mr. Clinton had asked for her? |
| McDougal: | *What he said was, "She needs the work." And I said, "That's fine with me." Those were his exact words. At that time, at that day,* |

---

[86]     Maraniss and Weisskopf, Lawyer Will Review Arkansas Land Deal, Washington
Post, Mar. 12, 1992, at A1. In an interview with the OIC, Jim McDougal was read Susan's quote
from The Washington Post. McDougal agreed with Susan's statement but added that either Bill
Henley or he must have told Susan about the jogging incident. J. McDougal 302, 2/19/97
(DRAFT), at 8-9.

29

NW: 15416 DocId: 70001585 Page 67

Obtained by Judicial Watch, Inc. via FOIA

> *"She needs the work." And I said, "That's fine, Jim."*

Sawyer:      Because, again, she has talked about the business coming in a
             different way -- coming through a connection between someone
             who was in her office and someone who knew your husband.

McDougal:    I don't know about that.

Sawyer:      *But this you do know? It did take place?*

McDougal:    *Oh, yes.*[87]

On the eve of her jailing for contempt of Court, Ms. McDougal told Larry King she did

not witness the jogging incident and that her only knowledge of it comes from Jim McDougal:

> I only know that *Jim came to me and said, "They need the money. I'm going to
> give her the work. Is that alright with you?" And I said yes.* That's all I know
> about how that came to be.[88]

#### iv.    Rae Ann Moles

Rae Ann Moles was hired by Madison in April 1983 to do miscellaneous clerical work.[89]

Moles remembers an event similar to the jogging incident described by McDougal.[90] Moles says

that late one afternoon in August or September 1984, Bill Clinton rushed past her into

McDougal's office wearing jogging clothes. Moles says she heard most of their conversation

---

[87]       Prime Time Live (ABC television, Sep. 4, 1996, out-takes, tape 2) (emphasis
added).

[88]       Larry King Live (CNN television broadcast, Sep. 6, 1996) (emphasis added).

[89]       Moles is writing a book on her experiences at Madison.
FOIA(b)7 - (C)

[90]       McDougal does not remember who his secretary was at the time of the jogging
incident. J. McDougal 302, 2/19/97 (DRAFT), at 9. Moles was McDougal's secretary until she
left in January 1985 and was later replaced by Sue Strayhorn.

30

Obtained by Judicial Watch, Inc. via FOIA

because McDougal's office door was open.[91] Moles said McDougal complained to Clinton about

an outstanding Whitewater loan and urged the Clintons to pay their fair share.[92] According to

Moles, Clinton told McDougal that Webb Hubbell was encouraging Rose attorneys to get more

savings and loan business, and then Clinton asked McDougal to put Mrs. Clinton on a $2,000 per

month retainer.[93] McDougal told Clinton "he really didn't have anything for the Rose Law Firm

to do [and] that the Mitchell law firm was representing the institution and performing as he

expected."[94] Moles testified McDougal asked Clinton how the account would be shown as

coming in, and Clinton said Hubbell would take care of it and that more than likely a young

associate would be given credit for the account.[95]

Moles says Clinton and McDougal met for about an hour and a half to two hours and that

she left before the meeting ended to go home. When Moles came to work the next morning,

McDougal said, "Well, we've put Hillary on the payroll. Susan will be in shortly. She doesn't

know about it. When I tell her, she's going to be really upset. There may be quite an incident. If

---

[91]     Moles GJ, 10/19/95, at 18. But see Moles 302, 8/4/94 & 2/9/95, at 7 ("McDougal
had Moles into his office and he introduced her to Clinton.").

[92]     Moles 302, 8/4/94 & 2/9/95, at 7; Moles GJ, 10/19/95, at 19-20.

[93]     Moles GJ, 10/19/95, at 22 ("Mr. Clinton asked him to hire the Rose Law Firm.");
Moles 302, 8/4/94 & 2/9/95, at 7 ("CLINTON said that he and HILLARY CLINTON were in
need of some money and because he was a government servant, he only made so much.
CLINTON then asked McDOUGAL to have MGSL put HILLARY
RODHAM CLINTON of the ROSE LAW FIRM on a $2,000 per month retainer."). Bill Clinton
says he has "absolutely no recollection" of talking to Hubbell about Hillary and Rose being on
retainer and doing legal work for Madison. B. Clinton OIC Deposition, 4/22/95, at 72-73.

