**<u>EXHIBIT 3 (Part 3)</u>**

to

Plaintiff's Response to Defendant's Statement of Material Facts
Not in Dispute and Statement of Undisputed Material Facts
in Support of Cross-Motion for Summary Judgment

Obtained by Judicial Watch, Inc. via FOIA

Thomases GJ, 2/29/96, at 57-58; Senate Banking Com.., 12/18/95, at 93. To the contrary, her recollection is that the Massey/Latham relationship cemented the client relationship. Senate Banking Com.., 12/18/95, at 91. However, Thomases has acknowledged that there is no other person besides HRC whom she is likely to have asked for this information. Senate Banking Com.., 12/18/95, at 94.

Thomases notes do, however, reflect that on March 6th she spoke with HRC. Those notes reflect HRC's opinion that "This [i.e. the Whitewater investment] is the only stupid dumb thing we ever did" and that they would not do it again if they could. Thomases GJ, 2/29/96, at 62-63.

On March 7th

Later that day Thomases spoke directly with WJC who said he lost money and would not make the investment if he had to do it over again, at least in part to avoid the appearance of a conflict of interest. Thomases GJ, 2/29/96, at 53.

On March 10th, Thomases notes reflect a conversation with an unknown individual, that for the first time recount the full story that Latham came to Massey and Massey went to the securities lawyers who said that the firm would decline MGSL's business because it had a delinquent bill. The notes also reflect an emendation of WLH's earlier acknowledgment that HRC had a conversation with BBS and instead contend that HRC never

87

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

Obtained by Judicial Watch, Inc. via FOIA

called BBS, but made only one ministerial call to her office. Thomases GJ, 2/29/96, at 67-68.

On March 11th, Thomases participated in a conversation with Jim Hamilton, which is reflected in Hamilton's notes of that discussion. Hamilton contends his notes reflect information provided to him by Thomases. Those notes reflect that Thomases told Hamilton that HRC took Massey to meet McDougal.

**88**

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

Obtained by Judicial Watch, Inc. via FOIA

<u>Rick Massey and the Documentary Record at the Rose Law Firm</u> -- After Rick Massey

learned of newspaper articles that were critical of the RLF representation of MGSL he ordered

his personal work file from remote storage. Documents reflect that his secretary Vera Hitt got

the files from storage on March 24, 1992. RIC 121384-92; Massey GJ, 12/3/97, at 34-35.[281]

Shortly after the files were ordered, Vince Foster asked Massey for his files. Massey gave Foster

copies and retained the files from storage. Massey GJ, 12/3/97, at 40; Sen. Banking Com.,

1/11/96, at 35. The files he gave Foster were approximately 1 ½ inches thick. Sen. Banking

Com., 1/11/96 at 191. His understanding was that Foster was collecting the files on behalf of the

firm, not the Clinton campaign. Sen. Banking Com., 1/11/96, at 202.[282] Indeed, it appears that

during this week Vince Foster was actively involved in developing an understanding of RLF's

representation of MGSL.

On March 26 Massey signed a memorandum regarding his activity in connection with

RLF's representation of MGSL before the ASD. The memorandum

---

[281] On March 25th files labeled "HRC Time Sheets" were checked out by "Millie." RIC 121481. Millie Alston does not recall checking out any of Mrs. Clinton's time sheets. Hubbell has testified that he obtained some time sheets from the 1987-89 time frame during the campaign and has since produced these to OIC. Mrs. Clinton's time sheets from 1985-86 cannot be found. Colloton & Azar Memo, at 10.

[282] The files later provide by Williams and Connolly to OIC appear to be Massey's files. Sen. Banking Com., 1/11/96 at 208.

89

was not prepared by Massey, but rather by either Vince Foster or Loretta Lynch.   Massey GJ,

12/3/97, at 56.[283]   At the time it was prepared Massey had reviewed his own files.  Massey GJ,

12/3/97, at 59.

> The relevant portion of Massey's statement reads as follows:
>
> I performed substantially all legal service on behalf of my firm . . . . My work was
> performed under the supervision of senior members of the Securities Section of this firm.
> To my knowledge, Ms. Clinton had no contact, either in person, telephonically or
> otherwise, with any ASD staff member in respect of [these] matter[s].  [I.e. the stock
> offering and the broker/dealer application.]  Further, I do not believe that any
> involvement by her in connection with this matter meaningfully influenced the ASD's
> ultimate determination with respect to this matter.

[                    ] At the time he signed this statement Massey had not reviewed the billing

records.  He would not have made the same statements had the billing records been available for

his review.  Massey GJ, 12/3/97, at 60.

This summary conflicts with Hubbell's recollection and also with information Hubbell

personally gave to Mrs. Clinton in late March or early April, 1992.  According to Hubbell, within

one month after the Gerth article was published, he had one conversation with Mrs. Clinton

relating to her phone call with Bassett.  Mrs. Clinton said she just didn't remember the call, and

Hubbell told her: "Well, it's in the bills and Rick does remember that it was in your office."

Hubbell GJ, 12/19/95, at 178.  Besides again establishing Mrs. Clinton's awareness of the

---

[283] It is very unlikely that Lynch was involved in the preparation of Massey's statement.
First, Lynch has no contemporaneous notes of her involvement in the preparation of this
document and she was a "religious" note-taker.  Second, the document was found in Vince
Foster's briefcase, and no copy of it was ever produced to OIC by the Clinton campaign,
suggesting that the campaign did not have a copy of it.  Third, had the document been available
to the campaign it would likely have been released to the press during this time period -- and it
was not.  Indeed, this statement may be the memo that Hubbell says he and Foster prepared after
they interviewed Massey.  Hubbell GJ, 12/19/95, at 91.

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

NW: 15416 DocId: 70001585 Page 128

information contained in the billing records, it suggests that whoever drafted Massey's statement

was either unaware of this fact or deliberately omitted it.

Also by March 26th, Foster had prepared a chronology on his computer, entitled "Re:

Madison Representation." [          ] The document was found in Foster's briefcase in

July 1997 and subsequently has been identified as originating on Foster's computer at RLF.

Clark GJ, 12/2/97, at 136. This document is notable for two reasons.

First, it reflects the state of Foster's knowledge of the Madison representation issue as of

March 26th. It contains the following entries:

- 07/30/82      Final bill of Rose Law Firm to Bank of Kingston (a/k/a Madison Bank
               & Trust) of $5,000 fees and $893 in costs (contains not in Giroir's hand:
               "Have Hillary bill with letter to McDougal -- will pay.")

- 1983         Bank of Kingston final bill written off

- 10/23/84     $5,000 paid on Bank of Kingston bill

- 04/85        Latham, as Madison's CEO, hired the Rose Law Firm to request an
               interpretive ruling of the S&L statutes from the S&L Administrator.

[          ] The chronology is silent on the "Massey generated the business" issue and on

the call to Bassett and appears to rebut the "unpaid bill" assertion.[284]

The other significance of Foster's chronology lies not in its substance but in the

"computer card" name associated with the document on the RLF computers. This document,

---

[284] One possible benign explanation for Mrs. Clinton's recollection of an unpaid bill lies
in the apparent effort by Giroir to have Mrs. Clinton get payment of the final bill originally. This
suggests that RLF anticipated problems at the time of the final billing and that Giroir was relying
on Mrs. Clinton's friendship with McDougal to assist collection. Mrs. Clinton might contend
that she has simply confused this event in 1982, with the subsequent representation of MGSL in
1985.

91

Obtained by Judicial Watch, Inc. via FOIA

when discovered on RLF computers in December 1997, was entitled "Clinton campaign document II." Clark GJ, 12/2/97, at 138. Knowledge of its existence allowed RLF to de-archive another document entitled, "Clinton campaign document I," Clark GJ, 12/2/97, at 139; LR GJ Ex. 1601. As an analytical matter, it is a fair inference that document "I" was prepared prior to document "II." Since we know that, at the latest, "document II," the chronology, was prepared on March 26, 1992, we may reasonably infer that "document I" was prepared before that date.[285]

Clinton campaign document I, LR GJ Ex. 1601, from Foster's computer, is an *edited copy of the draft campaign statement prepared by Mrs. Clinton.*[286] OIC had earlier been provided with a copy of Mrs. Clinton's draft statement that had handwritten changes in what may be her handwriting (though perhaps it is Foster's, which is similar).

