## **EXHIBIT 3 (Part 5)**

to

Plaintiff's Response to Defendant's Statement of Material Facts
Not in Dispute and Statement of Undisputed Material Facts
in Support of Cross-Motion for Summary Judgment

Obtained by Judicial Watch, Inc. via FOIA

ambassador today. Conn has stated that if he had known of the true nature of Hubbell's personal problems, he would never have hired him.

### 8) Wayne Reaud

Wayne Reaud is a plaintiffs class action attorney in Beaumont, Texas. Reaud retained Hubbell July 28, 1994, at the meeting in Hubbell's office in Washington, D.C. Reaud paid Hubbell $18,000.00 in a lump sum check dated July 28, 1994. Reaud has not yet been to the grand jury. Reaud was interested in looking for joint investment opportunities for the group at the July 28, 1994, meeting and/or possibility of establishing a Washington office with Hubbell.

### IV. PRISON TAPES

On various occasions, Hubbell spoke from prison with his wife Suzanna. While a large volume of the tapes provides moderately useful evidence, it is appropriate to end the evidentiary presentation with the two most telling excerpts.

The first call occurred on March 25, 1996. The context is that Hubbell believes he will be sued by the Rose Law Firm civilly to recoup its damages from his bill padding. Hubbell is considering a counter-suit which would, it seems, allege like billing practices by his Rose partners. His wife has been talking about Hubbell's plan with Marsha Scott, who is a employee at the White House and a close personal confidant of the Clintons. She relays Scott's concern with Webb's plan:

SWH:

FOIA(b)7 - (C)

WLH:

SWH:

172

Obtained by Judicial Watch, Inc. via FOIA

FOIA(b)7 - (C)

And she said that one of the biggest sticking points is that you never apologized, that there has been no expression of remorse whatsoever on your part, and that by suing, it is only made it look lie you really don't give a shit. And that, it's, that you are opening Hillary up to all of this.

WLH:    Well, honey, I keep telling you, sometimes you have to fight battles alone. You know, you just can't worry about other people. I know what I'm doing, OK? Now, if you don't want me to I won't.

SWH:    No, I want you to, I just want, I'm the one that bears the brunt of this stuff up here. I'm the one that has to try and talk to people. I'm the one that has to try and explain to Marsha. I'm saying, "Marsha." She said, "You're not going to get any public support for this pursuit if you open up Hillary. Well, by public support, I know exactly what she means. I'm not stupid.

WLH:    And I sat there and spent Saturday with you saying I would not do that. I won't, if I raised those allegations, it might open it up to Hillary. And you know that. We talked about that.

SWH:    Yes, but then, I get all this back from Marsha, who's racheting it up and making it sound like, you know, if Webb goes ahead and sues the firm back, then any support I have at the White House is gone.

WLH:    Well.

SWH:    I mean, that's what I'm hearing. I'm hearing the squeeze play.

WLH:    So, I need to roll over one more time.[348]

FOIA(b)7 - (C)

---

[348] Tape #27.a, March 25, 1996, 18:39 (emphasis supplied).

NW: 15416 DocId: 70001585 Page 211

Obtained by Judicial Watch, Inc. via FOIA



FOIA(b)7 - (C)

In short, many of the people and entities that hired Hubbell following his resignation

form DOJ can be traced to high administration officials or advisors. Mack McLarty and former

DNC Chairman Truman Arnold were responsible for five of Hubbell's seventeen clients. Vernon

Jordan was responsible for at least one client. The First Lady was the direct impetus for at least

---

349 | FOIA(b)7 - (C) | (emphasis supplied).

174

Obtained by Judicial Watch, Inc. via FOIA

one client, SunAmerica insurance company. Then SBA Chairman Erskine Bowles and United States Trade Representative Mickey Kantor also made efforts on behalf of Hubbell following his resignation. All this took place at a time where there was widespread public knowledge of a criminal investigation into Hubbell's billing practices while at the Rose Law Firm.

* * * * *

## II.    Chronological Background and Context

On January 12, 1994, President William Jefferson Clinton asked Attorney General Reno to appoint a Special Counsel to takeover the so-called Whitewater and Madison investigation. The U.S. attorney in Little Rock had recused herself on November 3, 1993, and the prosecution of David Hale, the investigation of Madison, and the investigation of the 10 RTC criminal referrals had been turned over to Don MacKay, a career Justice Department prosecutor.

Attorney General Reno appointed Bob Fiske as the Special Counsel on January 20, 1994. On June 30, 1994, the President signed into law the reauthorized Independent Counsel Act. The Special Division appointed Ken Starr as the Independent Counsel on August 5, 1994.

This Office was given jurisdiction to investigate whether any individuals or entities violated any criminal law, "relating in any way to James B. McDougal's, President William Jefferson Clinton's, and Mrs. Hillary Rodham Clinton's relationships with Madison Guaranty Savings & Loan association, Whitewater Development Corporation, or Capital Management Services, Inc.

Bob Fiske and his staff had been investigating these matters prior to the appointment of Judge Starr under the Independent Counsel Act.

Within the scope of the investigation, it was important to determine what the relationship

175

Obtained by Judicial Watch, Inc. via FOIA

was of the Clintons and the McDougals, and the relationship of both President Clinton and Mrs. Clinton with each of the three named entities within the jurisdictional grant.

Two grand juries have been utilized by the Office of the Independent Counsel in the Eastern District of Arkansas. The first grand jury was empaneled in March, 1994 and expired on March 23, 1996. Another grand jury was empaneled in Little Rock on May 7, 1996, and its term expires on May 6, 1998.

In addition to the investigation by the Independent counsel's Office, the FBI, the IRS, and the Little Rock and Washington grand juries, investigations have been conducted by criminal investigators from both he FDIC and the RTC. Civil investigations have taken place by RTC's outside counsel, Pillsbury, Madison & Sutro. Also, the House of Representatives and the U.S. Senate have conducted investigations.

Each of these investigations was entitled under the law to conduct their respective investigations free from activities which would fall into the general category of "obstruction of the due administration of justice."

Indeed, in the jurisdictional grant this Independent Counsel, "shall also have jurisdiction to investigate any . . . obstruction of the due administration of justice, or any material false testimony or statement in violation of Federal criminal law, in connection with any investigation of the matters [within its jurisdiction] described above."

[See the Introduction to the Clinton-Finance memorandum of June 1997, pages 1-10].