[94]     Moles GJ, 10/19/95, at 22.

[95]     Id. at 24.

31

NW: 15416 DocId: 70001585 Page 69

Obtained by Judicial Watch, Inc. via FOIA

you get uncomfortable, go downstairs."[96]  Moles said that after learning that Madison retained

Rose, she asked McDougal if Madison was going to split the legal work between the Mitchell

firm and Rose. McDougal responded, "You are to send the Rose Law Firm nothing."[97]  Moles

resigned from Madison in January 1985.[98]

### v.   Hillary Clinton's Income

The Clintons' tax returns are consistent with McDougal's claim that in 1984 when the

jogging incident occurred something was happening at the Rose Law Firm which reduced Mrs.

Clinton's earnings.  The Clintons' tax returns for years 1983, 1984, and 1985, reflect that Mrs.

Clinton's income from Rose decreased in each of those years as follows:

| Year | Wages from Rose |
|------|-----------------|
| 1983 | $ 82,741[99] |
| 1984 | $ 72,989[100] |
| 1985 | $ 55,382[101] |

### 4.   Statements Relating to Hillary Clinton's Version

---

[96]   Id. at 26.

[97]   Id. at 27.

[98]   Moles 302, 8/4/94 & 2/9/95, at 10.  Moles' testimony is corroborated by her sister,
Sarah Handley, a former financial examiner for the Arkansas Securities Department.  Handley
testified that Moles told her while Moles was working at Madison that "Clinton had come by
[Madison] and that at the conclusion of that visit . . . McDougal had retained Hillary, the Rose
Law Firm."  S. Handley GJ, 10/31/95, at 22.

[99]   DEK001329.

[100]   DEK000753.

[101]   DEK001371.

32

Obtained by Judicial Watch, Inc. via FOIA

Upon graduation from law school in May 1984, Rick Massey began work for the Rose Law Firm as a law clerk.[102] When he passed the bar examination in August 1984, he became an associate at Rose and was assigned to the securities section. Massey's "mentor" in the securities section was David Knight, a partner. Massey became involved with Rose's work for Madison at the very beginning of the representation and did most of the legal work on Madison's first two matters -- the preferred stock offering and the limited partnership/broker-dealer.

Mrs. Clinton's version of Madison's retainer of Rose puts Massey at the center of the origination. To the general question of whether he brought the Madison business to Rose, Massey says that he "do[es] not know how Madison Guaranty came to be a client of the firm."[103] However, Massey testified that while he does not remember how the business came in, he does not remember feeling he brought the client in: "I don't recall feeling like this was my -- that I killed this deer . . . . I didn't have a big part when they came in."[104] When pressed by Chairman D'Amato at the Senate Whitewater hearings, Massey conceded he would have remembered bringing in the client, but he does not remember bringing it in:

> Chairman D'Amato. Mr. Massey, let me say something to you. First-year associate, you're there, if you had brought in this business, it would have been the first piece of business I think you testified that you brought into the firm; right?

---

[102]     Massey is a republican. Massey GJ, 11/7/95, at 88. Massey testified before the Senate Committee that he has a "very good memory." Massey Senate Hearing, 1/11/96, at 238.

[103]     Massey GJ, 11/7/95, at 21 ("My position has been that I'm not -- and it is today that *I'm not aware of how -- what their motivation was for hiring us*. I have -- I had a relationship with their president, which might have been a factor. But I don't -- you know, *I don't know* that I -- you know, *I don't know*. You'd have to ask them why they came to us," id. at 82) (emphasis added). See also Massey FDIC Interview, 10/4/94, at 1.

[104]     Massey Senate Hearing, 1/11/96, at 78.

33

Mr. Massey. That's correct.

Chairman D'Amato. You would have remembered that?
Mr. Massey. That's correct.

Chairman D'Amato. You don't remember bringing that business into the firm?

Mr. Massey. No, sir, I do not.

\* \* \*

Chairman D'Amato. Same day, contemporaneously. If you had brought the client in, you would know that you brought the client in, we went over that. First-year associate, eight months, you would have known that, it would have been memorable, wouldn't it? Yes or no?

Mr. Massey. Yes.[105]

Despite this admission, Massey also maintained during the hearing, "I don't have all the facts . . . . it's outside my knowledge as to whether I brought the Madison matter in or not."[106] It is important to note a recurring theme in Massey's responses: Massey concedes that his memory differs from Mrs. Clinton's as to the facts of how the business came to Rose; as to the individual events, however, Massey does not unequivocally say that the event did not happen; he merely says that he does not remember that the event did happen.