The version on Foster's computer contains Mrs. Clinton's statement, as amended by the handwritten changes.

As modified on Foster's computer, Mrs. Clinton recalls:

- "[Massey] was told that the Firm could not do any work for McDougal or his businesses until the bill owed the Firm for the previous work was paid."

- "When I visited [McDougal] I told him that I understood Latham wanted Massey to do some work for them . . . McDougal called Latham into the meeting . . . McDougal told Latham he could proceed with Massey, and he told me that he would arrange to pay the past due bill."

---

[285]

FOIA(b)7 - (C)

[286] Mrs. Clinton has stated that her purpose in writing the statement "as best I can recall" was to put down her memory of what happened at the time Madison was represented by Rose. H. Clinton GJ, 1/26/96, at 54. She was unable, at that time, to identify when, during the campaign, she drafted the document. H. Clinton GJ, 1/26/96, at 54.

92

Obtained by Judicial Watch, Inc. via FOIA

- "[After discussing this with my partners] Massey and I called McDougal [to tell him a $2,000 retainer was required] but he was not in so we talked with Latham and another employee."[287]

- "I recall some uncertainty by Massey about who within the Commissioner's office would handle the issue raised by Madison Guaranty. . . . I have no recollection of ever discussing Madison Guaranty with the Securities Commissioner, although I may have made a procedural inquiry of her or her staff on this issue."

- "In addition to the matter Massey did for Madison Guaranty, the Firm was requested to handle two other legal matters that were unrelated to the State."

This document therefore establishes that: Prior to March 26th, Mrs. Clinton and Foster were in direct contact regarding her recollection of RLF's representation of MGSL; and At the time he reviewed Mrs. Clinton's draft statement Foster was in possession of information that contradicted the assertions she was making, in the form of his chronology, as well as the paid Bank of Kingston bill and the MGSL billing records.

The precise nature of Foster's interaction with Mrs. Clinton in drafting this document remains an open question. However, contemporaneous evidence establishes that it was a collaborative effort and that Diane Blair and Webb Hubbell were aware of Foster and Mrs. Clinton's work together. On March 23rd Diane Blair[288] faxed "5" pages (including cover sheet) to Mr. Hubbell, of which only the first two pages have been produced to OIC. DEK 535791-92. The second page has Diane Blair's handwritten note: "Webb -- Vince + Hillary are drafting her

---

[287] I am not aware that either Latham or Massey has ever been asked about this assertion.

[288] Blair has not been questioned about this document. Presumably she will acknowledge her own hand-writing and provide the evidentiary predicate for its admissibility.

93

Obtained by Judicial Watch, Inc. via FOIA

answers on law practice. Ignore marginal notes. D" DEK 53592.[289]

In this collaboration, Mr. Foster may not have told Mrs. Clinton that her statement was at odds with information in his possession. The alternative, however, is to believe that he deliberately concealed his information from her.

FOIA(b)7 - (C)

This evidence strongly indicates that HRC fully and completely immersed herself in a review of her billing records and her work for MGSL. From this one can infer a review of HRC's role in Castle Grande, which was not a prominent campaign issue. The evidence more strongly suggests that HRC had knowledge of evidence contradicting her public statement (and subsequent statements to federal investigators) of the manner by which MGSL came to retain RLF.

Potential Defenses -- We anticipate that certain evidentiary questions, outlined above, will be raised by the defendants and will have to be overcome. It is not anticipated that the factual events outlined above will be contested.

* * * * *

---

[289] Internal evidence of the note ("ignore marginal notes") and the known length of Mrs. Clinton's statement (2-4 pages, depending on font and spacing) suggest that the missing pages which were not produced were an earlier draft of Mrs. Clinton's statement sent to Mr. Hubbell for his editorial review. Moreover, since the fax originated at Clinton for President headquarters, it suggests that Foster and Mrs. Clinton began work on her statement outside of RLF and Foster subsequently had the document transcribed on his own computer.

94

*5) Foster Documents* -- [The facts relating to the handling of the documents in Vince Foster's office are detailed in Colloton & Kavanaugh, "Foster Docuements Memorandum," August 1996.]

On Tuesday, July 20, 1993 Vincent Foster, Jr., Deputy White House Counsel, and former partner of HRC and WLH at the RLF, committed suicide. At the time of his death, Foster had "Personal" Whitewater-related documents in his office in the West Wing of the White House.

The U.S. Park Police, who were charged with investigating Foster's death because his body was found on federal park property, wished to review the material in Foster's office for evidence that would shed light on his state of mind. Some evidence exists that documents were removed from Foster's office on the night of July 20th, before the office could be examined.

More significantly, on July 21st, concerned that the Park Police might examine sensitive Executive Branch documents White House Counsel Bernard Nussbaum initially agreed to allow the examination to be conducted by two career prosecutors from the Department of Justice, rather than by the Park Police. However, on the evening of the 21st and the morning of the 22nd a series of calls occurred between HRC, her chief of staff Maggie Williams, her close friend Susan Thomases and Nussbaum. Following these calls (and we submit, inferentially, as a result of those calls) Nussbaum changed his position and refused to allow the Department of Justice attorneys to review the Foster office documents. Instead, he conducted the review in their presence and separated the documents into categories, including certain official documents and

95

Obtained by Judicial Watch, Inc. via FOIA

other "personal" documents.[290]

Later on the 22nd, Maggie Williams moved the personal documents to the third floor of the East Wing of the White House where they were stored in a closet in HRC's office, Room 323 which is the room immediately adjacent to the Book Room, Room 319A, where the billing records were eventually found 2 years later.

Gail Kennedy -- Gail Kennedy, the wife of William Kennedy, Associate White House Counsel and former RLF partner, went with her husband to the home of Vince Foster on the night Foster's suicide. While at Foster's house she overheard a conversation between WLH, Bill Kennedy and possibly David Watkins and Marsha Scott to the effect that "there was some concern of what was in Vince's office . . . to the extent that there might be something harmful or embarrassing to Vince or the Clintons." G. Kennedy, GJ, 1/24/95 at 14. She is not aware of concern about particular documents, but rather of a "general concern from my perception." Id. at 16.[291]

Officer Henry O'Neill -- Officer O'Neill is a uniformed Secret Service officer. He was present in the White House on the evening of July 20th. He has testified on numerous occasions that he saw Maggie Williams, HRC's Chief of Staff, leave Foster's office that evening carrying

---

[290] Nussbaum denies that any agreement was reached and also denies that any discussion of personal documents occurred. He is supported in the former assertion by an Associate White House Counsel. He is supported in the later assertion by Williams, Thomases and HRC who have varying recollections of the phone calls but are clear that no discussion of personal documents occurred.

[291] The others named by Mrs. Kennedy say they do not remember any such conversation and have denied it in their grand jury testimony.

96

folders or files of that sort, in the company of another woman.[292]

O'Neill has, unfortunately, been interviewed, deposed or called to testify on 9 separate occasions -- beginning in April 1994 and ending in July 1995. Though his testimony has never varied in his assertion that Maggie Williams was observed carrying documents from Foster's office, e.g. O'Neill, GJ, 6/6/95, it has varied in many other respects -- as would be expected for a witness called upon to testify on so many occasions. For example, O'Neill has identified the woman accompanying Williams in three different ways -- as Patsy Thomasson, as Susan Thomases, and as Evelyn Liebermann. He has also described what Williams was carrying, variously, as "files and folders" and "folders and a cardboard box [like] a small hat box." Thus, while unvarying on the central fact of his testimony -- that Williams took material from Foster's office on the night of the 20th -- O'Neill brings some inconsistency's to any potential testimony. See Colloton & Kavanaugh, "Foster Memorandum," at 55-68.