In order to understand how there may have been obstruction of justice, false testimony, and false statements, which may have affected the Independent Counsel's investigation, and the investigation by other duly authorized investigators, it is important to understand the chronology

176

Obtained by Judicial Watch, Inc. via FOIA

of events involved in the different investigations.  It is also important to understand the

relationships between the Clintons and the McDougals and the institutions within our

jurisdictional grant.

A.    Madison Guaranty

Mrs. Clinton, and the Rose Firm , represented Madison Guaranty Savings & Loan

(MGSL) during the last 15 months of Jim McDougal's stewardship of that savings and loan

association.  It was during this April 1985 - July 1986 time frame that a number of questionable

and criminal transactions took place, (a number of which were in the RTC criminal referrals);

those which have been the subject of our investigations and our prosecution of US v. Jim

McDougal, Jim Guy Tucker, and Susan McDougal.

Madison had regulatory net worth problems from the time McDougal acquired it in

January 1982 through the time he was ousted in July 1986.  Both federal and state regulators

monitored the condition of MGSL and were concerned about it.  Savings and loans associations

were required under federal regulation to have a 3% net worth; that is, the assets of the institution

had to exceed the liabilities by at least 3%.

The institution was required to make regular reports, often monthly, to the Federal Home

Loan Bank Board, with a copy going to the state regulators.  [FBI Financial analyst☐

☐ was tasked with compiling documentation related to MGSL's net worth of the years

1982 - 1988 so as to demonstrate MGSL compliance or non-compliance with the FHLBB's 3%

regulatory net worth requirement.  A net worth schedule for these years has been prepared.]

In January, 1982, when the McDougals purchased the Woodruff County S&L, it had

assets of $3,899,434 and liabilities of $3,817,955 for a net worth of 2.09%.  McDougal "grew the

FOIA(b) 7 - (C)                                   177

institution" at a very fast rate. By the end of December, 1984, it had assets of $48.5 million and liabilities of $47.9 million, with a net worth of 1.25%.

As a result of a federal examination in 1984, Madison was placed under a supervisory agreement by the Federal Home Loan Bank Board in July 1984. By April, 1985, MGSL had assets of $67.1 million and liabilities of $66.2 million, with a net worth of 1.32%.

Bill Black, a former FHLBB official, who has testified as an expert witness before in high profile cases, has consulted with this office. He has reviewed the various records of MGSL. In his opinion, it was absolutely essential that McDougal, "goose up the net worth" of the institution prior to the next federal examination if he wanted the institution to survive.

Beginning in early 1983, Madison had utilized the law firm of Mitchell, Selig, Williams & Tucker. Jim Guy Tucker was a long-time political friend of Jim McDougal's, and John Selig was the former Arkansas Securities Commissioner, who specialized in securities law and banking matters.

The Mitchell, Williams Firm, where Beverly Bassett was employed as an associate in the early 1980's, opened and handled a number of "matters" for MGSL. In February, 1985, the Firm opened "matter no.9," entitled, "sale of stock." "Matter no. 10," at the Firm was entitled, "broker/dealer."

It was MGSL's plan in the spring of 1985 to issue preferred stock in the amount of $3 million in order to raise capital and help it comply with the Federal requirements concerning net worth. On April 3, 1985, Charles Handley, a career employee of the Arkansas Securities Department (ASD), advised Davis Fitzhugh, an MGSL employee, that he did not think that there was any authority under Arkansas law for a savings and loan association to issue preferred stock,

178

as proposed by MGSL.

On the next day, April 4, 1985, Jim McDougal held a fund raiser at MGSL to help retire the campaign debt of Governor Clinton, incurred in the Governor's race from the fall before. Some $33,000 was raised to retire that debt, primarily in the form of contributions from insiders and persons affiliated with MGSL.

On April 23, 1985, the Rose Law Firm opened its first ever matter for MGSL. "MGSL Matter no. 1" of the Rose Law Firm was styled, "stock offering." On April 29, 1985, Mrs. Clinton had a telephone conference with Beverly Bassett, the new Arkansas Securities Commissioner, who had been appointed some three months previously by her husband, Governor Clinton, partially upon the recommendation of Jim McDougal.

On the next day, April 30, 1985, the Rose Law Firm sent a letter to the ASD on the question of whether an S&L could issue preferred stock. This letter indicated that the ASD was to contact Hillary Clinton or Rick Massey if there were any questions. On May 14, 1985, Beverly Bassett wrote a letter beginning, "Dear Hillary," agreeing with the Rose Law Firm proposal. On May 23, 1985, Mrs. Clinton sent a copy of Bassett's letter to Jim McDougal, adding that, "we look forward to working with you on your plans for growth."

President and Mrs. Clinton had a personal and business relationship with Jim McDougal and his wife Susan dating back to the 1970's. They were joint participants in the Whitewater development beginning in 1978, and were joint participants in the Whitewater corporation beginning in 1979. Jim McDougal served in Bill Clinton's first gubernatorial administration in 1979 and part of 1980. He assisted the governor with his legislative program in 1983.

Thereafter, the Rose Law Firm opened five other "matters" for MGSL over the next 15

179

Obtained by Judicial Watch, Inc. via FOIA

months. The Firm received a $2,000 a month "retainer," more accurately described as an "advance against fees." Mrs. Clinton was the "billing attorney" or the responsible attorney for this client. In that capacity, she would have reviewed all of the work done by attorneys at the Rose Law Firm in representing MGSL prior to any invoice or statement going out to the client. She normally would write a cover letter transmitting the RLF invoice to MGSL. The backup data for the information contained in the actual bill to MGSL was contained on a computer generated "billing memorandum," which in turn, had come from the "time sheet" entries for each attorney working on that representation.

"Matter no. 2," opened by the Rose Law Firm, dealt with the matter of "limited partnerships" and broker-dealer licenses, which MGSL wanted to be involved in as a way to raise capital. Rick Massey, who was a young associate in the Firm, in the securities department, worked on this with other securities partners, but Mrs. Clinton remained the responsible attorney to review all of the work and sent the bill to the client.

The preferred stock was never issued, although MGSL had been given until the end of December 1985 in which to accomplish this. Instead MGSL got involved in a land transaction south of Little Rock, which generated nearly $3 million in profits, which would have "goosed their net worth," prior to the next federal examination.

"Matter no. 4," was labeled "general." The first entry on that matter being on June 19, 1985, wherein Massey recorded a conference with John Latham, president of MGSL, regarding "capital plans." Massey recorded time on July 11 and 12, 1985 for telephone conferences with Sarah Hawkins of MGSL regarding MGSL's "business plan," and the proposed conference with the FHLBB supervisor. Mrs. Clinton was the billing attorney on matter no. 4 and also recorded

180

Obtained by Judicial Watch, Inc. via FOIA

time on that matter beginning on September 4, 1985.