David Knight remembers attending the lunch with Latham and Massey, and Knight's

---

[105]   Id. at 232-233, 240-241. Chairman D'Amato's point is a classic deductive syllogism: Massey says that, had the event happened, he would have remembered the event, and he does not
remember the event; therefore, the event did not happen.

[106]   Id. at 29, 77.

34

NW: 15416 DocId: 70001585 Page 72

Obtained by Judicial Watch, Inc. via FOIA

memory of it is consistent with Massey's.[107] Knight testified the purpose of the lunch was to

solicit legal business from Latham: "We took Mr. Latham to lunch, and I can't remember

certainly the specific conversation but the gist of it was we told him a little bit about the types of

work that Rick and I did. Representative clients for the firm. And then asked him for

business."[108] Knight testified that Latham said McDougal made the decision as to which law firm

to hire and that Madison was happy with the Mitchell law firm: "My recollection is that he said

that Mr. McDougal was really the one that made decisions about hiring lawyers . . . . He also said

that Madison regularly used another law firm and that he thought they were satisfied with the

services provided by the law firm."[109] Knight further testified he left the lunch with the

impression that the matter was closed and that Rose was not going to get any business from

Madison.[110]

　　　　Latham says that he does not remember taking a class where Knight and Massey both

taught and does not remember a lunch with Massey and Knight.[111] Latham testified he

---

[107]

[108]　　Knight Senate Hearing, 5/16/96, at 10. Knight testified that the lunch occurred after the conclusion of the law school course which Massey helped him teach.

[109]　Id.

[110]　Id. at 11, 13.

[111]　Latham Senate Deposition, 5/15/96, at 10-11. Latham remembered being taught a corporations course by Knight while in law school. Latham seemed to leave open the possibility that he may have taken a course after law school that was taught by both Knight and Massey: "Not unless -- well, I may have, if it was a continuing ed course, or maybe they were teaching a course that I had an interest in and attended for a bit. It would have been after law school, but I don't remember it." Id.

35

FOIA(b)3 - Rule 6(e) Federal Rules of Criminal Procedure

Obtained by Judicial Watch, Inc. via FOIA

remembers Massey at some point expressing an interest in obtaining some of Madison's legal

work: "I do recall that Rick pitched the business in the sense that he wanted us to hire them to do

legal work for us. I do not remember the lunch."[112] In a deposition before the Senate Whitewater

Committee, Latham testified Massey did approach him, but told him the decision to hire Rose

was McDougal's:

> Rick Massey and I ran into each other when we were studying for the bar, and
> Rick went to work for the Rose Law Firm after that, and had talked with me about
> us using the Rose Law Firm. And I think I probably mentioned that to McDougal
> at some point. At some later point, Jim came back to me and said let's use the
> Rose Law Firm, and he wanted to put them on retainer. . . . I think he wanted to
> use them because he had friends over there, and one of those friends, of course,
> was Hillary. He had used the Rose Law Firm there before. What's open there, of
> course, is what prompted Jim to make that decision. Was it a conversation with
> Hillary or was it just because I had suggested that at some point I would like to
> work with the Rose Firm at some point. I don't know.[113]

In an interview with FDIC investigators, Latham said McDougal suggested that Madison

use Rose:

> LATHAM said that at one time, date not recalled, JAMES MCDOUGAL
> suggested that MADISON GUARANTY use ROSE for some of the legal work at
> the institution. LATHAM said that, "MCDOUGAL had friends over there, he
> suggested we use them." LATHAM said when asked who the friends were that it
> was HILLARY RODHAM CLINTON and others.[114]

Latham says McDougal made the decision which law firm to hire and that Latham did not

---

[112]    Latham Senate Hearing, 5/16/96, at 35.

[113]    Latham Senate Deposition, 5/15/96, at 7-8. Latham says the pitch from Massey
occurred while they studied for the bar examination and thus suggests that his conversation with
Massey occurred in the summer of 1984 -- roughly consistent with the timing of the jogging
incident alleged by McDougal. Latham graduated from law school in May 1984, so he would
have studied for the bar the summer of 1984. 2031-00000027.

[114]    Latham FDIC Interview, 7/12/95, at 1.