David Margolis/Roger Adams/Phillip Heymann -- Margolis and Adams are career prosecutors in the Criminal Division at the Department of Justice. On July 21, in response to a request from the Park Police to examine Foster's office, Nussbaum called Phil Heymann (then Deputy Attorney General) to request that DOJ coordinate the investigation. Heymann GJ, 6/13/95 at 6. Margolis and Adams arrived at the White House around 4 PM to meet with Nussbaum and two other Associate White House Counsel, Steve Neuwirth and Cliff Sloan.[293]

---

[292] Williams to an FBI polygraph and denied taking documents from Foster's office on the night of the 20th. The FBI examiner concluded that she was "truthful" in making this denial. FBI Polygraph Report of Margaret Williams, 9/16/94, at 3-4.

[293] Nussbaum denies that any agreement was reached. Nussbaum GJ, 6/13/95/ at 176. He is supported in this by Neuwirth. Neuwirth GJ, 2/28/95, at 100. Sloan, however, has no clear recollection either way. Sloan GJ, 4/4/95/ at 61.

NW: 15416 DocId: 70001585 Page 135

According to Margolis prior to the meeting Heymann had reached a tentative agreement with Nussbaum that Margolis and Adams would review each document. Margolis, Senate Hearing, 8/10/95, at 178. He also testified that at the meeting on the 21st he and Nussbaum concluded an agreement that they would review each document during a search of Foster's office. One reason Margolis recalls that event clearly is because at the end of the meeting, Neuwirth exactly misstated the agreement, saying that Nussbaum would review the documents and that Margolis corrected Neuwirth and Nussbaum assented to Margolis' correction. Margolis GJ, 6/14/95, at 11.

Adams corroborates Margolis recollection on the substance of the agreement. Adams GJ, 5/9/95, at 12. He says that it was intended that he and Margolis do a "summary" review of each documents. This understanding is reflected in notes Adams wrote within 7 days of the meeting. Adams also recalls in the same fashion the anecdote about Neuwirth's misstatement of the agreement. Adams, Senate Hearing, 7/27/95, at 96.[294]

However, on the morning of July 22nd, when Margolis and Adams arrived at the White House, they say that Nussbaum changed the search procedure they had agreed upon. According to Adams, Nussbaum definitely knew that he had changed the plans. Adams GJ, 5/9/95, at 20. Margolis agrees. Margolis, Senate Hearing, 8/10/95, at 182-83. Margolis called Heymann to complain and Heymann had a "heated" conversation with Nussbaum, explaining to him that Nussbaum would look foolish. Heymann GJ, 61/3/95, at 14. Heymann's assistant Cynthia

---

[294] Margolis' recollection and that of Adams is also supported by the contemporaneous "teletype" report prepared by FBI Supervisory Special Agent John Dana. FBI teletype, 175B-WF-187743-1 (July 23, 1993). One other FBI agent present says he was not aware of the nature of any arrangement between the DOJ attorneys and Nussbaum. Salter Deposition, 6/30/95, at 54.

98

Monaco, dictated notes in July 1993 which recorded the conversation from Heymann's end and which corroborate Heymann's description of his exchange with Nussbaum. Monaco Deposition, 7/6/95, at 26-27 (Bates# 70-149).

As a result of Nussbaum's decision, the search was conducted by Nussbaum in the early afternoon. Nussbaum reviewed each document and separated out the material into 3 piles: files the investigators wanted to see; personal papers of Fosters and miscellaneous documents. Heymann was furious at the manner in which the search was conducted. Heymann Deposition, 7/21/95, at 92 ("Bernie, are you hiding something?"). Cliff Sloan took notes and his penultimate entry is "get Maggie -- go thru office -- get HRC, WJC stuff."

Telephone Toll Records/WAVES data -- Telephone records reflect the following calls on July 21-22, 1993:

July 21st --

| | |
|---|---|
| 5:00 PM | Meeting between Nussbaum, Neuwirth, Sloan, Margolis and Adams ends |
| 7:45 PM | 12 minute call from Rodham residence in Arkansas to Bruce Lindsey's office |
| 9:11 PM | Thomases exits White House |
| 9:23 PM | 2 minute call from Thomases' cell phone to Maggie Williams home |
| 11:00 PM | 1 minute call charged to Thomases' calling card from Thomases' guest house to Rodham residence |

July 22nd --

| | |
|---|---|
| 7:43 AM | Nussbaum arrives at White House compound |
| 7:44 AM | 7 minute call from Williams home to Rodham residence |

99

Obtained by Judicial Watch, Inc. via FOIA

| | |
|---|---|
| 7:57 AM | 3 minute call from Rodham residence to Thomases guest house in DC[295]. |
| 8:01 AM | Page for Nussbaum: "pls call Susan Thomases at 202-659-8787"[296] |
| 8:25 AM | 4 minute call charged to Thomases from Thomases' guest house to Rodham residence |
| 9:00 AM | message for Williams from Thomases "call when you get in the office" |
| 10:48 AM | 3 minute call from Thomases secretary extension at Willkie Farr to White House Chief of Staff office |
| 11:04 AM | 6 minute call from Thomases extension at Willkie Farr to First Lady's office[297] |
| 11:11 AM | 3 minute call from Thomases extension at Willkie Farr to Chief of Staff office |
| 11:16 AM | 1 minute call from Thomases extension at Willkie Farr to Chief of Staff office |
| 11:37 AM | 11 minute call from Thomases extension at Willkie Farr to First Lady's office |
| 11:50 AM | 4 minute call from Thomases extension at Willkie Farr to First Lady's office[298] |

---

[295] Thomases says she may not have received this call and it is mere coincidence that she immediately after called the White House. Thomases Senate Hearing, 12/18/95, at 84-87.

[296] Thomases has testified that she did speak with Nussbaum that morning before the search but that Nussbaum raised the topic of the search procedures, not her. Thomases Interview, 9/9/94, at 54-59. Nussbaum disagrees and says that Thomases expressed a generalized privacy concern to him that was not tied either to specific documents or to concerns held by HRC or President Clinton. Nussbaum Deposition, 7/12/95, at 139-46.

[297] Sometime during the morning Nussbaum had further discussions with McLarty, Quinn, Lindsey, Neuwirth and Burton regarding the search of Foster's office. Williams may also have participated. Nussbaum was, apparently, including others in the deliberative process on how the search should be conducted.

[298] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Generally, the witnesses say they were calling to console one another -- which may lead one to ask: How come the widow is not in the circle of grief? No know phone calls to Lisa Foster are evidenced during this time period.

100

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure
NW: 15416 DocId: 70001585 Page 138

Obtained by Judicial Watch, Inc. via FOIA

| 2:50 PM | Search of Foster's office ends |
| 3:05 PM | Telephone message for Williams to call Chief of Staff office |
| 3:08 PM | 10 minute call from Thomases cell phone to First Lady office. |
| 3:25 PM | Telephone message for Williams from Neuwirth |
| 5:13 PM | 10 minute call from Thomases law office in New York [she had returned to New York that afternoon] to First Lady's office |

Steve Neuwirth -- Though Neuwirth is a witness supporting Nussbaum's version of the "agreement" with DOJ he has important other evidence to provide. He has testified that on the 22nd, prior to the search of Foster's office, he "had the impression that Susan Thomases had told Bernie [Nussbaum] that the First Lady had been concerned about unfettered access to Vince Foster office being granted." Neuwirth GJ, 2/28/95, at 97.[299] While he cannot recall exactly what Nussbaum said to create that impression he has acknowledged that the impression reflects the substance of what Nussbaum had said. Neuwirth GJ, 4/2/96, at 57-58.[300]

Carolyn Huber -- Huber was contacted by Maggie Williams between 4 and 6 PM on the 22nd. Williams said that HRC had asked her to call Huber and arrange for storage of a box in a closet on the third floor.[301] Huber met Williams and Castleton on the third floor at approximately

---

[299] Thomases is "absolutely firm" in her denial that the First Lady ever discussed documents in Foster's office with her during this time period. Thomases, Senate Hearing, 8/8/95, at 69.

[300] In his Senate testimony, Neuwirth did not specify how he got this impression and waffled on whether it occurred before or after the July 22nd search. Neuwirth Senate Deposition, 7/10/95, at 111.

[301] Williams own testimony confirms that she made a call to HRC who said she should put the personal files in the closed on the third floor to use to store them. Williams Interview, 10/24/94, at 22-25.