    B.    <u>The IDC/Castle Grande Matter</u>

"Matter no. 5," for MGSL at the Rose Law Firm was entitled, "IDC." According to the internal records of the Rose Law Firm, this matter was opened on August 4, 1985, not by Mrs. Clinton, but by Webb Hubbell. Mrs. Clinton, however, was the billing attorney on this matter as she had been on the others. Rose attorney, Tom Thrash, has time sheets and billing entries to MGSL in early-August through the first part of October 1985 for multiple meetings and conferences with Seth Ward and others involved in the acquisition of the 1,100-acre IDC property, and the sewer and water utility of it's subsidiary, ISC, from the Industrial Development Corporation of Little Rock. [Section II.1 and II.2 of this memo, give more detail concerning the matters occurring before the Arkansas Securities Department, and the acquisition of the IDC property, which was renamed Castle Grande by MGSL.]

The IDC property originally was to be acquired in total by Madison Financial Corporation, the subsidiary of MGSL. All of the resolutions drawn up by Rose attorney Thrash indicate this. However, shortly before the closing, it was determined that MFC could not acquire the entire property because it would be in violation of an Arkansas state regulation which would not allow a savings and loan association to invest more than 6% of its investments in its subsidiary.

Therefore, Seth Ward, an employee of MFC, agreed to have certain of the property placed in his name. There is much evidence and testimony that Ward was a "nominee" or "straw man" on this transaction. He was at "no risk" and had put up none of his own money. The entire purchase price was financed by MGSL. Ward is the father-in-law of Webb Hubbell, Mrs.

181

Obtained by Judicial Watch, Inc. via FOIA

Clinton's Rose Law Firm partner.

In summary, the IDC property, with its associated utility, was purchased by MFC and Ward for $1.75 million. By February 28, 1986, the property and the associated utility, had been sold to third parties (most of whom were insiders or affiliated persons) for in excess of $4 million. These purchases involved, in most instances, "inflated appraisals" by Robert Palmer and

FOIA(b)7 - (C)

On February 17, 1986, Sarah Hawkins of MGSL learned that the federal examination was going to begin on or about Monday, March 3, 1986, and would examine all transactions through Friday, February 28, 1986.

On February 28, 1986, a number of transactions "closed." MFC, to which Ward had transferred most of the property held in his name, sold a large tract to former U.S. Senator William Fulbright, who was a mentor for Jim McDougal.

MFC, upon transfer from Ward, sold the assets of the sewer and water utility to a recently formed corporation, Castle Sewer & Water, which was controlled by Jim Guy Tucker. The utility had been purchased for $400,000 in the name of Seth Ward on October 4, 1985, and was resold to Castle Sewer & Water for $1.2 million.

MGSL loaned Castle Sewer & Water $1.05 million on a non-recourse basis, with the $150,000 down payment coming from David Hale's company, Capital Management Services.

In addition, on that day, MGSL loaned Dean Paul, a nominee for David Hale, $825,000. This money was used to purchase three tracts of land from Hale, which generated roughly a $500,000 profit for Hale, which he then injected into his small business investment company. The SBA then matched this investment on a 3-1 basis.

182

According to Hale, in return for this loan, he then funded loans through CMS for designees of Jim McDougal: 1) Larry Kuca (a lawyer with whom McDougal was a silent partner); 2) Steve Smith, d/b/a/ The Communications Company (the funds being used to pay off a debt owed by Smith, Tucker and McDougal); 3) the down payment for the Castle Sewer & Water purchase of the utility; and 4) the $300,000 CMS loan to Susan McDougal, d/b/a/ Master Marketing. [These transactions were the essence of the US v. McDougal, Tucker and McDougal trial.)

The examiners came to the institution on or about March 3, 1986. Within a short time, they focused on the transactions involving the purchase of the IDC property and subsequent re-sales within a rather short period of time. Both the examiners, and later, an outside law firm brought into the institution to examine the transactions, determined that there were possibly fraudulent practices. Ultimately, there is evidence to show that indeed, crimes were being committed relative to this property.

Prior to the sale in 1986 of what was originally the IDC property, Mrs. Clinton had many conferences and telephone conferences with Seth Ward.

Mrs. Clinton, for example, billed for conferences with Seth Ward on November 20 and November 26, 1985, and also then had a conference with Webb Hubbell. A month earlier, on October 18, 1985, associate Davis Thomas of the Firm, indicated that he spent 3.5 hours researching what approvals, permits, etc., were necessary to operate sewer and water facilities, having multiple telephone conferences with state agencies. Thomas indicates that he wrote a memo not to Mrs. Clinton, but to Webb Hubbell.

Mrs. Clinton billed Madison for some 14 conferences or telephone conferences with Seth

183

Obtained by Judicial Watch, Inc. via FOIA

Ward. Some of it appears to have been in connection with a proposed brewery to be located on the property, and other entries seem to pertain to research on the sewer and water utility. However, some of the entries do not appear to be connected to either of these projects.

C.    The Federal Exam - March 1986

During the federal examination, which began in early March 1986, Seth Ward became worried about receiving "commissions" that were owed to him for his role as a nominee. Ward threatened to sue MGSL. To stave this off, Ward received $400,000 in the form of a loan from MGSL, and executed a document back to MGSL which indicated that he had loaned money to MFC although he had not. These "cross loans" are discussed in more detail in Section II.1 this memo.

The examiners questioned these "cross loans," and were told that they were not connected to each other. On or about May 1, 1986, an "option agreement" was prepared and put in place of the non-funded loan from Ward to MFC. The bank examiners would later testify that based on this option agreement, they stopped their pursuit of what appeared to them to be possible fraudulent activity.

The federal exam turned up many problems, and on June 19, 1986, the FHLBB wrote the MGSL Board of Directors directing them to cease and desist from certain practices until there could be a meeting in Dallas. Beverly Bassett, the Securities Commissioner, who also served as the Savings & Loan Supervisor, advised the Governor's office, attaching a copy of the FHLBB letter.

The meeting took place on Friday, July 11, 1986, in Dallas, at the conclusion of which, the Board was directed that Jim McDougal had to be out of any kind of control and/or

184

management at MGSL or MFC, and John Latham, who had served as president of MGSL, had to be out.

Governor and Mrs. Clinton apparently were in Miami over the weekend of July 12-13, 1986 attending Mrs. Clinton's brother's wedding.