.36

have that authority.[115] When specifically asked who made the decision to hire Rose, Latham
testified, "Jim McDougal did."[116] Latham does not remember any discussions about there being
an unpaid bill from the Bank of Kingston litigation[117] and says he is not aware of what legal issue
McDougal wanted Rose to work on, although he does remember discussions with McDougal
about acquiring a broker/dealer.[118]    Massey also says he does not remember a discussion with
any Rose partner about Madison's having an outstanding bill and partners objecting to bringing
Madison in again as a client because of the billing problems: "I've heard that there were
discussions, that there was some disgruntlement. And discussions like this could have gone on.
I don't believe I was a party to them."[119] Massey acknowledged that Mrs. Clinton's version of the
retainer "doesn't square" with his,[120] and he insists he has no memory of ever discussing Madison

---

[115]    Latham 302, 2/14/95, at 1; Latham Senate Deposition, 5/15/96, at 12-13; Latham
Senate Hearing, 5/16/96, at 14-15.

[116]    Latham Senate Hearing, 5/16/96, at 15. When asked if it is "safe to say you
personally did not hire the Rose Law Firm to work for Madison," Latham responded, "Yes, in the
sense . . . that I didn't make the decision to hire them and move that forward." Latham Senate
Deposition, 5/15/96, at 8-9. Pat Heritage-Hays, an assistant to Latham, says that when she
learned Madison was paying Rose $2,000 per month, she asked Latham about it, and he
responded, "Oh, it's one of Jim's deals." Heritage-Hays 302, 1/6/95, at 1.

[117]    Latham Senate Deposition, 5/15/96, at 20; Latham 302, 2/14/95, at 2.

[118]    Latham 302, 2/14/95, at 1, 3. Latham told FDIC investigators, however, that
Massey worked on the preferred stock and broker/dealer issues because Latham specifically
asked him to. Latham FDIC Interview, 7/12/95. at 1.

[119]    Massey Senate Hearing, 1/11/96, at 23-24; Massey GJ, 11/7/95, at 33, 86 ("I
wasn't usually consulted or involved in billing matters as a first year associate . . . . I didn't know
there had been a reduction in the bill.").

[120]    Massey GJ, 11/7/95, at 84 (In an exchange about Mrs. Clinton's allegation that
Massey went to some securities partners at Rose about bringing Madison in as a client, Massey
was told, "Mrs. Clinton's version doesn't square, of course, with your version," to which Massey

37

billing matters with any Rose partners:

> [D]o I remember going to the partners and saying, "We want to represent the --
> Madison," and other partners saying, "You're not going to do that until they catch
> up on their bill, and maybe there ought to be a retainer." I have read that Giroir
> said that. I don't recall Giroir ever having said that to me. I don't remember me
> being in any of that discussion, and it frankly would not have been a matter in
> which I normally would be involved because I was a first year associate, and we
> didn't have much input on billing arrangements of that kind. It's possible,
> however. I just don't remember it.[121]

Massey further testified to the grand jury that he remembers no such discussion with any

securities partners or Mrs. Clinton:

> Q.    Mr. Massey, do you remember anything about your going to the securities
> partners and saying, "I want to work on a case for Madison," and they said, "We're
> not going to approve that until Madison has paid us what they owe us on some
> other case"?
>
> A.    I don't -- no, sir. I don't remember that.
>
> Q.    Either with any securities partners or with Mrs. Clinton?
>
> A.    I don't remember doing that with anybody.[122]

c.    **Other Evidence**

### I.    **Webb Hubbell**

---

responded, "I understand.").

[121]    Massey GJ, 11/7/95, at 84-85. According to an article in The Los Angeles Times,
Giroir told Rose partners that he did not want Madison as a client again. Risen, White House
Woes: Documents Hint at More Help by Mrs. Clinton for S&L Owner, Los Angeles Times, May
31, 1994, at A5 ("McDougal had refused to pay Rose's bills, prompting the firm's managing
partner, Joseph Giroir, to declare that he did not want McDougal as a Rose client again in the
future, according to partners."). Giroir testified to the grand jury that he has no memory of Rose
representing Madison in 1985 and 1986 and no memory of any discussions in the firm about the
representation. Giroir GJ, 7/18/96, at 23-27.