101

7:30 PM that evening and escorted them to the closet in Room 323, which she unlocked with a key kept in the desk in HRC's office.

Thomas Castleton -- Castleton was an intern in the White House Counsel's office. He was asked to help carry a box up to the third floor with Maggie Williams on July 22. He understood that the box contained documents that belonged to the Clintons. Castleton 302, 6/9/94 at 2. He also understood, from someone that HRC and possibly President Clinton would review the documents and make a determination as to what would be done with them. Castleton 302, 9/15/94, at 6; Castleton GJ, 4/4/95, at 60. While initially uncertain as to who the source of this information was, he has since stated that Maggie Williams was either the "person who originally told me about moving the boxes . . . or she just further clarified once we picked them up . . . that the President or the First Lady had to review the contents of the boxes to determine what was in them." Castleton Senate Deposition, 6/27/95, at 139-41; Castleton Senate Hearing, 8/3/95, at 13-14.

Gary Williams -- Williams, a Plumbing Foreman at the White House, says he saw a box labeled "Vincent Foster" in the closet of Room 323 on August 25, 1993 and again, probably, on November 2, 1993. He was in the closet on both occasions to work on a shower in Room 324B, whose plumbing is accessible in the closet. G. Williams 302, 2/23/96.[302]

Potential Defenses -- Plainly the most significant defense is that this aspect of the case is wholly circumstantial. The pattern of phone calls is clear -- but the content of the phone calls is

---

[302] There is some uncertainty as to whether Castleton took one box or two boxes up to the closet. Nussbaum and Deborah Gorham believe two boxes were moved. Castleton is reasonably sure one box was removed but acknowledges that it might have been two. Only one box was given to Williams and Connolly on July 27th. The box Williams saw would, presumably, be the second box.

102

not know and/or denied by the participants. Thus, the only direct evidence of concern relating to the documents in Foster's office comes from the testimony of Gail Kennedy.

* * * * *

*6) The White House and RTC Contacts* -- [The facts relating to contacts between the White House and the Treasury in late 1993/early 1994 are detailed in Bates & Azar, "White House-Treasury Contacts Investigation," September 1996.]

In September 1993 several referrals went from he RTC to the Department of Justice containing additional criminal allegations relating to Madison Guaranty. In particular the referrals identified in several instances Hillary Clinton as a witness because of her legal work for Madison. They also identified the Bill Clinton political campaign committee as a potential criminal subject.

**1.      The October 14 Meeting At The White House.**

In early October, the New York Times began investigating the handling of these referrals. As a result, on October 14, 1993, a meeting took place at 3:30 p.m. in Nussbaum's West Wing office involving Bernie Nussbaum (White House Counsel), Cliff Sloan, and Neil Eggleston (Associate Counsel), Bruce Lindsey, Dave Gearan, Jean Hanson, DeVore, and Jonathan Steiner (Treasury officials) apparently so that DeVore could inform the White House of the press inquiries he had been receiving regarding the referrals and how he intended to respond to those inquiries.

According to testimony by Lindsey and the notes he took at the meeting, 008-DC-00000079, DeVore ran the meeting. DeVore explained that he had convened the meeting

103

Obtained by Judicial Watch, Inc. via FOIA

FOIA(b)7 - (C)

because he wanted to discuss several inquiries he had received. Lindsey has testified that his notes reflect information that DeVore was relating from these press inquiries. DeVore next stated that the press was claiming that the normal procedure was for a referral to be sent from the field office of the RTC (Kansas City) to the relevant United States Attorney's office but that these referrals had been sent to the RTC in Washington and the week before had been sent to Little Rock. The press was asking why the procedure deviated on these referrals. DeVore then said that Sue Schmidt was asking about the Rose Law Firm's involvement with Madison in 1985. There then was some speculation that ⬚⬚⬚⬚⬚ who used to work at the RTC, had some continuing contacts there and might be the source for the press information on these referrals.

In a memorandum to file dated October 20, 1993, Lindsey described the October 14 meeting. 008-DC-00000083. The memorandum is generally consistent with his testimony and notes from the meeting. The memo does include the additional information that, according to Gerth, Clinton was not a target of the referrals, although Tucker might be.[303] One point of controversy has been the fact that the memorandum has a "cc" indicated to Williams, Kennedy, and Gearan.

---

303. The memorandum also contains a parenthetical notation stating that "[a] check of our campaign records turned up three cashiers [sic] checks for $3,000 each from J.W. Fulbright, Ken Peacock, and Dean Landrum, and a personal check for $3,000 from Jim McDougal, signed by Susan McDougal." According to Lindsey, he checked with the person who runs Clinton's Little Rock office and who has access to the gubernatorial campaign records (an individual we have identified as Susan Whiteacre). She was able to find the deposit slip with copies of the checks attached and then faxed this material to Lindsey. 226-DC-00000005.

104

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

a copy of this memorandum was found in Kennedy's files, 011-DC-00000606, and Gearan's files, 004-DC-00000014. The

The meeting is significant on two fronts. First it is the single most detailed instance in which RTC officials appear to have given the White House a substantive heads-up regarding the Whitewater referrals. Second, it is a substantive meeting that, seemingly, was concealed from Senatorial inquiry in February 1994.

The question whether Altman knew of the October 14 meeting, either before it took place or after the fact, was central to our investigation. The three Treasury participants at the meeting, Hanson, Steiner, and DeVore, all testified that to their knowledge Altman was not aware of the meeting.

## 2.    February 1: Altman Considers His Possible Recusal From Madison Matters.

On February 1, Altman went through what, by all accounts, was a rather tortured process of discussing his possible recusal with senior Treasury and RTC officials and soliciting their advice. The evidence indicates that at least Hanson and Kulka informally advised Altman that he was not legally required to recuse on the basis of his friendship with the Clintons but that, as a political matter, he should recuse because he already said he intended to follow Kulka's recommendation and his failure to recuse would only put him in a "no win" situation politically.[304]

---

304. Dennis Foreman, the Deputy General Counsel of the Treasury and Designated Agency Ethics Official, testified that prior to February 2, Hanson asked him for his quick reaction to the question whether Altman should recuse himself, and Foreman responded that he thought Altman should do so. Hanson said that she agreed with Foreman. According to Foreman, Hanson

105

Subsequently, Altman arranged a meeting at the White House to discuss both the statute of limitations issue -- which was then slated to run on February 28th -- and his recusal.

### 3. Hanson Prepares Talking Points For The February 2 Meeting.

To assist Altman, a non-lawyer, in providing a briefing to the White House, Hanson assembled a one-page sheet of talking points for Altman's use. 001-DC-00000231. The talking points explained the request of the Republican Senators to seek tolling agreements, the retroactive extension of the statute of limitations for certain types of claims, and the fact that the statute would expire on February 28. The talking points also detailed the three choices available to the RTC if any claim existed: allow the claim to lapse, commence litigation to preserve it, or enter into a tolling agreement. They also explained the limitations on these options, that tolling agreements must be consented to by the relevant parties, and that a protective lawsuit must not be frivolous or the attorney could be sanctioned. The talking points noted that the RTC investigation was being supervised by Kulka and Ryan, and, significantly, they state that, "It is not certain when the analysis will be completed, but it will be before February 28."

The twelfth and final talking point states that Altman will recuse himself from the case: "I have decided that I will recuse myself from the decision making process, as interim C.E.O. of the RTC, because of my relationship with the President and Mrs. Clinton."

Hanson testified that she provided Altman with a copy of these talking points in advance of the meeting. Before heading over to the meeting on February 2, Hanson claims she asked Altman whether he had read the last talking point (announcing his recusal) and asked

returned to him some short time later and said that she had been talking with Altman, told him her view on recusal, and that Altman was leaning towards recusal.

106

Obtained by Judicial Watch, Inc. via FOIA

whether he was inclined to "move off" that point (i.e., change his mind on recusal) because if he was, she would change the last point. According to Hanson, Altman said that the talking point was fine. Hanson testified that she was concerned about the accuracy of the talking point both because she wanted it to be accurate and because, if Altman did end up changing his mind on recusal (he had been going back and forth on the issue), she would not want it to appear that Altman changed his mind on recusal because of the White House meeting.