On the next business day, Monday, July 14, 1986, Betsey Wright, the Governor's Chief of Staff, and main political advisor, sent the Governor a hand written note: "Whitewater stock (McDougal's company). Do you still have? (pursuant to Jim's current problems). If so, I'm worried about it."

On that same day, Mrs. Clinton and Seth Ward both attended a meeting of the Little Rock Municipal Airport Commission. Ward was a Commissioner, and Mrs. Clinton was the attorney for the Airport Commission.

On that same day, Ward came into Madison, displaying an unsigned document, representing that this was the agreement he had with Jim McDougal concerning the payment of commissions to him. It appears that this document was backdated, and was prepared by Webb Hubbell's secretary, Martha Patton. Patton has testified that she never prepared any documents handed directly to her by Seth Ward, but would have only done so only if Webb Hubbell gave it to her.

On that same Monday, July 14, 1986, Mrs. Clinton signed a letter to Jim McDougal and John Latham, which indicates it was hand-delivered, returning the retainer money the Firm had accumulated, and indicating that the Rose representation had not been "continuous or significant."

Within a few days, McDougal himself was in the hospital with a stroke. The MGSL

185

Board brought in an outside accounting firm and an outside law firm from Memphis to do an investigation within the institution. The law firm of Borod & Huggins, principally in the person of Jeff Gerrish, issued its report on or about March 1, 1987, concluding that the McDougals had run MGSL for the benefit of family and friends. They listed a number of suspect transactions, which not only would be actionable from a civil standpoint, but also would constitute possible crimes.

On March 19, 1987, the MGSL Board forwarded the Borod & Huggins report to the FBI and US Attorney's office, and the criminal investigation involving Jim McDougal and Madison began in earnest.

McDougal was ultimately indicted in 1989 and acquitted at a trial in June 1990. Much came out about his bad stewardship of MGSL during the course of the investigation and his trial. Public reports appeared in the Arkansas media, including references to Castle Grande.

Further, in 1987, the FHLBB was taking its own action. In response to a subpoena from the FHLBB, Seth Ward filed a lawsuit against MGSL claiming that he had not been paid the commissions owed him, even though he had received the "$400,000 loan." MGSL was represented by Tucker's firm at the trial in late August 1988, and the jury returned a verdict in favor of Ward. It was later settled after removal to federal court, with Ward relinquishing his judgement completely.

MGSL was put into a conservatorship by the federal regulators on February 28, 1989. Prior to that time, Gerrish's law firm had filed a lawsuit against the Frost accounting firm, alleging accounting malpractice. The FDIC Legal Division determined that the Gerrish firm had a conflict, and requested the Rose Law Firm represent the interests of the Government and

186

Obtained by Judicial Watch, Inc. via FOIA

Madison against Frost. The principal attorney at the Rose Law Firm handling this was Webb Hubbell. It is now clear that he did not reveal a number of things which potentially would have disqualified the Rose Firm from representing the Government. [See Section II.3].

D.     1992 Campaign

The Clintons' relationship with Whitewater and Madison, including Mrs. Clinton's roll, and that of the Rose Law Firm in the representation of Madison, was raised in February 1992 during the Presidential campaign. It came at a time shortly after there had been much media coverage about then Governor Clinton's alleged womanizing and his actions regarding the draft during the Vietnam War. The Whitewater-Madison allegations were a serious problem. It was important to the campaign that the best possible "spin" be put on their involvement with the McDougals, Whitewater, and Madison. [See Section II.4].

Prior to February 11, 1992, Jim McDougal, had talked to a reporter about the Whitewater investment, and Hillary Clinton's representation of Madison in the mid-80's. McDougal told the reporter that the representation originally came about as a result of a conversation he had with Governor Clinton when he jogged by Madison. On February 11, overt inquiries began concerning Mrs. Clinton's having represented Madison before the Arkansas Securities Department, a state agency headed by Clinton's then recent appointee Beverly Bassett.

A story in the New York Times on March 8, 1992, featured the failure of Madison, the business relationship of the Clintons and McDougals, and Mrs. Clinton's having represented Madison before the Securities Commissioner, who answered to Governor Clinton.

This article did not mention the role of Governor Clinton in getting the Madison business for Mrs. Clinton and Rose in part because there were no public, or other documents reflecting

187

NW: 15416 DocId: 70001585 Page 225

Bill Clinton's allegedly having asked McDougal to hire Mrs. Clinton. The Clinton campaign responded "no" in writing to the reporter's question, "Did you discuss with Jim McDougal in 1984 or 1985 the hiring of her [Hillary] and the firm by Madison Guaranty?".

There were some subsequent stories after the New York Times broke the story initially. A little over a week later, in a debate, Jerry Brown, another candidate for the Democratic presidential nomination, referring to a news article, accused Clinton of "funneling money to his wife's law firm." Clinton strongly defended Mrs. Clinton, stating, "You ought to be ashamed for jumping on my wife. You're not worth being on the same platform with my wife."

The next day, March 16, 1992, Mrs. Clinton stated that "you can't be a lawyer if you don't represent banks", and made her widely publicized "I suppose I could have stayed home and baked cookies and had teas" comment. Clinton won several key primaries that week; and for the most part the stories and inquiries about Whitewater and Madison faded away.

Actions were taken within the campaign and Rose Law Firm later in 1992, including during the transition period after the President was elected, bearing on "the Rose Law Firm/Mrs. Clinton representation of Madison" issue. This included the comprehensive review and removal of certain Rose Law Firm files, and involved Webster Hubbell and Vincent Foster, Jr. Foster joined the President's administration as Deputy White House Counsel. Hubbell was assigned to the Department of Justice. He began with the title of Special Assistant to the Attorney General. He then was nominated by President Clinton and confirmed as Associate Attorney General.

E.   RTC Criminal Referrals

The RTC sent criminal investigators to Little Rock in April 1992, and on or about September 1, 1992, the RTC sent to the FBI and the U.S. Attorney in Little Rock a criminal

188

Obtained by Judicial Watch, Inc. via FOIA

referral relating to Madison, naming Jim and McDougal as a suspects, and the Clintons as

witnesses. This referral, designated C-0004, primarily focused on overdrafts on the Whitewater

Development bank account at Madison, and the utilization of various other McDougal-controlled

accounts at Madison to replenish the Whitewater account. [This referral, designated C-0004,

languished until September 1993. The handling of this and later referrals was the subject of our

"DOJ Handling of Referrals" investigation.]