[122]    Massey GJ, 11/7/95, at 32. Massey told the grand jury, however, that although he
does not remember doing so, it is "possible" he may have gone to Knight and told him he thought
he was going to get Madison as a client. Id. at 84-85.

NW: 15416 DocId: 70001585 Page 76

Hubbell says that Massey approached him in 1984 and asked him for help in getting

Madison's business.[123] Hubbell testified that Massey said he had been talking to John Latham

and Massey felt that Rose had an opportunity to get some of Madison's work.[124] Hubbell says he

did not do anything to assist Massey in getting the business.[125]

As to who actually brought the client to Rose, Hubbell says, "Massey was the one who

wanted them as a client and that Mrs. Clinton was one of those who helped him accomplish that

task."[126] In an interview with the OIC, however, Hubbell said Mrs. Clinton brought the Madison

---

[123]    Hubbell Senate Deposition, 10/26/95, at 134-136; Hubbell 302, 2/1/95, at 5.
Hubbell left Rose from September 1984 through January 1, 1985, while he completed an
unexpired term on the Arkansas Supreme Court.

[124]    Hubbell Senate Deposition, 10/26/95, at 134-136.

[125]    Id.

[126]    Id. at 122. Hubbell says he has no personal knowledge as to who brought the
client in. Hubbell GJ, 5/7/96, at 74-75 ("I don't know for sure who brought it in . . . . I don't have
personal knowledge, right."). In the grand jury, Hubbell was read a quote from a news article as
follows: "Webster L. Hubbell, a partner and spokesman at Rose, said that nothing in the law
firm's records indicates that Hillary Clinton brought the Madison Guaranty business. 'That's a
new one on me,' he said." When asked whether the quote was accurate, Hubbell responded, "I
don't know if I said that, but there is nothing in the records -- this is where lawyers are being
lawyers, Mr. Ewing. There is nothing in the records of the firm that show that Hillary brought in
the business." Id. at 108.

According to notes of Susan Thomases from a conversation with Hubbell on February 24,
1992, Hubbell told Thomases that Massey will say he brought the business:

Massey had relationship w/ Latham & HC had relationship w/ MacD. *Rick will say he had
rel[ationship] w/ Latham & had a lot to do w/ getting the client in.* She did all the billing.
According to time recs, HC had numerous conf[erences] with Latham, Massey, and McDougal
on both transactions. She reviewed some docs. She had one TC in 4-85 at the beginning of the
deal w/ Bev. [Bassett]. Neither deal went through. Broker/dealer was opposed by staff approved
by Bev under certain condition which they never met. Preferred stock? *But for Massey, it would
not been there.* But HC was billing partner and attended conferences.

39

Obtained by Judicial Watch, Inc. via FOIA

business to Rose: "HUBBELL notes that MADISON was HILLARY's client, as she is the one who brought MADISON into the firm as a client, that is why she became the billing partner."[127] Hubbell was asked about this statement in the grand jury:

### ii.    Watt Gregory

Watt Gregory,[128] a senior member of the securities section at Rose, remembers that there was "some general discussion" within the firm about whether the firm should undertake representation of Madison.[129] Gregory remembers talking to Mrs. Clinton "about whether we should or shouldn't [represent Madison], or what some of the issues might be in connection with. the ability of the savings and loan to raise capital by that particular method."[130] Gregory testified that "Mrs. Clinton was instrumental in *introducing* the client to the members of the firm. . ."[131]

---

790-00000020 (emphasis added). See also Thomases GJ, 2/29/96, at 45.

[127]    Hubbell 302, 2/1/95, at 7.

[128]    Watt Gregory left Rose in 1989, and later formed the law firm of Giroir & Gregory with former Rose attorney Joe Giroir. Gregory 302, 5/24/95, at 1.

[129]    Gregory GJ, 1/3/96, at 7. Gregory testified that while he remembers some discussion, he cannot remember "names, places, or dates" of such discussions. Id. In an interview with the OIC in 1985, Gregory remembered that one party to the discussions was David Knight. Gregory 302, 5/24/95, at 2.

[130]    Gregory GJ, 1/3/96, at 25-26.

[131]    Id. at 6-7 (emphasis added). What Gregory meant by the term "introducing" is unclear. His interview with the OIC in 1985 reads as follows: "RLF's opportunity to represent Madison Guaranty Savings & Loan (MGSL) came through Hillary Clinton in the mid 1980's." Gregory 302, 5/24/95, at 2.

40