Altman claims that he first saw the talking points on the way over to the White House meeting, but he does not recall discussing them with Hanson.[305] Altman testified that he believes Hanson added the last point about recusal on her own initiative in order to prod Altman into announcing his recusal because she had been advising him to recuse.

**4.    The February 2 White House Meeting.**

The testimony about the February 2 meeting is relatively consistent and for the most part does not merit a recitation of the individualized recollections of each participant. (Obviously each witness remembers different details about the meeting, but only significant conflicting recollections are presented here.)

The meeting took place at approximately 5:00 p.m. in McLarty's office in the West Wing. Altman, Hanson, Ickes, Williams, Nussbaum, and Eggleston attended. Although he was scheduled to attend the meeting, McLarty was not able to be present because of a conflicting engagement in the Roosevelt Room.

The evidence indicates that Altman started the meeting by basically going through

---

305.    FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

NW: 15416 DocId: 70001585 Page 145

Obtained by Judicial Watch, Inc. via FOIA

the substance of the talking points prepared by Hanson.[306] As a result, this part of the meeting was by all accounts rather formal and stilted. As he was going through the discussion on the statute of limitations issue (the first eleven talking points), Hanson may have made some clarifying comments to correct some misstatements by Altman.

During this discussion, Hanson remembers Williams asking whether Altman was saying that if the investigation could not be concluded by the end of February, the RTC would have to secure tolling agreements from the potential defendants. Altman responded that he thought that was the case. According to Hanson, Altman did, however, make clear the eleventh talking point, to the effect that the RTC would under all circumstances complete its analysis by February 28.

The testimony of Ickes was somewhat different. Ickes stated that Altman said that it was not clear whether or not the RTC's investigation would be fully completed prior to the expiration of the statute of limitations. Importantly though, he did not understand Altman to be saying that the RTC would thereby be forced either to pass on otherwise meritorious claims or to seek tolling agreements. What Ickes claims Altman was saying was that while the RTC would not be able to complete a thorough and final factual investigation and analysis of claims prior to the deadline, the RTC would be able by the February 28 deadline to make an assessment of whether potential claims existed and, if necessary, file civil suits that would preserve those non-frivolous claims, even if after further study the RTC later decided to amend those complaints or

---

306. Nussbaum alone remembers that Altman opened the meeting by stating that the RTC had already provided a similar briefing about the statute of limitations issue to members of Congress.

108

Obtained by Judicial Watch, Inc. via FOIA

drop the cases.[307] Thus, Ickes testified that he understood that the RTC had three options. First, the RTC could decide not to file any claims. Second, the RTC could seek tolling agreements from potential defendants. Third, the RTC would be in a position to decide by February 28 whether to file protective lawsuits to toll the statute of limitations. As fully explained by Ickes, his recollection is not terribly inconsistent either with the talking points, the recollections of the other participants, or the information Altman had received in his briefing from Kulka (that while the investigation would not be as complete as one might like, the RTC would be in a position by February 28 to make a rational decision as to whether claims should be filed).

The notes Ickes took at the February 2 meeting are generally consistent with his testimony. 006-DC-00000005. They show Altman saying that February 28 is the last date for the RTC to reach a conclusion:

a) any claim for potential misconduct -- or fraud re any of the parties or

b) commence litigation to preserve claim -- or

c) tolling agreement

006-DC-00000005. They seem to indicate that the RTC would, by February 28, have to file a claim, file protective lawsuits to preserve potential claims, or secure tolling agreements.

Ickes also testified that as Altman went through the statute of limitations discussion, several questions were posed to him by others at the meeting. In particular, Ickes remembers asking Altman when the original statute had expired, how it had been extended, and

---

307. Altman remembers some sense of surprise from the White House when he stated that one of the options was for the RTC to file a protective claim in court to toll the statute of limitations.

109

Obtained by Judicial Watch, Inc. via FOIA

what Altman's view was of the timing of the report by the RTC general counsel.

The evidence also indicates that at some point during the meeting, Williams asked if private counsel for the parties would be contacted and receive a similar briefing on the RTC's procedures and the statute of limitations issues. Altman apparently responded that he assumed so, but was not sure. For her part, Williams does not remember asking this question but says it is possible she did so.

The tenth talking point states that Kulka and Ryan were supervising the RTC's investigation of Madison. The evidence indicates that either at this point or during Altman's later recusal discussion Nussbaum stated that he and his firm had gone up against Kulka in the Kaye, Scholer case and that she was a tough litigator. It was clear from his remarks about Kulka that he did not hold her or her judgment in high esteem. Nussbaum also asked what Ryan's background was and was informed that Ryan had, like Kulka, come from the Office of Thrift Supervision.

According to Altman and Hanson, Altman then announced his recusal, either stating that he had decided to recuse himself (Hanson's recollection is that he read the beginning of the twelfth talking point, which is worded in this manner) or that he intended to recuse himself (Altman's recollection) because of his friendship with Clinton.[308] Nussbaum testified that Altman said either that he intended to recuse himself or that he was considering recusal. Eggleston and Ickes testified that Altman simply stated that he was considering whether to recuse

308. 

             FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

himself, and Williams stated that Altman simply said hypothetically that if he were to recuse himself, Ryan would be the one to decide on the Madison case.

At some point, Hanson interjected that she had advised Altman to recuse and that Bentsen had concurred in that advice. Nussbaum testified that Altman stated that he had not received any opinion that he was legally or ethically required to recuse.

Altman's announcement apparently took the White House participants by surprise and caused the discussion to become more lively. By almost all accounts, Nussbaum was at this point "agitated," "displeased," "pugnacious," and "intense." Altman also remembers Williams shaking her head in exasperation. As Altman described it, he was then subjected to questioning by Nussbaum, in particular, that made him feel defensive (even flustered) about his announcement.

Hanson testified that Nussbaum asked whether Altman's recusal would mean that Kulka and Ryan would be the decisionmakers on the Madison case. It is possible that it was at this point that Nussbaum expressed his views about Kulka and asked for background information on Ryan. Hanson remembers Altman stating at this point that he had complete confidence in Kulka. The evidence indicates that Altman emphasized that he would follow Kulka's recommendation even if he did not recuse, and thus did not feel that his participation added much. Altman testified that Nussbaum became particularly agitated and the discussion rather heated when he made this point. Altman remembers Nussbaum questioning him as to why he felt he should recuse himself.

According to Nussbaum he told Altman that if there was any legal or ethical reason to do so, he should recuse immediately. (Eggleston believes Nussbaum also suggested

111

that Altman get a formal ethics opinion on the issue.)  He then stated that if Altman did not have

a legal or ethical obligation to recuse, even if he intended to follow the staff recommendation, the

mere fact that he would be reviewing the recommendation would provide additional discipline

and assurance of thoroughness and fairness by staff.  Finally, Nussbaum stressed that it was

Altman's decision to make.

According to Altman, he felt like he was "under pressure" from Nussbaum at this

point.  Altman testified that he believed the White House participants were taking his decision to

recuse personally, as if his recusal was an insult to the White House or the cowardly act of a rat

jumping off a sinking ship.

Williams alone recalls that she gave Altman what she calls "advice" on recusal.

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

and that she was tired of people of integrity in the government saying they could not

participate in anything.

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

Ickes remembers asking Altman why he thought he should recuse since there was

no matter yet before him and questioning whether friendship with Clinton was an adequate basis

for recusal.  Ickes believes he told Altman that in his opinion both reasons indicated he should

112

not recuse. But, according to Ickes, he emphasized it was Altman's decision.

The evidence indicates that at some point Ickes said that if Altman were going to recuse, it was better to do so sooner rather than later. The meeting apparently ended with Altman stating that he would sleep on the question whether he would recuse himself and Nussbaum responding that that was all the White House could ask for.