In late September 1993 the RTC's Kansas City office sent nine additional criminal

referrals concerning Madison to the RTC in Washington. [Jean Lewis and other investigators

had begun work on these in Arkansas in late May, 1993]. After scrutiny by the Washington

RTC, these 9 referrals were sent to the U.S. Attorney and FBI in Little Rock on October 8, 1993.

All of the nine new referrals involved Madison Guaranty and named Jim McDougal as a

suspect. Four of these criminal referrals related to the Castle Grande/IDC property and related

loans and selloffs, or made reference to Governor Clinton:

| . CR-0190 | $260,000 loan to Jim Guy Tucker on 10-25-85 [34 acres acquired from IDC by MFC]. |
|---|---|
| . CR-0192 | $30,000 Whitewater check to McDougal on 4-19-85, endorsed to Earth Movers, Inc., whose principal was J.W. Fulbright; with MFC resolution to pay McDougal a $30,000 bonus. [Both Bill and Hillary Clinton are listed as witnesses in this referral]; and another check for $20,000 on 5-20-85 to J.W. Fulbright. |
| . CR-0195 | Madison Financial Corporation |
| . CR-0196 | Loan to Peacock; Bill Clinton Political Committee Fund |

The other referrals related to McDougal, but not directly to the Castle Grande/IDC

property. There were media inquiries relative to the referrals beginning in late September, and

during all of October 1993. The first public story on these referrals appeared in the Washington

Post on Sunday, October 31, 1993.

189

NW: 15416 DocId: 70001585 Page 227

Obtained by Judicial Watch, Inc. via FOIA

F.    RTC Referral CR-0196

One of the RTC criminal referrals (CR-0196) [dated August 18, 1993; and signed out of the RTC in Kansas City on 9-24-93] named as suspects Jim McDougal, Charles Peacock III, and the Bill Clinton Political Committee Fund.

This referral contains reference to Madison having made two loans to Charles Peacock III, a Madison director. The referral stated that part of the proceeds of these loans were diverted to the benefit of McDougal - some for a down payment on the 145th Street property [IDC/Castle Grande], and some for the Clinton campaign.

The narrative of the suspected violation discusses the April 4, 1985 fundraiser for Governor Clinton held at Madison Guaranty, where a number of persons inside and affiliated with Madison contributed money to help the governor retire his 1984 campaign debt. It focused on $12,000 in contributions made by McDougal, or others, at or about the time loans from MGSL or other transactions involving MGSL took place. [The total amount raised for the campaign as a result of this fundraiser was approximately $33,000.]

Referral CR-0196 made reference to the Whitewater Development Company account at Madison, identifying Whitewater as "a partnership consisting of Jim & Susan McDougal, and Bill and Hillary Rodham Clinton." (pp.7-8). It also referred back to criminal referral C-0004 submitted a year earlier involving the Whitewater Development Company, which had not been acted on.

This referral also stated that during the same April 1985 time frame in which the fund raiser was held, Hillary Clinton of the Rose Law Firm was acting as counsel to Madison in representations to the AR Securities Department. According to the referral, "Ms. Clinton was

190

soliciting approval for the thrift to authorize and issue a class of preferred stock, which would provide badly needed capital for the thrift. . . The thrift was significantly below the required FHLBB capitalization limits."

The referral states that this was not the only time that McDougal or John Latham requested Ms. Clinton's specific legal assistance in addressing sensitive thrift issues (attaching exhibits), rather than utilizing John Selig of the Mitchell firm, who served as general counsel to MGS&L.

The referral pointed out and attached certain documents relative to communications between Hillary Clinton and Beverly Bassett. It pointed out that Ms. Bassett had previously been with the Mitchell firm and had done a memo to Jim Guy Tucker of that firm on Madison issues.

This referral contained a chronology of events, including the 4-4-85 fundraiser, a 4-30-85 letter from Hillary Clinton to Bassett, a 5-14-85 letter from Bassett to Mrs. Clinton, a 5-23-85 letter from Mrs. Clinton to McDougal, and two August 85 Madison memos mentioning Mrs. Clinton and moving the home office of Madison. Among the suggested investigative steps in this criminal referral were:

> . further investigation into the alleged diversion of the Peacock down payment to Jim McDougal for use in the Castle Grande transaction
> . a review of the source of deposits and account activity in the Bill Clinton Political Committee Account records at the Bank of Cherry Valley
> . further investigation into the possible conflict of interest regarding Hillary Clinton representing her business partner's thrift before another state agency whose department supervisor was a political appointee, designated by her husband.

Witnesses listed in this referral are: Ken Peacock, J.W. Fulbright, Patricia Heritage, Beverly Bassett Schaffer, and Hillary Rodham Clinton.

191

Investigations, both ours and those of Congress, have disclosed that persons at the Treasury Department alerted persons at the White House about the RTC criminal referrals shortly after they were received in Washington in late September 1993. The Clintons' friend Roger Altman was the Assistant Secretary of the Treasury, and acting head of the RTC. Altman ultimately recused himself, in February 1994, after much scrutiny and Administration efforts to "keep him" as head of the RTC.

[The extensive investigation done by the Starr OIC is summarized in the "White House-Treasury Contacts Memorandum" and in Part II.6. The Fiske regulatory IC also conducted extensive investigation of this matter.]

G.    Events leading to Appointment of Independent Counsel

On July 20, 1993, the FBI obtained a search warrant for the office of David Hale to seize certain records of CMS. The search was executed on July 21, 1993. Foster committed suicide on the afternoon of July 20, 1993.

The federal grand jury in Little Rock indicted David Hale on September 23, 1993. On the day of the indictment Hale made public statements that he had issued one loan from his Small Business Investment Company, Capital Management Services, to Susan McDougal at the behest of then Governor Clinton.

On or about November 3, 1993, in the wake of the publicity about the RTC criminal referrals, the U.S. Attorney in Little Rock formally recused herself from the Hale prosecution, the investigation of the RTC Referrals on MGSL, and other matters related to Madison and Capital Management Services.

[The Little Rock FBI had already identified as matters worthy of investigation to the U.S.

192

Obtained by Judicial Watch, Inc. via FOIA

Attorney's Office an $825,000 loan from Madison to Dean Paul, and related loans from David

Hale's company to others, including Susan McDougal's Master Marketing loan. The "825 loan"

from MGSL to Paul was not in the 10 RTC criminal referrals on MGSL].

Donald Mackay, of the Fraud Section of the Department of Justice, a career prosecutor,

was assigned responsibility for the pending Hale prosecution, and the investigation of Madison

and McDougal, including the RTC referrals.