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

5. **Altman Discusses The February 2 Meeting With Steiner: The Issue Of Steiner's Diary.**

The evidence indicates that Altman met with Steiner when he returned from the White House and told Steiner what had taken place at the meeting. According to Altman, he may have given Steiner a blow-by-blow description of the meeting. Altman told Steiner that he had no idea why the White House officials would be bothered by his recusal since he had told them that Kulka was going to be making the decision in any event. Altman testified that he told Steiner the White House officials were "disquieted" and that their concern was stupid because they knew he would not be making the decision under any circumstances. Altman even asked Steiner, "What do they care?" Altman claims he cannot recall precisely what he said to Steiner about Nussbaum's conduct, but he probably said, in recounting the conversation, "Bernie is jumping up and down." Altman also believes he may have mimicked or imitated Nussbaum

113

Obtained by Judicial Watch, Inc. via FOIA

speaking on the recusal issue.[309]

According to Steiner, Altman told him that the White House had not fully understood the statute of limitations issue and the fact that the deadline was fast approaching. Altman also reported that the White House was unhappy about Altman's decision to recuse himself and that Nussbaum had made some forceful arguments against recusal. Nussbaum had apparently stated that Altman's recusal would set a dangerous precedent of recusing in the face of political pressure. Nussbaum also had made the point that the RTC had a reputation for being a very partisan institution and that if Altman recused, the investigation might be carried out in a partisan fashion. Altman told Steiner that he planned to sleep on his decision whether to recuse. Steiner testified that his impression was that Altman felt pressured by the White House not to recuse.

In a February 12 diary entry, covering the period January 24 through February 12, Steiner recorded his impressions at the time, including what he had learned from Altman of the February 2 meeting:

> 1/24-2/12/94: Two extremes: In DC spent long hours w/ RA going over how he should handle the RTC's investigation of Whitewater. The statute of limitations on Madison Guaranty cases was supposed to expire 2/28. Should RA recuse himself or should he stay involved. The hurdle was so high (fraud) that it seemed unlikely the RTC would bring suit or seek a tolling agreement from BC/HRC, but the chance existed. *RA originally decided to recuse himself but under intense pressure from the White House, he said he would make the final determination based on a recommendation from Ellen Kulka,* the GC. The GOP through D'Amato began a countdown to the 28th which was particularly ironic

---

309. Nye similarly testified that soon after the February 2 meeting Altman told him that the White House was disinclined towards his recusal. Nye remembers Altman saying that the White House made the point that by remaining on the case, the staff would do a more thorough job before making a recommendation.

114

Obtained by Judicial Watch, Inc. via FOIA

> since he had voted against extending the statute during the RTC reauthorization period. As it turns out, RA's problem will probably pass when the Congress decides to extend the statute once again. Pressure on RA will certainly mount next week when Congress holds hearings on the RTC given that Ricki Tiegert [sic] the FDIC nominee declared that she would recuse herself from all Madison related issues due to her friendship w/ the Clintons. The WSJ also go into the act w/ a scathing attack on RA and Gene Ludwig.

010-DC-00000014 (emphasis added). In a February 27 entry covering the period February 13

through February 27, Steiner again addressed the issue of the February 2 meeting:

> 2/13-2/27/94: Every now and again you watch a disaster unfold and seem powerless to stop it. For weeks we have been battling over how RA should handle the RTC investigation of Madison Guaranty S&L. Initially, we all felt that he should recuse himself to prevent even the appearance of a conflict. *At a fateful WH mtg w/ Nussbaum, Ickes and Williams, however, the WH staff told RA that it was unacceptable.* RA had gone to brief them on the impending statute of limitations deadline and also to tell them of his recusal decision. *They reacted very negatively to the recusal and RA backed down the next day and agreed to a defacto recusal* where the RTC would handle this case like any other and RA would have no involvement.

010-DC-00000014 (emphases added).

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

NW: 15416 DocId: 70001585 Page 153

Obtained by Judicial Watch, Inc. via FOIA

that the fact that the terminology in both entries is different reflects his practice of recording his feelings at the precise moment he is writing each entry.

As to the diary statement that Altman came under "intense pressure" not to recuse, Steiner attempted to explain that Altman did not use those words with him during their February 2 meeting, nor did Steiner necessarily believe on February 2 that Altman was under "intense pressure." Rather, Steiner claims that this description reflects his impression ten days later, when writing the diary entry, of Altman's state on February 2. Steiner testified that if he had to describe today what he learned from Altman on February 2, he would say that Altman was under "pressure" from the White House not to recuse. According to Steiner, Altman "did not come under intense pressure." Nussbaum had made powerful arguments, and it is possible Altman felt pressure, but Steiner refuses to describe the level of pressure Altman felt.

Steiner used the same excuse to distance himself from his February 27 entry that the White House had told Altman that his decision to recuse was "unacceptable." According to Steiner, that word described only what Steiner's impression was from what Altman had told him 25 days before about the February 2 meeting, and that he does not believe the use of that word was accurate. By "the White House staff" Steiner says he meant Nussbaum, as he was only aware of Nussbaum having offered his views on recusal. Steiner says he uses the term "unacceptable" in conversation quite often, and imprecisely. Steiner testified that to his knowledge, at no point did Nussbaum say to Altman, "You may not do that." Again the "they" who "reacted very negatively" was actually just Nussbaum, who was strongly opposed to Altman's recusal, according to Steiner. By "backed down," Steiner meant to say that Altman changed his mind and that Steiner at the time felt that this decision was a mistake.

116

Obtained by Judicial Watch, Inc. via FOIA

Altman testified that he does not remember telling Steiner he had come under "intense pressure" from the White House. He was not under intense pressure from the White House not to recuse. Altman was quite adamant that the White House did not tell him that his recusal would be "unacceptable."

6.    **February 3: Altman Decides Not To Recuse Himself.**

Altman testified that after sleeping on the issue, he decided that he would not recuse himself, at least for the time being. His rationale was that recusal was not required, he would follow Kulka's recommendation in any event, and he did not want the White House to take his decision as a personal rebuke.

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

The evidence indicates that during this conversation, Altman told her that he had decided not to recuse himself for the time being. Altman said that his decision did not matter since he would follow Kulka's recommendation, but that the decision made "them" (meaning the White House officials) happy.

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

Altman also said that the White House had one request, that Kendall be contacted so that he would be aware of the timing and the legal issues on the statute of limitations.

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

117

Obtained by Judicial Watch, Inc. via FOIA
FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

[                                        ] Altman asked Hanson to check with Kulka on that point. That morning, Hanson called Kulka, and Kulka said that private counsel (including Kendall) would be contacted in due course, but that it was premature to do so at that point. Altman had no objections when Hanson later reported this information back to him.[310]

Hanson testified that at some point she told Altman that she assumed he would get rid of his copy of the talking points. She did so because she did not want a version of the talking points lying around that stated that Altman had decided to recuse himself prior to changing his mind as a result of the White House meeting.[311] Altman claims not to remember this conversation.

**7.    February 3: Altman Announces His Recusal Decision To The White House.**

The evidence indicates that sometime after a conversation with Bentsen, Altman called over to the White House to arrange to meet with some of the same White House officials he had met with the day before. The testimony about how this meeting was set up, what time of day it took place, and what occurred at the meeting is widely varied.

In short, the evidence shows that Altman set up a meeting (on short notice) in Williams' office for the purpose of announcing that he had decided not to recuse himself for the time being. He arranged the meeting by calling either Williams or Ickes, and Williams, Ickes, Eggleston, Nussbaum, and Stephanopoulos may have been in attendance. Hanson was late,

---

310. [                                                                    ]

311. Hanson testified that she had another similar conversation with Altman where she said to him that she assumed he had gotten rid of his talking points.

118

NW: 15416 DocId: 70001585 Page 156

arriving only after Altman had already made his announcement and departed. She then had a discussion about Altman's recusal decision with possibly Williams, Ickes, and Eggleston present. The best evidence indicates that these meetings took place as an independently-scheduled event around the lunch hour on February 3, although there is some testimony that the meeting was simply a precursor to a regularly scheduled health care meeting in Williams' office around 6:00 p.m. that evening.[312]

Altman testified that he called Ickes on the afternoon of February 3 and said that he wanted to stop by and see him for a minute. Altman cannot recall, but he thinks it is possible he told Ickes he would like to talk to him prior to that evening's 6:00 p.m. health care meeting that both would be attending in Williams' office in the West Wing. Altman does not remember asking that anyone else be present for the conversation with Ickes.