In December 1993 and early January 1994, there were calls for an Independent Counsel.

Between Christmas and New Years, the Clintons attended a Razorback basketball game in

Fayetteville with Hubbell, Bruce Lindsey, Jim Blair and others.

On January 11, 1994, over 30 subpoenas were issued to persons and entities by Mackay

for the Little Rock grand jury. Subpoena to the Rose Law Firm and Rick Massey (of the Firm)

were served on January 12, 1994.

On that same day, the President (who was on a trip in Russia) announced through a

spokesman that he was asking Attorney General Reno to appoint a special prosecutor. The Rose

Law Firm subpoenas were withdrawn late that day.

On January 20, 1994, the Attorney General appointed Bob Fiske as the regulatory

Independent Counsel. He was tasked with investigating whether any criminal violations had

occurred relating to the relationships of President and Mrs. Clinton and Jim McDougal with the

Whitewater Development Company, Madison Guaranty, and Capital Management Services. He

thus took over the prosecution of David Hale, the investigation of the specific RTC criminal

referrals, and other Madison-related allegations.

H.    The Fiske Investigation

193

Obtained by Judicial Watch, Inc. via FOIA

Shortly after the arrival of Bob Fiske in Little Rock there were reports in the media of the shredding of documents at the Rose Law Firm. Thus, the first grand jury work by the Fiske investigation was relative to the shredding allegations. In March 1994, an additional Grand Jury (dedicated solely to Fiske's investigation) was empaneled to consider all matters within the jurisdiction of Mr. Fiske.

Mr. Fiske took over the prosecution of Hale, and began investigating the other allegations and referrals. Just prior to his scheduled trial, Hale pled guilty in March 1994, repeating his allegations concerning President Clinton, and implicating Jim McDougal, Susan McDougal, then Governor Jim Guy Tucker, and others in transactions involving CMS and Madison.

Arising out of the shredding investigation, the OIC learned of, and began investigating, possible crimes committed by then Associate Attorney General Webster Hubbell, a former Rose Law Firm partner of Mrs. Clinton.

Other matters "arose out of" the investigation of the "core matters" including: the allegations against Jim Guy Tucker and his business partners; Chris Wade; and The Perry County Bank.

The Fiske team also investigated the death of Deputy White House Counsel Vincent Foster Jr., and the possible removal of Whitewater and Madison-related documents from his office in the wake of his death on July 20, 1993. [See Section II.5]

The relationship of the Clintons with Madison, including Mrs. Clinton's representation of Madison, was one of the subjects of the Fiske investigation. In furtherance of the investigation Fiske issued grand jury subpoenas to President and Mrs. Clinton in May 1994 to produce in June 1994 any and all documents in their possession or control related to Whitewater, Madison,

194

Obtained by Judicial Watch, Inc. via FOIA

Capital Management Services, and other named entities. The Rose Law Firm was subpoenaed to produce many documents including any and all documents related to the representation of Madison by the Rose Law Firm and/or Hillary Clinton.

Mrs. Clinton held a televised news conference on April 22, 1994, answering questions on a number of issues, and giving her explanation of how the Rose Law Firm came to be retained by Madison, and her role in the representation. She minimized her role in the MGSL representation, making statements which were not accurate .

By June 1994 Hubbell, through his attorney, declined to produce further records.

I.    The Starr Investigation Begins

After Ken Starr's appointment on August 5, 1994, he built on the work of the Fiske team. A team of 2 agents, 6 financial analysts, and an attorney was in place and investigating Hubbell. They became very familiar with the inner workings of the Rose Law Firm and with some of its key attorneys and staff. Hubbell pled guilty in December 1994 to one count of mail fraud and one count of tax evasion, relative to his billing and expense practices at the Firm.

Certain of the Starr team previously dedicated to the investigation and prosecution of Hubbell for his criminal acts involving the Rose Law Firm, and its clients, then began looking at Mrs. Clinton's role in the Rose representation of Madison; as well as the allegations that the business had first come to Rose through Governor Clinton's asking Jim McDougal to hire Hillary and her Firm. Rick Massey, John Latham and others were interviewed in Feb-March 1995, prior to Mrs. Clinton's interview on that subject on April 22, 1995.

Hubbell, who had agreed to cooperate, was questioned about a number or issues, including the

195

Obtained by Judicial Watch, Inc. via FOIA

Rose Law Firm's representation of Madison Guaranty, and the role of Mrs. Clinton in obtaining

the business and what work she performed for Madison.

During the OIC investigation the Rose Law Firm, through its attorneys and managing

partner Ron Clark, responded to subpoenas, including records reflecting what work Rose and

Mrs. Clinton performed for Madison in 1985 and 1986. Clark produced some files,

FOIA(b)3 – Rule 6(e), Federal Rules of Criminal Procedure

The only document relating to how

much work any Rose attorney performed for Madison was a 2-page fee allocation recapitulation

(and related fee allocation documents).

J.    The FDIC/RTC-OIG Investigations

In addition to the OIC investigation, both the FDIC and RTC conducted separate audits

and investigations related to the Rose Law Firm in the 1993-1996 time period. Both the RTC

and FDIC conducted audits of the Rose Law Firm relating to fees and expenses billed to those

agencies, for work Rose did in representing the interests of the government in civil actions

involving S&L's placed into conservatorships.

Both the RTC and the FDIC also conducted investigations into possible conflicts of

interest of the Rose Law Firm in representing the interests of the government beginning in March

1989 in Madison v. Frost. The reports of the initial investigations by the FDIC Legal Division

and the RTC-OCOCS were released in February 1994. They were publicized and received a lot

of criticism. The names of Webb Hubbell, Seth Ward, and Mrs. Clinton were prominently

mentioned in most of the media accounts. Webb Hubbell was interviewed by the FDIC Legal

196

Obtained by Judicial Watch, Inc. via FOIA

Division on January 11, 1994, lying about the 85-86 RLF representation of MGSL.

As a result of Congressional criticism, the Inspector Generals of the FDIC and the RTC conducted more thorough investigations into the Rose Law Firm conflicts allegations beginning in late February/early March 1994.

The FDIC Inspector General obtained from Mrs. Clinton an affidavit in September, 1994 concerning in part her role in representing Madison. She was also interviewed by two special agents of the FDIC OIG in November 1994.