According to Altman, he went over to Williams' office at the White House to meet with Ickes. Hanson was late arriving. As he and Ickes stood just inside Williams' doorway, Altman told Ickes that for the time being he was not going to recuse himself. Ickes either said "good" or simply acknowledged what Altman was saying. At some point, Stephanopoulos came in and sat down on the couch, but Altman had already told Ickes about his recusal. Altman is not sure whether Eggleston was present for this discussion and does not believe Williams was even present.

According to Altman, he learned later that evening from Hanson that

---

312. When the meeting took place, and hence whether it was simply a precursor to another regularly scheduled meeting at the White House on an unrelated topic, was a significant question for our investigation because the meeting seems a more significant contact if it was a separately-scheduled event rather than a casual add-on to another meeting.

119

Federal Rules of Criminal Procedure

she had shown up just after he had left the meeting.

To the contrary, Williams testified that Altman called her at about noon a day or two after the February 2 meeting. Altman told her that he had decided not to recuse himself, and he said he wanted to tell people at the White House of his decision prior to going to a meeting he had scheduled on Capitol Hill. (Altman's calendar confirms that he was due for a meeting on the Hill at 1:15 p.m. on February 3. 001-DC-00000487.) Williams thinks Altman asked if she could get Ickes and Stephanopoulos together so that he could tell them that he had decided not to recuse himself. Williams told Altman she would try to get them together in her office in the West Wing in five minutes. According to Williams, Ickes showed up, but Stephanopoulos walked in late. She also remembers that someone from the Counsel's office was there, either Eggleston or Nussbaum. Altman then came into her office and said that he had decided not to recuse himself. Ickes may have asked Altman if he was comfortable with his decision.

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

Ickes initially testified in the grand jury that Altman called him on the phone or told him in the White House within a day or two of the February 2 meeting that he would not recuse himself. When he later testified in the grand jury, Ickes testified that he remembers meeting with Altman *and* Williams in the doorway to her office. Altman said that he was not going to recuse. According to Ickes, this meeting took place before a 6:00 p.m. health care meeting in Williams' office. Ickes' phone log for February 3 shows an entry stating, "Roger Altman needs another meeting today," 006-DC-00000206, but Ickes is not sure whether that

120

Obtained by Judicial Watch, Inc. via FOIA

refers to the meeting regarding Altman's recusal decision.

Eggleston testified that he was in Williams' office on February 3 with Williams and Ickes for some unknown reason. Eggleston is not sure whether he knew Altman would be coming over, but at some point Altman stuck his head in the office. Altman said that he had decided not to recuse for the time being and left.[313]

Stephanopoulos recalls being in a health care meeting in Williams' office that was about to start, and Altman walked in and announced that he had decided not to recuse.

According to Hanson, she was having lunch on February 3



FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

Hanson testified that when she arrived, Eggleston, Ickes, and Williams were

---

313. Nussbaum initially testified that he remembers running into Ickes or Altman in the hallway in the West Wing within a few days after February 2 and being informed that Altman was leaning against recusing himself. In his second grand jury appearance, Nussbaum was more confident he had this conversation with Altman on February 3 and believed he may have also had the same discussion with Ickes.

314. Hanson's schedule card confirms that she had a 12:00 p.m. lunch date scheduled at the Old Ebbitt Grill on February 3. 329-DC-00000116.

315. Both Hanson's secretary and Gross corroborate Hanson's version of these events, further supporting the view that the February 3 meeting took place around the lunch hour.

121

Obtained by Judicial Watch, Inc. via FOIA

standing in Williams' office, and they told her that Altman had just left. Hanson testified that

Ickes asked her who else was aware that she had recommended to Altman that he recuse himself.

Hanson remembers giving Ickes three names, Ben Nye (Altman's special assistant), Michael

Levy (the Assistant Secretary for Legislative Affairs), and one other person whose name she does

not now recall. Hanson testified that Ickes said that that was good because if that fact got out, it

would not look good in light of Altman's decision not to recuse. Hanson responded by saying

that she would have recused had she been in Altman's position, and Ickes again stated that it

would be better if her advice did not get out. Hanson replied that she would say what she

advised Altman if asked.

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

Eggleston remembers telling Hanson that Altman had just left and that Altman had told

them he would not recuse. Ickes then asked Hanson how many other people knew that she

recommended Altman recuse himself. Hanson responded with a list of names sufficiently long

that Ickes became uncomfortable. The list included Steiner, Levy, and possibly several others.

Ickes testified that he saw Hanson on the second floor of the West Wing within a

day or two of the February 2 meeting, but claims not to recall any discussion about Altman's

122

Obtained by Judicial Watch, Inc. via FOIA

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

recusal.

**8.    Ickes Discusses The Madison Civil Investigation With The President And Mrs. Clinton.**

A critical issue for the investigation was whether anyone present at the February 2 meeting discussed with the Clintons (or anyone else who might have communicated with the Clintons or their counsel) either the fact of the meeting or the substance of the information that had been conveyed during the February 2 meeting regarding the RTC's handling of the statute of limitations issue or Altman's recusal. All of the participants except Ickes denied having passed on this information to the Clintons or their agents.

Ickes testified that he told Clinton the gist of what the February 2 meeting had been about, but Ickes claims not to be able to recall when or where he did so or exactly what was said other than that he recounted what had transpired in the meeting, including both the statute of limitations and recusal discussions. Ickes believes he probably told Clinton about the February 3 follow-up meeting with Altman during this same discussion. Ickes does doubt that this conversation would have taken place, however, after the February 12 enactment of the extension of the statute of limitations.[316] Ickes does not recall but believes it is possible he told Clinton that the RTC would not have time to decide whether it had claims that it intended to pursue with full force. Ickes testified that he never discussed with Clinton whether Clinton should sign a tolling agreement.

---

316. One possibility we explored was whether Ickes' conversations with the Clintons may have taken place after the controversy had erupted regarding the February 2 meeting. While Ickes was not positive, he thought, however, that the discussions took place before February 12 and before Altman disclosed the February 2 meeting in his February 24 testimony.

123

Obtained by Judicial Watch, Inc. via FOIA

Ickes remembers having essentially an identical but separate conversation with Mrs. Clinton. He similarly does not remember the circumstances of that discussion, except that, like the conversation with Clinton, it probably occurred before February 12.

During the course of the summer 1994 investigations, Ickes' private counsel, Amy Sabrin, had a conversation with Jane Sherburne and Sheila Cheston, both of the White House Counsel's Office. Sherburne and Cheston took notes during this discussion, in which Sabrin apparently conveyed her client's confidences to the White House. Portions of these notes were produced to the OIC. Both sets of notes reveal that Ickes may have also had separate conversations with each of the Clintons regarding Altman's decision not to recuse. Sherburne's notes read:

> HI Recalls informing both WJC and HRC (meets with them several times/wk) separately that Altman not going to recuse.

442-DC-00006538, at 6538-6539. Cheston's notes similarly state (to the best they can be deciphered in her handwriting):

> Informed HRC + BC individually that RA w/d not recuse self, mtg w/ each [at least] 1/day and this time. Told between 2/3-24.

442-DC-00006542. These notes are at least generally consistent with Ickes' testimony that he believes he likely told both Clintons about the February 3 meeting with Altman (at which Altman announced he would not recuse himself).

Mrs. Clinton testified that she did not learn of the February 2 meeting until around the time Altman announced his recusal (February 25). Moreover, she denied having any discussions with Ickes prior to Altman's testimony on February 24 regarding the RTC's civil investigation of Madison. She specifically claims not to recall Ickes having briefed her on the

124

options the RTC had in light of the statute of limitations -- filing suit, not filing suit, or seeking

tolling agreements. Nor does she remember Ickes discussing with her prior to February 24,

Altman's possible recusal.