Webb Hubbell was interviewed by the FDIC & RTC OIG agents on March 16, 1995 and April 20, 1995. Two days after Hubbell's RTC OIG interviews, Mrs. Clinton was interviewed in an under oath deposition by the OIC at the White House on April 22, 1995. At the time the OIC did not have copies of the Rose Law Firm bills to Madison, the backup billing memoranda, or any of Mrs. Clinton's time sheets for work performed for Madison. This deposition was conducted with an agreement that it would be read to the Little Rock grand jury, and it was so read to the grand jury in May 1995.

On that same day the President was also deposed. He said that he could not remember talking with Jim McDougal about Madison hiring Hillary Clinton and the Rose Firm. [The campaign in 1992 had replied "no" to the question about whether Bill Clinton had visited Madison and asked McDougal to have Hillary represent the Rose Law Firm.] He said that he was not disputing Jim McDougal's account; he just couldn't remember.

A month later, in May 1995, both President and Mrs. Clinton provided written answers under oath to certain RTC Interrogatories related to Whitewater and Madison. Included were answers to questions about Mrs. Clinton's representation of Madison Guaranty.

197

Obtained by Judicial Watch, Inc. via FOIA

FOIA(b)3 - Rule 6(e), Federal Rules of Criminal Procedure

K.    Little Rock Grand Jury - Oct., Nov., Dec., 1995

Beginning in October, 1995, a number of present and former Rose Law Firm attorneys and support personnel, as well as Arkansas Securities Department personnel, including Beverly Bassett Schaffer, were questioned before the Little Rock grand jury. Additionally key persons connected to the 1992 Clinton campaign were subpoenaed, including Jim Blair and Susan Thomases.

In mid-November 1995 an agent assigned to the OIC located the Madison copies of certain Rose Law Firm billing statements to Madison from the 1985-86 time frame. Prior to that time, the OIC had questioned Rose attorneys (including Mrs. Clinton) advising them that no billing documents were available except the 2-page fee recap. Several Rose attorneys(Clark, Donovan       were questioned before the grand jury in early December 1995 and were shown copies of some Rose bills to Madison. The Vinson & Elkins attorney representing the Rose Firm stated that it was obvious the OIC now had billing records and requested that the OIC furnish the Firm with a copy of same, since the Firm had no copies of any billing records in its possession. The OIC declined to do so.

The Senate Whitewater Committee began focusing on Mrs. Clinton's representation of Madison on December 1, 1995. Hubbell testified before the Committee on that date, and on December 18, 1995, Susan Thomases was questioned about what the 1992 campaign learned about HRC and MGSL.

In early December 1995 the OIC also focused on the Firm's prior representation of the McDougal-controlled Bank of Kingston (renamed Madison Bank & Trust) during the early 1980's and litigation handled by the Rose Firm. That prior representation, and the failure of

198

McDougal to pay the outstanding "old bill", was relevant in determining the accuracy of what Mrs. Clinton had said about how the Rose Firm came to represent Madison Guaranty.

On December 19, 1995, Webb Hubbell testified before the Little Rock grand jury, primarily about the work of Hillary Rodham Clinton for MGSL, and the actions during the 1992 campaign to accumulate and review all the RLF-MGSL records.

On December 21, 1995, the attorneys representing the RTC in its civil investigation sent to David Kendall, the Clintons' attorney, Supplemental Interrogatories concerning her work for Madison. This included questions about Seth Ward, the cross loans, and the "option agreement." The RTC had just learned from Rose that the computer code on the "option agreement" was that of HRC.

L.     The RLF Billing Records are Produced

On January 5, 1996, David Kendall, counsel for President and Mrs. Clinton , notified the OIC that certain Rose Law Firm billing records, responsive to an earlier grand jury subpoena, had been found at the White House by Carolyn Huber. He produced same, releasing copies to the media on that same day. He stated words to the effect that the records backed up what Mrs. Clinton had said all along about her role in the Madison representation. There is strong disagreement with that characterization.

These records reflected that much more work was billed to Madison by Mrs. Clinton than was previously stated by her. For the first time the details of what she worked on and what she billed Madison for in 1985 and 1986 was made know.

FOIA(b)7 - (C)

199

Obtained by Judicial Watch, Inc. via FOIA

These Rose billing records disclosed work billed by her to Madison on the IDC matter during a period of fraudulent activity at the institution. Especially revealing were her 14 entries mentioning Seth Ward, including her work on issues relating to the utility IDC sold to Ward and which was later sold to Jim Guy Tucker and Castle Sewer & Water; and preparation of the May 1, 1986 option agreement, which regulators would say misled them during their 1986 examination of Madison.

These particular records were covered by and should have been produced pursuant to the Fiske grand jury subpoena in June 1994. In light of the 18 month+ delay in production, and in light of all the facts and circumstances, an investigation was conducted by this office as to the RLF billing records. There were interviews of almost all persons who were in the White House residence during relevant periods.

Mrs. Huber, a long time friend of the Clintons, had served in Arkansas as Governor's Mansion administrator and also as office manager of the Rose Law Firm. She said that in August 1995 she found the records in the book room on the 3rd floor of the White House residence. This was adjacent to a room being utilized as an office by Mrs. Clinton in part to write her book. Huber has testified that she removed these to her White House office not realizing what they were until January 1996. [See the memo on the "Rose Law Firm billing records" investigation, and Section II.7.]

The book room where Huber says she found the billing records was a short distance away from a closet, where documents found in Vince Foster's office on July 22, 1993, had been placed pending transfer to the Clintons' personal attorney. This, of course, raised the question of whether the "missing billing records" had been in Foster's office at the time of his death in July

200

Obtained by Judicial Watch, Inc. via FOIA

20, 1993 and removed by White House employees. The fingerprints of Mrs. Clinton, Vince

Foster, and others were found on the set of billing records found in the White House and

produced to the OIC in January 1996.

[The "Foster Documents" memo covers the events of the night of Foster's death on July

20 including: the possible removal of records that night and the next morning, the "search" by

Bernard Nussbaum on July 22; the taking of "Whitewater" documents to the residence, etc.]

Mrs. Clinton was questioned before the Washington grand jury on January 26, 1996 on

the subject of how the Rose billing records came to be located in the White House. She testified

that she did not know how the records got there. She acknowledged that the records were

responsive to the prior OIC subpoena issued some 18 months previously. She was not

questioned that day on her substantive work for Madison. She did identify a 2-page statement

prepared at her direction during the 1992 campaign on the subject of her's and Rose's

representation of Madison in 1985 and 1986.