Clinton testified that he did not learn of the February 2 meeting until it was

disclosed in the newspapers. He testified that he learned basically what had appeared in the

press, that Altman had briefed the White House on procedural issues relating to the RTC's

investigation; he did not learn that recusal had been discussed. Clinton further testified that the

first he learned that Altman was considering recusal was only when he did recuse on February

25. Similarly, he does not believe he was aware prior to public reports that Altman had

discussed his possible recusal with the White House.[317]

**9.     The February 24 Senate Banking Committee Hearing.**

During the hearing on February 24, Senator Gramm first raised the issue of

communications by the RTC or Treasury with the White House regarding Madison or

Whitewater. The following exchange ensued:

> Q.     . . . Mr. Altman, I want to ask you first.
>
> Have you or any member of your staff had any communication with the
> President, the First Lady, or any of their representatives, including their
> legal counsel, or any member of their White House staff, concerning
> Whitewater or the Madison Savings & Loan?
>
> A.     I have had one substantive contact with White House staff, and I want to
> tell you about it.
>
> Q.     Let me, if I may, just given that "yes," I would like to know what the

---

317. Fiske did not question Clinton about his conversations with Ickes, and we never had the
opportunity to question Clinton on this issue.

125

Obtained by Judicial Watch, Inc. via FOIA

substance of the communication was, when it occurred, who initiated it, and what you were asked to do.

A.  First of all, I initiated it.

About three weeks ago, Jean Hansen [sic], who is Treasury's General Counsel, and I requested a meeting with Mr. Nussbaum -- he is the White House Counsel.

The purpose of that meeting was to describe the procedural reasons for the -- the procedural reasons for the then-impending -- then-impending -- February 28th deadline as far as the then-statute of limitations was concerned.

I am sure you know that that statute of limitations has subsequently been retroactively reinstated for certain types of civil claims.

And we explained the process which the RTC would follow in reaching a decision before that February 8 [sic] deadline; that it would be exactly identical to procedures used in any other case, any other PLS case, and that the RTC fundamentally would come to a conclusion as to whether or not there existed the basis for a claim, or whether there did not.

In the event a basis for a claim existed, then it would pursue either a tolling agreement -- which is the equivalent of a voluntary extension of the statute of limitations from the parties at interest -- or it would file that claim in court.

That was the whole conversation. I was asked one question. That question was whether we intended to provide the same briefing to attorneys for the parties at interest.

I said, I assume so.

I went back. Jean Hansen [sic] checked with the RTC General Counsel. The answer was: In due course.

I said, fine, that was it.

I have not had any contact with the President of the United States or the First Lady on any matter like this.

126

Altman, Senate Hearing, Feb. 24, 1994, at 55-56.[318]

Hanson testified that she noticed right away that Altman had not mentioned the recusal discussion in describing the February 2 meeting. Indeed, he had missed the entire paragraph on his prepared Q&A that included the sentence on recusal. Gross, who was sitting right behind Hanson, tapped Hanson on the shoulder and said that Altman had left out recusal, and Hanson responded that she knew.[319] According to Hanson, she immediately considered handing Altman a note to remind him of the recusal discussion, but then Altman stated that, "That was the whole conversation," and she believed the opportunity had passed for correcting his testimony.

Hanson also testified that she was not concerned about Altman's failure to mention the February 3 follow-up meeting, because she actually had been under the impression that he had mentioned it; she claims it was not until she later reviewed the transcript that she realized he had failed to include this information.

Eggleston, who attended the hearing for the White House, testified that he was immediately concerned that Altman had failed to mention the recusal discussion that had taken place at the February 2 meeting. He telephoned Podesta from the hearing to tell him that Altman had failed to mention recusal. (Podesta does not remember speaking with Eggleston while

---

318. The excerpts from Altman's February 24 testimony are taken from the final printed hearing transcript. *The Semiannual Report of the Resolution Trust Corporation Thrift Depositor Protection Oversight Board -- 1994: Hearing before the Committee on Banking, Housing, and Urban Affairs*, 103d Cong., 2d Sess. (1994). That transcript reflects several minor typographical corrections that were made to the preliminary hearing transcript. None of the changes appears to be material to the investigation.

319. Gross stated that she does not recall this incident.

127

Eggleston was at the hearing. He also does not remember the issue of Altman's failing to mention the recusal discussion coming up this soon.) Stern does remember receiving a call from Eggleston as the hearing ended, in which Eggleston reported that the recusal issue had not come up during the hearing.[320]

Altman testified that he used the word "substantive" to mean "relating to the substance of the case," "the facts of the case," "the merits of the case," "the status of the case," "or where the case is going." Altman also testified that by "substantive" he meant "about the case, about the procedures applying to the case." He explained that he did not consider a discussion regarding his possible recusal a "substantive" discussion; he never associated himself with the substance of the case since in any event he was de facto recused and thus did not view his recusal as relating to the procedures (and in his terminology "substance") of the case. Altman testified that when he used the word substantive he was not thinking of other meetings that would be excluded by using that word (other than the February 3 meeting, obviously).

Altman testified that he did not intentionally leave out the prepared sentence on recusal and that he now wishes he had read it out loud. He admits that his answer as given is "susceptible to misinterpretation" and that the distinction he drew between the substance of the case and his recusal was "stupid" in retrospect given that few agreed with the distinction. Indeed, when looking at the transcript of his testimony, Altman stated that he knows people must think he was trying to hide the recusal discussion.

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

---

320. It had also been expected that Altman would be asked more generally why he had failed to recuse himself from the Madison matter.

128

Obtained by Judicial Watch, Inc. via FOIA

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

Altman testified that when he said, "That was the whole conversation," he meant that was the whole conversation regarding the "substance" of the case. He also explained that he was referring to what he thought was the purpose of the meeting, which was to discuss the statute of limitations procedures; the recusal discussion was a "by the way" type of remark. He claims he made no attempt to conceal the recusal discussion. As he asked the grand jury, "I mean, if I had had an intent, would I have sat around the night before with all these people, with the line 'recusal' in there? -- I mean, 10 or 12 people -- if I'd intended to conceal it? . . . and would I have gone over to the White House and talked -- with our general counsel, taking with me, and four White House staff members, if I intended to conceal it?" Altman testified that he did not have any fear that disclosing the recusal discussion would create more controversy. (He also claims that in the preparation sessions nobody ever said that the recusal discussion was in any way an explosive or particularly embarrassing fact.)

Altman explained his statement that he was asked only one question during the February 2 meeting as relating to the procedural discussion part of the case, the "substantive" portion of the meeting. "One question about the substance, that's what I meant." According to Altman, that is why he did not disclose the questions he admits being asked during the recusal discussion.

According to Altman, he did understand that Senator Gramm's question required him to answer for himself and his staff -- whether either had any contacts with the White House regarding Madison.

A short while later, Senator D'Amato again raised the issue of contacts:

129

Obtained by Judicial Watch, Inc. via FOIA

Q.  Mr. Chairman, I have to say to Mr. Altman that I would like to go back to a question that Senator Gramm brought up as it relates to any meetings with White House Staff or counsel.

Mr. Altman, I think you said that you and an official from Treasury sought out Mr. Nussbaum? Is that correct?

A.  Yes, I did.

Q.  Could you tell us why? In other words, I have difficulty understanding why it is you felt compelled to seek out the White House counsel.

A.  Solely to ensure --

Q.  Solely to?

A.  Solely to be sure that he understood the legal and procedural framework within which the RTC was working.

If you recall, as I said, at that time there was a February 28, 1994 date which was the subject of major attention in the Congress and in the press. It is not uncommon of meetings of that type to take place. And I describe it as a "heads-up" and a very stiff conversation.

Q.  A heads-up? In what connection would that heads-up be? Do you mean that the statute of limitations was running?

A.  No, that they should be aware of the internal processes and the types of criteria which the RTC was going to be following in order to reach a decision by February 28, 1994.

Q.  Were any representatives of the President or Mrs. Clinton, or any legal counsel, which I think would be appropriate, speaking to the counsel for the RTC, or people handling this particular matter? I mean, was there any legal representation going on? Was this you just called them? Did they have any representatives, or any counsel who may have been meeting with staff people, or talking to staff people?

A.  I was accompanied by our General Counsel, Treasury General Counsel.

Mr. Nussbaum had his assistant with him. And Mr. Ickes and Margaret Williams were both at the --

130