Within a month of her grand jury appearance she was questioned about the substance of

her work for Madison On February 14, 1996, she answered the questions of the RTC's outside

counsel in a transcribed interview, which was not under oath.

M.    The McDougals's and Tucker

The McDougals and Jim Guy Tucker were indicted in Little Rock on August 17, 1995.

They were charged primarily with events relating to both Madison and CMS loans occurring in

the October 1985 - April 1986 time frame. They were convicted on May 28, 1996. The sale of

the sewer and water system at IDC/Castle Grande to Tucker's company on February 28, 1986

was the subject of some of the charges that were tried. The evidence aduced included: Madison

201

Obtained by Judicial Watch, Inc. via FOIA

loans on February 28, 1986 to Dean Paul and Castle Sewer & Water; CMS loans to Castle Sewer & Water, and Susan McDougal d/b/a/ Master Marketing, and others.

President Clinton testified as a defense witness at the trial. On cross examination he stated that he could not remember whether he talked to Jim McDougal about Madison hiring Mrs. Clinton and the Rose Law Firm.

Jim McDougal entered a cooperation agreement with the OIC in August 1996. At the outset McDougal stated that some of the testimony of the President at his trial was at variance with the truth. In addition to shedding light on the President's role with Madison, Whitewater, and David Hale's loan to Susan McDougal, Jim McDougal told of Hillary Clinton's hiring at the Governor's behest, and the work she did for Madison. He also shed light on the role of Webb Hubbell and his father in law Seth Ward, as it related to the Rose work for Madison.

Susan McDougal refused to cooperate, and defied a September 1996 Court Order to give testimony to the grand jury. She was jailed for civil contempt September 1996 - March 1998.

N.    Obstruction of the Due Administration of Justice, False Statements and Testimony

Most of the Arkansas substantive events occurred over 10 years ago. For example, Jim McDougal was out of the Madison management as of July 15, 1986. He was indicted as a result of this investigation on August 17, 1995, at a time when the statute of limitations had not yet run on his acts in late 1985, and in 1986. He began cooperating in August 1996, at a time when most, if not all, of the possible substantive criminal violations involving Madison were over 10 years old.

Bob Fiske was appointed on January 20, 1994, at a time when there appeared to be time

202

to fully investigate possible criminal violations occurring in Arkansas, especially during the

1985-86 time period. But delays in finding the truth, be that from recalcitrant or perjurious

witnesses, concealment or destruction of documents, and the time it took to develop cooperating

witnesses, has caused the statute of limitations to run on the underlying transactions in 1985 and

1986.

      O.     The Little Rock Grand Jury Empaneled May 1996

The first Whitewater-dedicated grand jury in Little Rock expired on march 23, 1996, during the

US v. McDougal, Tucker, and McDougal trial. Another grand jury (solely dedicated to

Whitewater-Madison) was empaneled in Little Rock on May 7, 1996. Supervisory Special

Agent Steve Irons was the first witness before them summarizing the investigation from its

inception to that point.

      In its early months, the grand jury heard from witnesses regarding matters related to the

Clintons on the Whitewater investment and matters related to the "825 trial." This included

viewing the videotape of the President's trial testimony given at the White House on April 28,

1996, and played by the defense at trial in May, 1996.

      Beginning in late 1996 and early 1997 it heard extensive testimony regarding what was

publicly characterized as possible "hush money" paid to Webb Hubbell - at a time he was under

investigation in Little Rock and later while he was allegedly fully cooperating with the OIC.

Most of the persons involved in the payments to Hubbell (which were in excess of $400,000

occurred between May and December 1994) were questioned before the Little Rock grand jury.

      [See Section II.8]

203

NW: 15416 DocId: 70001585 Page 241

Obtained by Judicial Watch, Inc. via FOIA

The grand jury heard testimony from Jim McDougal on April 23, 1997 including evidence about the Madison land deals, Ward, and Mrs. Clinton.

In late July 1997, Jim Hamilton, the attorney for Lisa Foster (Moody), contacted the OIC stating that Vince Foster's widow had recently discovered in the attic of her residence in Little Rock documents which were responsive to previous grand jury subpoenas. This call from Hamilton came shortly after the OIC had issued its long awaited report on the death of Vince Foster, concluding that he died as a result of suicide in Ft. Marcy Park.

These documents were discovered by Foster's daughter in a briefcase of Vince Foster's in the Little Rock residence. They were delivered to the OIC after the attorney for the Rose Law Firm, and the attorney for the Clintons were allowed to examine the documents for possible privilege claims. The documents all appear to have been compiled in the 1992 Presidential campaign. Among the more significant documents were:

- Another full set of the Rose Law Firm - Madison billing records. This was the only other set of these records ever found or produced during the course of the OIC investigation.

- A copy of the "old bill," from the Rose Law Firm to the Bank of Kingston marked "paid 10/23/84." This document was included in the set of the RLF - MGSL billing records. The "old bill" was not contained in the set produced by the attorney for Mrs. Clinton.

- A Memorandum prepared for Rick Massey dated in late March 1992. It set forth work done by Massey for the ASD, but did not discuss how the MGSL business got to the Rose Law Firm.

- A number of documents relative to work done by Mrs. Clinton or the Rose Law Firm on behalf of Arkansas state agencies.

[See the discussion of the "1992 Campaign" and the obtaining of the work by the Rose Firm, Section II.4.]

Beginning in mid to late 1997, the grand jury heard extensive testimony concerning the

NW: 15416 DocId: 70001585 Page 242

Obtained by Judicial Watch, Inc. via FOIA

Rose Law Firm conflicts referrals from the FDIC and RTC. A number of Rose attorneys testified before the grand jury, including those with knowledge about HRC's work for MGSL.

As in any criminal investigation any document concealed, or any misleading or false statement, had the potential to delay, hinder, impede, and obstruct our investigation. Such appears to have actually happened in this investigation.

There is, of course, a five year statute of limitations on perjury, false statements, and obstruction of justice. Thus, as of April 1998, any such statement or actions occurring since April 1993 would still be actionable.

Even though the substantive statute of limitations may have run, the underlying events occurring in 1985-1986 and before are still highly probative and relevant in determining whether there has been actionable obstruction, perjury, or false statements. Thus, understanding and analyzing the events in Arkansas in that time period has been a continuous focus of the investigation.



FOIA(b)7 - (C)

205

Obtained by Judicial Watch, Inc. via FOIA

FOIA(b)7 - (C)

* * * * *

*Conclusion* -- We look forward to our discussion on Monday, April 27th.

206

NW: 15416 DocId: 70001585 Page 244